**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - x

PROSPECT CAPITAL CORPORATION,        :
PROSPECT CAPITAL MANAGEMENT LLC,     :
JOHN F. BARRY, M. GRIER ELIASEK,     :
WALTER PARKER and BART DE BIE,       :

              Petitioners,     :

    - against -     :

                 :

MICHAEL ENMON,        :
              Respondent.     :
                 :

- - - - - - - - - - - - - - - - - - - - - - - - - x

'08 Civ **CIV 3721**

## DECLARATION OF TIMOTHY GRAHAM
## NELSON IN SUPPORT OF PETITION

      I, TIMOTHY G. NELSON, hereby declare under penalty of perjury:

      1.      I am a member of the Bar of this State and the firm of Skadden, Arps, Slate,

Meagher & Flom LLP, counsel for Petitioners Prospect Capital Corporation, Prospect Capital

Management LLC, John F. Barry, M. Grier Eliasek, Walter Parker and Bart De Bie.

      2.      In connection with the Petition, I attach true copies of the following

documents:

| Ex.: | Date: | Document: |
|------|-------|-----------|
| A | April 14, 2008 | Partial, Final Arbitral Award by John H. Wilkinson, Esq., in *Prospect Energy Corporation et al. v. Michael Enmon*, American Arbitration Association (the "Arbitration"). |
| B | April 11, 2006 | Letter Agreement between Michael Enmon and Prospect Energy Corporation. |
| C | | American Arbitration Association: Commercial Arbitration & Mediation Procedures. |

| D | Sept. 21, 2006 | Petitioner's Complaint in *Robert Fiser Attorney at Law P.C. v. Enmon*, B-0177745, Jefferson County, Texas ("Texas Action"). |
| E | Dec. 4, 2006 | Answer and Cross-Action of Michael Enmon ("Enmon") in Texas Action. |
| F | Jan. 9, 2007 | Application of Enmon in the Arbitration seeking stay. |
| G | Jan. 11, 2007 | Order to Show Cause and Temporary Restraining Order (Patterson, J.) in *Prospect Energy Corp. et al. v. Enmon*, No. 07 Civ. 117 (RLC) ("Petition to Compel Arbitration"). |
| H | Jan. 11, 2007 | Ex Parte Temporary Restraining Order in Texas Action. |
| I | Jan. 26, 2007 | Transcript of Oral Argument before Hon. Leonard B. Sand in Petition to Compel Arbitration. |
| J | Feb. 13, 2007 | Transcript of Oral Argument before Hon. Leonard B. Sand in Petition to Compel Arbitration. |
| K | Feb. 19, 2007 | Enmon's Arbitration Counterclaim. |
| L | July 12, 2007 | Motion for Relief from Arbitration Order and Injunction filed by Enmon and "Caprock Pipe & Supply Inc." (as "Intervenor") in *Prospect Energy Corp. et al. v. Michael Enmon*, No. 07 Civ. 117 (RLC) ("Rule 60(b) Motion"). |
| M | July 24, 2007 | Order denying Rule 60(b) Motion. |
| N | July 24, 2007 | Transcript of Oral Argument in Rule 60(b) Motion. |

Dated: New York, New York
April 18, 2008

TIMOTHY G. NELSON

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

—————————————————————————x

PROSPECT ENERGY CORPORATION; PROSPECT
CAPITAL MANAGEMENT LLC; BART DE BIE;
JOHN BARRY; GRIER ELIASEK; and WALTER
PARKER,

Claimants,

vs.

MICHAEL ENMON,

Respondent.

Case No.:
13 148 02866 06

—————————————————————————x

## PARTIAL, FINAL ARBITRATION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the parties, dated April 11, 2006, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby render the following Partial, Final Arbitration Award:

I

### BACKGROUND FACTS

A. **The Parties**

Prospect Energy Corporation[1] is a business development company that lends to and invests in companies that have little or no access to capital from banks and the national capital markets. Prospect Capital Management, LLC is the investment advisor to Prospect. The individual Claimants and Counterclaim-Respondents are:

- **John F. Barry**, the Chairman and Chief Executive Officer of Prospect.

- **M. Grier Eliasek**, the President and Chief Operating Officer of Prospect.

---

[1] In 2006, the name of Prospect Energy Corporation was changed to Prospect Capital Corporation. These two entities are collectively referred to herein as "Prospect."

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

- **Walter Parker**, an independent outside director of Prospect, and

- **Bart de Bie**, a Principal of Prospect in 2006 and presently a Managing Director.

Respondent Michael Enmon holds an MBA from the University of Chicago and since 2006, he has been an officer of Compass Bank in Houston. Prior to that: he was a commercial banker at Wells Fargo Company ("Wells Fargo") in Albuquerque in 2005 and early 2006; a banker at Bank of America in Albuquerque in 2003-04; Director of Corporate Finance for SBC Communications in San Antonio in 2001; an investment banker at Merrill Lynch in New York in 1998-2000; and an officer at Nationsbank in Houston in 1994-96.

## B. Caprock LP, Efforts to Sell

As of 2005, Caprock Pipe & Supply LP ("Caprock LP") was a New Mexico limited partnership engaged in the purchase, refurbishment and sale of pipe for use in connection with oil and natural gas wells. In mid-2005, the owners of Caprock LP wished to sell their business, thus capitalizing on existing high gas prices and accommodating the wish of Caprock LP's CEO (Alan Powers) to return to Texas. In furtherance of this goal, Caprock LP retained the investment banking firm Wells Fargo Securities, LLC ("Wells Fargo") as investment advisor to assist in the sale. Shortly after being retained, Wells Fargo prepared a Confidential Information Memorandum for potential purchasers wherein it discussed numerous aspects of Caprock LP's management and operations.

During 2005 and early 2006, Caprock LP's owners engaged in discussions to sell their ownership interests to a company named Speedy Heavy Hauling. In early 2006, however, Mr. Enmon (while still a Wells Fargo employee) approached his client Caprock

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

LP directly and made his own personal offer to purchase the company.[2] This ultimately resulted in a February 2006 non-binding letter of intent proposing that Mr. Enmon purchase 100% of all interests in Caprock LP for approximately $42 million. It was additionally stipulated, however, that a condition of closing any such purchase was Mr. Enmon's procurement of financing sufficient to fund the transaction. Mr. Enmon thus began shopping for lenders to finance 100% of his proposed acquisition of Caprock LP.

## C. **Enter Prospect**

In early April 2006, PNC Bank contacted Prospect's Bart de Bie to explore the possibility of Prospect's providing subordinated debt to finance Enmon's proposed acquisition of Caprock LP. In the initial discussions among PNC Bank, Mr. de Bie and Mr. Enmon, Mr. de Bie was urged to offer indicative terms for such a deal promptly since there were other contenders for the business and since Enmon already had term sheets from two other sources.

While Mr. de Bie's initial reaction to the PNC/Enmon overture was positive, he was concerned by the current owners' proposed sale of 100% of the business since this would have left those owners with no motivation to assist in the post-acquisition management of the company. As a result, Mr. Enmon renegotiated the acquisition terms so that he would acquire only 75% of Caprock LP.

## D. **Caprock Pipe & Supply, Inc.**

In April 2006, Mr. Enmon created a New Mexico Company called Caprock Pipe & Supply, Inc., later renamed Enmon Capital Inc. ("Caprock Inc."). Caprock Inc. was a single purpose entity which was formed solely as the vehicle for purchasing Caprock L.P. and for borrowing funds in connection therewith. Mr. Enmon has at all times controlled

---

[2] This was contrary to Wells Fargo policy and led to Wells Fargo's firing Mr. Enmon for cause.

Caprock L.P. and has at all times treated it as his own entity. Based on considerable evidence at the hearing, it is clear that Caprock Inc. is the <u>alter ego</u> of Mr. Enmon and is in privity with him.

**E. Letter Agreement,**
   **Term Sheet**

Based on the above-described negotiations, Prospect tendered to Mr. Enmon a four page draft Letter Agreement, wherein it stated the terms on which it was prepared to consider financing on the basis set forth in an indicative Term Sheet which was attached to the draft agreement. Upon receipt of these documents, Mr. Enmon initiated further negotiations which resulted in significant changes to Mr. Enmon's benefit. On April 11, 2006, Mr. Enmon signed the Letter Agreement under the words "Agreed to and Accepted" and, at the same time, he paid a $25,000 deposit, as required by Section 6 of the Letter Agreement.

While the Letter Agreement constituted a binding commitment to engage in good faith negotiation and to furnish other specified consideration, there was no binding obligation at the time to enter into a final financing. In fact, the Letter Agreement stated that the attached Term Sheet did "not purport to summarize all of the terms and conditions upon which the proposed financing is to be based" and, in addition, it provided that any financing was expressly contingent on Prospect's completion of due diligence to its satisfaction. More particularly, Section 2 of the Letter Agreement stated:

> In the event that our continuing review of the Borrower discloses information relating to conditions or events not previously disclosed to us or relating to information or developments concerning conditions or events previously disclosed to us which we believe may have an adverse effect on the business, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects of

the Borrower or its subsidiaries or the proposed financing or for any other reason, we may in our sole discretion suggest alternative financing amounts or structures or decline to participate in the proposed financing without incurring any liability and you agree to assert none. When we refer to anyone's "sole discretion", we each mean that party's sole and absolute discretion as to process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise.[3]

### (i) Investment Committee Approval

The Letter Agreement also provided that no financing could be furnished to Prospect without approval of Prospect's Investment Committee. This was a standard requirement by Prospect since it had never consummated any transaction without the unanimous, written approval of its Investment Committee which consisted of Prospect's CEO, Mr. Barry, its COO, Mr. Eliasek and a number of others. Typically, Investment Committee meetings are robust, comprehensive exchanges, with one Prospect participant being the champion of the deal in question and another being the loyal opposition. Often, these meetings culminate with a request that further questions be answered and that further due diligence be conducted.

One reason for the overriding caution of Prospect's Investment Committee is that Prospect (as a "mezzanine lender") is issuing highly risky loans which a bank would never even consider. Whereas a bank or other secured lender can protect itself with liens over corporate assets, a mezzanine lender has few, if any, assets against which to seek recourse. Thus, a mezzanine lender is heavily dependent on an enterprise's cash flow

---

[3] The Letter Agreement also provides that: (i) "Under no circumstances shall Prospect be responsible or liable to the Borrower or any other person for damages . . ." (Sec. 9) and (ii) " . . . neither Prospect nor any of its affiliates shall have any liability to any person in connection with Prospect's refusal to fund the financing or any portion thereof . . . ." (final par.).

13 148 02866 06; Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

being sufficient to fund repayment of the loan and, in addition, a mezzanine lender must rely heavily on the character and management capabilities of the principals behind the enterprise.

## F. **Due Diligence**

Upon receipt of the signed Letter Agreement and the $25,000 deposit from Mr. Enmon, Prospect immediately began its due diligence investigation. Mr. de Bie, as deal "originator", led this process. In the course of its due diligence, Prospect devoted over 100 management hours to things such as reviewing significant amounts of Caprock financial information and obtaining and checking personal and professional references about Enmon and Caprock management. Further, some of Prospect's representatives interviewed Mr. Enmon in person at Prospect's New York office on April 18, 2006 and, in addition, they visited Caprock's primary facility in Lovington, New Mexico and its headquarters in Houston; they conducted interviews with the managers of Caprock, who were to have reported to Mr. Enmon after closing; they reviewed Caprock's inventory; and they interviewed Caprock's major customers.

In short, Prospect conducted comprehensive, good faith due diligence on Caprock, indeed, due diligence which far exceeded what was required by the Letter Agreement.[4] And when the first round of due diligence was nearing completion, Mr. de Bie (Prospect's designated "champion" of the deal) told Mr. Enmon he was cautiously optimistic that the Enmon/Caprock transaction would ultimately be consummated. There still remained, however, the finalization of due diligence, as well as the presentation of

---

[4] Section 10 of the Letter Agreement provided that Prospect's good faith efforts:

> shall be conclusively shown by evidence, without more, that Prospect has gathered or reviewed more than fifty pages of due diligence materials relating to the proposed transaction.

6

the deal to Prospect's Investment Committee followed by the necessary unanimous vote of that Committee.

## II
## MAY 8-16, 2006

### A. CIT Reduces Its Loan Commitment

In March 2006, CIT Group, Inc. ("CIT"), a consumer and commercial finance company, provided Enmon with a term sheet proposing to furnish approximately $18 million of senior secured debt to partially finance the purchase of a controlling interest in Caprock LP. On May 8, 2006, however, Enmon informed Prospect that CIT was reducing its loan commitment by $2 million, apparently because of downward adjustments to inventory and receivables since CIT first calculated its borrowing base. As a result, Mr. Enmon asked Prospect to make up the $2 million difference by raising its commitment from $10 million to $12 million.

In response to this troubling development, Mr. de Bie asked Prospect's attorneys (Vinson & Elkins) to amend the draft Credit Agreement to increase Prospect's commitment to $12 million. This did not represent a funding commitment, however, since Prospect's Investment Committee had not even approved the initial $10 million loan and since the $2 million increase was simply a change in the proposal that would ultimately be presented to that Committee.

### B. Change of the Closing Date

In the early stages of the negotiation, there had been a general understanding that everyone was working toward May 12 as the closing date for the Caprock acquisition and the related financing transactions. By May 7, 2006, however, CIT's delay in furnishing

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

loan documentation prompted Mr. de Bie to send an email to Mr. Eliasek and others at
Prospect advising that CIT's "foot dragging" would likely preclude a closing before May
19. Further, as of May 9, Prospect had still not completed its due diligence and was still
seeking, for example "a few more interviews", as well as "a draft of [CIT's] final
background check" on Mr. Enmon.

Given the slow moving status of the project, Prospect and CIT both expressed
concern on May 10 that a May 12 closing date was extremely aggressive and unlikely to
happen. CIT's counsel, in turn, conveyed this view directly to Mr. Enmon.

Despite this broad acquiescence in a delayed closing date, Mr. Enmon abruptly
informed Prospect on May 10 that the Caprock transaction had to close in **two days** by
Friday May 12, 2006. At the same time, Mr. Enmon circulated a May 10, 2006 email
from Caprock LP's CEO, Alan Powers, wherein Powers stated that if the transaction did
not close by May 12 "the [other Caprock LP] partners are through with the deal and I
know I am." Suffice it to say that this sounded a literal fire alarm within Prospect. Thus,
for example, Mr. Eliasek (Prospect's President and COO) testified that "from Prospect's
perspective, the [investment] committee's perspective, this thing was put in rapid fast
forward, you know, 8X on your DVD." Similarly:

- On May 11, Mr. de Bie informed colleagues at Prospect that: "the deal
  recently jumped to a very tight time frame to close (we had expected a
  Tues or Wed [May 16 or 17] close based on progress as of earlier this
  week)", and

- On May 13, 2006, John Barry (Prospect's CEO) complained that "[f]or
  some reason this deal was accelerated past anyone's ability to analyze it."

## C. Emergency Meeting of
## Investment Committee

On learning of the unexpected "need" to close two days hence on May 12, Prospect accelerated its efforts on an emergency basis. Thus, Mr. de Bie worked around the clock to put together a transaction memorandum, which was circulated at 1:33 p.m. on May 11. And at the same time, Mr. de Bie convened a meeting of the Investment Committee for that same day on just a few hours' notice.

Prospect's Investment Committee met at approximately 6 p.m. on Thursday May 11, 2006. In the course of that meeting, Mr. de Bie (the designated "deal champion") strongly supported Mr. Enmon's loan request while Richard Brand (the "loyal opposition") joined the other Committee members in critiquing the deal.

As a whole, the Committee had serious concern over late-arriving information that Caprock LP's first quarter 2006 EBITDA had significantly declined in relation to the first quarter of 2005. This was highly significant to Prospect since a borrower uses operating cash flow to service its debt and since a decrease in EBITDA could therefore impair Enmon's ability to repay the loan. So too, the Committee was troubled by CIT's unilateral reduction of its loan by $2 million and the concomitant request that Prospect increase its loan by the same $2 million. More particularly, the Committee was concerned that the reduction in the CIT loan was an indicator of inventory problems at Prospect and, in addition, the Committee had difficulty with how a $2 million reduction by the fully secured creditor (CIT) could sensibly be accompanied by a $2 million increase on the part of the subordinated lender (Prospect).

At the close of its May 11 meeting, Prospect's Investment Committee determined it could not approve the Enmon loan on the basis of the information then before it and,

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

accordingly, it requested that Mr. de Bie seek further data, as well as answers to a number of questions of serious concern. Mr. de Bie immediately communicated this information to Mr. Enmon, expressing hope that perhaps the loan could close the following Monday, May 14 or Tuesday, May 15.

## D. Enmon's May 12 "Closing"

Confronted, on the one hand, with Prospect's notice that it would not be closing on May 12 and, on the other, with the pronouncement of Caprock LP's CEO (Alan Powers) that Caprock LP was "through with the deal" if it did not close by May 12, Mr. Enmon opted to "close" with CIT and Caprock LP on May 12 without telling them that Prospect was not closing on the same day. Mr. Enmon's decision to proceed in this manner was apparently a result of his near desperation to bind Caprock LP and CIT to a deal on May 12, coupled with his hope that Prospect would soon thereafter come on board and close on its $12 million loan to Enmon.

* * * *

At the same time as Enmon was participating in the "closing", Mr. de Bie was repeatedly contacting him with further questions about Caprock LP's financial affairs. During these calls, Mr. de Bie made clear that Enmon's proposal had not received Investment Committee approval and that Prospect had not committed to fund the acquisition of Caprock LP. Indeed, Mr. Enmon could not possibly have understood otherwise since Mr. de Bie's pursuit of further due diligence (along with Mr. Enmon's same day responses) were entirely inconsistent with Prospect's having bound itself to do anything.

10

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

### E. May 12—Emergence
###    of Further Concerns

On May 12, 2006, Prospect analyzed a CIT inventory audit which had arrived in the late afternoon of May 11 and had therefore not been a part of the Investment Committee's May 11 deliberations. This audit showed further shortcomings with Caprock LP's inventory, including: "accounts receivable, a turnover slowdown"; "increase in the accounts receivable dilution"; "aging test irregularities"; "inventory turnover slow down"; and "significant change in inventory level." This was a red flag to Prospect that Caprock LP's inventory problems were potentially far more serious than what CIT had previously described when it was justifying the $2 million reduction of its secured loan to Enmon.

Late in the day on May 12, Prospect also reviewed a background report on Enmon which had been furnished by CIT the preceding day and, again, had not been part of the Investment Committee's May 11 deliberations. This report showed, among other things, that: (i) Enmon had defaulted on two student loans; (ii) tax liens against Enmon had been obtained by the State of Illinois and the State of New York; (iii) a GMAC auto account in Enmon's name had been closed with an outstanding balance of $29,800; and (iv) Enmon's FICO score was below the national average. All of this was of understandable concern to Prospect.

In addition, Prospect became aware at this time that one Chad Dufrene had funded Enmon's due diligence costs in return for a 5% interest in the purchaser of Caprock LP. This seriously concerned Prospect because it meant that Enmon was contributing zero dollars to the transaction and was undertaking zero financial risk. And finally, natural gas prices—which directly affected the ability of Caprock LP to service its debt—had

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

plunged dramatically since April 2006 and were still dropping during the week of May 8,

2006.

**F. Saturday, May 13**
**Sunday, May 14**

   **(i) Discovery of Negative Flow**
    **for 1st Quarter 2006**

    Throughout Saturday, May 13 and Sunday, May 14, Messrs. de Bie and Enmon spent

significant time analyzing the financial results of Caprock LP. In the course of making

some adjustments which transferred some revenue from 2005 into the first quarter of

2006, they discovered a number of additional first quarter 2006 expenses. When they

were finished incorporating these expenses and making other adjustments, Enmon's prior

representation of a $3 million positive cash flow for the first quarter of 2006 was

radically changed to reflect a $4 million negative cash flow in that quarter. This raised

additional serious concerns about the viability of the proposed financing for the reason,

among others, that the negative operating cash flow figures showed that Caprock LP was

already in default of the debt covenants in the proposed credit agreement between

Caprock LP and Enmon.[5]

   **(ii) Conversation with Alan Powers**

    Acting on instructions from Messrs. Barry and Eliasek, Mr. de Bie told Enmon on

Saturday, May 13 that Prospect needed to talk to Alan Powers (Caprock LP's CEO) in

order to better understand Caprock LP's questionable recent performance and to obtain

---

[5] While financial statements provided by Enmon to Prospect after the close of the first quarter 2006 did not
disclose the negative cash flow numbers, Enmon argues that Prospect could nonetheless have derived the
actual cash flow figures from several other documents in its possession at the time. This is of no present
significance, however, since the point is not whether Prospect might have pieced together some documents
and found the negative cash flow sooner (which should not have been its burden) but, rather, that Prospect
was justifiably concerned when the negative numbers did come to the fore.

more information about management's future plans. Mr. Enmon strongly resisted this request, probably because he had theretofore withheld from Mr. Powers the fact that the Prospect loan had not closed. Despite Enmon's opposition, Messrs. Barry and Eliasek remained firm and, as a result, Mr. Enmon contacted Mr. Powers on Saturday to request a call between Powers and Prospect. In the course of his conversation with Enmon, Mr. Powers for the first time learned that the Prospect loan had not closed. Powers' reaction on hearing this was deep anger, followed by a statement that he would not talk to Prospect until after Prospect had closed on the loan on Monday. Mr. Enmon passed this ultimatum back to Mr. de Bie and at the same time stated that he (Enmon) had assured Mr. Powers of Prospect's commitment to close the following Monday. Upon hearing all this, Mr. de Bie responded swiftly and brusquely to Enmon as follows:

> If Alan wants to buy that ranch of his, he might want to change his attitude. His attitude just made things a lot worse than they needed to be. Guys around here don't like getting pushed around. No one ever committed to wiring a penny. We simply indicated that we were moving in that direction. I challenge you . . . to find a single document or message where anyone at Prospect committed to funding this deal.

Ultimately, Prospect succeeded in speaking with Mr. Powers for five or ten minutes during the afternoon of Sunday, May 14. That call, however, provided no comfort to Prospect since, among other things: (i) Mr. Powers did not provide satisfactory explanations concerning Caprock LP's finances; (ii) Mr. Powers (the expert in Caprock LP's business) indicated he would not be staying at Caprock LP for more than six months

after the sale of the company; and (iii) Mr. Powers said that he and his colleagues did not think Enmon was capable of running the business.[6]

Following this phone call, there were further conversations between Enmon and Prospect in which Enmon was verbally abusive toward Prospect's senior management, even engaging in threats and obscenities which further increased Prospect's concerns about Enmon's suitability to be the CEO who would lead the company.

### (iii) Exploration of Alternatives

Given the wave of negative news about Caprock and Mr. Enmon, Prospect determined on Sunday, May 14 that it could not loan Mr. Enmon $12 million on the basis that had previously been envisioned. Late Sunday afternoon, however, Messrs. Barry, Eliasek and de Bie had two telephone conversations with Mr. Enmon and his lawyer (Mr. Fiser) wherein the Prospect representatives sought to explore a possible alternative transaction whereby: (i) Enmon and the other members of the Caprock LP management team would continue to run the company; (ii) Enmon would acquire an initial 24.9% interest in Caprock LP with the right to obtain further percentage interests in the company upon reaching certain EBITDA targets or goals which were below those projected by Enmon; (iii) pending attainment of such targets, Prospect would own 50.1% of Caprock LP which would be reduced to 12.5% following achievement of the EBITDA goals; (iv) Enmon and his wife would draw an increased salary for their services; (v) Prospect's

---

[6] Enmon asserts that in this call between Prospect and Mr. Powers, Prospect explored the possibility of its purchasing Caprock LP without the participation of Enmon. Messrs. Barry, de Bie and Eliasek (the Prospect representatives who participated in the call) all testified, however, that it was solely a due diligence call, nothing more. The Arbitrator accepts this testimony since: (i) the Prospect witnesses were generally credible; (ii) the "evidence" that Prospect made such an overture to Powers at this time is, at best, highly questionable; and (iii) in the circumstances of Sunday, May 14, it would have made no sense for Prospect to initiate a discussion with Mr. Powers about the possibility of Prospect's purchasing Caprock LP itself.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

interest rate/minimum internal rate of return would be increased to reflect its heightened

risk; and (vi) Enmon would continue to contribute zero dollars to the project.

While Prospect's new proposal would have provided Enmon the same interest in

Caprock LP once the EBITDA targets were met, Enmon summarily rejected Prospect's

offer. As he testified:

> Q. You continued through the weekend and you ultimately did not reach an agreement with Prospect; right?
>
> A. I did not accept their back-flip, total-screw-me agreement that they stuck in my face on Sunday, you're right, I didn't.

* * * *

Following Mr. Enmon's rejection of Prospect's alternative proposal, there were a few

communications between the parties but those contacts basically led nowhere and, in the

end, Prospect did not loan $12 million to Mr. Enmon, and Mr. Enmon did not purchase

Caprock.[7]

### III
### ARBITRABILITY

The April 11, 2006 Letter Agreement between Prospect and Enmon contains a

clearly stated arbitration clause which provides:

---

[7] Enmon makes much of the fact that at some point after the Prospect/Enmon deal had completely fallen apart, Prospect contacted Caprock LP to inquire about whether Mr. Powers was still seeking to sell the Company. Passing the fact that nothing ever came of this, Prospect was wholly within its rights to have made such an inquiry. Until the total collapse of its negotiations with Enmon, Prospect was providing him with alternative, last minute proposals, and when Enmon brusquely and finally rejected all such offers, Prospect was clearly entitled to see if any new and different approaches might be of interest to Caprock LP.

Contrary to what Enmon asserts, Prospect's after the fact overture to Caprock LP in no way indicates that Prospect wanted Caprock LP for itself throughout its negotiations with Enmon and that it scuttled its loan to Enmon at the last minute in order to position itself to grab Caprock LP for itself. Suffice it to say that there is **no evidence** to support Enmon's speculation along these lines, and there is substantial evidence to support Prospect's good faith throughout its negotiations with Enmon.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

> This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws. Unless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration in New York City according to the rules of the American Arbitration Association with the losing party paying the legal and related fees and expenses of the prevailing party. Borrower agrees that Prospect has the right, at any time, to remove any claim in arbitration to a New York court.

The above-quoted language incorporates the "rules of the American Arbitration Association" including Rule 7(a) which provides that: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." In light of Rule 7(a), this Arbitrator has jurisdiction to decide any issues as to arbitrability which might be presented. See Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005) ("when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to the arbitrator.")

Here, Respondent raises a number of arbitrability issues each of which is separately discussed and ruled upon below.

## A. **Effect of Non-binding Term Sheet**

Claimants argue that the Term Sheet attached to the Letter Agreement is non-binding and that this renders the Letter Agreement itself (including its arbitration clause) non-binding and unenforceable. This contention, however ignores the fact that the Letter Agreement and the Term Sheet are two separate and distinct documents, with the Term Sheet setting forth the non-binding basics of the substantive agreement toward which the

parties were working and the Letter Agreement containing the binding framework within which the parties were to negotiate and otherwise act in good faith in an effort to consummate a loan agreement along the lines set forth in the Term Sheet.

Preliminary commitments such as those in the Letter Agreement are known under New York law[8] as binding and enforceable "Type 2 Preliminary Agreements." As the court stated in <u>Teachers Insurance and Annuity Association of America vs. Tribune Co.</u>, 670 F. Supp. 491, 498 (S.D.N.Y. 1987):

> [In a Type 2 Preliminary Agreement, a party] may demand . . . that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of [a] final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. **The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.** (Emphasis added.)[9]

<u>Accord</u>: <u>Adjustrite Systems, Inc. v. GAB Business Services, Inc.</u>, 145 F.3d 543, 548 (2d Cir. 1998).[10]

---

[8] The Letter Agreement provides that: "This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws."

[9] <u>Brown v. Cara</u>, 2005 WL 1785064 (C.A.2 (N.Y.) lists five factors that bear on whether there is a valid and enforceable Type 2 Preliminary Agreement. Without getting into unnecessary detail, suffice it to say that the Letter Agreement satisfies all five of these considerations.

[10] In support of his contention that the Letter Agreement is unenforceable, Enmon cites to portions of cases pertaining to Type 1 (not Type 2) preliminary agreements. E.g., <u>Arcadian Phosphates, Inc. v. Arcadian Corp.</u>, 884 F.2d 69 (2d Cir. 1989). A Type 1 Preliminary Agreement arises when the parties have reached agreement on all or virtually all terms of their underlying deal and await only the formalization of those terms in executed documents. Neither the Letter Agreement nor the Term Sheet are even close to being a Type 1 Preliminary Agreement and, that being so, portions of cases pertaining to Type 1 Preliminary Agreements are irrelevant here.

Further, the Letter Agreement contains language clearly and specifically reflecting the parties' intent that it is to be binding. Thus, for example, Mr. Enmon executed the Letter Agreement under the heading "Agreed to and accepted", and the Letter Agreement contains other similarly indicative language, such as:

> If this proposal is satisfactory to you, please memorialize your intention to proceed on these terms by signing and returning a copy of this letter. By signing and returning this letter, Borrower agrees to pay all reasonable out-of-pocket costs and expenses as incurred by Prospect in connection with all [due diligence and the like].
>
> * * *
>
> In consideration of the delivery of this letter, the Borrower hereby indemnifies and holds harmless Prospect . . . from and against any and all losses . . . that arise out of or relate to any matter referred to in this agreement . . . .
>
> * * *
>
> All obligations described in paragraphs 3 through 14 of this letter shall survive termination hereof. No modification or waiver of the requirements set forth in . . . this letter shall be effective unless a formal instrument providing therefore is signed by Borrower and John F. Barry, CEO of Prospect.

For the reasons stated, the Arbitrator rejects the argument that the Letter Agreement is rendered non-binding by the non-binding nature of the Term Sheet which is attached thereto.

## B. Alleged Lack of Consideration

Claimant asserts that the Letter Agreement (and its arbitration clause) are unenforceable because the Agreement fails to provide for any consideration or required performance on the part of Prospect. This contention is rejected for the following reasons:

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

**FIRST**, This Arbitrator has already held that the Letter Agreement obligated Prospect "to negotiate and otherwise act in good faith in an effort to consummate a loan agreement along the lines set forth in the Term Sheet." (See pgs. 16-17, supra), and

**SECOND**, In fact, the Letter Agreement specified additional obligations on the part of Prospect, such as the requirements that it:

- proceed with "continuing review" and with "completion of its due diligence" upon execution of the Letter Agreement.

- hire experts and pay for due diligence expenses (subject to promised reimbursement by Enmon).

- submit to the exclusive jurisdiction of the New York courts.

- Attempt to work with Enmon under the conditions specified in paragraph 12.

- waive any and all rights to a jury trial, and

- abide by all surviving "obligations" described in paragraphs 3 through 14 of the Letter Agreement, even after termination of the Letter Agreement.

## C. **Claimed Unconscionability**

Mr. Enmon asserts that the arbitration clause in the Letter Agreement is unenforceable because the Letter Agreement and its arbitration clause are unconscionable. A contract may only be invalidated as unconscionable, however, if it is "'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 534 N.E.2d 824, 537 N.Y.S.2d 787 (1988).

Unconscionability has two essential elements—**procedural** and **substantive** unconscionability, both of which must generally be established in order to render an

agreement unenforceable. <u>Ciago v. Ameriquest Mortgage Co.</u>, 295 F. Supp. 2d 324

(S.D.N.Y. 2003). As the court stated in <u>Gillman</u>, <u>supra</u>:

> A determination of unconscionability generally requires a showing that the contract was **both** procedurally and substantively unconscionable when made—*i.e.,* "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" (Citations omitted; emphasis added.)

* * * *

The procedural and substantive aspects of Enmon's unconscionability argument are separately discussed below.

### (i) Procedural Unconscionability

Mr. Enmon has in no way established that he was subjected to procedural unconscionability, <u>i.e.</u>, that he had no "meaningful choice" at the time he executed the Letter Agreement. To the contrary:

- Mr. Enmon is a sophisticated businessman who holds an MBA from the University of Chicago and has been an officer of several banks, as well as an investment banker at Merrill Lynch and Director of Corporate Finance for SBC Communications in San Antonio.

- Mr. Enmon was at all times represented by counsel in the negotiation of the Letter Agreement. In fact, Enmon's counsel ultimately billed him $40,000 for these services.

- The Letter Agreement was part of a complex transaction being negotiated by Enmon whereby he would acquire control of a substantial corporation without putting a penny into the deal himself.

- In fact, it was Enmon who urged Prospect to enter the Letter Agreement posthaste (not vice versa), his argument being that certain Prospect competitors were poised to lend him the money if Prospect did not jump in and grab the business.

* * * *

In light of the foregoing, there was nothing even close to procedural unconscionability here. See, e.g., Rubin v. Telemet America, Inc., 698 F. Supp 447 (S.D.N.Y. 1988) (court struck an unconscionability argument as a matter of law, noting that "Telemet . . . had been investing in the stock market for 20 years and was not an unsophisticated businessman.")

### (ii) Substantive Unconscionability

While certain provisions of the Letter Agreement unquestionably tilt toward Prospect, this was a necessary part of the deal since Prospect had no obligation to loan Enmon anything and since Prospect needed to isolate itself from liability in the event a loan was never consummated.

In any event, the only "unconscionability" that could affect the enforceability of the Letter Agreement's arbitration clause would be unconscionability directed to the arbitration clause itself, as opposed to the Letter Agreement as a whole. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 18 L. Ed.2d 1270, 87 S. Ct. 1801 (1987); JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004). Here, the only argument advanced by Enmon as to unconscionability of the arbitration clause is based on the clause's provision that: "Prospect [not Enmon] has the right, at any time, to remove any claim in arbitration to a New York court." For the following reasons,

however, this assertion of unconscionability cannot possibly satisfy the standard of Gillman, supra, that a contract can only be unconscionable if it is "grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place":

**FIRST**, Claimant Prospect's removal right has no applicability here since removal is a procedure solely exercisable by a respondent in arbitration. Stated somewhat differently, it would be unseemly, at best, for a claimant such as Prospect to initiate an arbitration and then seek to remove its own arbitration to a court. Clearly, therefore, a claimant who files an arbitration demand waives any right it might otherwise have had to remove the arbitration to court.

**SECOND**, Prospect has expressly and unequivocally waived any right to remove this arbitration to court.

**THIRD**, Even if Prospect were somehow to remove this arbitration to court, that would not be unconscionable since a court would provide a neutral and fair forum for Enmon. Indeed, Enmon has left no stone unturned in its effort to have this dispute heard in court, as opposed to arbitration.

**FOURTH**, Under New York law, an arbitration clause is not unenforceable by reason of one side's reserving a right not to arbitrate. In Sablosky v. Edward S Gordon Company, Inc., 73 N.Y.2d 133, 535 N.E.2d 643, 538 N.Y.S.2d 513 (1989), for example, the court enforced an arbitration clause, stating:

> The principal issue submitted is whether an employment contract, which is supported by consideration on both sides and which contains an arbitration clause compelling one party to submit all disputes to arbitration but allows the other party the choice of pursuing arbitration or litigation, is invalid for lack of mutuality of remedy or obligation.

* * *

Mutuality of remedy is not required in arbitration contracts. If there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement.

\* \* \*

Nor should the court refuse to enforce the clause on policy grounds. Over the last 20 years arbitration has emerged as a preferred method for the settlement of many controversies. . . . Arbitrators customarily have an expertise over a particular subject matter and are able to offer parties a relatively expeditious and inexpensive forum to resolve their disputes. Although a party gives up an important right when it agrees to submit a dispute to arbitration, such proceedings are not less effective in discovering the truth than are judicial proceedings and it is not, as a matter of public policy, per se unfair to give one party the right to select them.

## D. "Executed" Credit Agreement

Enmon asserts that: (i) a Credit Agreement between him and Prospect became effective on May 12, 2006; (ii) the Credit Agreement did not contain an arbitration clause; (iii) the Credit Agreement superseded the Letter Agreement, which did contain an arbitration clause; and (iv) the present dispute between Enmon and Prospect is therefore not arbitrable.[11]

The foregoing argument is based on Prospect's having forwarded provisionally signed signature pages of a Credit Agreement to its own counsel, Vinson & Elkins. These pages, however, were undated; they were unattached to any specific draft of the Credit Agreement; and their purpose was to place Vinson & Elkins in a position where it could

---

[11] Rule 7(c) of the American Arbitration Association's Commercial Arbitration Rules provides that:

A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. . . .

Enmon's challenge to arbitrability based on a superseding Credit Agreement is untimely under Rule 7(c) since it was first asserted long after the filing of Enmon's counterclaim and since Enmon knew the basic facts supporting this challenge to arbitrability at the time his counterclaim was filed.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

quickly circulate an executed Credit Agreement if and when one was ever finalized and agreed to by Prospect. In fact, when Mr. de Bie forwarded these pages to Peter Broadbent (an associate at Vinson & Elkins), the covering email expressly stated:

> **Pete, Attached are our signature pages. Please check form. DO NOT SEND OUT UNTIL YOU TALK TO ME. For V&E only.**[12]

Prospect never authorized Vinson & Elkins to release the executed signature pages of of the Credit Agreement to Enmon, and Vinson & Elkins of course never did so. Since there was never a "delivery" of an executed Credit Agreement to Enmon, there was never compliance with the following condition of the Letter Agreement:

> Accordingly, Prospect's proposal to provide the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence . . . with all aspects of the proposed transaction, including but not limited to: . . . (iv) the negotiation, execution and **delivery of final documentation** acceptable to Prospect in its sole discretion, . . .[13] (Emphasis added.)

It is routine in complex business transactions for a party to forward executed signature pages to its counsel on the understanding that the pages have no legal effect until there is a final agreement between the parties and the signatures are physically delivered to the other side. This practice is recognized and respected by the New York courts which will not enforce an agreement in such circumstances until the executed pages are released to the other side, along with a final copy of the agreement.

---

[12] The same instruction accompanied Prospect's transmission to Vinson & Elkins of provisional signature pages to the proposed funds disbursement letter:

**AGAIN: DO NOT FORWARD THOSE SIGNATURE PAGES.**

[13] Similarly, the draft Credit Agreement provided that it would need to be delivered to be binding ("Delivery of an executed counterpart of this Agreement by telecopier shall be equally as effective as delivery of an original executed counterpart of this Agreement.").

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

In <u>Schwartz v. Greenberg</u>, 304 N.Y. 250, 107 N.E.2d 65 (1952), for example, each

party to a negotiation, signed a final agreement but did not furnish signature pages to the

other side. The day after the signings, one of the parties withdrew from the deal. In these

circumstances, the New York Court of Appeals held that there never had been a contract

between the parties since:

> [T]here is no evidence of an intention of the parties to be
> bound by any mere oral understanding. Indeed they drafted
> a formal contract on April 4, 1950, and each of them
> retained a copy thereof until they met again the next day,
> when the defendant withdrew from the transaction. It is
> entirely plain, then, that the parties did not intend to be
> bound until a written agreement had been signed and
> delivered . . . .

> <u>Accord</u>: <u>Intercontinental Monetary Corp. v. Performance Guarantees, Inc.</u>,
> 705 F. Supp. 144 (S.D.N.Y. 1989), where the court stated:

> The general rule in New York, applicable to most written
> agreements, is that the intent of the parties determines
> whether they are enforceable immediately upon their
> execution or only upon delivery.
> * * *
> Even where delivery is not absolutely required as a matter
> of law, there are situations where the absence of delivery
> may provide conclusive evidence that the process of
> contract formation is incomplete. Such may be the case, for
> example, where the parties to a written agreement sign the
> instrument outside of the presence of each other and then
> withhold delivery of the signed document.

* * * *

For all the reasons set forth above, there was never a binding and enforceable Credit

Agreement between Prospect and Enmon and, hence, their Letter Agreement (together

with its arbitration clause) was never superseded.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

# IV
# ENMON'S CLAIMS

Mr. Enmon claims that Prospect's wrongful acts (as "proven" at the hearing) give rise to meritorious claims for: (i) breach of fiduciary duty; (ii) tortious interference; (iii) fraud; and (iv) negligent misrepresentation. Each of these legal theories is discussed directly below.

## A. Fiduciary Duty

The primary shortcoming in Enmon's claim for breach of fiduciary duty is that there is no credible evidence to support Enmon's position (see pgs. 1-15, supra). In addition, however, the claim is legally deficient because the relationship between Prospect and Enmon was one of lender and borrower which, as a matter of law, is not fiduciary in nature. See, e.g., BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003); In re N.T. Grant Co., 699 F. 2d. 599, 609 (2d Cir. 1983); Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 272 (E.D.N.Y. 1994); Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp., 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors.")

According to Enmon, the foregoing cases are trumped by the facts that: (i) Prospect was to receive a 12.5% Net Participation Interest in Caprock, Inc., as part of the loan arrangement; and (ii) this Participation created a joint venture and, thus, a fiduciary relationship between Prospect and Enmon. This contention is rejected for the following reasons:

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

**FIRST**, The draft Participation Agreement between Caprock Inc. and Prospect,

which was an exhibit to the draft Credit Agreement, expressly disclaimed any

"partnership, agency, independent contractor or other relationship." See CNA

Ins. Co. v. Travelers Ins. Co., 105 A.D.2d 680, 481 N.Y.S.2d 121 (2d Dep't 1984)

(finding no fiduciary duty where the parties' contract expressly defined the parties'

relationship as contractor/subcontractor).

**SECOND**, As defined, Prospect's anticipated Participation Interest in Caprock Inc.

excluded any voting or other management rights in Caprock Inc. because Prospect's only

rights, as "Holder" were: (i) the right to payment of participation amounts; (ii) "board

observation" rights; (iii) "information rights"; and (iv) contingent options to purchase

stock. See Mitler v. Friedeberg, 32 Misc. 2d 78, 82, 222 N.Y.S.2d 480, 485-86 (Sup. Ct.

N.Y. County 1961), where the court held that a similar arrangement lacked the essential

features of a joint venture, i.e., "'a mutual promise or undertaking of the parties to share

in the profits of the business, and submit to the burden of making good the losses'", and

**THIRD**, A fiduciary duty cannot arise where, as here, there was a planned but

unconsummated investment transaction. See Solutia Inc. v. FMC Corp., 456 F. Supp. 2d

429, 444-47 (S.D.N.Y. 2006) (no fiduciary duty between prospective joint venturers);

Frutico, S.A. de C.V. v. Bankers Trust Co., 833 F. Supp. 288, 301 (S.D.N.Y. 1993) ("An

agreement to enter into a joint venture must be finalized before a fiduciary duty is

created.)"

## B. Tortious Interference

There is no credible evidence supporting Enmon's claim for tortious interference (see

pgs. 1-15, supra). What Enmon characterizes as tortious interference was no more than

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

Prospect's exercise of its contractual right to decline to make the $12 million loan to Enmon. Further--as a matter of law--Prospect's decision not to do business with Enmon cannot give rise to a claim for tortious interference. See WFB Telecomms., Inc. v. NYNEX Corp., 188 A.D.2d 257-58, 590 N.Y.S.2d 460, 461 (1st Dep't 1992).

## C. Fraud and Negligent Misrepresentation

Enmon's fraud and misrepresentation claims are of course dependent on Enmon's establishing that Prospect wrongfully made material misstatements to Enmon or that it failed to make material disclosures. Enmon's argument that Prospect made such misstatements or omissions is based on his claim that: (i) Prospect made an oral commitment to fund Enmon's $12 million loan; and (ii) it failed to give Enmon timely notice that Prospect's Investment Committee had not approved the loan. This factual position, however, is rejected for the following reasons:

**FIRST**, Right after Prospect's Investment Committee declined to approve the Enmon loan in the evening of Thursday, May 11, 2006, Mr. de Bie so informed Enmon.

**SECOND**, While Mr. de Bie at times gave Enmon reason to hope, indeed, perhaps even expect that the loan would ultimately be consummated,[14] no one from Prospect **ever** told Enmon that Prospect had committed to make the loan or that Prospect's Investment Committee had approved the loan.

**THIRD**, If Prospect had orally committed to loan $12 million to Enmon, one would expect that so important a commitment would somewhere be reflected in a writing, even if it only be an email. To the contrary, however—Mr. de Bie wrote to Mr. Enmon in the

---

[14] Such expressions of hope or expectations cannot give rise to a claim based on fraud. See Roney v. Janis, 77 A.D.2d 555, 557, 430 N.Y.S.2d 333, 335 (1st Dep't 1980), aff'd, 53 N.Y.2d 1025, 425 N.E.2d 872 (1981) (a claim for fraud "cannot be based upon a statement of future intentions, promises or expectations which are speculative or an expression of hope at the time when made").

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

evening of Saturday, May 13, 2006 that: "No one ever committed to wiring a penny. We simply indicated that we were moving in that direction. I challenge you . . . to find a single document or message where anyone at Prospect committed to funding this deal."

**FOURTH**, The Letter Agreement clearly stated that a Credit Agreement could only take effect upon "the negotiation, execution and delivery of final documentation acceptable to Prospect in its sole discretion, . . . ." In Jordan Panel Systems, Corp. v. Turner Construction Co., 45 A.D.3d 165, 841 N.Y. Supp.2d 561 (1st Dep't 2007), a term sheet similarly provided that defendant did not intend to be bound until it had actually executed a written agreement. Nonetheless, plaintiff asserted (as does Enmon) that there had been a breach of an oral agreement between the parties. In rejecting this argument, the court relied on the term sheet, stating:

> . . . it should be borne in mind that the concept of freedom of contract includes the "[f]reedom to avoid oral agreements," a freedom that "is especially important when business entrepreneurs and corporations engage in substantial and complex dealings." Jordan's position, if adopted, would essentially destroy this freedom. We think it preferable to allow sophisticated parties operating in the business world to decide when and how they wish to enter into legally enforceable contracts.

* * * *

For the reasons stated immediately above and based on all the facts recited throughout this Award, Enmon's claims based on fraud, negligent misrepresentation, breach of fiduciary duty and tortious interference are denied and dismissed.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

# V
# PROSPECT'S CLAIMS

## A. Alleged Breaches of Arbitration
##    and Forum Selection Clauses

The facts on which Prospect bases its claim for breach of the arbitration and forum

selection clauses of the Letter Agreement are briefly recited below.

On or about December 4, 2006, Enmon instituted an action against Prospect and

others in the Texas State Court in Beaumont ("Texas Action") alleging fraud, statutory

fraud and tortious interference with Enmon's contract with Caprock LP, based on

Prospect's failure to consummate any financing agreement with Enmon. In response,

Claimants initiated the present arbitration before the American Arbitration Association on

December 22, 2006 and, then, they petitioned the United States District Court for the

Southern District of New York ("District Court") to compel Enmon to arbitrate. In

addition, Claimants sought an order from the District Court enjoining Enmon from

further prosecuting the Texas Action. These proceedings are referred to herein as the

"District Court Petition".

On February 13, 2007, Judge Sand granted Claimants' petition to compel arbitration

and enjoined Enmon from further pursuing the Texas Action. Enmon thereafter appealed

that decision to the United States Court of Appeals for the Second Circuit ("Second

Circuit Appeal").

In July 2007 (on the eve of the hearings in this arbitration), Enmon filed a Rule 60(b)

action before Judge Sand, claiming that the arbitration clause in the Letter Agreement had

been superseded by an executed Credit Agreement, which did not contain an arbitration

clause. (See pgs. 23-25, supra). After argument, Judge Sand declined to recommend Rule

60(b) relief, stating that Enmon's position was a "radical departure from the law of contracts." After initially appealing this decision, Enmon abandoned the appeal with prejudice.

* * * *

Prospect claims that Enmon's Texas action and related legal activities are in direct violation of the arbitration and forum selection clauses in the Letter Agreement and that Prospect is therefore entitled to all of its reasonable attorneys' fees and costs incurred in enforcing those clauses against Enmon. The Arbitrator agrees. The validity and enforceability of the arbitration and forum selection clauses in the Letter Agreement were upheld on the basis of a detailed discussion at an earlier point in this Award. (See pgs., 15-25, supra). And where, as here, a party to valid arbitration and forum selection agreements initiates a lawsuit in violation of those agreements, then the other party has a right to recover its costs and expenses incurred in enforcing the arbitration and forum selection agreements. See, e.g.:

- Morrell & Co. v. Lehr Constr. Corp., 287 A.D.2d 257, 730 N.Y.S.2d 709 (1st Dep't 2001) (permitting arbitration claim "for legal fees incurred by defendant in resisting alleged breaches of the underlying agreement by plaintiff's previous recourse to litigation instead of the arbitration remedy provided by contract")

- MWN Group, Inc. v. MAG USA, Inc., No. 3:06-MC-47, 2007 U.S. Dist. LEXIS 57979, at *11 (E.D. Tenn., Aug. 8, 2007) (upholding arbitrator's award of damages incurred by prevailing party arising from opponent's actions in "filing suit in Michigan rather than instituting arbitration proceedings")

- Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 304 A.D.2d 429, 431, 758 N.Y.S.2d 308, 311 (1st Dep't 2003) (awarding damages in the form of attorneys' fees expended as a result of defendant's breach of exclusive forum clause: "damages may be obtained for breach of a forum selection clause and

13 148 02866 06; Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

an award of such damages does not contravene the American Rule that deems attorneys' fees a mere incident of litigation") (Citations omitted.)[15]

- The Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 119 (2d Cir. 2003) (permitting arbitration claim "to charge [appellee] with breaching the Representation Agreement by pursuing a court stay of arbitration . . . [and seeking] damages in an amount equal to [appellant's] attorneys' fees and costs in opposing the stay")

* * * *

For the reasons stated, Prospect's claim for attorneys' fees and related expenses incurred in connection with the Texas Action, the District Court Petition and the Second Circuit Appeal is granted.

## B. Due Diligence Expenses

Under paragraph 6 of the Letter Agreement, Enmon was required to reimburse Prospect for all reasonable out-of-pocket costs and expenses incurred by Prospect in connection with its due diligence, documentation and other costs incidental to the proposed financing, "whether or not the proposed financing [was] consummated." Prospect allegedly incurred costs and expenses that were not reimbursed by Enmon and now seeks recovery thereof. This claim is granted, subject to verification as to the amount due.

## C. Costs and Attorneys' Fees

Section 10 of the Letter Agreement provides that the "losing party" in an arbitration under the Agreement is to pay "the legal and related fees and expenses of the prevailing party." Prospect is the "prevailing party" and Mr. Enmon is the "losing party" in this arbitration which was brought pursuant to the terms of the Letter Agreement. Therefore,

---

[15] See Allendale Mut. Ins. v. Excess Ins. Co., 992 F. Supp. 278, 285-86 (S.D.N.Y. 1998) (awarding damages in the form of fees expended in defending proceedings instituted in England in breach of a forum selection clause specifying jurisdiction in the United States)

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

Mr. Enmon is to pay the reasonable legal and related fees and expenses incurred by Claimants in connection with this arbitration.

## VI
## CONCLUSION

By way of summary and conclusion, the undersigned Arbitrator hereby enters his Partial, Final Arbitration Award as follows:

1. Claimants' claim that Respondent's Texas Action and related legal activities are in direct violation of the arbitration and forum selection clauses in the Letter Agreement and that Claimants are therefore entitled to all of their reasonable attorneys' fees and costs incurred in enforcing those clauses against Enmon in the Texas Action, the District Court Petition and the Second Circuit Appeal is granted. Within three weeks of receipt of this Partial, Final Arbitration Award, Claimants are to submit one or more affidavits, together with backup and supporting papers, setting forth and supporting the amount of such fees and costs. Respondent is to serve any answering papers within six weeks of receipt of this Partial, Final Arbitration Award.

2. Prospect's claim under Paragraph 6 of the Letter Agreement that Respondent is required to reimburse it for its reasonable out-of-pocket costs and expenses incurred by it in connection with its due diligence, documentation and other costs incidental to the proposed financing, "whether or not the proposed financing [was] consummated" is granted. Within three weeks of receiving this Partial, Final Arbitration Award, Prospect is to submit one or more affidavits, together with backup and supporting papers, setting forth and supporting the amount of any such costs and expenses, which have not been

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

previously reimbursed by Respondent. Respondent is to serve any answering

papers within six weeks of receipt of this Partial, Final Arbitration Award.

3.  All of Respondent's counterclaims are denied and dismissed.

4.  Section 10 of the Letter Agreement provides that the "losing party" in an

    arbitration is to pay the legal and related fees and expenses of the "prevailing

    party." Prospect is the prevailing party in this arbitration within the meaning

    of Section 10. Within three weeks of receipt of this Partial, Final Arbitration

    Award, Prospect is to serve one or more affidavits, together with backup and

    supporting papers, setting forth and supporting the reasonable amount of any

    such attorneys' fees and expenses, other than Arbitrator fees and

    administrative fees of the American Arbitration Association. Respondent is to

    serve any answering papers within six weeks of receipt of this Partial, Final

    Arbitration Award.

5.  Aside from attorneys' fees and costs, as well as Arbitrator fees, administrative

    fees of the American Arbitration Association and due diligence costs, this

    Partial, Final Arbitration Award is in full settlement of all claims submitted to

    this arbitration. To the extent that any such claim is not specifically mentioned

    herein, it is denied.

                                        _____  4/14/08
                                        John Wilkinson          Dated


I, John Wilkinson, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is my Partial, Final Arbitration
Award.

                                        _____  4/14/08
                                        John Wilkinson          Dated


                                        34

Captck Pipe & Supply – April 11, 2006



PROSPECT ENERGY

10 EAST 40TH STREET • SUITE 4400 • NEW YORK, NEW YORK 10016

April 11, 2006

Mr. Michael Ennson
6620 Briarcliff NE
Albuquerque, NM 87111

RE:     Proposal to provide up to $10,000,000 of Subordinated Debt ("Sub Debt") plus Net Profit Interest ("NPI")
        by Prospect Energy Corporation or an Affiliate to Caprock Pipe & Supply, LP

Dear Mr. Ennson:

1.  Prospect Energy Corporation ("Prospect", "we" or "us") is pleased to provide Mr. Michael Ennson ("Sponsor") with this proposal (the "Proposal") to provide and/or arrange up to $10,000,000 of subordinated secured debt pursuant to the terms set forth in this letter and the attached Summary of Proposed Terms and Conditions dated April 11, 2006 (the "Term Sheet") to fund the acquisition of Caprock Pipe & Supply, LP ("Borrower") by Sponsor. The terms and conditions of this Proposal are not limited to those set forth herein or in the Term Sheet. The Term Sheet does not purport to summarize all of the terms and conditions upon which the proposed financing is to be based, which terms and conditions would be contained fully only in final documentation which must be satisfactory to Prospect and its counsel in their sole discretion. The Term Sheet indicates only the principal terms and conditions under which the financing would be considered. Those matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion.

2.  Neither Prospect nor its counsel have had the opportunity to complete the due diligence efforts necessary to substantiate the financial, legal, tax and accounting premises upon which this proposal is based or the reasonableness of the projections delivered to Prospect by the Sponsor regarding the Borrower (the "Projections"). Accordingly, Prospect's proposal to provide the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence, and until the execution of definitive documentation and closing, with all aspects of the proposed transaction, including but not limited to: (i) the business, operations, properties, assets, liabilities (whether contractual or otherwise, and including without limitation environmental liabilities), condition (financial or otherwise) and prospects of the Borrower and its respective subsidiaries, (ii) the legal and capital structure of the Borrower, (iii) the reasonableness of the Projections and the accuracy and completeness of all material furnished Prospect, (iv) the negotiation, execution and delivery of final documentation acceptable to Prospect in its sole discretion, (v) the absence of any material adverse change in the condition or prospects of the Borrower and its subsidiaries, to be determined in the sole discretion of Prospect, (vi) compliance with all the terms and conditions set forth in the Term Sheet and this letter and such final documentation, and no default thereunder, (vii) final approval in its sole discretion of Prospect's Investment Committee, (viii) compatibility of the corporate form of the Borrower and structure of the transaction with regulatory requirements governing Prospect as a result of its status as a regulated investment company under the 1940 Act and under the Internal Revenue Code, and (ix) any other matter we regard as material, in our sole discretion. In the event that our continuing review of the Borrower discloses information relating to conditions or events not previously disclosed to us or relating to information or developments concerning operations, properties, assets, liabilities, condition (financial or otherwise) or prospects of the Borrower or its subsidiaries or the proposed financing or for any other reason, we may in our sole discretion suggest alternative financing amounts or structures or decline to participate in the proposed financing without incurring any liability and you agree to assert none. When we refer to anyone's "sole discretion", we each mean that party's sole and absolute discretion as to process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise.

3.  You agree that our proposal of alternative financing amounts or structures or our decision not to proceed for any or no reason, at any time, shall not be inconsistent with this proposal and shall not support any claim or assertion of liability by the Borrower or any affiliate or other person against us. You agree to accept any such decision by us without

1

Caprock Pipe & Supply – April 11, 2006

disputing it, and agree not to assert any claim before any court, arbitrator or other tribunal. You also agree not to assert that we fraudulently induced you to sign this agreement, that you signed under duress or coercion, that you lack mental or other capacity, that we have discriminated against you in any way, or that we have made any representations or that we have any understanding or agreement other than as set forth in this letter. You have reviewed this agreement with able counsel of your own free choosing.

4.  This letter shall terminate on the earlier of (1) April 11, 2006 unless this letter is accepted and agreed to prior to such date, (2) a default listed in the Term Sheet, (3) a material adverse change in the condition or prospects of the Borrower, to be determined in the sole discretion of Prospect, (4) notification by Prospect to the Borrower that the results of its due diligence were unsatisfactory, that it was unable to obtain approval by its Investment Committee of the financing, or that the final definitive documents do not meet with the approval of Prospect or its counsel (preparation of documents proposed by Prospect counsel does not remove Prospect's right to object to such documents for any reason regardless of who prepared such documents), or (5) the financing is for any reason not closed on or prior to May 15, 2006 unless this letter is extended in the sole discretion of Prospect. Prospect may terminate before, on or after any deadline set by Borrower or anyone else without liability. Prospect is not obligated to explain exercise of its sole discretion to terminate but need only cite this paragraph when terminating and Prospect shall have no liability.

5.  This letter is being made available to Borrower on a confidential basis. Neither this letter, including the attached Term Sheet, nor its contents are to be divulged to any person without the prior written consent of Prospect. Borrower and its employees, agents, directors, advisors and affiliates shall not refer to this letter, the Term Sheet or Prospect in any communication with any other party except with the written consent of Prospect. This letter describes with specificity all of the discussions between Borrower and Prospect. There are no other understandings or agreements except as specifically described herein. This letter can only be amended by a formal written instrument signed by Borrower and John F. Barry as CEO of Prospect.

6.  If this proposal is satisfactory to you, please memorialize your intention to proceed on these terms by signing and returning a copy of this letter. By signing and returning this letter, Borrower agrees to pay all reasonable out-of-pocket costs and expenses as incurred by Prospect in connection with all (i) due diligence by Prospect, its officers, employees, agents, consultants and representatives, (ii) documentation and (iii) other costs incidental to the closing of the proposed financing, including but not limited to fees and disbursements to engineers, accountants, consultants, advisors and legal counsel, whether or not the proposed financing is consummated (and regardless of the reason for consummation or non-consummation). In further consideration of the delivery of this letter, and recognizing that in connection herewith Prospect may be incurring substantial costs and expense including without limitation fees and expenses of counsel and due diligence, transportation, duplication, consultant, search, filing and recording fees, Borrower hereby acknowledges its obligation to pay such costs and expenses (whether incurred before or after the date hereof) as incurred or immediately upon demand, whichever is earlier, regardless of whether any of the transactions contemplated hereby are consummated or any definitive documents are agreed to and signed. Prospect may cease all work on this matter without liability in the absence of immediate payment. In addition, Borrower shall pay all costs and expenses, including legal fees, incurred in connection with any enforcement of this letter. As a nonrefundable deposit against such costs and expenses, Borrower will pay to Prospect $25,000 (the "Deposit") at such time that this Proposal is accepted. Borrower shall at all times keep on deposit with Prospect $5,000 in excess of all expenses paid or accrued, as noticed to Borrower in Prospect's sole discretion, such that Prospect will always have on deposit from Borrower a $5,000 instant cushion against unpaid and future expenses. The Deposit is nonrefundable under all circumstances, except that the unused amounts will be returned to Borrower after payment of all expenses.

7.  Neither the Borrower nor any of its affiliates or advisors shall (i) solicit, encourage or enter into discussions concerning any proposed financing by or involving you or any of your affiliates that is similar to, or would obviate the need for, the financing contemplated herein or (ii) furnish any non-public information concerning the proposed financing or the acquisition targets to be financed to any other person or entity except in connection with (x) a transaction not restricted under clause (i) or (y) as required by law. The Borrower agrees to notify Prospect promptly of any inquiries from other sources of capital.

8.  You agree that this letter and the related term sheet are for your confidential use only and will not be disclosed by you to any person.

9.  In consideration of the delivery of this letter, the Borrower hereby indemnifies and holds harmless Prospect and each director, officer, employee, agent, advisor, representative, shareholder and affiliate (including controlling parties) thereof (each, an "Indemnified Person") from and against any and all losses, claims, damages, expenses and liabilities,

2

Caprock Pipe & Supply – April 11, 2006

joint or several, incurred by an Indemnified Person that arise out of or relate to any matter referred to in this agreement (including any claim by the Borrower or its affiliates and including any claim related to any services to be rendered or action to be taken hereunder) or any investigation or other proceeding (including any threatened investigation or threatened litigation or other proceeding and whether or not such Indemnified Person is a party hereto or thereto) relating to this letter or the transactions contemplated hereby or to the actual or proposed use of the financing or that are attributable wholly or in part to the acts or omissions of the Borrower, or any of its directors, officers, employees, agents, advisers, representatives, shareholders or officers including without limitation the fees and disbursements of counsel (with respect to any claim or defense) as incurred, and amounts paid in settlement, whether or not (i) any proceeding, action or suit is commenced, (ii) Prospect or any Indemnified Party is or is not a party thereto, and (iii) the transactions contemplated hereby are or are not consummated. The Borrower agrees not to settle any such claim except on terms acceptable to all Indemnified Parties, and solely for the purpose of this agreement accepts the jurisdiction and venue in any forum where any such claim is made. Under no circumstances shall Prospect be responsible or liable to the Borrower or any other person for damages, including any punitive, exemplary, incidental, indirect or consequential damages, including any which may be alleged as a result of this letter or any of the transactions contemplated hereby, whether or not any financing closes.

10. This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws. Unless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration in New York City according to the rules of the American Arbitration Association with the losing party paying the legal and related fees and expenses of the prevailing party. Borrower agrees that Prospect has the right, at any time, to remove any claim in arbitration to a New York court. Without in any way diminishing such agreement to binding arbitration or Prospect's right to remove, each party hereto expressly waives, to the fullest extent permitted by applicable law, any right to trial by jury of any dispute relating hereto, including any claim, demand, action or cause of action arising in connection with this letter or term sheet, any transaction relating hereto or thereto, or any other instrument, document, or agreement executed or delivered in connection herewith or therewith, whether sounding in contract, tort or otherwise. Each party hereto consents and agrees that the state or federal courts located in New York County, City of New York, shall have exclusive jurisdiction to hear and determine any claim or disputes between or among any of the parties hereto pertaining to this letter, the term sheet, the financing or the transaction under consideration, any other financing related thereto, any investigation, litigation, or proceeding related to or arising out of any such matters, any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party to this agreement provided that the parties hereto acknowledge that any appeals from those courts may have to be heard by a court located outside of such jurisdiction and that any such dispute must first be submitted to binding arbitration (subject to Prospect's right to remove, as aforesaid). Each party hereto expressly agrees not to assert any claim relating hereto elsewhere, but instead submits and consents in advance to such New York jurisdiction in any action or suit commenced in any such New York court, and hereby waives any objection which such party may have based upon lack of personal jurisdiction, improper venue or inconvenient forum. Should Prospect's good faith efforts hereunder be tendered as a defense in any proceeding, such good faith efforts shall be conclusively shown by evidence, without more, that Prospect has gathered or reviewed more than fifty pages of due diligence materials relating to the proposed transaction.

11. The Borrower recognizes that Prospect is a registered investment company regulated by the Investment Company Act of 1940, Subchapter M of the Internal Revenue Code, as amended, and by other laws and regulations, and that any investment hereunder must comply therewith, which may require changing the amount of any financing, the terms or other variables, and the Borrower agrees not to assert any claim should these changes be required or deemed advisable or appropriate by Prospect even if it can be asserted that such changes were or should have been known at any prior time or are, in fact, not advisable, appropriate or necessary.

12. Prospect is a publicly traded closed end fund and as a result may become fully invested from time to time, pending draws on credit facilities, equity raises, and other means of growing Prospect's asset base that may or may not become available from time to time. Should Prospect be unable to fully fund the financing contemplated here as a result, wholly or in part, of one or more of the conditions described in the immediately preceding sentence (or any other condition), Prospect will attempt to work with the Borrower to complete the financing in as complete and timely a manner as practicable but shall have no liability to Borrower and Borrower shall assert no liability.

13. Prospect may, at its option and expense, publish an announcement of a closed transaction.

14. Borrower and its affiliates shall not rely on any work or analysis by Prospect or any consultant to Prospect, whether or not paid by Prospect or Borrower.

3

15. All obligations described in paragraphs 3 through 14 of this letter shall survive termination hereof. No modification or waiver of the requirements set forth in the Term Sheet or this letter shall be effective unless a formal instrument providing therefore is signed by Borrower and John R. Barry, CEO of Prospect.

We appreciate the opportunity to provide this proposal. We will proceed after we have received this letter signed by you and returned to Prospect with the required payment by April 11, 2005 at which time this proposal will otherwise automatically expire and be of no force or effect. Once effective, Prospect's proposal to provide financing in accordance with the terms of this letter shall cease if the transaction does not close, or the financing is not funded, for any reason, on or before May 15, 2006 and neither Prospect nor any of its affiliates shall have any liability to any person in connection with Prospect's refusal to fund the financing or any portion thereof before or after such date.

Very truly yours,

Prospect Energy Corporation
By:

Name: M. Grier Eliasek
Title: President and COO
Date: 4/11/06

I have read and understand the contents of this letter agreement.

Agreed to and accepted:

Mr. Michael Enmon

Date: 4/11/06

4

Caprock Pipe & Supply -- April 11, 2006

## UP TO $10,000,000 SUBORDINATED DEBT WITH NET PROFITS INTEREST

## SUMMARY OF PROPOSED TERMS AND CONDITIONS

*Nothing contained in this Summary of Proposed Terms and Conditions is or is intended to be a commitment to provide or arrange all or any portion of the financing. Outlined below are some of the major terms and conditions that Prospect Energy Corporation ("Prospect" or "Lender") is considering for this transaction. These terms and conditions are intended for discussion purposes only. The actual terms and conditions upon which the Lender might provide financing are subject to satisfactory completion of due diligence (satisfactory in the sole discretion of Lender), approval of the investment in the sole discretion of Lender's Investment Committee, satisfactory review of the documentation (satisfactory in all respects in the sole discretion of Lender), and such other items as are determined by the Lender and its counsel in their sole discretion. This outline does not bind Lender and cannot provide any part of the basis for any claim against Lender in any court or arbitration.*

**BORROWER:** Caprock Pipe & Supply, LP, a New Mexico limited partnership ("Borrower") to be acquired by Mr. Michael Bannon ("Guarantor").

**LENDER:** Prospect Energy Corporation ("Prospect" or "Lender"), a Maryland Corporation, or its affiliate assignee.

**LOAN AMOUNT:** Up to $10,000,000 of a subordinated secured debt facility (the "Sub Debt").

**PURPOSE:** To partially-fund the acquisition of the Borrower by Mr. Michael Bannon.

**SOURCES:**
| | |
|---|---|
| CIT Senior Debt | $ 17,800,000 |
| Prospect Subordinated Debt | 10,000,000 |
| Equity | 0 |
| TOTAL | $ 26,750,000 |

**USES:**
| | |
|---|---|
| Purchase Price -- Caprock Pipe & Supply, LP | $ 13,194,382 |
| Repay Royellen Resources | 3,500,000 |
| Repay Wells Fargo Term Loan | 3,305,618 |
| Repay Wells Fargo Line of Credit | 6,000,000 |
| Investment Banker Fee | 1,050,000 |
| Debt Service Reserves and Closing Costs | 750,000 |
| TOTAL | $ 16,750,000 |

**CLOSING:** No later than May 15, 2006.

**MATURITY:** Three (3) years from the date of Closing.

**GUARANTOR:** Mr. Michael Bannon shall personally guarantee the Sub Debt. The guarantee document shall include language specifically waiving the defense of validity of the guarantee.

**INTEREST RATE:** Higher of (i) 10.00% over 12-month LIBOR and (ii) 15.0% per annum, payable monthly in advance and computed on basis of 360 day year counting actual days elapsed.

**PAYMENT-IN-KIND:** None.

**UP-FRONT POINTS:** 2.5% of the Loan Amount payable to Lender at Closing.

Capstock Pipe & Supply – April 11, 2006

**NOTE:** Note or Notes evidencing the Loan Amount.

**DEBT SERVICE RESERVE ACCOUNT:** A Debt Service Reserve Account (the "DSRA") shall be funded at Closing in order to meet potential shortfalls in debt service on the Note. The DSRA will initially be funded with three (3) months debt service (interest plus principal repayment) from the proceeds of the Note into an escrow account held by Prospect's counsel or, at Prospect's option, at a financial institution acceptable to the Lender and governed by a deposit account control agreement. Any draws on the DSRA will be replenished with Free Cash Flow (as defined below) until the required balance is achieved. Interest income on the DSRA will accrue to the balance of the DSRA.

**AMORTIZATION:** The principal amount of the Sub Debt would be repaid in full at maturity ("Bullet").

**CASH SWEEP:** Lender will have the option at its sole discretion to amortization payments equivalent to 100.0% of Free Cash Flow above a cash floor of $100,000, payable within fifteen (15) days of the end of each calendar quarter. Free Cash Flow as of each quarter's end shall be defined as cash and cash equivalents as of the beginning of the quarter, plus cash flow from operations (after payment of general and administrative expenses defined in the G&A Budget (defined below), Permitted Tax Distributions (defined below), changes in working capital and budgeted capital expenditures defined in the Capex Budget (defined below)), less scheduled debt service on the CIT senior debt. There shall be no Yield Maintenance Premium (defined below) applied to cash swept per this Cash Sweep.

**SUBORDINATION:** The Sub Debt shall be subordinated in right of payment to loans to up to $20,000,000 provided by CIT with subordination terms acceptable to the Lenders in the Lenders' sole discretion. The Sub Debt shall be senior to all other loans and debt obligations. All restricted accounts, including any Operating Account (defined below) and the DSRA shall be pledged to secure the Sub Debt and be for the benefit of and subject to the second lien of CIT.

**SECURITY:** The Note shall be secured by all equity interests of the Borrower held by Mr. Michael Eamon (effected by delivery of share certificates and execution and delivery of an irrevocable proxy) and a second lien on all of Borrower's tangible and intangible assets, to include patents and all other intangibles, subordinated only to the liens of an approved Senior Lender, enabling non-judicial foreclosure and an opinion from counsel confirming the same. First liens on acquired real estate will permit subsequent senior debt liens subject to the approval of the Lenders. Borrower's counsel shall provide to Prospect its written opinion confirming Prospect's non-judicial foreclosure remedies upon default.

All restricted accounts, including the Operating Account (defined below) and DSRA shall be maintained with a financial institution acceptable to Prospect and subject to a control agreement, satisfactory to Prospect, for the purposes of (i) providing Prospect with the right to control cash account in the event of default and (ii) perfecting a security interest in such account as security for the Sub Debt. In the case where CIT establishes an account equivalent to the Operating Account (i.e., in the case where CIT establishes a lock-box), Prospect shall nonetheless take a second perfected security interest in the lock-box and enter into an intercreditor agreement with CIT regarding the lockbox acceptable to Prospect in its sole discretion in advance of Closing.

**DEFAULT REQUIRING MANDATORY PREPAYMENT:** At Lender's option, at any time upon (1) a casualty or condemnation event, (2) a Change of Control (as defined herein), (3) insolvency of the Borrower, (4) the sale of 20% or more of the Borrower's assets (proceeds from sales of lesser amounts shall be 100% utilized to pay optional prepayments), (5) an IPO, or (6) any other default, the Sub Debt outstanding shall be prepaid in full with fees, expenses, accrued interest and the Yield Maintenance Premium (defined below). A Change of Control will mean that Mr. Michael Eamon shall cease to own at least 51.0% of the voting common stock of the Borrower, or any other transfer or transfers of ownership that in the aggregate exceed 20.0% of the voting common stock of the Borrower.

**VOLUNTARY PREPAYMENT:** The Sub Debt may not be voluntarily prepaid within one (1) year of Closing. Thereafter, the Sub Debt may be prepaid with fifteen (15) business days' prior notice in increments of no less than $300,000. Prepayments shall be applied to payments of all unpaid expenses, fees and interest, in

6

Caprock Pipe & Supply – April 11, 2006

that order, then to any term loans in the inverse order of their maturity.  At the time of any prepayment (whether voluntary or by acceleration), Borrower would be required to pay to Lender the Yield Maintenance Premium.

**YIELD MAINTENANCE PREMIUM:** Upon a Mandatory or Voluntary Prepayment, Lender shall receive an additional payment beyond that otherwise required hereunder equivalent to the discounted value of the remaining expected interest and principal payments avoided by such prepayment, assuming an interest rate of 15.0% for the prepaid amount's average life, discounted at the yield at closing of actively-traded three-month U.S. Treasury Securities.  The Yield Maintenance Premium shall not apply to a Cash Sweep.

**EQUITY DISTRIBUTIONS:** There shall be no distributions to equity or any class of security subordinate to the Sub Debt so long as (i) any portion of the Sub Debt remains outstanding and (ii) so long as the Lender has failed to achieve the lesser of (a) 25.0% IRR Threshold (defined below) and (b) 2.5x Cash-on-Cash Threshold (defined below); provided, however, that Mr. Michael Eamon and the other owners of Borrower may take distributions to himself for tax liabilities directly as a result of their ownership of Borrower (the "Permitted Tax Distributions").  Borrower may satisfy the test herein at any time, subsequent to which the Lender would retain its 10.0% NPI (defined below).

**KEY-MAN LIFE INSURANCE:** In advance of Closing, Borrower shall purchase life insurance in the amount of $9,000,000 in the aggregate insuring the lives of Mr. Alan Powers ($7,000,000) and Mr. Arvel M. Berry ($2,000,000), and naming the Lenders as beneficiary to the extent of the outstanding Sub Debt.

**NET PROFITS INTEREST (NPI):** At Closing, Borrower shall deliver to Lender a detachable Net Profits Interest ("NPI") that provides for distributions to Lender equivalent to 10.0% of any and all distributions to the owners of the Borrower, including but not limited to periodic distributions, distributions at a Mandatory Prepayment Event or exit and Permitted Tax Distributions.  The NPI shall contain customary rights and restrictions on fundamental transactions and investments, incurrence of debt and liens, affiliate transactions, dividends, distributions, restricted payments, changes in organizational documents, accounting policies, capital accounts and book up of underlying assets.

**MANDATORY NPI REDEMPTION:** Upon the occurrence of a Mandatory Prepayment Event, an initial public offering, an event of default or at their expiration, Lender may put back to the Borrower all or any portion of the NPI originally issued to Lender (the "Put") at a Redemption Price equal to 10.0% multiplied by the highest of:  (a) Fair Value of the common equity as determined by an independent appraiser mutually acceptable to the Borrower and Lender;  (b) the Put Valuation defined as a multiple of 3.0x times the higher of (i) trailing twelve month Adjusted EBITDA plus cash and marketable securities less total funded debt, excluding shareholder loans or (ii) the average of the previous three (3) years Adjusted EBITDA plus cash and marketable securities less total funded debt, excluding shareholder loans; or (c) the highest offer received from a third party.  Adjusted EBITDA shall exclude deductions for extraordinary items and excess owner compensation (to be defined in final documentation).

**IRR THRESHOLD:** Upon the occurrence of the earlier of a Mandatory Prepayment Event, an initial public offering, an event of default or ten (10) years from Closing, if the Lender has not earned the lesser of (a) a 25.0% realized cash annualized IRR (the "IRR Threshold") or (b) 2.5x Cash-on-Cash (the "Cash-on-Cash Threshold), the Borrower will provide the Lender with additional an additional NPI in an amount that provides the Lender with the lesser of an IRR of at least 25.0% or Cash-on-Cash of at least 2.5x.  Dilution will occur only with the Lender's permission.  IRR and Cash-on-Cash shall be calculated including all cash flows from and to the Lender, including Drawdown, Up-Front Points, Interest, Cash Sweep, any Prepayment and any Yield Maintenance Premium, and any payments to the Lender as a result of its NPI, but not including expense reimbursement to Lender (where IRR shall be calculated using the Microsoft Excel XIRR function).

**UNLOCKING PROVISION:** At any time after the Maturity of the Sub Debt (three years from Closing) the Lender has the option to put its NPI to the Borrower at a purchase price to be determined by the greatest of:  fair market value ("FMV") determined by third party; actual sale value; or 3.0x trailing twelve month EBITDA.

7

Caprock Pipe & Supply – April 11, 2006

consolidated balance sheet, consolidating and consolidated income statement, and a statement of cash flow. These statements shall be accompanied by representations from the Chief Financial Officer and Chief Executive Officer of the Borrower that confirm their review of the statements, their completeness and accuracy, and a certification of covenant compliance and compliance with all terms of the Credit Agreement.

ii.  Annual financial statements within 75 days of fiscal year end audited by an accounting firm acceptable to the Lender with officer's Compliance Certificate and auditor's management letter.

iii. Comparative information for prior comparable periods with respect to 1-2 above.

iv.  Detailed annual budget and capital expenditure program for three (3) years on a monthly basis for the Borrower delivered to Lender 30 days prior to fiscal year end, including consolidating and consolidated balance sheets, income and cash flow statements. For the FYE 12/31/06, this will be prepared and within 30 days of Closing. It will be reviewed and revised quarterly with monthly reports to be prepared and submitted to Lender. Any expenses larger than $20,000 in excess of approved annual budget must be pre-approved by Prospect.

v.  Such other financial information as is customary or Lender or its counsel requests.

vi.  Immediate notice of any default or potential default or material adverse change or change in accounting or financial practice.

**AFFIRMATIVE COVENANTS – OTHER:**   The loan agreement shall contain usual and customary affirmative covenants for facilities and transactions of this type, including, but not limited to:

i.  Maintenance of insurance;

ii.  Inspection of books and properties;

iii. Maintenance of licenses and authorizations;

iv.  Maintenance of books and records;

v.  Compliance with customary environmental and ERISA requirements;

vi.  Maintenance of security interests and security accounts;

vii. Compliance with budgeting process and annual budgets;

viii. Use of proceeds as agreed;

ix.  Preservation of and compliance with material contracts;

x.  Provision of additional collateral as it becomes available, including all after acquired property;

xi.  Monthly certificates from CEO and CFO confirming compliance herewith;

xii. Obligation to notify Lender immediately of any default;

xiii. Obtaining all necessary authorizations; and

xiv. Providing further assurances as reasonably requested.

**NEGATIVE COVENANTS – FINANCIAL:**   The loan agreement shall contain the following financing covenants, which shall be calculated by the Borrower within twenty (20) days of the end of each calendar quarter:

i.  EBITDA:  EBITDA of the Borrower shall not be less than $8,900,000 in any trailing four (4) quarter period.

ii.  TOTAL DEBT/EBITDA:  Total debt as of quarter end divided by EBITDA for four (4) trailing quarters shall not exceed 3.0x.

9

Caprock Pipe & Supply – April 11, 2006

xviii.  Limitations on partnerships and joint-ventures.

**EVENTS OF DEFAULT:** The loan agreement shall contain usual and customary Events of Default for facilities and transactions of this type, including, but not limited to:

i.  Failure to pay expenses, principal, interest or fees when due (no cure period);

ii.  Breach of covenants, representations or warranties (5 day cure period);

iii.  Cross default to any other debt or obligation;

iv.  Assertion of and/or failure of any loan document to remain in full force and effect;

v.  Assertion of and/or failure or loss of priority of any lien or security interest of Lenders;

vi.  Bankruptcy, insolvency or dissolution;

vii.  Loss, termination or default under any material contract, consent, authorization, permit or license;

viii.  Judgments in excess of specified amounts;

ix.  Abandonment of any Project or significant asset;

x.  Change in control (defined above);

xi.  Change in ownership or management;

xii.  Material adverse change;

xiii.  Mandatory Prepayment event or other prepayment event;

xiv.  Reporting failures;

xv.  ERISA violations; and

xvi.  Loan documents asserted invalid.

**POST-DEFAULT AND CURE PERIOD INTEREST RATE AND EQUITY PAYMENT:** The Interest Rate plus 5.0 % (i) upon the occurrence and continuation of an Event of Default, whether or not declared and (ii) for so long as any management or financial reports are overdue, whether or not declared.  For each month or partial month of default, whether or not declared, Lender shall receive 1.0% of the undiluted equity of the Borrower, which equity shall be cancelled if such default shall be cured within two weeks of its occurrence.

**MANAGERIAL ASSISTANCE FEE:** Borrower shall pay lender a Managerial Assistance fee of $10,000 for every month that the Borrower is in default, payable in cash on the last day of each month.

**INDEMNIFICATION:** Customary language.

**EXPENSES:** Borrower hereby agrees to reimburse Lenders on demand for all reasonable expenses of Lenders, their counsel and their consultants, whether or not any transaction closes.

**CONDITIONS TO CLOSING:** Closing of the Sub Debt is conditioned upon the fulfillment of certain conditions including, but not limited to:

i.  Accuracy of Representations and Warranties;

ii.  The Lender's satisfaction with the terms and conditions of the total financing package consistent with the stated Sources and Uses;

iii.  Completion of legal documentation satisfactory in sole discretion of Lenders;

iv.  All contracts, permits, licenses and regulatory approvals have been received and are valid;

v.  Formal approval of the proposed Sub Debt loan by the Lender's Investment Committee in it sole discretion;

11

Caprock Pipe & Supply – April 11, 2006

vi.   A copy of the executed Definitive Purchase Agreement ("DPA") between the Mr. Michael Ekston and the sellers of the Borrower;

vii.   The Lenders' satisfaction in their sole discretion with all due diligence including financial and legal, accounting, and management due diligence, as may be deemed necessary or appropriate;

viii.   Delivery of a long range business and strategic plan;

ix.   Environmental review by consultant to be retained by Lender;

x.   Prospect is satisfied in its sole discretion with reference checks for key management personnel;

xi.   Satisfactory management employment agreements;

xii.   Satisfactory title review of all properties;

xiii.   Lenders are satisfied in their sole discretion with the cash management systems of the Company;

xiv.   Creation of Operating Account (unless equivalent created by CIT, in which case Lender will require an intercreditor agreement with CIT acceptable to Lender in its sole discretion);

xv.   No material adverse changes;

xvi.   Verification to the satisfaction of Lender that every statement or fact regarding this transaction of any importance to Lender has been proven by objective third party evidence completely satisfactory to each Lender in its sole discretion;

xvii.   Delivery of legal opinions in form and substance from (i) seller's counsel, (ii) Borrower's counsel and (iii) Prospect counsel in each case satisfactory to Lender in its sole discretion under New York Law and the law of each jurisdiction where Borrower or any project is located;

xviii.   Borrower has insurance, reasonably satisfactory to Lenders for which Lenders would be named as an additional insured and property insurance with respect to the Collateral for which Lenders would be named a loss payee;

xix.   No Event of Default; and

xx.   Any such other conditions as the Lenders and their legal counsel shall reasonably request in the course of their due diligence.

**GOVERNING LAW:**   State of New York, without regard to conflicts of laws principles.

**JURISDICTION:**   Exclusive to New York courts.

**CONFIDENTIALITY:**   This Summary of Proposed Terms and Conditions is being made available to the Borrower on a confidential basis. Neither this Term Sheet nor its contents are to be divulged to other parties without the express written consent of the Lenders.

**ASSIGNMENT:**   Prospect may sell or assign its securities to any affiliate or 3rd party in sole discretion, and shall have the right to alienate its interests herein at any time.

**JURY TRIAL:**   All parties will waive any right to jury trial.

**NOT A COMMITMENT:**   This term sheet is not binding on Lender or any of their affiliates and is submitted for discussion purposes only. No binding agreement can be reached on the subject matter of this term sheet unless and until definitive and final documentation has been signed and delivered by all parties containing such terms and conditions as are satisfactory to Lender. This term sheet cannot form any part of any claim by Borrower before any court, arbitrator or other tribunal.

12



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

# *Commercial Arbitration Rules and Mediation* PROCEDURES

(Including Procedures for Large, Complex Commercial Disputes)
Amended and Effective September 1, 2007

Summary of Changes

**TABLE OF CONTENTS**

IMPORTANT NOTICE
INTRODUCTION
STANDARD ARBITRATION CLAUSE
ADMINISTRATIVE FEES
MEDIATION
LARGE, COMPLEX CASES

COMMERCIAL MEDIATION PROCEDURES
M-1. Agreement of Parties

M-2. Initiation of Mediation
M-3. Representation
M-4. Appointment of the Mediator
M-5. Mediator's Impartiality and Duty to Disclose
M-6. Vacancies
M-7. Date and Responsiblities of the Mediator
M-8. Responsibilities of the Parties
M-9. Privacy
M-10. Confidentiality
M-11. No Stenographic Record
M-12. Termination of Mediation
M-13. Exclusion of Liability
M-14. Interpretation and Application of Procedures
M-15. Deposits
M-16. Expenses

M-17. Cost of Mediation

COMMERCIAL ARBITRATION RULES
R-1. Agreement of Parties
R-2. AAA and Delegation of Duties
R-3. National Roster of Arbitrators
R-4. Initiation under an Arbitration Provision in a Contract
R-5. Initiation under a Submission
R-6. Changes of Claim
R-7. Jurisdiction
R-8. Mediation
R-9. Administrative Conference
R-10. Fixing of Locale
R-11. Appointment from National Roster
R-12. Direct Appointment by a Party
R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties
R-14. Nationality of Arbitrator
R-15. Number of Arbitrators
R-16. Disclosure

R-17. Disqualification of Arbitrator
R-18. Communication with Arbitrator
R-19. Vacancies
R-20. Preliminary Hearing
R-21. Exchange of Information
R-22. Date, Time, and Place of Hearing
R-23. Attendance at Hearings
R-24. Representation
R-25. Oaths
R-26. Stenographic Record
R-27. Interpreters
R-28. Postponements
R-29. Arbitration in the Absence of a Party or Representative
R-30. Conduct of Proceedings
R-31. Evidence
R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence
R-33. Inspection or Investigation
R-34. Interim Measures
R-35. Closing of Hearing
R-36. Reopening of Hearing
R-37. Waiver of Rules
R-38. Extensions of Time
R-39. Serving of Notice
R-40. Majority Decision
R-41. Time of Award
R-42. Form of Award
R-43. Scope of Award
R-44. Award upon Settlement
R-45. Delivery of Award to Parties
R-46. Modification of Award
R-47. Release of Documents for Judicial Proceedings
R-48. Applications to Court and Exclusion of Liability
R-49. Administrative Fees
R-50. Expenses
R-51. Neutral Arbitrator's Compensation
R-52. Deposits
R-53. Interpretation and Application of Rules
R-54. Suspension for Nonpayment


EXPEDITED PROCEDURES
E-1. Limitation on Extensions
E-2. Changes of Claim or Counterclaim
E-3. Serving of Notices
E-4. Appointment and Qualifications of Arbitrator
E-5. Exchange of Exhibits
E-6. Proceedings on Documents
E-7. Date, Time, and Place of Hearing
E-8. The Hearing
E-9. Time of Award
E-10. Arbitrator's Compensation


PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES
L-1. Administrative Conference

L-2. Arbitrators

L-3. Preliminary Hearing

L-4. Management of Proceedings


OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION

O-1. Applicability
O-2. Appointment of Emergency Arbitrator
O-3. Schedule
O-4. Interim Award
O-5. Constitution of the Panel
O-6. Security
O-7. Special Master
O-8. Costs


ADMINISTRATIVE FEES
Fees
Refund Schedule
Hearing Room Rental


**IMPORTANT NOTICE**


These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA. To ensure that you have the most current information, see our Web Site at www.adr.org.


**INTRODUCTION**


Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.


The American Arbitration Association (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on all forms of out-of-court dispute settlement.


**Standard Arbitration Clause**


The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:


*Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*


Arbitration of existing disputes may be accomplished by use of the following:


*We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following controversy: (describe briefly) We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*


In transactions likely to require emergency interim relief, the parties may wish to add to their clause the following language:


*The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings.*


These Optional Rules may be found below.


The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.


**Administrative Fees**


The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees.


The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

**Mediation**

The parties might wish to submit their dispute to mediation prior to arbitration. In mediation, the neutral mediator assists the parties in reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional administrative fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

If the parties want to adopt mediation as a part of their contractual dispute settlement procedure, they can insert the following mediation clause into their contract in conjunction with a standard arbitration provision:

*If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission:

*The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

**Large, Complex Cases**

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs.

The key features of these procedures include:

§ a highly qualified, trained Roster of Neutrals;

§ a mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;

§ broad arbitrator authority to order and control discovery, including depositions;

§ presumption that hearings will proceed on a consecutive or block basis.

**COMMERCIAL MEDIATION PROCEDURES**

**M-1. Agreement of Parties**

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (AAA) or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

**M-2. Initiation of Mediation**

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

  i.   A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.
 ii.   The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.
iii.   A brief statement of the nature of the dispute and the relief requested.
 iv.   Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the AAA, a

party may request the AAA to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the AAA will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

**M-3. Representation**

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

**M-4. Appointment of the Mediator**

Parties may search the online profiles of the AAA's Panel of Mediators at www.aaamediation.com in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

    i. Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

    ii. If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

    iii. If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

**M-5. Mediator's Impartiality and Duty to Disclose**

AAA mediators are required to abide by the Model Standards of Conduct for Mediators in effect at the time a mediator is appointed to a case. Where there is a conflict between the Model Standards and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

**M-6. Vacancies**

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

**M-7. Duties and Responsibilities of the Mediator**

    i. The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

    ii. The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

    iii. The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

    iv. The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

    v. In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

    vi. The mediator is not a legal representative of any party and has no fiduciary duty to any party.

**M-8. Responsibilities of the Parties**

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

**M-9. Privacy**

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

**M-10. Confidentiality**

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

  i. Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;
  ii. Admissions made by a party or other participant in the course of the mediation proceedings;
  iii. Proposals made or views expressed by the mediator; or
  iv. The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

M-12. Termination of Mediation

The mediation shall be terminated:

  i. By the execution of a settlement agreement by the parties; or
  ii. By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or
  iii. By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or
  iv. When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

**M-13. Exclusion of Liability**

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

**M-14. Interpretation and Application of Procedures**

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

**M-15. Deposits**

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

**M-16. Expenses**

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

**M-17. Cost of the Mediation**

There is no filing fee to initiate a mediation or a fee to request the AAA to invite parties to mediate.

The cost of mediation is based on the hourly mediation rate published on the mediator's AAA profile. This rate covers both mediator compensation and an allocated portion for the AAA's services. There is a four-hour minimum charge for a mediation conference. Expenses referenced in Section M-16 may also apply.

If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the agreement to mediate is filed but prior to the mediation conference the cost is $250 plus any mediator time and charges incurred.

The parties will be billed equally for all costs unless they agree otherwise.

If you have questions about mediation costs or services visit our website at www.adr.org or contact your local AAA office.

Conference Room Rental

The costs described above do not include the use of AAA conference rooms. Conference rooms are available on a rental basis. Please contact your local AAA office for availability and rates.

## COMMERCIAL ARBITRATION RULES

### R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs. Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-4 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

(d) All other cases shall be administered in accordance with Sections R-1 through R-54 of these rules.

* The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

+ A dispute arising out of an employer promulgated plan will be administered under the AAA's National Rules for the Resolution of Employment Disputes.

### R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

### R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Commercial Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

### R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

**R-5. Initiation under a Submission**

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

**R-6. Changes of Claim**

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

**R-7. Jurisdiction**

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

**R-8. Mediation**

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

**R-9. Administrative Conference**

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

**R-10. Fixing of Locale**

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other

party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

### R-11. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) Immediately after the filing of the submission or the answering statement or the expiration of the time within which the answering statement is to be filed, the AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c) Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

### R-12. Direct Appointment by a Party

(a) If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

(b) Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-17 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-17(a) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

(c) If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

(d) If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

### R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

(a) If, pursuant to Section R-12, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

(b) If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

(c) If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-11, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

### R-14. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

### R-15. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the demand or answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

### R-16. Disclosure

(a) Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-16 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

## R-17. Disqualification of Arbitrator

(a) Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for

(i) partiality or lack of independence,

(ii) inability or refusal to perform his or her duties with diligence and in good faith, and

(iii) any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-12 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

(b) Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## R-18. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate ex parte with a candidate for direct appointment pursuant to Section R-12 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

(b) Section R-18(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-17(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-17(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-18(a) should nonetheless apply prospectively.

## R-19. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## R-20. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion.

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

## R-21. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

i) the production of documents and other information, and

ii) the identification of any witnesses to be called.

(b) At least five business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

**R-22. Date, Time, and Place of Hearing**

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

**R-23. Attendance at Hearings**

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

**R-24. Representation**

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

**R-25. Oaths**

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

**R-26. Stenographic Record**

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

**R-27. Interpreters**

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

**R-28. Postponements**

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

**R-29. Arbitration in the Absence of a Party or Representative**

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

**R-30. Conduct of Proceedings**

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

**R-31. Evidence**

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

**R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence**

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

**R-33. Inspection or Investigation**

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

**R-34. Interim Measures\*\***

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

\*\* The Optional Rules may be found below.

**R-35. Closing of Hearing**

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall b e declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

**R-36. Reopening of Hearing**

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

**R-37. Waiver of Rules**

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

**R-38. Extensions of Time**

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

**R-39. Serving of Notice**

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (E-mail), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

**R-40. Majority Decision**

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

**R-41. Time of Award**

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

**R-42. Form of Award**

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

**R-43. Scope of Award**

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-49, R-50, and R-51. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include:

(i) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

(ii) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

**R-44. Award upon Settlement**

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

**R-45. Delivery of Award to Parties**

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-46. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

### R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

### R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

### R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

### R-50. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

### R-51. Neutral Arbitrator's Compensation

(a) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

### R-52. Deposits

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

### R-53. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

**R-54. Suspension for Nonpayment**

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**EXPEDITED PROCEDURES**

**E-1. Limitation on Extensions**

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the demand for arbitration or counterclaim as provided in Section R-4.

**E-2. Changes of Claim or Counterclaim**

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

**E-3. Serving of Notices**

In addition to notice provided by Section R-39(b), the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

**E-4. Appointment and Qualifications of Arbitrator**

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-17. The parties shall notify the AAA within seven days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

**E-5. Exchange of Exhibits**

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

**E-6. Proceedings on Documents**

Where no party's claim exceeds $10,000, exclusive of interest and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. The arbitrator shall establish a fair and equitable procedure for the submission of documents.

**E-7. Date, Time, and Place of Hearing**

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

**E-8. The Hearing**

(a) Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

(b) Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-26.

### E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 days from the date of the closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

### E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

## PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES

### L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

### L-2. Arbitrators

(a) Large, Complex Commercial Cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. If the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

(b) The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the Regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

### L-3. Preliminary Hearing

As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the preliminary hearing will be conducted by telephone conference call rather than in person. At the preliminary hearing the matters to be considered shall include, without limitation:

(a) service of a detailed statement of claims, damages and defenses, a statement of the issues asserted by each party and positions with respect thereto, and any legal authorities the parties may wish to bring to the attention of the arbitrator(s);

(b) stipulations to uncontested facts;

(c) the extent to which discovery shall be conducted;

(d) exchange and premarking of those documents which each party believes may be offered at the hearing;

(e) the identification and availability of witnesses, including experts, and such matters with respect to witnesses including their biographies and expected testimony as may be appropriate;

(f) whether, and the extent to which, any sworn statements and/or depositions may be introduced;

(g) the extent to which hearings will proceed on consecutive days;

(h) whether a stenographic or other official record of the proceedings shall be maintained;

(i) the possibility of utilizing mediation or other non-adjudicative methods of dispute resolution; and

(j) the procedure for the issuance of subpoenas.

By agreement of the parties and/or order of the arbitrator(s), the pre-hearing activities and the hearing procedures that will govern the arbitration will be memorialized in a Scheduling and Procedure Order.

**L-4. Management of Proceedings**

(a) Arbitrator(s) shall take such steps as they may deem necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution of Large, Complex Commercial Cases.

(b) Parties shall cooperate in the exchange of documents, exhibits and information within such party's control if the arbitrator(s) consider such production to be consistent with the goal of achieving a just, speedy and cost-effective resolution of a Large, Complex Commercial Case.

(c) The parties may conduct such discovery as may be agreed to by all the parties provided, however, that the arbitrator(s) may place such limitations on the conduct of such discovery as the arbitrator(s) shall deem appropriate. If the parties cannot agree on production of documents and other information, the arbitrator (s), consistent with the expedited nature of arbitration, may establish the extent of the discovery.

(d) At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) may order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter.

(e) The parties shall exchange copies of all exhibits they intend to submit at the hearing 10 business days prior to the hearing unless the arbitrator(s) determine otherwise.

(f) The exchange of information pursuant to this rule, as agreed by the parties and/or directed by the arbitrator(s), shall be included within the Scheduling and Procedure Order.

(g) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

(h) Generally hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

**OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION**

**O-1. Applicability**

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

**O-2. Appointment of Emergency Arbitrator**

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

**O-3. Schedule**

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

**O-4. Interim Award**

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will

result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

## O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

## O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

## O-7. Special Master

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

## O-8. Costs

The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the panel to determine finally the apportionment of such costs.

## ADMINISTRATIVE FEES

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the *Supplementary Procedures for Consumer-Related Disputes* when filing a consumer-related claim.

The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

Fees

An initial filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed. A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |

| | | |
|---|---|---|
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| Above $10,000,000 | * | * |
| Nonmonetary Claims** | $3,250 | $1,250 |

**Fee Schedule for Claims in Excess of $10 Million** .

The following is the fee schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $ 12,500 plus .01% of the amount of claim above $ 10 million. | $6,000 |
| | Filing fees capped at $65,000 | |

** This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 case service fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases held in abeyance for one year by agreement, will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

**Refund Schedule**

The AAA offers a refund schedule on filing fees. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all other cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

- 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.
- 50% of the filing fee will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.
- 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: the date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

**Hearing Room Rental**

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

© 2007 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

AAA235

AAA MISSION & PRINCIPLES    PRIVACY POLICY    TERMS OF USE    TECHNICAL RECOMMENDATIONS
©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED

NO. _____ **B177745**

| | | |
|---|---|---|
| ROBERT FISER ATTORNEY AT LAW, P.C. | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | OF JEFFERSON COUNTY, Texas |
| | § | |
| MICHAEL ENMON | § | ____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, ROBERT M. FISER ATTORNEY AT LAW, P.C. hereinafter referred to as "Plaintiff", and files this Original Petition complaining of MICHAEL ENMON hereinafter referred to as "Defendant", and would show unto the Court as follows:

I.

Discovery is intended to be completed under Level 2 of Rule 190.

II.

Defendant, MICHAEL ENMON may be served with process at his residence located at 4630 Collier Road, #326, Beaumont, Texas 77706.

III.

This Court has jurisdiction over the case and controversy. Specifically, this Court has jurisdiction over Defendant. Defendant has availed himself to jurisdiction by residing within the State of Texas. The Court has jurisdiction over the controversy because Plaintiff has suffered damages from Defendant's acts in excess of the minimum jurisdictional limits of this Court.

IV.

Venue is proper in Jefferson County, Texas. Specifically, venue is proper under Texas Civil Practice and Remedies Code §15.002(a)(2) Defendant is a natural person and resides in Jefferson County, Texas.

V.

Plaintiff sues Defendant for failure to pay for services rendered. Plaintiff provided services to Defendant as agreed to between the parties. Plaintiff has delivered invoices to Defendant detailing the services rendered and the amount owed for such services rendered. When the services were rendered, the charges were reasonable and worth the services rendered. Plaintiff has made demand on Defendant to pay the amounts owed. Defendant owes Plaintiff FOURTY ONE THOUSAND SEVEN HUNDRED FIVE DOLLARS AND 11/100 ($41,705.11), together with all incidental damages.

VI.

Defendant promised to pay this account when same became due but has failed to do so. Defendant is liable to Plaintiff in the total sum of FOURTY ONE THOUSAND SEVEN HUNDRED FIVE DOLLARS AND 11/100 ($41,705.11)

VII.

Plaintiff has employed Jill S. Chatelain to bring this suit and is entitled to reasonable attorney's fees from the Defendant in such amount as may be proven at the time of trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendant be cited to appear and answer herein, and that upon final hearing Plaintiff have and recover judgment against Defendant in the sum of FOURTY ONE THOUSAND SEVEN HUNDRED FIVE DOLLARS AND 11/100 ($41,705.11), together with interest at the highest allowable rate, its

reasonable attorney's fees, costs of Court, and for such other and further relief, at law and in equity, to which Plaintiff may show itself justly entitled.

Respectfully submitted,

McPHERSON, MONK, HUGHES,
BRADLEY, WIMBERLEY & STEELE, L.L.P.
3120 Central Mall Drive
Port Arthur, Texas 77642
(409) 724-6644 – Telephone
(409) 724-7585 – Facsimile

BY: _Jill S. Chatelain_

JILL S. CHATELAIN
TBA #00788498

ATTORNEYS FOR PLAINTIFF

CAUSE NO. B-0177745

| | | |
|---|---|---|
| Robert Fiser Attorney at Law P.C. | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| Michael Enmon | § | |
| Defendant/Third-Party Plaintiff, | § | JEFFERSON COUNTY, TEXAS |
| | § | |
| vs. | § | |
| | § | |
| Prospect Energy Corporation, | § | |
| Prospect Capital Management LLC, John F. | § | |
| Barry, M. Grier Eliasek, Walter Parker | § | |
| and Bart de Bie | § | |
| Third-Party Defendant. | § | 60th JUDICIAL DISTRICT |

## DEFENDANT'S ANSWER AND CROSS-ACTION

Defendant/Third-Party Plaintiff Michael Enmon files this Answer and General Denial to Plaintiff Robert Fiser Attorney at Law P.C.'s Complaint, and files this Cross-Action complaining of Third-Party Defendants Prospect Energy Corporation, Prospect Capital Management LLC, John Barry, Grier Eliasek, Walter Parker, and Bart de Bie.

## I.

### Discovery Control Plan

1.    Enmon intends to conduct discovery under Level 2 of TEX. R. CIV. P. 190.3.

## II.

### Jurisdiction

2.    Defendant Prospect is subject to personal jurisdiction because Prospect has continuous and systematic contacts with Texas.  Further, the acts complained of arise from Prospect's contacts with Texas.

3.     Defendant Prospect Capital Management LLC is subject to personal jurisdiction because PCM has continuous and systematic contacts with Texas. Further, the acts complained of arise from PCM's contacts with Texas.

4.     Defendant John F. Barry III is subject to personal jurisdiction because he has continuous and systematic contacts with Texas. Further, the acts complained of arise from Barry's contacts with Texas.

5.     Defendant M. Grier Eliasek is subject to personal jurisdiction because he has continuous and systematic contacts with Texas. Further, the acts complained of arise from Eliasek's contacts with Texas.

6.     Defendant Bart de Bie is subject to personal jurisdiction because he has continuous and systematic contacts with Texas. Further, the acts complained of arise from de Bie's contacts with Texas.

7.     Defendant Walter Parker is subject to personal jurisdiction because he has continuous and systematic contacts with Texas. Further, the acts complained of arise from his contacts with Texas.

8.     This case is not removable to federal court because Enmon is a resident of Texas and there are not any claims or issues that arise under federal law.

## III.

### Parties

9.     Plaintiff Robert Fiser Attorney at Law P.C. is a New Mexico entity.

10.    Defendant/Third-Party Plaintiff Michael Enmon is a resident of Jefferson County, Texas.

11.    Defendant Prospect Energy Corporation is a resident of Maryland with its principal place of business in New York. Prospect may be served with process through the secretary of state by serving its registered agent The Corporation Trust Inc., 300 E. Lombard St., Baltimore, MD 21202.

12.    Defendant Prospect Capital Management LLC is a limited liability company with its principal place of business in New York. Prospect Capital Management's address is 10 East 40th Street, 44th Floor, New York, NY 10016. Prospect Capital Management has no agent for service of process in Texas. As such, service of process may be had upon Prospect Capital Management by serving the Secretary of State of the State of Texas as provided by V.A.T.C. Civ. Prac. & Rem.Code §§ 17.044, or as otherwise directed by this Court.

13.    Defendant John F. Barry III is a resident of Connecticut. He may be served by delivering a copy of the summons and this Complaint to him in person at 27 Indian Point Lane Riverside, CT 06878.

14.    Defendant Bart de Bie is a resident of New York. He may be served by delivering a copy of the summons and this Complaint to him in person at 10 East 40th Street, 44th Floor, New York, NY 10016.

15.    Defendant Walter Parker is a resident of New York. He may be served by delivering a copy of the summons and this Complaint to him in person at 10 East 40th Street, 44th Floor, New York, NY 10016.

16.    Defendant Grier Eliasek is a resident of New York. He may served by delivering a copy of the summons and this Complaint to him in person 205 East 95th Street, New York, New York 10128.

3

## IV.

### Overview

17.    During the early part of 2006, Enmon negotiated a deal to purchase a controlling interest in Caprock Pipe and Supply Co. Caprock is a New Mexico and Texas company that specializes in selling refurbished pipe for oil and gas drilling operations.

18.    In order to finance the transaction, Enmon entered into an agreement with Prospect whereby Prospect agreed to finance a portion of Enmon's acquisition of Caprock as a lender, partner, and joint venturer.

19.    Unbeknownst to Enmon, Prospect never intended to close the Caprock transaction along the terms that were represented. Instead, the Prospect Defendants intentionally misled and defrauded Enmon in an attempt unjustly keep the profits from the Caprock transaction for themselves. Defendants' wrongful actions caused Enmon to lose the Caprock transaction and have necessitated the filing of this lawsuit.

## V.

### Facts

20.    In early 2006, Enmon learned he had a unique opportunity to purchase Caprock for substantially less than its market value. Caprock is one of the nation's largest sellers of refurbished pipe for oil and gas production. Caprock operates primarily in Texas and New Mexico. Over the last twelve months, Caprock's earnings exceeded $15 million. Based on expected market conditions, Caprock's profits will rise significantly over time.

21.    Excited about the opportunity, Enmon began the process of acquiring the assets. He hired Robert Fiser as his lawyer, spent significant sums of money performing due diligence, and arranged for financing of the transaction.

4

22.    In February of 2006, Caprock agreed to sell its assets to Enmon.    From February 9, 2006 until May 2006, Enmon performed substantial due diligence on Caprock. Enmon's due diligence confirmed that the Caprock transaction was a unique business opportunity that would allow him to earn enormous profits.    The transaction was so good that Enmon spent his life savings, sold his house, and sold many valuable possessions in order to cover due diligence and closing expenses.

23.    Enmon also engaged CIT—one of the nation's largest and most trusted banks—to act as senior lender on the transaction.    After considering other options, Enmon also engaged Prospect to act as subordinated lender, joint venturer and partner. Enmon signed a term sheet with Prospect that outlined proposed terms of the transaction.    Both Enmon and Prospect recognized that the term sheet was not binding and could not be relied upon. Enmon is not asserting any claims that are based upon representations and/or omissions in the term sheet.

24.    Enmon believed that Prospect would be a good financial partner because:

- Defendants represented that Prospect had immediate funds to finance the transaction;

- Defendants represented that they were eager to participate in the venture;

- Defendants repeatedly assured Enmon that Prospect was prepared to close the Caprock transaction on time and in accordance with the terms in the final deal documents;

- As a public company, Prospect had to adopt a code of ethics and frequently report to the public and SEC.    Enmon relied on Prospect's status as public company when deciding to partner with Prospect in the Caprock transaction;

- Prospect held itself out as a Business Development Company (BDC).    Enmon relied on Prospect's status as a BDC when deciding to partner with Prospect.

5

Specifically, Prospect's status as a BDC reassured Enmon that Prospect would not try to usurp the Caprock opportunity; and

25.    According to its website, "Prospect Energy is an energy finance company focused on investing mezzanine debt and equity into energy-related companies." Enmon relied on this statement when deciding to partner with Prospect.

26.    The deal was supposed to close on May 12, 2006.    In fact, final deal documents were prepared and signed by all the parties on that date.    However, Prospect refused to transmit the executed deal documents or its portion of the financing unless Enmon agreed to alter the terms of the deal in a manner that was extremely favorable to Prospect and extremely disadvantageous to Enmon.    Prospect's last minute machinations caused the entire deal to implode, and cost Enmon at least $50 million dollars.

27.    Enmon now knows that Prospect had no intention of abiding by the substantive terms of the parties' final documentation.    Enmon also knows now that Defendants' representations were part of a plan and scheme to defraud Enmon in an attempt to reap greater benefits from the Caprock transaction than it could have otherwise.

28.    Prospect never intended to abide by the final documentation, Defendants' representations to Enmon, or even the statements on its website.    To the contrary, Defendants had developed a plan and scheme to betray Enmon.    Defendants intended by their scheme to unjustly reap larger profits from the Caprock transaction than they would have had if they had honored their promises to Enmon.    Defendants accomplished their scheme by:

- Fraudulently inducing Enmon into selecting Prospect as its lender for the Caprock transaction through a series of untrue oral and written statements; and

- Waiting until literally the day of closing to inform Enmon of their intent to completely alter the deal's key terms in a manner that unjustly enriched

Defendants at Enmon's expense. Defendants waited until the "eleventh hour" to announce their intention to significantly depart from the economic terms agreed upon by the parties in order to prevent Enmon from finding an alternate source of financing.

28.    Prospect—through  its investment advisor PCM and its agents John Barry, Grier Eliasek, and Bart de Bie—put  its unlawful plan in motion by showing real interest in the transaction as evidenced by the final definitive documentation and then trying to renegotiate at the last minute by raising pretextual, dubious concerns about the deal. Defendants used the fact that it had walked away to try to force Enmon to accept a grossly unfavorable result.

29.    On May 12, 2004 and on many earlier occasions, Prospect's and PCM's John Barry, Grier Eliasek, and Bart de Bie each represented to Enmon that Prospect was excited about the Caprock transaction because the due diligence confirmed that Enmon was purchasing Caprock substantially below its market value. During these conversations, each of the Defendants also reassured Enmon that the Caprock transaction would close on economic terms consistent with the final documentation, which was eventually prepared by Prospect's lawyers and signed by Enmon and CIT. Enmon knows now that Defendants had no intention of closing the transaction on terms consistent with the final documentation.

30.    As a result of Defendants' fraud, dishonesty and wrongful conduct, Enmon has hired the law firm of Arnold & Itkin LLP and has agreed to pay Arnold & Itkin LLP's reasonable attorneys' fees.

## VI.

### Causes of Action

### Fraud

31.   Enmon repeats and re-alleges each allegation contained above.

32.   Defendants made the material misrepresentations and omissions described above.

33.   Defendants made these misrepresentations, and numerous other misrepresentations until literally the day of closing.

34.   Defendants knew that the misrepresentations and omissions were false when made or made such material misrepresentations recklessly and without any knowledge of their truth, and knew that the omissions failed to correct prior representations that were false. Defendants intended that Enmon rely on the material misrepresentations and omissions.

35.   Enmon did rely on Defendants' material misrepresentations and omissions. As a result of Defendants' fraud, Enmon suffered a substantial injury. Enmon's actual damages are in the millions of dollars.

36.   Defendants willfully, maliciously, and intentionally defrauded Enmon and should be punished with exemplary damages.

### Statutory Fraud

37.   Enmon repeats and realleges each allegation contained above.

38.   Enmon brings this Count for fraud in a transaction involving stock in a corporation and real estate under Tex. Bus. & Comm. Code § 27.01.

39.   Defendants misrepresented their true intentions with regard to the Caprock transaction. Defendants made the material misrepresentations described above with the intent to steal the transaction from Enmon.

8

40.     Enmon relied on Defendants' material misrepresentations. Enmon had no knowledge of the falsity of the material misrepresentations.

41.     As people who made material false representations to Enmon in violation of § 27.01(a), Defendants are liable to Enmon for actual damages under § 27.01(b).

42.     Because Defendants had actual awareness of the falsity of their material misrepresentations, Defendants are liable to Plaintiff for exemplary damages under § 27.01(c). Defendants are also liable to Enmon under § 27.01(e) for reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

### Tortious Interference With An Existing Contract

43.     Enmon repeats and realleges each allegation contained above.

44.     Defendants tortiously interfered with Enmon's valid, existing contract with Caprock by using improper and unlawful means, including, but not limited to making false and misleading statements

45.     Such acts by Defendants constitute willful and intentional acts of interference with Enmon's existing contract. Defendants knew and should have known, by reasonable inquiry, of the existence of the Agreement between Enmon and Caprock.

46.     Because of Defendants' unlawful conduct, Enmon has suffered and continues to suffer millions of dollars of damages. Enmon is entitled to recover his actual damages caused by Prospect, including lost profits. Enmon is also entitled to recover all available exemplary damages against Prospect.

### VII.

### Jury Trial Demanded

9

Defendant / Third-Party Plaintiff Mike Enmon hereby demands a trial by jury on all claims.

## VIII.

## Prayer for Relief

ENMON prays that the Court enter a judgment against Prospect in a total sum in excess of $50 million plus pre-judgment and post-judgment interests, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, costs of court, exemplary damages, and all such other and further relief, to which Enmon may show himself entitled.

Respectfully submitted,

ARNOLD & ITKIN LLP

Jason A. Itkin
Texas State Bar No. 24032461
Stephen R. Foster
Texas State Bar No. 24027314
700 Louisiana Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

**ATTORNEYS FOR DEFENDANT/
THIRD-PARTY PLAINTIFF MIKE ENMON**

## Certificate of Service

I certify that a copy of the this instrument was served under Rules 21 and 21a, Texas Rules of Civil Procedure, on November 6, 2006, upon the following counsel of record:

Jill S. Chatelain
McPherson, Monk, Hughes, Bradley, Wimberley & Steele, L.L.P.
3120 Central Mall Drive
Port Arthur, Texas 77642
*Counsel for Plaintiff*

Stephen R. Foster

11

# ARNOLD & ITKIN LLP

A REGISTERED LIMITED LIABILITY PARTNERSHIP
ATTORNEYS AT LAW
700 LOUISIANA STREET, SUITE 4700
HOUSTON, TEXAS 77002
(713) 222-3800
(713) 222-3850 (FAX)
www.arnolditkin.com

January 9, 2007

By Email & Facsimile

Mr. Robert A. Zanni
Case Manager
American Arbitration Association
Northeast Case Management Center
950 Warren Avenue
East Providence, RI 02914

      Re:   13 148 02866 06
            Prospect Energy Corporation / Bart De Bie / John Barry / M. Eliasek /
            Walter Parker / Prospect Capital Management LLC and Michael
            Enmon

Dear Case Manager Robert Zanni:

      Michael Enmon hereby objects to the jurisdiction of the arbitrator and to the arbitrability of his claims against Prospect Energy Corporation, Prospect Capital Management LLC, Bart De Bie, John Barry, M. Grier Eliasek, and Walter Parker. Enmon requests that the Arbitration Panel stay this proceeding until the Texas Court determines whether the arbitration provision is binding. But by way of summary, Enmon notes that the AAA lacks jurisdiction because:

Mr. Robert A. Zanni
January 9, 2007
Page 2

    1.    <u>The arbitration provision is unenforceable because it is illusory.</u>

Under New Mexico and Texas law (the two likely sources of law in this case), the arbitration agreement cannot be enforced because it lacks mutuality in that it only supposedly binds Enmon. *See Dumais v. American Golf Corp.*, 299 F.3d 1216, 1220 (10th Cir.2002) (interpreting New Mexico law to hold that an arbitration agreement subject to unilateral alteration by the employer was illusory and therefore unenforceable.); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 230 & n.2 (Tex. 2003) ("We have recognized that an arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate."). Under the arbitration provision, Prospect has the right to choose whether to arbitrate and has the right to remove the case from arbitration at any time, for any reason. This type of one-sided agreement smacks of the lack of mutuality that has been held unenforceable.

    2.   <u>The Term Sheet Is Not Enforceable</u>

Prospect cannot enforce the Term Sheet's arbitration provision because the Term Sheet is not an enforceable contract. Under New Mexico and Texas law an agreement that is subject to unilateral modification or revocation is illusory and unenforceable. *Bd. of Educ. v. James Hamilton Constr. Co.*, 891 P.2d 556, 561 (N.M. Ct.App.1994); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46 (Tex.App.-Dallas, 2006, no pet h.). The Term Sheet does not meaningfully bind Prospect in any way and therefore cannot be used against Enmon.

Mr. Robert A. Zanni
January 9, 2007
Page 3

    3.  <u>Enmon is Not Asserting Any Claims Subject To Arbitration</u>

    Even if the Term Sheet and arbitration provision were enforceable (which they are not), the claims asserted by Enmon are not based on the Term Sheet.  To the contrary, paragraph 23 of Enmon's Texas petition makes clear that "Both Enmon and Prospect recognized that the term sheet was not binding and could not be relied upon. Enmon is not asserting any claims that are based upon representations and/or omissions in the term sheet."

    Because of the apparent disagreement over the scope and applicability of the arbitration provision, Michael Enmon requests that the AAA stay these proceedings until the Texas Court has had an opportunity to determine where this action should proceed.

    Sincerely,

    Jason A. Itkin

cc:  Ms. Maura Grinalds  (*By Email & Facsimile*)
    Skadden, Arps, Slate, Meagher & Flom LLP
    Four Times Square
    29th Floor, Room 424
    New York, NY 10036

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
PROSPECT ENERGY CORPORATION,                  :
PROSPECT CAPITAL MANAGEMENT LLC,              :
JOHN F. BARRY, M. GRIER ELIASEK,              :
WALTER PARKER and BART DE BIE,                :       07 Civ. 117 (RLC)
                                              :
                          Petitioners,        :       **ORDER TO SHOW CAUSE**
                                              :       **AND TEMPORARY**
            - against -                       :       **RESTRAINING ORDER**
                                              :
MICHAEL ENMON,                                :
                                              :
                          Respondent.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Upon the accompanying declaration of Maura B. Grinalds, the Memorandum of

Law in Support of Petitioners' Application for a Temporary Restraining Order, the Petition to

Compel Arbitration and for Injunctive Relief dated January 5, 2007 and accompanying

documents and exhibits, the arguments of counsel on the record, and for good cause shown,

IT IS HEREBY ORDERED that Respondent show cause before this Court, at

Room **20 5** United States Courthouse, 500 Pearl Street, in the City, County and State of New

York, on the **2 6** day of **J A N U A R Y**, 2007, at **11    A**.m or as soon thereafter as counsel

*and evidence presented* may be heard why an Order should not be issued pursuant to Rule 65 of the Federal Rules of

Civil Procedure preliminarily enjoining Respondent and its agents, servants, employees and all

persons acting in concert or participation with them from initiating, maintaining, pursuing,

assisting or otherwise participating in any claim or action against Petitioners in contravention of

the letter agreement entered into on April 11, 2006 between Prospect Energy and Michael

Enmon (the "Caprock Agreement") and the arbitration agreement contained therein (the

"Arbitration Agreement"), including but not limited to all claims asserted by Respondent against

Petitioners in the action in the District Court, Jefferson County, Texas, captioned Robert Fiser

Attorney at Law P.C. v. Michael Enmon, Index No. B-0177745 (the "Texas Action") pending the

~~hearing and determination of Petitioners' Motion to Compel Arbitration and for Injunctive Relief~~

~~dated January 5, 2007,~~

IT IS FURTHER ORDERED that:

(a)    Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Respondent and its agents, servants, employees and all persons acting in concert or participation with them are hereby temporarily enjoined from:

(i)    taking any action that interferes with, obstructs or otherwise delays the arbitration initiated before the American Arbitration Association ("AAA"), captioned <u>Prospect Energy Corporation / Bart De Bie / John Barry / M. Eliasek / Walter Parker / Prospect Capital Management LLC and Michael Enmon</u>, No. 13 148 02866 06, or otherwise undermines the jurisdiction of the AAA;

(ii)    taking any action that interferes with, obstructs, delays or undermines the jurisdiction of this Court to hear and determine any and all matters between the Petitioners and the Respondent, such jurisdiction being conferred upon this Court by the exclusive forum selection clause in the Caprock Agreement; and

(iii)    maintaining, pursuing, assisting or otherwise participating in any further action in Texas State Court against Petitioners, including but not limited to all claims asserted by Respondent against Petitioners in the Texas Action;

(b)    A bond be filed by Petitioners in the sum of $ *50,000.00* on or before the close of business on *January 17* 2007; and

(c)    The Order referred to in subparagraph (a) hereof will be effective until *January 26*, 2007, at *11 AM* in the *FORE* noon and not longer unless ordered by the Court, and

IT IS FURTHER ORDERED that service of a copy of this Order to Show Cause and Temporary Restraining Order upon Respondent by facsimile and overnight delivery to his

counsel appearing herein on or before *Noon* on *January 18*, 2007 shall be deemed good

and sufficient service.

This Order issued this *11th* day of January, 2007, at *320P*.m.

_____
UNITED STATES DISTRICT JUDGE

3

01/11/2007  13:19    4697845649                    68TH DISTRICT COURT                    PAGE  02

CAUSE NO. B-0177345

Robert Fiser Attorney at Law P.C.        §
        Plaintiff,                       §        IN THE DISTRICT COURT
                                         §
                                         §
vs.                                      §
                                         §
Michael Eamon                            §
        Defendant/Third-Party Plaintiff, §        JEFFERSON COUNTY, TEXAS
                                         §
vs,                                      §
                                         §
Prospect Energy Corporation,             §
Prospect Capital Management LLC, John F. §
Barry, M. Grier Eliasek, Walter Parker   §
and Bart de Bie                          §
Third-Party Defendant.                   §        60th JUDICIAL DISTRICT

Temporary Restraining Order

Upon the accompanying declaration of Jason Idzin, the Petitioners' Application for a
Temporary Restraining Order, and accompanying documents and exhibits, the arguments of
counsel on the record, and for good cause shown,

IT IS ORDERED THAT:

(a)    Pursuant to the Texas Rules of Civil Procedure, Prospect Energy Corporation,

       Prospect Capital Management LLC, John F. Barry, M. Grier Eliasek, Walter

       Parker, and Bart de Bie ("Prospect Defendants") and its agents, servants,

       employees and all persons acting in concert or participation with them are

       hereby temporarily enjoined from:

              (1)    taking any action that interferes with, obstructs, delays or

                     undermines the jurisdiction of this Court to hear and determine

                     any and all matters between Eamon and the Prospect

                     Defendants, and

1

(ii)     maintaining, pursuing, assisting or otherwise participating in any further action in New York courts against Enron for ten days so that the Court may conduct necessary hearings on all matters concerning this litigation.

(b)     A bond be filed by Enron in the sum of $200.00 on or before the close of business on January 11, 2007; and

(c)     The Order referred to in subparagraph (a) hereof will be effective until January 21, 2007, at 5:00 p.m. and not longer unless ordered by the Court; and

(d)     This Order has been entered ex parte based upon representations of counsel for both sides. It has come to the attention of the Court that Prospect Defendants are seeking a temporary restraining order in New York trying to prevent this Court to consider motions currently pending before it. I find that Enron will be irreparably injured if this Court does not issue a temporary restraining order and issuance of this temporary restraining order will do nothing but ensure that the status quo is maintained until the parties can sort this out.

(e)     The parties should appear on January 21, 2007 at 1:30 p.m. for a temporary injunction hearing.

IT IS FURTHER ORDERED that service of a copy of this Order to Show Cause and Temporary Restraining Order upon Respondent immediately.

This Order issued this 11 day of January, 2007, at 1:16 p.m.

Judge Sanderson

2.

71QAAPROO.txt

1

<pre>
         71QAAPROO            Order to Show Cause
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  PROSPECT ENERGY CORPORATION,
 3  ET AL,
 4
 4           Plaintiffs,
 5
 5      v.                            07 CV 117 (RLC)(LBS)
 6
 6  MICHAEL ENMON,
 7
 7           Defendant.
 8
 8  ------------------------------x
 9                                   New York, N.Y.
 9                                   January 26, 2007
10                                   2:30 p.m.
10
11  Before:
11
12                  HON. LEONARD B. SAND,
12
13                                   District Judge
13
14                    APPEARANCES
14
15  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
16        Attorneys for Plaintiffs Prospect Energy
17  BY:  MAURA BARRY GRINALDS
18  BY:  TIMOTHY G. NELSON
19  BY:  JULIE BEDARD
20
21  ARNOLD & ITKIN LLP
21        Attorneys for Defendant Enmon
22  BY:  JASON A. ITKIN
22
23  QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
23        Attorneys for Defendant Enmon
24  BY:  WILLIAM MACK
24
25  ALSO PRESENT:  Caj Boatright
                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
</pre>

2

<pre>
         71QAAPROO            Order to Show Cause
 1       (Case called)
 2       THE COURT:  All right.  I'll hear from the petitioner.
 3       MS. GRINALDS:  Good afternoon, your Honor.
 4       My name is Maura Grinalds.  We represent the
 5  petitioners who include Prospect Energy Corporation and
 6  individual petitioners John Barry, Grier Eliasek, Walter Parker
 7  and Bart De Bie.  We're here today on the final hearing on
 8  petitioner's petition to compel arbitration under the Federal
 9  Arbitration Act.
10       THE COURT:  A number of things.  Let's see if we can
11  agree on the sequence.
12       The counsel for Mr. Enmon takes the position that
13  until there is an order compelling arbitration this Court has
14  no basis for issuing any injunctive relieve because there is no
                          Page 1
</pre>

71QAAPROO.txt
```
15   jurisdiction that it has to preserve in such cases which -- do
16   you agree with that?
17          MS. GRINALDS:  I agree he cites cases, but I disagree
18   that the cases support that proposition.
19          THE COURT:  Tell me --
20          MS. GRINALDS:  The cases that's he cites and I should
21   start out that he ignores all of the Second Circuit authority
22   that we have cited that is directly on point in which courts of
23   this district have held that in issuance of the anti-suit
24   injunction to effectuate the court's judgment and to aid its
25   jurisdiction and also to achieve the policies of the FAA is a
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    3
71QAAPROO                    Order to Show Cause
```
1    natural concomitant of a motion to compel arbitration.  And
2    typically we're in exactly the posture here now, once the Court
3    grants the motion to compel arbitration --
4           THE COURT:  But that's the first thing that has to
5    happen.
6           MS. GRINALDS:  But in these cases the Court
7    adjudicates the motion to compel arbitration and simultaneously
8    as is on the Court's agenda today would issue the anti-suit
9    injunction and even as a matter of preliminary relief could
10   have awarded that same type of relieve.
11          THE COURT:  So the first thing we have to address is
12   the motion to compel arbitration.
13          MS. GRINALDS:  I think that would be fair.  I should
14   say that the cases that they cite from, again, outside of the
15   circuit which include that Transouth Financial case from the
16   11th Circuit --
17          THE COURT:  But there is no need, right.  We're all in
18   agreement.  We have to first decide whether or not to issue an
19   order to compel arbitration.
20          MS. GRINALDS:  Yes, your Honor.
21          THE COURT:  Okay.
22          MS. GRINALDS:  I'll turn to that first.
23          THE COURT:  Great.
24          MS. GRINALDS:  We bring our petition under the FAA
25   because the parties entered into an arbitration agreement
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    4
71QAAPROO                    Order to Show Cause
```
1    involving interstate commerce that would be governed by the
2    FAA.  I don't think there is any dispute that the arbitration
3    agreement between the parties is governed by the FAA.
4           THE COURT:  The dispute seems to be that Mr. Enmon
5    seeks to treat the letter that you refer to as the -- begins
6    with a "C".
7           MS. GRINALDS:  -- agreement, your Honor.
8           THE COURT:  Agreement is separate -- and you treat it
9    as a separate agreement assigned enforceable agreement.  The
10   Cap Ark agreement and Mr. Enmon treats it as part of the term
11   sheet which is not a separate agreement, right?
12          MS. GRINALDS:  That is correct.  Mr. Enmon describes
13   the letter agreement that we call the Cap Ark agreement -- and
14   if your Honor needs another copy I could hand it up.
15          THE COURT:  No.
16          MS. GRINALDS:  He describes it as a "term sheet".  In
17   fact that's a misleading simplification.  The agreement has two
18   components.  It is a letter agreement hat attaches a term sheet
19   of proposed non binding terms.  But the letter agreement itself
```
                                Page 2

71QAAPROO.txt
20  is a free-standing agreement that's supported by its own
21  adequate consideration and would be enforceable as an agreement
22  under New York law and it contains mutual promises and
23  considerations.  So that's the first thing that the Court
24  should look at.  And if you were to look at the letter
25  agreement itself which was attached to the Barry affidavit as
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                5

      71QAAPROO               Order to Show Cause
 1  Exhibit One, it makes clear that it is a letter agreement which
 2  attaches a term sheet.  And within the letter agreement it
 3  distinguishes the term sheet.  Paragraph one describes the
 4  "attached summary of proposed terms and conditions, the "term
 5  sheet" that is attachment.  Those are the non bonding terms for
 6  which the lender Prospect Energy was going to conduct due
 7  diligence and going to enter into negotiations with Mr. Enmon
 8  with an eye towards potentially providing that financing if it
 9  were satisfied with the results of its due diligence.
10        THE COURT:  And indeed the whole point of that letter
11  is to be an antecedent to a consideration and dealing with the
12  term sheet.
13        MS. GRINALDS:  Precisely, your Honor.
14        And if you would look at page, obviously, page three
15  of the letter agreement contains at Paragraph 10 the exclusive
16  New York Choice of Law clause and the arbitration agreement
17  that is at issue in our petition.  That's at Paragraph 10 on
18  page three.  But, your Honor, if I could direct your attention
19  to page four.  I note that when Mr. Enmon supplied the Court
20  with a copy of this letter he made a point of supplying an
21  unexecuted draft of the letter.  We have provided the Court
22  with a fully executed draft that was attached with Exhibit One
23  to the Barry affidavit.  And as you can see here it is signed
24  by both Prospect Energy and Michael Enmon, and it states right
25  above Mr. Enmon's signature which has never been challenged "I
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                6

      71QAAPROO               Order to Show Cause
 1  have read and understood the contents of this letter agreement
 2  agreed to and accepted Mr. Michael Enmon".
 3        THE COURT:  All right.  So it's your position that
 4  that is a separate binding agreement and regardless of what
 5  occurred with respect to the term sheet?
 6        MS. GRINALDS:  Most certainly, your Honor.
 7        And may I also add that even if there were a
 8  legitimate challenge to the validity or binding nature of this
 9  letter agreement which I submit to you there is not and cannot
10  be, that would not spare Mr. Enmon of his obligation to go
11  forward with arbitration.  Under the Supreme Court --
12        THE COURT:  Yes.  But maybe we don't have to get to
13  that.  Let me hear from counsel for Mr. Enmon on why this
14  agreement which is signed is not a separate enforceable
15  agreement.
16        MR. ITKIN:  Sure, your Honor.
17        At the outset I would like to say that we're here
18  today subject to our motion to dismiss for lack of jurisdiction
19  and improper venue.
20        THE COURT:  That's all of which is dependent on the
21  enforceability of this letter agreement because this letter
22  agreement is valid and enforceable that there is a consent to
23  jurisdiction and so on.  Okay.  So let's deal with that now.
24        MR. ITKIN:  Your Honor, if I may, a couple of things.
                          Page 3

71QAAPROO.txt

25    THE COURT: I tell you what you can do.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

71QAAPROO          Order to Show Cause

1      MR. ITKIN: I'll go to this first, your Honor.
2      THE COURT: Now, you got the theory.
3      MR. ITKIN: The letter agreement and term sheet is one
4  document. When it was transmitted to Mr. Enmon the first time
5  on April 10th it was accompanied by an e-mail that said, here
6  is the non binding term sheet, didn't call the non binding term
7  sheet and letter agreement or any of the legal arguments that
8  are coming on now. And when you look at the first paragraph,
9  your Honor, of it incorporates both the letter part and the
10  term sheet. Going further it's all numbered consecutively.
11  They have page numbers. This is not two separate documents.
12  It's one.
13     THE COURT: I am looking at it now. April 11, 2006, a
14  letter from Prospect Energy to Mr. Michael Enmon with a
15  signature page, dated April 11. That's the date it was sent.
16     Now, what is this about? Oh, I see. The letter is
17  page 4 and the term sheet is page five.
18     MR. ITKIN: Correct, your Honor. And term sheet is a
19  defined term in the letter and it incorporates both the letter
20  and the summary terms and conditions in the first sentence.
21     It says, the terms sets forth in this letter and the
22  attached summary proposed term and conditions dated April 11,
23  2006 ("TERM SHEETS")
24     Your Honor, I'm on the last page of the -- it's a long
25  first sentence but it is starting in, you could read but it
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

71QAAPROO          Order to Show Cause

1  starts the relevant part starts at the beginning of the third
2  line.
3     THE COURT: What significance are you drawing?
4     MR. ITKIN: Your Honor, they're trying to say these
5  are two -- the letter agreement and the term sheet are two
6  separate documents. They're, in fact, one. As you can tell by
7  the fact that they're both combined to be called the term
8  sheet. As you can also tell and I can provide you, your Honor
9  I think it's also an exhibit to our motion, the e-mail that
10  transmitted the term sheet the day before where they refer to
11  the entire document as a term sheet and that was what was
12  transmitted. Either way, your Honor, under either scenario,
13  the term sheet is not binding. Under clear law and --
14     THE COURT: There is no issue as to the whether or not
15  the term sheet is binding.
16     MR. ITKIN: Or the letter agreement whatever --
17     THE COURT: The crux of the dispute is to whether or
18  not the letter is binding. If the letter is not binding then
19  there is no consent to jurisdiction to the form of arbitration,
20  right.
21     MR. ITKIN: Right. And, your Honor, if I may I
22  brought some blow-ups that show exactly why the letter is not
23  binding if I may show them to the Court.
24     THE COURT: Yes.
25     (Pause)
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

71QAAPROO          Order to Show Cause
Page 4

71QAAPROO.txt

```
 1        MR. ITKIN:  Your Honor, the Second Circuit in the
 2   Acadian case talks specifically about these types of agreement
 3   about whether or not they are binding or not, and, basically,
 4   what you do is look towards the terms of the agreement.  And
 5   the Court was very clear.  If you want to be bound you should
 6   indicate an intent to be bound and if you don't want --
 7        THE COURT:  Which you usually do by signing, yes?
 8        MR. ITKIN:  Your Honor, they say to look to the
 9   language because these term sheets are often signed.  In fact,
10   Prospect --- Ventures which is an entity which is still a
11   concern of, Mr. Barry recently had this fight in the New York
12   Court of Appeals said the term sheet was not enforceable
13   because for the very reason the terms of the document did not
14   show an intent to be bound.
15        And if you look, your Honor, and it's also laid out in
16   the briefs, the term sheet indicates only the principal terms
17   and conditions under which financing would be considered.
18        THE COURT:  Yes.
19        MR. ITKIN:  Prospect's proposal provides financing
20   described in this letter is subject to Prospect's satisfaction
21   in its sole discretion.  In other words, Prospect can get out
22   any time they want.  He talked about as arbitrarily
23   capriciously as they may wish to exercise.
24        Going further, and this is found under the term sheet,
25   your Honor, it says that we may our sole discretion suggest
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

```
71QAAPROO                    Order to Show Cause
 1   alternative financing amounts to structure the client to
 2   participate in the proposed financing.  In other words, they
 3   are not binding themselves at all to anything in this document
 4   and in fact --
 5        THE COURT:  If you are dealing with Texas law then the
 6   lack of mutuality or the lack of consideration would be a
 7   defense.  But it is clear Second Circuit law that the lack of
 8   mutuality and the lack of consideration would not be a defense
 9   to arbitration.
10        MR. ITKIN:  Let me get to the arbitration part, your
11   Honor, because I think under both Texas law and under Second
12   Circuit law and New Mexico law that you can look to
13   consideration in the contract to find consideration for the
14   arbitration agreement.  Because there is no consideration for
15   this contract because prospect never showed an intent to be
16   bound, we need to find consideration in the arbitration
17   agreement and there is none.  The arbitration agreement -- and
18   I've got another blow-up for you.  It's paragraph ten -- only
19   binds or purports to bind Mr. Enmon.  It allows Prospect to
20   waive the agreement to arbitrate, its own regard.  It allows
21   Prospect to opt out of the arbitration at any time for injuries
22   and thwarting the policy behind arbitration.  So in other
23   words, these types of arbitration agreements standing alone in
24   New York have not been uphill.  Now, if there is consideration
25   somewhere else --
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

```
71QAAPROO                   Order to Show Cause
 1        THE COURT:  Wait.  You have a case in New York that
 2   says --
 3        MR. ITKIN:  I can point you to one, your Honor, if you
 4   will give me one second to run back to my podium table.
 5        THE COURT:  Sure.
```

Page 5

71QAAPROO.txt

```
 6            (Pause)
 7            MR. ITKIN: Your Honor, actually, what I have with me
 8    is the Sibalsky decision where the arbitration contract was in
 9    force because there is consideration to the underlying
10    contract.  The Sibalsky case cites other New York cases where
11    the arbitration clause standing alone was not enforced because
12    of a lack of mutuality.  I don't have the case.  I'm sorry,
13    your Honor.  I misspoke.
14            THE COURT:  Isn't what was happening here was Prospect
15    Energy was saying as a precondition to our getting further
16    involved in this proposal, these are the terms that are a
17    prerequisite, which is why there is a separate signature line
18    on page 4 and why it proposed this letter shall terminate on
19    the early of April 11 unless the letter is -- prior to such
20    date, and it goes on to list other things.
21            So the consideration was Prospect agreed to go forward
22    with this proposed project.
23            MR. ITKIN: Actually, I disagree with that, your
24    Honor.  A couple of reasons is because Prospect actually didn't
25    agree to go forward.  If Prospect said, hypothetically, your
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71QAAPROO                    Order to Show Cause

```
 1    Honor, that, you signed this and we will go forward and do
 2    this.  We will look at the deal and we will decide if we want
 3    to do it, that may be true.  But in this case what Prospect
 4    says is that it didn't have to do anything.  Prospect doesn't
 5    have to look at the deal, doesn't have to do any due diligence,
 6    doesn't even have a good faith requirement to do anything.
 7    There is nothing that Prospect obligates itself to do.  Which
 8    Prospect makes very clear when it says, this term sheet is not
 9    binding on the lender or any of their affiliates and is
10    submitted for discussion purses only.  Prospect makes that
11    clear in its own papers.
12            Either way, your Honor, if I may backtrack for one
13    moment, is I think that that issue that you raised and I
14    imagine that Prospect is going to disagree with me on it is
15    something that really isn't before the Court today because
16    before the motion to compel arbitration is not ripe yet for
17    decision.
18            THE COURT:  Because?
19            MR. ITKIN:  Because our answer date is not until
20    Monday.  So in other words, we're going to demand a jury trial
21    as we are allowed to, and Judge Carter will get to decide.
22            THE COURT:  Whoa.  Whoa.  Demand a jury trial as to
23    what?
24            MR. ITKIN:  On the arbitration issue, your Honor,
25    which I believe we're allowed to do under the FAA.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71QAAPROO                    Order to Show Cause

```
 1            THE COURT:  No, not in this district.
 2            MR. ITKIN:  Either way, your Honor, we have the answer
 3    to their motion to compel arbitration on Monday and at which
 4    time it will be ripe before Judge Carter.
 5            THE COURT:  Judge Carter is ill and will not be back
 6    in the courthouse, I'm told by the staff, for several weeks.
 7    There will be somebody else in Part One.  But tell me why the
 8    order to show cause is returnable today, is it not?
 9            MR. ITKIN:  Your Honor, what happened was --
10            MS. GRINALDS:  Yes, it is.
```

Page 6

71QAAPROO.txt

11          MR. ITKIN: They filed an arbitration -- there's
12     competing cases going on.
13          THE COURT: Excuse me?
14          MR. ITKIN: There are two cases going forward right
15     now, the Texas state court and this case. There is also an
16     arbitration proceeding initiated by Prospect against my client
17     Mr. Enmon. We had an initial phone call with the arbitration
18     director who said, is there is anybody challenging the
19     arbitration. We said, yes. We're going to take it up in the
20     Texas court because they had filed a motion to compel
21     arbitration in a Texas court. At which point, Prospect
22     announced that it was going to get an injunction to stop the
23     Texas court, the TRO and the order to show cause that you have
24     in front of you to stop the Texas court from proceeding. And
25     so that's why there is the order to show cause today. But in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

71QAAPROO          Order to Show Cause
1     fact, the answer to their motion to compel arbitration is not
2     due until the, I believe it is the 28th off the top of my head,
3     your Honor. So it would be Monday.
4          MS. GRINALDS: May I be heard?
5          THE COURT: Yes.
6          MS. GRINALDS: Actually, your Honor, under Section 4
7     of the FAA, as I'm sure your Honor knows, this notice of
8     petition can be brought on on five days' notice. We accorded
9     extra notice to the respondent and gave them until the 17th to
10    file their answering papers. They didn't file any answering
11    papers.
12          Furthermore, under Section 4 of the FAA, if the
13    respondent were even going to try to request a jury trial that
14    would have had to have occurred before the return date which is
15    unequivocally today. So no jury trial had been demanded before
16    today, and, furthermore, would have had to make a very explicit
17    factual showing which has not been made in any way shape or
18    form.
19          And I am quoting the Second Circuit in Doctors
20    Associate Inc. v. Stewart 85 F.3d 975 at 983 1986 "a party
21    resisting arbitration cannot obtain a jury trial merely by
22    demanding one, rather, he bears the burden of showing that he
23    is entitled to a jury trial under Section 4 and he is required
24    to submit affidavits and evidentiary facts that would warrant
25    the granting of a jury trial. He has done none of that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

71QAAPROO          Order to Show Cause
1          Now, I don't know what the problems were that
2     Mr. Itkin had on his electronic filing, but that didn't prevent
3     him from two days ago making an electronic filing of a motion
4     to dismiss albeit an untimely one or yesterday making a filing
5     of other opposition papers, neither of which contained anywhere
6     the requisite demand for a jury trial. So without conceding
7     that a jury trial would ever be appropriate under those
8     circumstances, that right has clearly be waived by the
9     respondent.
10          And if you I could just respond to some of the other
11    comments --
12          THE COURT: I'll give you an opportunity.
13          MS. GRINALDS: Thank you.
14          THE COURT: Yes.
15          MR. ITKIN: Your Honor, let me back up and explain.

Page 7

71QAAPROO.txt

16  We to file the motions to dismiss to preserve our defenses.
17  They, on January 8 asked me to accept service on behalf of my
18  client for a motion for a petition for injunction as well as a
19  motion to compel arbitration.  I accepted the service.  The
20  Court issued a citation that I don't have but I believe they
21  will have that will tell you the return date on that will be 20
22  days, I believe, your Honor.  I've never seen it.  But it will
23  be 20 days.  So at that time after the 20 days comes across
24  then I have the burden to present the affidavits and such to do
25  the jury trial and demand arbitration.
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                          16

71QAAPROO                Order to Show Cause
1        MS. GRINALDS:  Your Honor, the order to show cause
2   that was signed by Judge Patterson unequivocally states that
3   today is the, not only the return date but is the day for the
4   final hearing on the motion to compel arbitration as well as on
5   the petitioner's request for injunctive relief.  It is
6   unequivocal here that respondent was due to come here today on
7   the 26th for the final hearing on the petition.  So any other
8   dates that he may think were generated by law are superseded by
9   this unequivocal order of the Court.
10       If you look, your Honor, on page one of the order to
11  show cause, the handwritten notations, it says that respondent
12  must show cause before the Court at room 20B at 500 Pearl
13  Street on the 26th day of January 2007, at 11 a.m. or as soon
14  as thereafter as counsel may be heard and evidence presented
15  why an order should not be issued pursuant to Rule 65 of the
16  Federal Rules of Civil Procedure One compelling respondent to
17  submit all its claims against petitioners to arbitration before
18  the American Arbitration Association in New York, and, two,
19  preliminarily and permanently as demanded in the petition
20  enjoining respondent and his agents and all persons from etc.
21  persisting in the Texas action.  And that is why we're hear
22  here today, your Honor --
23       THE COURT:  It does not talk about ordering
24  arbitration.
25       MS. GRINALDS:  Yes.  In fact, your Honor, Judge
               SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                          17

71QAAPROO                Order to Show Cause
1   Patterson handwrote in --
2        THE COURT:  That's what I am trying to read what he
3   handwrote in.
4        MS. GRINALDS:  It was a little difficult to read.  We
5   actually sent a redline around.  He hand wrote at the first
6   order of business today, your Honor, that the hearing would
7   address our motion seeking to compel the respondent to submit
8   all of his disputes against petitioner's arbitration before the
9   American Arbitration Association in New York, New York.  That
10  is the first order of business today and we have sent a
11  typewritten redline to Mr. Itkin.  He was informed of this on
12  the day -- that this would be the final hearing on the petition
13  to compel arbitration and that any evidence to be presented was
14  to be presented today, and, again, he made no attempt to
15  request that there be any jury trial.  He was served with
16  notice of this.
17       THE COURT:  So what you are saying is compelling
18  respondent to submit all its claims against petitioner
19  arbitration before the AAA in New York is, it implicitly says
20  grant arbitration and -- okay.
                       Page 8

71QAAPROO.txt

```
21        MS. GRINALDS: Yes, your Honor.  That is the precise
22   relief that is sought in the petition as noted here by Judge
23   Patterson in parentheses as demanding a petition.  So we are
24   here today to hear the final hearing on the petition and the
25   associated request on injunctive relief.
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              18

71QAAPROO              Order to Show Cause
```
1         MR. ITKIN: Your Honor, as you note in the order it's
2    pursuant to Rule 65 which is permanent injunctions.  It is not
3    asking for preliminary injunctions which is why we are here
4    today to talk about the preliminary injunctions and at a later
5    date if the injunctions are, one court or another will decide
6    whether or not the motion to compel it should be granted, your
7    Honor.  And that is why we're here today is to talk about
8    whether to extend the injunction or not.
9         THE COURT: You know, it's obvious from the original
10   of the order to show cause that this was, I guess, this had
11   gone to Judge Carter.  Judge Carter being out it went to Judge
12   Patterson.  I don't know quite how.
13        MS. GRINALDS: -- the part one judge on that day.
14        THE COURT: He was substituting as the Part One judge?
15        MS. GRINALDS: Yes, your Honor.
16        THE COURT: What day was this?
17        MS. GRINALDS: January 11, on Thursday.  We provided
18   notice --
19        THE COURT: This was last Thursday.
20        MS. GRINALDS: He chose to exercise his discretion
21   which the Court has, as your Honor is a well aware of the
22   Paramedics case to consolidate the hearing for the preliminary
23   and permanent injunction which he specifically did and
24   expressed it unambiguously on the order to show cause which was
25   provided to Mr. Itkin.
```
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              19

71QAAPROO              Order to Show Cause
```
1         THE COURT: Now, doesn't an order compelling to show
2    cause why all of the issues should not be -- shall be submitted
3    to arbitration before the AAA until New York preliminarily and
4    permanently described as in the petition?  Isn't that,
5    obviously, assuming that at this hearing you will have to show
6    cause why all the claims should not be submitted before
7    arbitration and does not necessarily subsume that arbitration
8    is ordered?  If there is no arbitration then you are not going
9    to be compelled to submit all of your claims to arbitration.
10        MR. ITKIN: Your Honor, my understanding of the
11   order -- and I wasn't there when Judge Patterson, nobody from
12   our office was there when Judge Patterson issued it -- but our
13   understanding of the order, your Honor, is that this would be a
14   preliminary injunction hearing where the burden of proof --
15        THE COURT: He specifically says preliminary and perm
16   injunction.  That's explicit.
17        MR. ITKIN: The standard that we would have to meet
18   today, your Honor, is to show you that they don't have a
19   probable right to relief.  That's what we came here prepared to
20   argue about, your Honor, not prepared to argue who has the
21   burden of proof on the motion to compel.  To me it's a
22   different burden, your Honor, is what I'm saying.  We came here
23   today to argue is there a probable right to relief under the
24   arbitration agreement?
25        THE COURT: Yes.
```
                            Page 9

71QAAPROO.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

71QAAPROO                    Order to Show Cause
1    MR. ITKIN: And we don't think there is. But our
2  contention coming in here, your Honor, and if I'm wrong and you
3  say that the order says something different I would throw
4  myself at the mercy of the Court and be allowed to have an
5  answer and extension to get it out there to properly --
6    THE COURT: When do you think all of this will be ripe
7  for --
8    MR. ITKIN: Consideration?
9    THE COURT: Yes.
10   MR. ITKIN: Monday, your Honor.
11   THE COURT: This Monday? What's going to happen
12 between now and Monday?
13   MR. ITKIN: We're going to file --
14   THE COURT: What is going to happen in the Texas
15 court?
16   MR. ITKIN: Nothing. And we need at least three days
17 notice of the hearing between now and Monday in Texas to set
18 this up and I can't accept that hearing, your Honor. Three
19 days notice today because it would have to be, if we're going
20 to tee up the arbitration issue in Texas; is that what you are
21 saying, your Honor?
22   THE COURT: I am trying to see what significance
23 attaches to Friday or Monday.
24   MR. ITKIN: Here is two significances. One is in our
25 minds our response is due Monday, so we're preparing the full
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

71QAAPROO                    Order to Show Cause
1  response for Monday. But beyond that, your Honor, between --
2  nothing is happening in the Texas action because everything is
3  stayed. There is no hearing set. We have been enjoined, my
4  client has been enjoined improperly, albeit, I think from doing
5  anything in the Texas action. If the injunction is lifted we
6  would potentially seek to have the Texas court decide the
7  motion to compel or do something along those lines, but I don't
8  think by Monday we could even do that, your Honor.
9    THE COURT: If you are prepared to represent to the
10 Court that if this goes over to Monday no action will be taken
11 in any court including the Texas court that would impact on any
12 of this.
13   MR. ITKIN: I can represent that, your Honor, yes,
14 absolutely.
15   MS. GRINALDS: Your Honor, this is hugely prejudicial
16 to us. We after an unequivocal agreement to arbitration. It
17 requires inclusive jurisdiction in New York courts under New
18 York law. Mr. Itkin and his client have brought a suit in
19 Texas.
20   THE COURT: What is the difference? Assuming there is
21 a representation made in court and enforceable that nothing
22 will happen between now and Monday, what is the significance of
23 putting it over to Monday?
24   MS. GRINALDS: Among other things, we have a business
25 busy schedule. I need to be up with the SEC next week, so
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

71QAAPROO                    Order to Show Cause
1  Monday is not even a possibility for me. So my client can't be
Page 10

71QAAPROO.txt

2   under the cloud of having the potential of Mr. Itkin running to
3   the Texas state court which has already issued an ex parte TRO
4   preventing us from coming to this court to seek relief on our
5   motion to compel. Mr. Itkin did that on two hours notice while
6   is on hold.
7          THE COURT: Mr. Itkin has represented in court,
8   subject to all kinds of penalties if it's not a valid
9   representation, that nothing will happen between now and
10  Monday. One thing that will happen is that I will be in the
11  Court of Appeals on Monday and you'll be before the SEC.
12         MS. GRINALDS: Your Honor, the Supreme Court in Moses
13  Cohen said that the Federal Arbitration Act directs courts to
14  move arbitrable claims out-of-court and into arbitration as
15  quickly as possible. We are being deprived the benefit of our
16  bargain forced to litigate in Texas while these proceedings
17  drag out in New York. We are all here today for the final
18  hearing. Mr. Itkin got unequivocal notice of the final
19  hearing. He is here today for it. And it's --
20         THE COURT: What is going to happen by way of your
21  preparation? What difference is it going to make if you have a
22  weekend other than maybe you are losing a little sleep over the
23  weekend?
24         MR. ITKIN: Your Honor, we're going to prepare both.
25  We would have witnesses here, the evidence of things that we

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              23

71QAAPROO                        Order to Show Cause

1   need --
2          THE COURT: Witnesses here?
3          MR. ITKIN: Yes, your Honor.
4          THE COURT: And evidentiary hearing?
5          MR. ITKIN: On the motion to compel, yes, your Honor.
6          THE COURT: Witnesses who are going to testify with
7   respect to what?
8          MR. ITKIN: We could talk about, your Honor,
9   representations that were made at the signing of the contract,
10  or not contract, the alleged contract, your Honor. This
11  document the, even if your Honor or the judge, I guess, that
12  you will be in the court of Appeals, that will be hearing this
13  on Monday, we would like a chance to fully respond to the issue
14  of whether this claim should be sent to arbitration or whether
15  there is an arbitration agreement at all.
16         THE COURT: I have to tell you, I am prepared to stay
17  here as long as is appropriate and I am prepared to hear you as
18  long as appropriate and I do witnesses as to oral and
19  representations that were made, is there something about --
20         MR. ITKIN: Your Honor, to the extent that it's
21  ambiguous, and if you don't want witnesses, your Honor, we went
22  won't bring any.
23         THE COURT: I want to hear you on any and all reasons
24  why you think that the four page letter which your client
25  signed is not a self-standing valid and enforceable agreement,

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              24

71QAAPROO                        Order to Show Cause

1   and I'll hear it now. Okay.
2          MR. ITKIN: Okay. Your Honor, if I may, first of all,
3   the four pages is not a valid self-standing agreement because
4   from the very first sentence of it nothing contained in this
5   summary -- excuse me. I'm not on the four page letter -- but
6   if you look at the re line, your Honor, it's a proposal it's

                           Page 11

71QAAPROO.txt

7   not a binding agreement. It's noted as a proposal.
8        THE COURT: Where? What is a proposal? Please,
9   provide with the proposal. The propose, I take it, is a term
10  sheet.
11       MR. ITKIN: The terms and conditions of the proposal
12  are not limited those set forth herein under the term sheet.
13  In other words, it doesn't have all of the terms in it. One of
14  the factors that the Second Circuit looks at to determine
15  whether it's a contract. The term sheet does not purport to
16  summarize all the terms and conditions upon which a proposed
17  financing is to be based, which terms and conditions would be
18  contained only in final documentation which must be
19  satisfactory --
20       THE COURT: That's all you are talking about the term
21  sheet, right?
22       MR. ITKIN: It's all the same document. But the point
23  is there is not indicating an intent to be bound by this
24  agreement, by this document. I'm not calling it --
25       THE COURT: They are indicating an intent to you be
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              25

71QAAPROO           Order to Show Cause
1   bound. They're saying, you want us to proceed with this term
2   sheet proposal. These are the conditions under which we will
3   do so.
4        MR. ITKIN: Your Honor, the fact that they're
5   indicating an intent not to be bound has been held by the
6   Second Circuit to be enough to make this not a binding
7   agreement.
8        THE COURT: In what case?
9        MR. ITKIN: It's the Acadian case. And the cite for
10  that case, your Honor, is 884 F.2d 69. I am going to give you
11  my highlighted copy, your Honor.
12       THE COURT: If you are giving me a case in which the
13  arbitration agreement is contained within the body of another
14  agreement as to which it was not to be binding then I don't see
15  the relevance of this case.
16       MR. ITKIN: Your Honor, it's dealing with a term sheet
17  just like the term sheet at issue.
18       THE COURT: And the Court of Appeals said the term
19  sheet was not binding to what the parties indicated that it
20  wasn't intended to be binding.
21       MR. ITKIN: Correct, your Honor. Your Honor, if I may
22  also show you a couple of other things that may get you --
23       THE COURT: What is there in this letter that the
24  client signed which indicates that that letter as distinguished
25  from the term sheet was not to be binding?
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

                                                              26

71QAAPROO           Order to Show Cause
1        MR. ITKIN: Your Honor, there is nothing in the four
2   page letter that requires Prospect to do anything. It is only
3   things that Mr. Enmon is supposed to do. And, your Honor, to
4   speak to the point of whether the --
5        THE COURT: So then you are back to the question of
6   whether an agreement to arbitrate which is not mutual is
7   enforceable and to which the answer in the Second Circuit is
8   clearly, yes.
9        MR. ITKIN: Only if it's part of another otherwise
10  enforceable agreement, your Honor. In this case the term sheet
11  is not an enforceable agreement under the Second Circuit's
                        Page 12

71QAAPROO.txt

12  standard. And, your Honor, even under Prospects own words if I
13  may hand, this is the day before the final document was
14  transmitted. This is an e-mail from Prospect to my client that
15  doesn't talk about the term sheet as two separate agreements:
16  It talks about it as one agreement and refers to it as non
17  binding.
18          THE COURT: Non binding term sheet.
19          MR. ITKIN: But it attaches the final document.
20          THE COURT: The first four pages, are they a term
21  sheet?
22          MR. ITKIN: Yes, your Honor. They're a term sheet.
23  What makes them a term sheet? By their own definition of term
24  sheet within the document, your Honor. The term sheet is
25  defined as both the letter agreement and the summary terms and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

71QAAPROO                    Order to Show Cause
1   conditions that follow it in first paragraph of the four-page
2   letter that we have been talking about.
3           THE COURT: The terms set forth in this letter and the
4   attached summary of proposed terms and conditions.
5           MR. ITKIN: Which is all defined, your Honor, as term
6   sheet.
7           THE COURT: The terms and conditions of this proposal
8   are not limited to those set forth herein or in the term sheet.
9           (Pause)
10          THE COURT: Now, if Paragraph 4 says this letter shall
11  terminate on the early of April 11, 2006, unless this letter is
12  accepted prior to such date. And this is an April 11th letter.
13  There is no way in which the term sheet proposal would have
14  been finalized on that very day.
15          MR. ITKIN: Your Honor, it was all attached, in fact,
16  as one document.
17          THE COURT: But it wasn't final.
18          MR. ITKIN: Your Honor, that is the point is that none
19  of this got finalized until May 12.
20          THE COURT: Except this letter. And the whole point
21  of this is that Prospect wanted to be assured before it went
22  further that it was not going to be dragged into a Texas state
23  court. Isn't that the thrust of this letter?
24          MR. ITKIN: No, your Honor, I don't think that it is.
25  And to the extent that that was the case then it would be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

28

71QAAPROO                    Order to Show Cause
1   another reason to allow us to fully respond. Because of one of
2   the arguments that we have not raised in this case, your Honor,
3   is that this arbitration clause if you find it binding or the
4   contract bonding was induced by fraud, and I can produce
5   evidence of that if given the time, we have a very viable fraud
6   theory in this case based on other litigation that Prospect is
7   involved in and changes they made to the term sheet. I don't
8   want to get into it today but I can lay it out in my papers on
9   Monday, the true answer date.
10          THE COURT: Well, you know hindsight always makes us
11  wise.
12          Ms. Grinalds, what's given me pause here is the second
13  sentence. The terms and conditions of this proposal are not
14  limited to those set forth herein or in the term sheet.
15          MS. GRINALDS: The proposal is the actual proposal to
16  provide the financing.
                        Page 13

71QAAPROO.txt

```
17          THE COURT:  Yeah, but this letter is re, proposal.
18          MS. GRINALDS:  Right.  The letter is about the
19    proposal, but the letter is still a free-standing agreement
20    which sets up the framework for the parties to go about
21    conducting due diligence, doing the negotiations and creating
22    the documentation to make the proposal into an actual
23    financing.
24          THE COURT:  What is to those set forth herein?
25    Herein, I assume, means this letter.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    29

71QAAPROO                Order to Show Cause
```
 1          MS. GRINALDS:  Herein in the letter or in the term
 2    sheet.
 3          THE COURT:  So it says the terms and conditions are
 4    not limited to those set forth herein, herein being --
 5          MS. GRINALDS:  Of the proposal.  Now, the proposal is
 6    what the letter agreement --
 7          THE COURT:  The proposal is the term sheet, isn't it?
 8          MS. GRINALDS:  The term sheet prescribes the proposed,
 9    some of the proposed terms of a potential financing.  That is,
10    that the parties are contemplating negotiating and this letter
11    sets up the framework for them to commence due diligence,
12    gather documents and start the documentation for that.
13          THE COURT:  What terms and conditions of this letter
14    are -- strike that.  The terms and conditions of this proposal
15    with a capital "P" in this letter is begins re, proposal with a
16    capital "P" are not limited to those set forth herein.  Let's
17    just stop there.
18          MS. GRINALDS:  The proposal is the proposed financing
19    of $10 million defined largely, that's the proposal.  We are
20    making a proposal to you to consider a financing on these rough
21    terms.
22          THE COURT:  And that's all in the term sheets?
23          MS. GRINALDS:  Well, the letter writer, the proposal
24    doesn't purport to specify every possible term of the ultimate
25    financing in the term sheet.because there will be
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    30

71QAAPROO                Order to Show Cause
```
 1    negotiation --
 2          THE COURT:  But is the herein is this letter a final
 3    and binding letter?
 4          MS. GRINALDS:  Most certainly, your Honor.
 5          THE COURT:  Well, then, what is the meaning of the
 6    terms and conditions of this proposal are not limited to those
 7    set forth herein.
 8          MS. GRINALDS:  Because the proposal is not synonymous
 9    with the letter.  The letter is the agreement to under -- to go
10    forward with a framework on a proposal within the letter and
11    the letter sets forth a lot of mutual obligations that I am
12    certain Mr. Itkin's client would not say were totally elusory.
13    For example, the letter becomes executory once the borrower
14    pays $25,000 as a deposit upon agreeing to the letter.  And if
15    Prospect doesn't use that money it has to refund it.
16          There are other mutual problems is, again, along the
17    lines of proceeding along the framework set forth in the letter
18    to conduct due diligence.  There is a confidentiality
19    agreement.  There is an obligation for Mr. Enmon to continue
20    paying the fees for due diligence as the parties go forward.
21    There is an express acknowledgment by Mr. Enmon in this letter
```
                            Page 14

71QAAPROO.txt

22  in paragraph six that they recognize in connection herewith
23  that Prospect may be incurring substantial costs and expenses
24  including the costs of counsel and due diligence and
25  transportation and consultants and the like, just in

31

71QAAPROO         Order to Show Cause

1  considering the proposal. That's part of the detriment to
2  Prospect. To say Prospect does nothing ignores reality.
3     In fact, in Mr. Enmon's complaint he admits that
4  Prospect did, in fact, conduct due diligence and did work for
5  documentation. And I just note that letter to avoid any
6  ambiguity about Prospect providing consideration and good faith
7  specifies that once Prospect reviews 50 pages of documents that
8  is sufficient to show that it has acted in good faith, that it
9  has provided consideration.
10     THE COURT: All right. That's another issue. You may
11  continue.
12     MR. ITKIN: Your Honor, I think you hit on one of the
13  points, the herein shows this was not intended to be a final
14  document. Herein refers to the letter agreement. The point is
15  and I think, your Honor, this is most like an at will contract.
16     THE COURT: What?
17     MR. ITKIN: At will employment contract, your Honor,
18  if I may make an analogy because it allows Prospect to walk
19  away from the deal, from of its obligations at any time for any
20  reason no matter how arbitrary or capricious. It's not binding
21  on them.
22     THE COURT: Is that unusual?
23     MR. ITKIN: It's not unusual in those term sheets
24  because they are usually not binding. Which is exactly the
25  point, your Honor, is that Prospect is not obligated to do

32

71QAAPROO         Order to Show Cause

1  anything, and that's why the contract, the letter agreement or
2  the term sheet, whatever we're calling it today is not binding
3  and because of that we have to look at the arbitration clause
4  on its own and the arbitration clause clearly cannot survive
5  because it doesn't have consideration.
6     THE COURT: What else do you want to tell me?
7     MR. ITKIN: Your Honor, what I would like to tell you
8  is some things I can't do today because we're not prepared to
9  answer today, but I would tell you this about the contract,
10  that we have alleged in our answering papers if we get to the
11  point to be able to answer on Monday we will allege that the
12  plan of what happened in this deal, what happened was, your
13  Honor, quick background?
14     THE COURT: Yes.
15     MR. ITKIN: I could present evidence of this, your
16  Honor, given the time and why the whole Monday thing was making
17  sense to me, is that Prospect has a repeated history, your
18  Honor, of taking deals up to the last minute and trying to
19  renegotiate it. It happened in this case. And what I think is
20  going on here, your Honor, if you think that what you suggested
21  earlier, that Prospect put this in here to avoid being hauled
22  into a Texas court, I can present evidence on Monday or when
23  the Court hears us, that Prospect knew this was going to happen
24  that they were aware of what they were going to do on May 12 to
25  my client. And really that's the issue I can present evidence

71QAAPROO.txt
(212) 805-0300
33

71QAAPROO                    Order to Show Cause
1  that this clause was going to be enforceable it was inserted
2  with the idea that we were going to pull the fraud, that they
3  did in this case. which is why I am prejudiced by not getting
4  to talk about the answer date today.
5          THE COURT: That could be an issue that you could
6  raise in the arbitration. I am going to take a five minute
7  recess.
8          (Recess)
9          THE COURT: Mr. Itkin, what else do you wish to tell
10  me?
11          MR. ITKIN: Your Honor, I would like to focus my
12  attention on a comment you had made earlier regarding the first
13  or -- excuse me -- I believe it's the second sentence that the
14  terms and conditions of this proposal are not limited to those
15  set forth herein in the letter agreement or the term sheet.
16          And look at the Second Circuit case of Acadian
17  Phosphates that I handed you earlier which deals with the
18  question of whether these preliminary agreements are -- ^the
19  Court noted in that case that there is a strong presumption
20  against finding binding obligations in agreements which include
21  open terms, call for future approvals and expressly anticipate
22  future preparation and execution of contract documents.
23          THE COURT: Yes, I am aware of that decision which is
24  why I am concerned about -- excuse me there is a matter I have
25  to attend to.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
34

71QAAPROO                    Order to Show Cause
1          (Recess)
2          THE COURT: You may be seated.
3          On the representation that no action will be taken by
4  Enmon or any counsel on his behalf which in any way will impact
5  on this case. I am going to adjourn this matter until Monday
6  at 10:30 in Courtroom 12B before the Honorable John Koeltl who
7  is the Part One judge.
8          At that time the parties are to brief and be prepared
9  to argue the enforceability of the letter dated April 11, 2006,
10  in light of the second sentence thereof, which says "the terms
11  and conditions of this proposal, capital "P" are not limited to
12  those set forth herein or in the term sheets.
13          I ask madam reporter, is there a possibility that a
14  transcript of what has transpired this far could be available
15  on Monday?
16          THE COURT REPORTER: Yes, you Honor.
17          MS. GRINALDS: May I be heard?
18          THE COURT: Yes.
19          MS. GRINALDS: May I just petition the Court for a
20  moment, please, reconsider the ruling that was just made on the
21  very important dispositive ground that under the Supreme
22  Court's controlling decision in Prima Paint to the extent there
23  is any issue as to the enforceability for lack of conditions
24  which is the sole consideration being made by Mr. Itkin and
25  Mr. Enmon --
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
35

71QAAPROO                    Order to Show Cause
1          THE COURT: It has nothing to do with the basis of my
2  ruling. I've said at least three times, I am not concerned
Page 16

71QAAPROO.txt
3  about the lack of mutuality. I'm not concerned that the
4  argument that it is unenforceable because of lack of mutuality.
5  I am not concerned about the argument that is unenforceable
6  because of lack of consideration.
7        I am concerned about the enforceability of an
8  agreement which says the terms and conditions of this
9  proposal -- it means this letter -- are not limited to those
10 set forth herein.
11       MS. GRINALDS: If I could refer you to what are
12 clearly understood to be the surviving obligations on the last
13 page of this agreement. It specifically states, all
14 obligations described in paragraphs three to 14 of this
15 agreement shall survive termination thereof. There is an
16 explicit the undertaking that there is surviving obligations.
17 Your Honor, if you look at paragraph 15, those are the specific
18 mutual obligations that are agreed to in this binding contract.
19 They are identified in paragraph 15 as those contained in
20 paragraphs three through 14. The preparatory language in
21 paragraph one doesn't define those obligations and shouldn't
22 detract from the enforceability of this agreement or the
23 ability of the parties to move forward with arbitration.
24       THE COURT: You will repeat that and argue that before
25 Judge Koeltl on Monday. It talks about termination and it
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                              36

71QAAPROO              Order to Show Cause
   doesn't talk about a variation of terms and limitation.
1        MS. GRINALDS: At a minimum, your Honor, while I would
2  be prepared to rely on a certain representation of plaintiff's
3  counsel. We have already had a situation where --
4        THE COURT: I want to address that.
5        MS. GRINALDS: After the last TRO they had
6  Mr. Pfizer's counsel, they said they were bound by the TRO and
7  when they went to Texas they had another counsel stand up and
8  seek the relief against us that was directed prohibited by this
9  Court's TRO.
10       THE COURT: Should I call Judge Sanderson?
11       MS. GRINALDS: I think at a minimum we need to
12 continue the TRO pending this Court's final determination and
13 we have an order to do that and so there will be no ambiguity
14 and no additional risks to my client.
15       THE COURT: Any objection to the continuation of the
16 TRO through Monday?
17       MR. ITKIN: Your Honor, I have no objection to the
18 continuation of the TRO through Monday, so long as I am not
19 waiving my right to later on say if we have on Monday to say
20 that, Judge, I don't think the TRO was proper in the first
21 place. We're not going to do anything.
22       THE COURT: Mr. Itkin, let me tell you very clearly
23 and frankly, should anything happen between now and Monday or
24 on Monday which in any way conflicts with the representation
            SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300
                                              37

71QAAPROO              Order to Show Cause
   you had made you'll be before me; you understand?
1        MR. ITKIN: I understand clearly, your Honor.
2        MS. GRINALDS: Your Honor, may I also beg the Court, I
3  am the main counsel for the petitioners in this case and I need
4  to prepare for a meeting with the SEC next week and this would
5  hugely prejudice my client who would not be able to be prepared
6  for a hearing on Monday. I know Mr. Itkin has just suggested
                  Page 17

71QAAPROO.txt

8    to the Court without any consultation of opposing counsel, we
9    were all here prepared today for the final hearing that Judge
10   Patterson set.
11            THE COURT:  What are you asking?
12            MS. GRINALDS:  I would say at a minimum provided that
13   the TRO remains in place.
14            THE COURT:  The TRO will remain in place.
15            MS. GRINALDS:  At a minimum we need to negotiate no
16   less than a ten-day adjournment of this.
17            THE COURT:  Do you have an objection to that?
18            MR. ITKIN:  Your Honor, I am happy to go Monday in ten
19   days, whatever.  I prefer to get it done next week, your Honor,
20   if we can.  If she has a conflict on Monday we can do it on
21   Tuesday or Wednesday.  I'd like to get it done this week, your
22   Honor.  She's made representation that Prospect, again, wants
23   to get a decision on this one way or the other.  Let's get it
24   done next week at some time we're both free.
25            MS. GRINALDS:  Your Honor, I understand in the absence
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                38

71QAAPROO                Order to Show Cause
1    of Judge Carter that this poses burdens on the Court and I am
2    very grateful for the Court's review of the papers.
3             THE COURT:  I am going to be in the Court of Appeals
4    next week, otherwise, I would do this sometime next week.
5             MS. GRINALDS:  We would be very grateful to have your
6    Honor continue with this.  As your Honor may know you are the
7    third judge that we have had on what was the summary proceeding
8    of what should have allowed my client to proceed expeditiously.
9             THE COURT:  What do you want?
10            MS. GRINALDS:  I would ask for at a minimum for ten
11   days to schedule the hearing for the final injunction and for
12   the final hearing on the petition and if there is other
13   argument that it all be had on that date certain.
14            THE COURT:  But that would impose on your client and
15   anyone on his behalf the obligation not to do anything with
16   respect to the state court proceeding in Texas for ten days.
17   Can you do that?  Do you have to consult with anybody about
18   that?
19            MR. ITKIN:  One second, your Honor.  I can do it for
20   myself.  The problem -- your Honor, this is what I can
21   represent to the Court and your Honor, potentially, I am trying
22   to think of the right way to make this work because there is
23   another party that I do have no control over, your Honor.  What
24   I could do is agree --
25            THE COURT:  The other party, being the plaintiff in
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                                39

71QAAPROO                Order to Show Cause
1    the state court?
2             MR. ITKIN:  The plaintiff in the state court case,
3    your Honor, which I have been accused of all sorts of things.
4    I really don't have any control.  I could agree in ten days and
5    have it heard in front of you.  I could call the lawyer on the
6    other side or you could call Judge Sanderson.  I am trying to
7    think outside the box in any way to make sure nothing happens
8    because I don't want to be brought before you and be in trouble
9    your Honor.
10            MS. GRINALDS:  Your Honor, we have a draft TRO for
11   this.  We were hoping we would end up here for final
12   termination, a draft TRO extending this TRO until the final
                         Page 18

71QAAPROO.txt

13  determination of our motion for preliminary injunction and
14  permanent relief, and we would be prepared to submit it to the
15  Court for review and we would be satisfied if this remained in
16  effect and there is no motion pending that we have put on in
17  Texas, but this would at least, we would hope, protect us from
18  action by Mr. Itkin to subvert this Court's jurisdiction to
19  conclude those proceedings.
20          THE COURT: Have you seen it?
21          MR. ITKIN: I haven't seen it, your Honor. I will
22  take it look at it and I would like to ask is the other side
23  have agreed not to do anything in New York or in the
24  arbitration panel that everything comes to a stand still until
25  ten days from now or whatever.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

71QAAPROO                 Order to Show Cause
1           MS. GRINALDS: Your Honor, there is no motion before
2   this Court for a stay of arbitration which would be hugely
3   prejudicial, and no showing has been made to warrant the stay
4   of arbitration. That proceeding is going forward. The panel
5   is being selected and parties have been directed by the triple
6   A to go forward with that arbitration and Mr. Itkin just can't
7   make a motion to say before this Court. He has made no showing
8   that he is entitled to that --
9           THE COURT: Were you making a motion?
10          MR. ITKIN: All I am asking is that no party does
11  anything. We don't move forward in arbitration in this court
12  or Texas. You decide whether or not to go forward with
13  arbitration.
14          MS. GRINALDS: Mr. Itkin proposed this two weeks ago
15  when we within down to the state court to enjoin us from
16  proceeding in the federal court and from doing anything that
17  would interfere with the state court. That was an
18  unconstitutional order but he sought to get it and to impose it
19  on us. We are not in parity here. We have properly brought
20  petition to compel arbitration based on, in our view, an
21  agreement to arbitrate and we are seeking to go forward with
22  that. There is no motion to stay arbitration.
23          THE COURT: Therefore, what is the issue?
24          MS. GRINALDS: He is requesting that this Court ask us
25  not in the interim therefore motion not to proceed with the
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

71QAAPROO                 Order to Show Cause
1   pending arbitration in New York, the Triple A is proceeding
2   already in New York. There is an arbitration that has been
3   brought the Triple A --
4           THE COURT: What does proceeding mean?
5           MS. GRINALDS: Well, at this stage we are in the stage
6   now under a deadline of February 2 to select our panel to
7   provide the name to the Triple A so that our panel can be
8   impaneled and the arbitration can proceed to the preliminary
9   hearing then on with the --
10          THE COURT: Is that the only thing you are going to do
11  is select your panel?
12          MS. GRINALDS: As is currently scheduled for February
13  28th. But once that happens then we will proceed to
14  preliminary hearing.
15          MR. ITKIN: That is my understanding, your Honor.
16          THE COURT: Any objection to their submitting the
17  names to the panel?
                        Page 19

71QAAPROO.txt

18      MR. ITKIN: As long as that's all they're doing.  I'll
19  submit names, but I don't want to go forward with all sorts of
20  things that may never happen.
21      MS. GRINALDS:  Your Honor, Mr. Itkin had voiced an
22  objection to the Triple A at our fist conference as to its
23  jurisdiction.  The Triple He Will A asked Mr. Itkin, do you
24  have a stay with -- he had to respond, no, he has not sought
25  one.  He is not entitled to one.  Therefore, the Triple A said
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    42

71QAAPROO                    Order to Show Cause
1   this arbitration will go forward.  That's its standard
2   operating procedure.  I don't want Mr. Itkin to cite anything
3   in this record to suggest that he is entitled to immediate
4   hinder in any way to obstruct the proceedings before the Triple
5   A.
6       MR. ITKIN: I am not planning on doing that.  I am
7   just making sure we are not hit blind-sided with TRO or motion
8   or something we go to the court in ten days and decides it.
9   Want to see if that agreement is -- I will probably want to
10  make some changes to it your, Honor.
11      THE COURT:  Let Mr. Kenneally, my deputy, know when
12  you are ready.
13      All right.  I'll take a look at the order to show
14  cause.
15      (Recess)
16      THE COURT:  I was chatting with Judge Sanderson's
17  court coordinator.  She said that would not in any way impact
18  either case and she said she would give him that message.
19      Mr. Kenneally tells me you want to know when I am
20  available, don't want to go before a fresh judge.
21      MS. GRINALDS:  We would be honored to have your Honor
22  remain with this case and that the case really have a judge
23  that could see it to conclusion.
24      THE COURT:  I signed the order.  February 13th?
25      MS. GRINALDS:  That would be fine.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    43

71QAAPROO                    Order to Show Cause
1       THE COURT:  All right.  And you are going to brief the
2   issue of the second sentence and that.  OK.  Thank you.
3       MS. GRINALDS:  Your Honor, is there a time on the
4   13th?
5       THE COURT:  Ten a.m. on the 13th.
6                       o 0 o
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

71QAAPROO.txt
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

S

72DVPROA.txt

72DVPROA                    Argument                                    1
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   PROSPECT ENERGY CORPORATION,
3   ET AL,
4
4               Plaintiffs,
5
5        v.                        07 CV 117 (RLC) ( LBS)
6
6   MICHAEL ENMON,
7
7               Defendant.
8
8   ------------------------------x
9                                  New York, N.Y.
9                                  February 13, 2007
10                                 10:05 a.m.
10
11  Before:
11
12                   HON. LEONARD B. SAND,
12
13                              District Judge
13
14                      APPEARANCES
14
15  SKADDEN ARPS SLATE MEAGHER & FLOM
15       Attorneys for Plaintiffs
16  BY:  MAURA BARRY GRINALDS
16       TIMOTHY G. NELSON
17       ELLIOT FRIEDMAN
17
18  ARNOLD & ITKIN
18       Attorneys for Defendant
19  BY:  KURT B. ARNOLD
19       JASON A. ITKIN
20
20
21
22
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
                                                                        2
72DVPROA                    Argument
1            (In open court)
2            (Case called)
3            THE DEPUTY CLERK:  Prospect Energy Corporation v.
4   Michael Enmon.  TRO.  Is the plaintiff ready?
5            MS. GRINALDS:  Yes.
6            THE DEPUTY CLERK:  Defendant ready?
7            MR. ITKIN:  Yes.
8            THE COURT:  All right.  I'll hear you.
9            MS. GRINALDS:  Good morning, your Honor.  On behalf of
10  the petitioners, we would like to thank you for scheduling this
11  hearing so promptly after the return from the Court of Appeals.
12            As you know, your Honor, we are here today on
                         Page 1

72DVPROA.txt
13  petitioner's motion to compel arbitration, and also to enjoin
14  Texas state court proceedings that had been commenced by the
15  respondent, Michael Enmon, we submit, in violation of an
16  unequivocal written agreement requiring the parties to submit
17  all disputes to arbitration.
18        Your Honor, the last time --
19        THE COURT:  You state in the footnote in your last
20  submission that your adversaries are relying or citing a
21  preliminary agreement which was not a final agreement?  What is
22  the difference between the two?
23        MS. GRINALDS:  I'm trying to identify the footnote
24  that you're referring to, your Honor.  Our adversaries are
25  relying on case law concerning generally actions for specific
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              3
72DVPROA                        Argument
1   performance of final agreements where litigants seek to have
2   the Court enforce specifically or through actions for damages
3   agreements that may have been agreements to agree to a final
4   transaction, and the litigant is seeking enforcement of the
5   final transaction.
6         And in our case, we are not seeking enforcement of the
7   final transaction, nor do we believe that the respondent is
8   proposing to seek enforcement of the final transaction, which
9   was to be a $10,000,000 loan by Prospect Energy as the
10  subordinated lender to Michael Enmon to enable him to purchase
11  Caprock Pipe and Supply.
12        No one in this courtroom is contending that that
13  agreement was enforceable according to the terms in the summary
14  of terms that were attached to the letter agreement.
15        We're here today, your Honor, seeking to enforce the
16  arbitration provision that's contained in the April 11, 2006
17  letter agreement.  That letter agreement, your Honor, is the
18  complete final integrated agreement of the parties that set up
19  the procedures, mutual obligations and conditions, pursuant to
20  which Prospect and Mr. Enmon agreed to investigate, consider,
21  and proceed to negotiate and execute final documentation for
22  this loan by Prospect to Enmon.
23        And, your Honor, what's happened here, and perhaps the
24  reason for some of the confusion is Mr. Enmon has repeatedly
25  cited to the term sheet as if that's what we're seeking to
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                              4
72DVPROA                        Argument
1   enforce here today.  No, we are merely seeking to enforce the
2   letter agreement which attaches the term sheet of nonbinding
3   terms.
4         The term sheet reflects the proposal, the financing
5   proposal that is being presented by Prospect to Mr. Enmon, and
6   it states a summary of the terms upon which that financing may
7   ultimately be made subject to due diligence, to negotiation for
8   documentation, and the like.
9         At the last hearing, your Honor posed a question to
10  the parties, and that sent us out to do some additional
11  briefing.  And I'd like to respond to the specific question
12  that your Honor raised at the last hearing on January 26th.
13        And the question your Honor asked us was you asked us
14  to brief, quote, the enforceability of the letter dated April
15  11, 2006, in light of the second sentence thereof, which
16  states, quote, the terms and conditions of this proposal are
17  not limited to those set forth herein, i.e., in the letter
                         Page 2

72DVPROA.txt
18  agreement, in the term sheet.
19      And I believe that your Honor was concerned that while
20  at least on the record your Honor suggested that you understood
21  that the letter agreement had consideration and the like, and
22  several binding obligations, your Honor was concerned that this
23  may indicate the existence of open terms in the letter
24  agreement itself, as opposed to the term sheet, which everyone
25  concedes is not binding and naturally does have open terms.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    5
72DVPROA                    Argument
1   And we respectfully submit to you, your Honor, that upon
2   examination, it is very clear that this letter agreement is
3   complete and fully integrated.  And your Honor --
4       THE COURT:  I want to afford the parties to deal with
5   the issue of whether there had been, subsequent to the letter,
6   an agreement upon any additional terms or limitations.  And
7   having read the papers, it's apparent that nobody is claiming
8   that there was any subsequent addition of any terms or
9   conditions.
10      MS. GRINALDS:  That's correct, your Honor.  And as we
11  noted, and we had a little handout, because we expected the
12  other side to show up with all sorts of -- if I may approach
13  the bench.  The letter agreement, if I may approach, is a fully
14  integrated agreement, and it has several very express
15  integration clauses.  And we just wanted to identify those to
16  your Honor to allay any concerns your Honor may have had about
17  there being open terms or about the letter agreement not being
18  the definitive and final agreement reached between the parties
19  to establish the conditions upon which Prospect would go
20  forward and conduct due diligence, examine this potential
21  lender for the significant $10,000,000 loan that was being
22  proposed in the proposal as further described in those terms in
23  the term sheet.
24      And I take it then that, your Honor, are you satisfied
25  with your question from the other week about whether or not
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    6
72DVPROA                    Argument
1   this reference to the proposal containing terms that are both
2   in the letter agreement and the term sheet and maybe additional
3   terms, are you satisfied that?
4       THE COURT:  I have no question on that issue.
5       MS. GRINALDS:  Okay.  Thank you.  Then I refer to our
6   briefs, should you.
7       The other issue that has come up is whether or not
8   this is really a binding agreement that creates binding
9   obligations.  I think that your Honor has already indicated a
10  clear understanding that there are numerous very explicit
11  binding obligations in this letter agreement.  And I had
12  another handout for that, and I'll just move through it
13  quickly, if I may approach, your Honor, please.
14      And as you can see, to borrow the expression of the
15  eminent Judge Cardozo, this agreement is instinct with binding
16  obligations.  And you can see them all the way through from the
17  beginning where it repeatedly refers to this as the agreement,
18  it asks the respondent to memorialize his intention to proceed
19  by signing --
20      THE COURT:  Most significantly, there is a signature
21  line at the end of the letter.
22      MS. GRINALDS:  Precisely.  And, your Honor, that
                            Page 3

72DVPROA.txt

```
23   signature line is all important under controlling Second
24   Circuit authority.  We referred the Court to the SCS
25   Communications case.  And in that case, the Court of Appeals
```

7

72DVPROA                    Argument
```
1    held that an agreement that was agreed to and it emphasizes the
2    words "agreed to," was a binding preliminary agreement.  And it
3    emphasized that the litigant had actually used these words
4    "agreed to," and found that it was a binding preliminary
5    agreement, even though there was language in the parties'
6    agreement which said that they would later reduce their
7    agreement -- that they would not have a binding agreement
8    unless and until they executed a final partnership agreement.
9         The Court found there was still an agreement as to the
10   conditions upon which the parties would go forward in their
11   acquisition of Oleander.
12        This is precisely the type of agreement we are seeking
13   to enforce here:  The agreement antecedent to the parties going
14   forward to investigate and negotiate the final ultimate
15   financing.  And it is that agreement that contains the
16   arbitration provision.
17        Now, I think that certainly any challenge as to the
18   enforceability of this agreement would be frivolous, the letter
19   agreement.  But even if the Court were to find that there were
20   any issues as to the enforceability of that agreement, under
21   the Supreme Court's controlling decisions in Buckeye and in
22   Prima Paint, those determinations should be submitted to the
23   arbitrator.
24        And just to update the Court on that, our arbitrator
25   has been selected by the American Arbitration Association, and
```

8

72DVPROA                    Argument
```
1    the first preliminary hearing is scheduled for February 15th.
2    And it is our hope to proceed with all due speed with that
3    arbitration.
4         The other new argument that Mr. Enmon has recently
5    raised, and apparently in response to your Honor's question,
6    was that the letter agreement itself expired before it was even
7    offered to Mr. Enmon.  And as you know, the letter agreement
8    states that it needed to be accepted prior to April 11th or by
9    April 11th, and the deposit made on that date.  And this was an
10   April 11th agreement that was tendered to Mr. Enmon on April
11   11th.
12        Mr. Enmon's novel argument is that when Prospect
13   tendered the letter to him on April 11th and said pay us by
14   April 11th, and the parties, in fact, did go forward and sign
15   the agreement on April 11th, and Mr. Enmon did go forward and
16   pay the $25,000 deposit on April 11th, and Prospect thereupon
17   did go forward and start to conduct due diligence, all of this
18   was a legal nullity because supposedly the agreement had
19   already expired before it was offered.
20        Now, it's not surprising, your Honor, that Mr. Enmon
21   doesn't submit any affidavit to say he actually believed this.
22   And, of course, under controlling law, one, his interpretation
23   of the contract violates the most basic principles of contract
24   interpretation.  One does not interpret a contract in a way to
25   render it meaningless or impossible of performance, nor do we
```

72DVPROA.txt

9

72DVPROA                    Argument
1   interpret it in a way that does not give credit to all of its
2   provisions, and we've cited the case law on that.
3           But interestingly enough, your Honor, there is no
4   dispute hear that all of the parties understood that there was
5   a binding agreement, and they went forward.  Mr. Enmon paid us
6   $25,000 to go forward with due diligence.  Surely he wouldn't
7   have claimed that we could have just gone off on a frolic with
8   that money.  We were constrained by the express terms of the
9   letter agreement to apply that deposit toward due diligence,
10  and we did so.
11          Now, Mr. Enmon doesn't submit any affidavit to suggest
12  that this agreement actually expired or he believed it did.
13  But it's telling that Mr. Enmon did submit an affidavit to this
14  Court in support of his motion to dismiss for lack of personal
15  jurisdiction.  And it's very telling that in that affidavit, we
16  have some copies we can hang up, Mr. Enmon admitted that
17  Prospect performed under the letter agreement; and that
18  Mr. Enmon, following the signing of the letter agreement,
19  participated in due diligence; and that further, following the
20  signing of the letter agreement, Prospect engaged attorneys to
21  work on the final documentation.
22          Your Honor, under controlling Second Circuit
23  authority, whereas here, there's already been performance of
24  the agreement, that is a further grounds for finding that it's
25  a fully enforceable agreement.  So I don't think that there's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

10

72DVPROA                    Argument
1   any non-frivolous challenge to the enforceability of the
2   agreement.
3           As you know, respondent has raised some challenges to
4   the enforceability of the arbitration provision, and I think
5   that they can be disposed of readily.
6           The first challenge is to claim that it is not
7   enforceable because it is non-mutual.  In other words, Prospect
8   has the right to the choose between court and arbitration.  And
9   respondent's argument was originally under Texas law, but now
10  he has sort of reworked that argument to say, one, it's not
11  enforceable because it's non-mutual, and the rest of the
12  agreement doesn't provide consideration because Prospect
13  doesn't agree to do anything.
14          We know that's not a compelling argument because, in
15  fact, Prospect does provide ample consideration under the
16  agreement to do plenty of things from due diligence to managing
17  the deposit to going forward and working on the documentation.
18  In fact, there's no dispute that Prospect, in fact, did provide
19  that consideration.
20          The other challenge to the mutuality of the agreement
21  is now framed in terms of an unconscionability argument.  And
22  the argument is that somehow because Prospect has a right, that
23  courts in this state and in this circuit have upheld, to decide
24  between arbitration and litigation, somehow that's
25  unconscionable.  Well, of course, if an arbitration agreement
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

11

72DVPROA                    Argument
1   has been upheld by the courts and is not contrary to public
2   policy, which -- and even asymmetrical arbitration agreement is
3   not, then by definition it would not be unconscionable.
                        Page 5

72DVPROA.txt

```
 4          And I should say in terms of unconscionability, it was
 5   Enmon's obligation to show both procedural and substantive
 6   unconscionability under the Second Circuit's controlling
 7   decision in Doctor's Associates, which dealt with a very
 8   similar challenge there.  The litigant claimed that it was
 9   unconscionable that he was being forced to travel to New Jersey
10   to arbitrate.
11          And the Court said, There's no unconscionability here.
12   You were put on clear notice where you would need to arbitrate.
13   And so this is not the high standard that would be needed to be
14   shown to challenge an agreement on the basis of
15   unconscionability.
16          And I should say, even with the alleged non-mutuality
17   of the arbitration provision, there is complete mutuality of
18   the parties' agreement to litigate or arbitrate only in New
19   York.  Only in New York County.
20          And so Mr. Enmon, who has tried to drag my client and
21   a slew of their officers and agents, into state court in Texas,
22   knew full well, your Honor, that the only place he could
23   proceed on any disputes was in New York, New York County; and
24   that Prospect had the right to require that those claims all go
25   to arbitration.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

72DVPROA                    Argument
```
 1          The other argument Mr. Enmon makes is, Well, the
 2   arbitration provision gives Prospect the right to remove at any
 3   time a claim from arbitration to court.  In fact, the only
 4   explanation for that provision is that Prospect has the right
 5   to choose.  So to be sure, if Mr. Enmon had gone to
 6   arbitration, Prospect would have had the right to bring this to
 7   federal court or to state court.  That was the right that it
 8   bargained for.
 9          Now, Mr. Enmon claims, Well, we're always at risk that
10   Prospect might scuttle the arbitration.  First of all, I don't
11   think any court would ever enforce the agreement along the
12   interpretation that they're proposing, which is one that
13   Prospect has never advanced.  And Prospect itself has
14   unequivocally stated that all disputes between these parties
15   must be submitted to arbitration before the American
16   Arbitration Association.  And it stated that in its demand to
17   the AAA.  And it would be bound by that.  So that argument also
18   has to go by the boards.
19          Just quickly, there was another attempt to evade the
20   arbitration provision by bringing in all of Prospect's officers
21   and directors, a whole bunch of folks; and to claim, Well, we
22   are not bound by the arbitration agreement with respect to
23   these people, because they are not signatories.
24          Under the Roby case, the Campaniello case, and the
25   long line of Second Circuit authority we lay out in our briefs,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

72DVPROA                    Argument
```
 1   it's very clear that even if they are not signatories to the
 2   arbitration agreement, a company's directors and officers who
 3   are being sued solely in that capacity out of a transaction
 4   that's covered by an arbitration agreement are completely
 5   protected by it.  So that attempt to circumvent the agreement
 6   must fail as a matter of law.
 7          There is one other attempt to avoid the arbitration
 8   clause which is just cute legal draftsmanship, your Honor.
```

Page 6

72DVPROA.txt

9   They claim, well, we are not bound by the arbitration clause
10  because we're not suing for anything on the letter agreement or
11  the term sheet.  We're not suing based on that.
12.          Well, the Supreme Court had dealt with that in the
13  Mitsubishi Motors Corporation v. Solar Chrysler-Plymouth, 473
14  U.S. 614 1985.  And in footnote 9 in affirming the First
15  Circuit's order compelling arbitration and rejection of a
16  similar argument, made it very clear it is not whether the
17  arbitration clause specifically names that cause of action,
18  rather, it is whether the, quote, factual allegations
19  underlying the litigant's claims are within the scope of the
20  arbitration clause, whatever legal labels are attached to these
21. allegations.
22          And, likewise, in the Alemac case, your Honor, which
23  we also cite, Judge Pauley dismissed the identical argument, as
24  well, where the litigant said, Look, there is an arbitration
25  agreement in the partnership agreement, but we're not suing on
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              14
72DVPROA                    Argument
1   the partnership agreement, we're suing for fraudulent
2   inducement and other theories outside of it.
3           Judge Pauley rejected that, as every court that's
4   looked at this and complied with Mitsubishi's directive has
5   done, because arbitration agreements in this circuit as a
6   matter of federal law are to be sustained with the highest
7   dictates of public policy.
8           And at this stage, we've been before your Honor now
9   twice; we've been litigating in Texas; we've been denied the
10  benefit of our bargain, which was to be swift, expeditious
11  dispute resolution through arbitration in the AAA in New York.
12  And we would very respectfully request that your Honor order
13  them to that immediately.  I think their last-minute request
14  for a jury trial, which is nothing other than a complete
15  last-ditch effort to stave off the inevitable, is also
16  frivolous.
17          It's very clear under the Doctor's Associates cases,
18  the Stuart case; and the Distajo case that they are required to
19  come forward with a very high evidentiary showing of
20  identifying triable issues of fact.  Even if they had done
21  that, which they clearly have not, there are no affidavits,
22  they haven't even identified the issues on which they think
23  they are entitled to a jury trial, that would fail.  Not to
24  mention the fact, your Honor, that their request is interposed
25  well outside the statutory deadline.  And lastly, is directly
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                              15
72DVPROA                    Argument
1   barred by the parties' very mutual jury waiver in the
2   arbitration agreement itself, in the letter agreement itself,
3   which precludes us from seeking a jury trial just as much as it
4   precludes them, and which is fully enforceable also in this
5   circuit.
6           If your Honor has no further questions --
7           THE COURT:  No further questions.
8           MS. GRINALDS:  Thank you.  Oh, one last just -- we
9   were prepared to argue the anti-suit injunction.  Quite
10  clearly -- can I have my last handout?  And we will rest on the
11  papers.  It's very clear that, your Honor, whereas here, there
12  is a binding agreement to arbitrate.  The FAA mandates that
13  this Court compel arbitration.  There is no discretion that the
                          Page 7

72DVPROA.txt

14  party be compelled to arbitration.  And likewise, it's equally
15  settled in this circuit that where -- may I approach, your
16  Honor?
17          THE COURT:  Yes.
18          MS. GRINALDS:  Whereas here, there is a binding
19  agreement to arbitrate, and the party must arbitrate; that
20  courts to effectuate that order, compelling them to arbitrate,
21  are empowered to enjoin state court proceedings that would
22  deprive the party of the benefit of that agreement; and,
23  likewise, would undermine the Court's order compelling
24  arbitration.
25          And we have just gathered some of the cases from our
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            16

72DVPROA                    Argument
1   briefs that make it pellucid that this is very established
2   procedure in this circuit to effectuate an arbitration
3   agreement and the very important policies of the Federal
4   Arbitration Act.  Thank you, your Honor.
5           THE COURT:  Thank you.  Counsel for Mr. Enmon.
6           MR. ITKIN:  Your Honor, thank you.  I'd like to start
7   off with what you had asked us to brief, which is the
8   definiteness of this letter agreement.  And, your Honor, going
9   back for over 25 years in New York from the Joseph Martin case
10  to the Express Industries case, it is very clear in New York
11  law that a contract that has material open terms is not
12  enforceable.
13          The second sentence --
14          THE COURT:  What material open terms do you find in
15  the letter?
16          MR. ITKIN:  Well, your Honor, the terms that are
17  not -- the open terms I think are amended.
18          THE COURT:  Just give me a few.
19          MR. ITKIN:  Sure.  The first and most important, your
20  Honor, I think the letter agreement talks repeatedly about what
21  Prospect can do to walk away from the transaction.  It does not
22  talk about what Mr. Enmon can do to walk away from the
23  transaction.  It doesn't give him the right to terminate or
24  step away.  If we look at the letter agreement like a
25  framework, like Prospect wants you to, then the framework, and
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            17

72DVPROA                    Argument
1   still open for negotiation, is how Mr. Enmon gets to walk away.
2   Under the way the letter agreement is written, Mr. Enmon would
3   never have the right to walk away, if Prospect just continued
4   to extend the deal.
5           THE COURT:  Then you're arguing a lack of mutuality.
6           MR. ITKIN:  Your Honor, I'm arguing open terms, but I
7   can tell you some more open terms that were in the final
8   documents.
9           As your Honor knows, this transaction cratered after
10  the final documents were sent by Prospect and signed by
11  Mr. Enmon and CIT.  In that document had the open terms that
12  had been negotiated by the parties, sent as an execution
13  version by Prospect, discussing framework issues, including,
14  your Honor, talking about whether or not the return of
15  confidential documents, whether you construe the documents or
16  whether you construe the contract against the drafter --
17          THE COURT:  We're talking about the letter now, right?
18          MR. ITKIN:  Yes, your Honor.
                            Page 8

72DVPROA.txt

19    THE COURT:  And you said open terms in the letter.
20    And I'm asking you what open terms in the letter, and you are
21    saying that there's a lack of mutuality with respect to ability
22    to walk away from the deal, is that --
23        MR. ITKIN:  No, your Honor.  What I'm saying is that
24    the second sentence -- and do you have a copy of the term sheet
25    in front of you, your Honor?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                18

72DVPROA                   Argument
 1        THE COURT:  The term sheet, yes.
 2        MR. ITKIN:  The letter agreement term sheet?  May I
 3    approach, your Honor?  Your Honor, I'll give you a copy.
 4        THE COURT:  I'm sure I do.  Yes.
 5        MR. ITKIN:  Your Honor, as the second sentence notes,
 6    the terms and conditions of this proposal are not limited to
 7    those set forth herein, the letter agreement, or in the term
 8    sheet.
 9        THE COURT:  And what do you believe that that means?
10    What is the consequence of that?
11        MR. ITKIN:  The consequence, your Honor, is that the
12    letter agreement, the four corners of the letter agreement,
13    does not contain all of the terms of how the parties will go
14    about this framework of negotiation.  And the proof of that,
15    your Honor, can be found in the closing documents that were
16    signed by all the parties.
17        Because those documents, your Honor, contain framework
18    for negotiations, framework for withdrawing; they contain those
19    types of open terms that were not set forth in the letter
20    agreement.  For example, your Honor --
21        THE COURT:  As I said earlier, that I focus on that
22    sentence in being concerned that Enmon might come forward and
23    say, Here is an additional term or condition which we have
24    agreed upon and which has some impact on the arbitration
25    provision.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                19

72DVPROA                   Argument
 1        And my understanding from your papers is that no such
 2    claim is made.  If such a claim were made, then we would have
 3    to consider the significance of paragraph 15, which says, No
 4    modification or waiver of the requirements set forth in the
 5    term sheet or this letter shall be effective unless a formal
 6    instrument providing, therefore signed by... and Barry CEO of
 7    Prospect.
 8        So I think although that sentence held open the
 9    possibility for the parties to add additional terms and
10    conditions provided they conformed, provided they were agreed
11    upon and conformed with the requirements of a foremost
12    instrument, you have not been restrained in the number of
13    issues you advance.  But I do not understand you to be claiming
14    that there was any subsequent agreement agreed upon by the
15    parties which modify the terms and conditions in the letter
16    with respect to arbitration.
17        MR. ITKIN:  Your Honor, if I may say that, that I
18    think if you want to focus specifically on arbitration --
19        THE COURT:  I want to focus on arbitration.  I also
20    want to focus on the letter.
21        MR. ITKIN:  Okay.  And, your Honor, what I would
22    assert to you, and what is a issue of contested fact in this
23    case, is whether the final documents that were transmitted on
                            Page 9

72DVPROA.txt

24    May 12th were signed by all the parties. And if they were,
25    your Honor, and it appears that they were, that the letter
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              20

      72DVPROA              Argument
1     agreement, even if you find it binding and enforceable, goes
2     away, there's no arbitration, there is --
3              THE COURT: It goes away because of what?
4              MR. ITKIN: Because the final documents, your Honor,
5     that the parties -- that were transmitted on May 12th signed by
6     all the parties, you have the signature pages in an earlier
7     submission, supersedes the letter agreement altogether by its
8     terms.
9              THE COURT: What supersedes the letter agreement?
10             MR. ITKIN: The final documents, your Honor. The
11    final documents.
12             THE COURT: The final documents of the term sheet?
13             MR. ITKIN: Of the transaction.
14             THE COURT: Of the transaction.
15             MR. ITKIN: Yes, your Honor.
16             THE COURT: There's one dispositive issue on this
17    motion, and that is the relationship between the letter and the
18    term sheets. There's no question by its specific terms that
19    the term sheet is not a final document. No one signed a
20    closing agreement that I'm aware of. And so the question then
21    becomes what was the purpose of the letter?
22             Now, I know you say that's really one integrated
23    document, and the pagination runs consecutively. But one has
24    to look at the nature of the transaction and what it was that
25    Prospect sought to memorialize and have agreed to.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              21

      72DVPROA              Argument
1              And I think a fair reading of that, indeed, I believe
2     the only possible reading of that, is that they wanted to
3     establish certain terms and conditions and receive a payment of
4     $25,000 for them to go forward to expend further time and
5     efforts in negotiating and closing the deal.
6              And as I said, where does the signature line appear?
7     The signature line appears at the end of the letter. And
8     Mr. Enmon signed the letter and forwarded the $25,000.
9              MR. ITKIN: And, your Honor, in the Adjust Rite
10    case --
11             THE COURT: Yes.
12             MR. ITKIN: -- it dealt with a very similar issue.
13    The parties signed it; the judge, similar to you, thought the
14    parties had made an agreement. But the Second Circuit looking
15    at the agreement out in the four corners found that it was not
16    an agreement, even though it's what the judge thought the
17    parties intended. And the reasoning for that, your Honor, was
18    because open terms. I want to get back to open terms.
19             THE COURT: Yes, I'm still waiting to hear your point
20    to an open term in the letter.
21             MR. ITKIN: Termination, your Honor, that's what I
22    want to focus, how do you get out of the deal?
23             How Prospect gets out of the deal is not open. How
24    Michael Enmon gets out of the deal, he's left wide open. There
25    is not one provision in there discussing how Enmon can walk
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              22

                     Page 10

72DVPROA.txt
72DVPROA                        Argument
1   away from the deal.
2           THE COURT:  Are you saying that if Enmon decided that
3   he lost interest in acquiring whatever it is.
4           MR. ITKIN:  Caprock.
5           THE COURT:  Caprock.  And wanted not to go forward, he
6   could not?  That Prospect could sue for specific performance or
7   what?
8           MR. ITKIN:  Correct, your Honor.  That's my point.  If
9   you were going to have a framework for the negotiation in
10  drafting these documents, you would want Enmon to have the
11  right to say, Hey, you know what?  I don't like dealing with
12  Prospect, or the deal doesn't look as good to me.
13          THE COURT:  And what precludes him from doing that?
14          MR. ITKIN:  The term sheet doesn't allow him to do it.
15          THE COURT:  The term sheet --
16          MR. ITKIN:  Or, I'm sorry, the letter agreement, your
17  Honor.  The letter agreement does not provide -- I'm sorry,
18  your Honor, I figured it was a term shot in the letter
19  agreement.
20          THE COURT:  I know you wish they were one, but --
21          MR. ITKIN:  I'm not trying to confuse the issue, your
22  Honor.  But the letter agreement does not provide for a way for
23  Enmon to walk away from the deal.
24          THE COURT:  And do you think as a matter of law he
25  could not do that?
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                23
72DVPROA                        Argument
1           MR. ITKIN:  I do, your Honor.  Because the term sheet
2   provides that Prospect can extend the terms of the letter
3   agreement for as long as it wants.  So, in other words, your
4   Honor, there's no mechanism for Enmon to leave; which, if you
5   were to have a complete framework for doing the deal, under a
6   letter agreement, that would be one of the open terms.  It is
7   not described and not contained in the second sentence.
8           THE COURT:  Now, before that provision in the
9   acquisition agreement, let's talk about the acquisition
10  agreement being the prospective end of the term sheet.
11  Eventually, if the deal went forward, there would be an
12  acquisition agreement, yes?
13          MR. ITKIN:  Correct, your Honor.
14          THE COURT:  And Mr. Enmon or his designee would have
15  to sign that, would have to agree to that, yes?
16          MR. ITKIN:  Correct, your Honor.
17          THE COURT:  And are you saying that there was
18  compulsion on him to sign it?
19          MR. ITKIN:  That's what I'm saying, your Honor, is
20  that --
21          THE COURT:  Why?  What provision in this compels him
22  to sign?  What provision in this says, Even if you're totally
23  disenchanted with this deal and you want to walk away, you may
24  not do so?
25          MR. ITKIN:  Because it says that they have an
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                24
72DVPROA                        Argument
1   exclusive relationship, Prospect and Enmon.
2           THE COURT:  Yes.
3           MR. ITKIN:  Under the letter agreement, there's an
4   exclusive --
                        Page 11

72DVPROA.txt

5          THE COURT: Oh, he couldn't walk away from this and
6    then find a substitute for Prospect and go ahead and make this
7    deal, but that's --
8          MR. ITKIN: What Prospect can do, and what they tried
9    to do, your Honor, in this case, what they could do is say,
10   You're stuck with us. And even though you want to get away and
11   we've changed the summary terms and conditions to something
12   that you would never agree to, you now have to sign this
13   document and close this transaction because you are not allowed
14   to go out with somebody else; and if you do, we can sue you
15   under the letter agreement.
16         THE COURT: Where's that provision in the letter
17   agreement?
18         MR. ITKIN: Your Honor it would be the exclusivity
19   provision, which is paragraph -- let me find it here real
20   quick.
21         THE COURT: You know, I have a feeling that if this
22   went on and on, there would be no limit to the number of new
23   arguments that you would advance. I give you points for your
24   creativity, but I don't see -- show me the language in the
25   letter agreement that you rely on.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              25

72DVPROA              Argument
1          MR. ITKIN: Are you talking about the exclusivity
2    provision, your Honor? I'm sorry, I didn't understand the
3    question.
4          THE COURT: You're saying that Mr. Enmon would be --
5    that under the letter agreement, Mr. Enmon would be compelled
6    to go ahead and close the acquisition of Caprock, even though
7    he did not want to.
8          MR. ITKIN: With Prospect. He would be compelled to
9    close with Prospect, even though he didn't want to, under
10   paragraph 7, your Honor.
11         THE COURT: Paragraph 7.
12         MR. ITKIN: Which is the exclusivity provision. And
13   then also, your Honor, paragraph 4, subsection 5, which allows
14   Prospect to extend the agreement indefinitely at its sole
15   discretion.
16         THE COURT: Now, have you ever seen or are you aware
17   of any agreement of the sort, that is, an agreement between a
18   would-be borrower and an entity that was arranging or providing
19   the financing which did not call for exclusivity during the
20   period prior to the closing of the agreement? Isn't this a
21   standard provision?
22         MR. ITKIN: There is -- often exclusivity, your Honor,
23   is a custom in the industry, but not by way of formal
24   documents. And, your Honor, oftentimes what they do is you put
25   in a break-up fee so that if parties decide to go their
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              26

72DVPROA              Argument
1    separate ways, there's a break-up fee. Similarly, your
2    Honor --
3          THE COURT: And what do you think the legal
4    consequences are of there not being a break-up fee?
5          MR. ITKIN: Your Honor, the legal consequences are
6    that if this is the framework, the letter agreement provides
7    the framework, it's an open term that makes the contract
8    indefinite. What these parties would be contemplating, your
9    Honor, by the specific terms that are not included within the
                        Page 12

72DVPROA.txt
```
10   letter agreement are the ability for Enmon to be able to
11   terminate the agreement, with or without a break-up fee,
12   depending on what they negotiated; or your Honor can look at
13   the final closing document for other things that were agreed to
14   by the parties in the framework to substitute the open terms
15   that are noted in the second sentence.
16           THE COURT:  I don't think it's appropriate to do that.
17   The term sheet couldn't be more explicit that it is not a final
18   or binding agreement.
19           MR. ITKIN:  I agree, your Honor.
20           THE COURT:  Yes.
21           MR. ITKIN:  My point is is that there are certain
22   things in the final closing documents, there are specific areas
23   for the term sheet.
24           THE COURT:  What final closing documents?
25           MR. ITKIN:  They're before you in an earlier briefing,
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                      27
```
     72DVPROA              Argument
1    your Honor.  I can hand you a copy, but on May 12th --
2            THE COURT:  Yes, May 12th.
3            MR. ITKIN:  -- Caprock -- or, excuse me, Prospect sent
4    to my client and the other lender what were the "execution
5    documents," which are the final big transaction documents.  My
6    client signed them; CIT signed them; sent them back to
7    Prospect, and John Barry, Prospect's CEO, apparently signed
8    them, although they were never delivered back.
9            THE COURT:  Okay.
10           MR. ITKIN:  That document contains all of the other
11   agreements, both to the summary terms and conditions to the
12   term sheet stuff, but also the letter agreement, how the
13   parties deal with each other, issues, are contained in that
14   document.
15           THE COURT:  And what is the relevance of that
16   document?
17           MR. ITKIN:  Because, your Honor, the relevance of that
18   document is that the second sentence talks about the open
19   terms; the things that haven't been decided that aren't
20   contained that discuss the parties' relationship.
21           THE COURT:  Yes.
22           MR. ITKIN:  Those open terms are contained in the
23   final document.  Not only the financial terms, but also the
24   framework how the parties deal with each other terms.
25           THE COURT:  That's the final thing, right?  That's the
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```
                                                                      28
```
     72DVPROA              Argument
1    final agreement which dictates the rights and obligations of
2    the parties.  What we're dealing with in the letter is what the
3    relationship will be between Mr. Enmon and Prospect prior to
4    reaching that point.
5            And what you're doing is you're saying because the
6    letter did not contain all of the terms and provisions that
7    ultimately ended up in the not-consummated agreement for the
8    acquisition of Caprock, that the letter is not a binding and
9    enforceable agreement.  And I don't think that's permissible.
10           MR. ITKIN:  I think your Honor can look to that other
11   document to figure out -- your Honor's question, I believe, if
12   I heard it correctly, was something to the effect of what other
13   things did the parties agree upon were the open terms.  Because
14   we know there's open terms based on the second sentence.
                              Page 13
```

72DVPROA.txt

```
15          THE COURT:  But you're citing a May 12th document, and
16     we are looking at what the intent of the parties was on, what
17     is it, April?  I know it's the 11th.  On April 11th.
18          MR. ITKIN:  And, your Honor, I think that's -- the
19     point is that the intent of the parties on April 11th was not
20     to have a binding agreement, because the express language says
21     there's extra terms that we're going to have to fill in.
22          THE COURT:  And if there are going to be extra terms
23     with respect to the letter, they have to be signed by the
24     parties.  And I gave you an opportunity to come to the Court
25     and say, Well, look, these are the other things which we agreed
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                      29

72DVPROA                    Argument

```
1      upon following the formality set forth in the letter agreement
2      which alter Prospect's right to enforce the arbitration clause.
3      And that you have not done.  I take it the acquisition
4      agreement would be a very lengthy document if it's a typical
5      acquisition agreement.
6           MR. ITKIN:  It's about 129 pages, your Honor, not
7      including attachments and things like that, but, yes.
8           THE COURT:  Yes.  And the fact that the letter
9      agreement does not contain all the terms and conditions in that
10     is not surprising.
11          MR. ITKIN:  For example, your Honor, the final
12     document does not contain an arbitration provision.
13          THE COURT:  It's a very, very different type of
14     transaction, right?
15          MR. ITKIN:  I don't think so, your Honor, because --
16          THE COURT:  An arbitration agreement between what,
17     between Caprock and Enmon?
18          MR. ITKIN:  No, between Prospect and Enmon.
19          THE COURT:  Yes.
20          MR. ITKIN:  It still has a choice of law provision; it
21     still has a choice of form provision it has almost everything
22     that's in the letter agreement.
23          THE COURT:  And what is the significance of there not
24     being an arbitration agreement in the acquisition agreement?
25          MR. ITKIN:  Your Honor, it shows that the parties
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

                                                                      30

72DVPROA                    Argument

```
1      changed not only the open terms in the term sheet, but also the
2      open terms in the letter agreement.
3           THE COURT:  I don't know how you can say that.
4      Caprock may have said, I don't like arbitration; I like jury
5      trials, and I'm not going to sign any document which foregoes
6      my right to a jury trial.
7           MR. ITKIN:  Your Honor, let's talk about maybe then
8      the second issue about acceptance in this case.
9           THE COURT:  Okay.
10          MR. ITKIN:  Because even if your Honor decides that
11     the parties intended to be down, etc., Enmon accepted too late.
12     And under clear New York law, Second Circuit law, restatement
13     of contracts, if you accept after the offer deadline, no
14     contract.
15          THE COURT:  What is it?  If you accept after the
16     deadline, what is it?
17          MR. ITKIN:  It's a counteroffer, your Honor.
18          THE COURT:  Yes.  And if it's a counteroffer by
19     signing the agreement, by cashing -- I don't know how the
```

                                Page 14

72DVPROA.txt

20  $25,000 was transmitted in keeping it, was not the counteroffer
21  accepted?
22         MR. ITKIN:  It wasn't, your Honor, for the very reason
23  you articulated and Prospect articulated, which is that any
24  modification to a letter agreement needs to be signed by John
25  Barry, the CEO of Prospect.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                              31
    72DVPROA                Argument
1          THE COURT:  And why is that a modification?  Oh,
2   there's a modification of the termination there?
3          MR. ITKIN:  That's correct, your Honor.  And there
4   is -- it's undisputed that John Barry never signed the term
5   sheet -- or the letter agreement.
6          THE COURT:  It's significant that you keep exchanging
7   term sheet and letter agreement.  But there is an affidavit, is
8   there not, from the principal of Prospect?
9          MS. GRINALDS:  Yes, that's Mr. DeBie.
10         THE COURT:  What is there that you say did not occur?
11  I'm looking at the letter dated -- the signature of the
12  president and CEO of Prospect and Mr. Enmon.  What is --
13         MR. ITKIN:  Grier Eliasek I think is what you're
14  looking at, your Honor, a gentleman named Grier Eliasek
15  signed --
16         THE COURT:  I guess, something like that.  I'm looking
17  at Exhibit E to the affidavit of Bart DeBie.
18         MS. GRINALDS:  DeBie.
19         THE COURT:  DeBie.
20         MR. ITKIN:  It's signed by Grier Eliasek.  Except to
21  have a modification, in other words, changing the date of the
22  termination, it would need to be signed, by the letter
23  agreement's own terms, by John Barry, the president and CEO.
24         THE COURT:  Modification is that the letter calls for
25  something to be signed by one officer of Prospect and it's
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
                                                              32
    72DVPROA                Argument
1   signed by another officer of Prospect, president and COO, is
2   that --
3          MR. ITKIN:  CEO, your Honor.  In fact, you can look at
4   the handout that they provided you; it highlights that very
5   part.
6          It is clear New York law that to have an offer and
7   acceptance, they got to match.  And so if you want -- if
8   Prospect wants to accept the counteroffer, they needed to do it
9   by having John Barry sign as CEO.  Grier Eliasek's signature
10  doesn't meet the terms of the letter agreement.
11         THE COURT:  It binds Prospect, doesn't it?
12         MR. ITKIN:  It does not, your Honor.
13         THE COURT:  It does not?
14         MR. ITKIN:  Because the only thing that can bind
15  Prospect is a formal written instrument signed by John F. Barry
16  as CEO of Prospect.
17         THE COURT:  Okay.  What else do you want to tell me?
18         MR. ITKIN:  Your Honor, I'd like to focus also on the
19  arbitration agreement a little bit; they've touched on it some.
20  We've talked about it extensively.
21         THE COURT:  The paragraph that deals with arbitration
22  in the term sheet -- in the --
23         MR. ITKIN:  Yes, the letter agreement.
24         THE COURT:  Okay.  In the letter agreement.
                         Page 15

72DVPROA.txt
25        MR. ITKIN:  And, your Honor, the part we're
        SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

33

72DVPROA                    Argument
1  complaining about, the part that makes this clause standing
2  alone, because the contract itself isn't valid; we have to look
3  at the arbitration agreement, is it valid.  The part standing
4  alone that makes it invalid is their right, Prospect's right,
5  to get an arbitration result they don't like, opt out, and come
6  back to court.
7        THE COURT:  Oh, after there's been a decision by the
8  arbitrator they could opt out, right?
9        MR. ITKIN:  Your Honor, it allows them to do it at any
10  time.
11        THE COURT:  And what's your authority to that?
12        MR. ITKIN:  Your Honor, the arbitration -- and, I'm
13  sorry, do you mean by case authority, your Honor, or --
14        THE COURT:  Any authority from whatever source would
15  enable a party to proceed to arbitration, get an arbitration,
16  have an adverse arbitration award, and then say, Oh, no, I
17  withdraw from the jurisdiction of the arbitrator the matter on
18  which the arbitrator has heard the parties and rendered a
19  decision.
20        MR. ITKIN:  Okay.  And, your Honor, that would be in
21  paragraph 10 by their own document that Prospect drafted of the
22  letter agreement.
23        THE COURT:  Yes, I have it in front of me.
24        MR. ITKIN:  Okay.  You look at -- it's about midway
25  through there.
        SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

34

72DVPROA                    Argument
1        THE COURT:  "Borrower agrees that Prospect has the
2  right at any time to move any claim in arbitration to a New
3  York court."  And you read that to give to Prospect the right
4  to remove the claim in arbitration after it has been submitted
5  to the arbitrator and the arbitrator has rendered a decision,
6  right?
7        MR. ITKIN:  Yes, your Honor.  I think it says "at any
8  time."
9        THE COURT:  Okay.  I understand your argument.
10        MR. ITKIN:  And, your Honor, I believe that because
11  they can do that at any time, it defeats the whole purpose
12  behind arbitration, which they have told us is, you know, the
13  swift, speedy resolution of claims.
14        Your Honor, is there anything else you'd like to hear
15  from us?
16        THE COURT:  No.  Thank you.  Do you want anything in
17  rebuttal?
18        MS. GRINALDS:  Do you have any other questions?
19        THE COURT:  I have no other questions.  I'll take a
20  five-minute recess.
21        MS. GRINALDS:  Thank you, your Honor.
22        (Recess)
23        THE COURT:  Aspects of this controversy between
24  Prospect Energy Corporation and Michael Enmon are before two
25  courts:  This Court and state court in Texas.
        SOUTHERN DISTRICT REPORTERS, P.C.
                (212) 805-0300

35

72DVPROA                    Argument
                            Page 16

72DVPROA.txt

```
 1          Prospect Energy seeks to enforce an agreement to
 2     arbitrate contained in a letter dated April 11, 2006.  And the
 3     Court has been advised by Prospect's counsel this morning that
 4     the first session before the arbitrator is scheduled for
 5     February 15th.
 6          Mr. Enmon has been sued for fees in connection with
 7     this transaction by his previous lawyer, and in his
 8     counterclaim against Prospect seeks to litigate issues which
 9     Prospect claims it may not do by virtue of the arbitration
10     provision contained in the April 11, 2006 letter.
11          Mr. Enmon sought to fund the acquisition of an entity
12     known as Caprock Pipe and Supply, LLP, and Prospect Energy
13     Corporation was serving as a financial adviser to Mr. Enmon in
14     connection with that proposed acquisition.  The April 11, 2006
15     letter is headed "Re: Proposal to Provide Up to $10,000,000 of
16     Subordinated Debt ('subdebt') Plus Net Profit Interest ('NPI')
17     by Prospect Energy Corporation or an affiliate to Caprock Pipe
18     & Supply LLP."
19          In connection with that proposed provision of
20     $10,000,000 of subordinated debt and Prospect's agreement to
21     provide its expertise and financial services, the parties
22     entered into an agreement dated April 11, 2006, which is the
23     agreement which contains in paragraph 10 thereof the
24     arbitration provision at issue here.
25          Prospect seeks an order of this Court to compel
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

36

```
       72DVPROA                    Argument
 1     arbitration and to stay any proceedings in state court relating
 2     to this transaction.  Enmon seeks dismissal of the demand for
 3     arbitration.
 4          I want to stress at the outset that the only issue
 5     before this Court relates to arbitrability.
 6          Enmon advances in opposition to arbitrability a number
 7     of issues.  For example, fraud in the inducement by Prospect,
 8     other matters relating to the merits of the underlying dispute
 9     between Prospect and Enmon.  This Court does not purport in any
10     way to opine on the issues which Mr. Enmon may raise before the
11     arbitrator.
12          The fundamental disagreement between the parties is
13     whether the April 11, 2006 letter is in and of itself a
14     complete binding agreement between the parties, as Prospect
15     contends, or whether that letter must be read together with the
16     term sheet which was forwarded together with the letter and,
17     indeed, paginated consecutively with the letter, which sets
18     forth in some detail the proposed terms and conditions of the
19     acquisition.
20          We conclude that the letter of April 11, 2006 is a
21     freestanding binding agreement between the parties; and that
22     the objections to that letter and to the terms of the
23     arbitration provision, paragraph 10 of that letter, are without
24     merit.
25          It is quite common, indeed it is more likely the rule
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

37

```
       72DVPROA                    Argument
 1     than the exception, that in transactions of this sort, the
 2     entity in the role which Prospect was to engage in with respect
 3     to this transaction are the subject of an agreement between the
 4     parties short of the actual consummation of the transaction.
 5          And reading the April 11th letter and the term sheet,
                          Page 17
```

72DVPROA.txt

6  one can only conclude that the letter agreement was a separate
7  document from the nonbinding term sheet, which was signed by
8  the parties and which caused Mr. Enmon to transmit to Prospect
9  $25,000, and cause both parties to go forward in an attempt to
10  consummate the Caprock acquisition. Obviously, that
11  acquisition never took place, which is why the parties are in
12  dispute.
13        Mr. Enmon advances a multitude of objections to the
14  enforceability of the arbitration provision in the April 11,
15  2006 letter, and the Court will attempt to deal with all of
16  them. Although many, many issues are advanced, they either
17  strain the language of the agreement of April 11, 2006 or are
18  precluded by clear and controlling precedent in the Second
19  Circuit.
20        Let me address some of the issues which have been
21  raised.
22        The most recently-advanced contention is that the
23  letter of April 11, 2006 is not binding because the offer
24  contained in that letter expired by its terms. Paragraph 4 of
25  the April 11th agreement said, This letter shall terminate on
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    38

72DVPROA                    Argument
1  the earlier of one, April 11, 2006, unless this letter is
2  accepted and agreed to prior to such date. Mr. Enmon contends
3  that as of midnight on April 10th, this agreement terminates by
4  its specific terms. It would indeed be anomalous if a letter
5  dated April 11th was sent in connection with an offer which had
6  already expired.
7        What occurred, as is set forth in the affidavit of a
8  principal of Prospect, Bart DeBie, is that on April 11th he
9  sent to Mr. Enmon via e-mail an unsigned copy of the letter
10  agreement; that on April 11th, Mr. Enmon returned a signed copy
11  of the letter agreement; that on April 11th he sent Mr. Enmon
12  an e-mail requesting that he wire the deposit of $25,000 to
13  Prospect, as was required by clause 6 of the letter agreement,
14  and stated, "We will proceed after we have received this letter
15  signed by you and returned to Prospect with required payment by
16  April 11, 2006."
17        The Court construes agreements wherever possible and
18  indicated by not only the language, but the nature of the
19  transaction, that the April 11th letter did not terminate
20  before it was accepted.
21        The more natural reading is that the letter had to be
22  accepted by April 11, 2006, as found in the final paragraph of
23  the letter agreement. That the April 11th agreement was
24  understood by the parties not to have terminated before it was
25  accepted is evidence by the transmission of the funds, the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    39

72DVPROA                    Argument
1  acceptance of the funds, and the fact that the parties, that
2  is, both Prospect and Enmon, proceeded to work on the
3  transaction.
4        Even if the offer had expired before the letter was
5  transmitted to Enmon, the signing of the April 11th letter and
6  the transmission of the $25,000 may be regarded as a
7  counterclaim which Prospect accepted and executed on the same
8  day. We, therefore, reject the notion that the April 11th
9  agreement expired before it came into being.
10        Another argument advanced by Mr. Enmon is that the
                            Page 18

72DVPROA.txt
```
11  acceptance of the April 11th agreement is invalid since
12  paragraph 5 of that letter says, "This letter can only be
13  amended by a formal written instrument signed by borrower and
14  John F. Barry as CEO of Prospect."  Whereas, the April 11th
15  letter was signed by a Mr. Eliasek as president and CEO.
16  Again, this is a pure afterthought, belied by the actions of
17  the party.
18          Another objection to the binding nature of the April
19  11, 2006 letter relates to the second sentence of that which
20  reads, "The terms and conditions of this proposal are not
21  limited to those set forth herein or in the term sheet."
22          At the prior appearance of the parties before this
23  Court, as the Court raised the question of whether in the
24  language, "the terms and conditions of this proposal are not
25  limited to those set forth herein... provided a basis for a
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

40

72DVPROA                  Argument
```
1   valid objection to the enforceability of the arbitration
2   provision contained in that letter."
3           What that sentence means, the Court finds, is that it
4   was open to the parties to agree to additional terms and
5   conditions of the April 11th agreement.  If the parties agreed
6   to such additional terms and provisions and complied with a
7   requirement set forth in paragraph 15 of the letter, which
8   provides, "No modification or waiver of a requirement set forth
9   in the term sheet or this letter shall be effective unless a
10  formal instrument providing therefor is signed by borrower and
11  Mr. John F. Barry, CEO of Prospect."
12          Enmon, in his exhaustive challenges to the
13  enforceability of the letter, does not claim that there was any
14  such limitation or modification of the April 11 letter agreed
15  upon by the parties.
16          Mr. Enmon advances a number of additional issues,
17  including the following:
18          That the arbitration agreement is invalid because it
19  lacks mutuality.  The Court rejects that because it believes
20  that there was mutuality involved in that Prospect agreed in
21  good faith to expend its time and efforts and resources in
22  furtherance of a proposed transaction.  But, in any event,
23  Second Circuit law is clear that there is no requirement for
24  mutuality in agreements to arbitrate.
25          Enmon's claim that the agreement is unconscionable has
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

41

72DVPROA                  Argument
```
1   no basis on the record before this Court and is an issue which
2   might be addressed before the arbitrator, but is not a basis to
3   avoid arbitration.
4           Enmon also cites the provision in the arbitration
5   agreement which gives Prospect "The right, at any time, to
6   remove any claim in arbitration to a New York court."  That's
7   paragraph 10 of the April 11th letter.
8           Prospect replies that it has agreed that it will
9   submit all issues to the arbitration before the American
10  Arbitration Association.  Enmon contends that Prospect could go
11  through an arbitration on a particular claim, and then, after
12  receiving an adverse determination by the arbitrator, could
13  seek to withdraw that claim.
14          The Court believes that Prospect would not have a
15  right to remove after arbitration and after an adverse decision
```
Page 19

72DVPROA.txt

16  by the arbitrator.
17       Enmon contends that his suit in state court in his
18  counterclaim against officers and directors of Prospect who are
19  nonsignatories to the April 11th agreement provides that as a
20  consequence, that he may litigate within Texas state court
21  since they are not bound by the April 11th letter which they
22  did not sign.
23       There's clear Second Circuit law which indicates that
24  officers and directors of a corporation which is a party to an
25  arbitration agreement may not be sued independently of the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

72DVPROA                    Argument
1  arbitration agreement.
2       Defendant also advances the claim that in a Texas
3  court he is not suing on the April 11th agreement itself,
4  either there's Supreme Court authority, for the proposition
5  that one cannot avoid the terms of an arbitration agreement by
6  suing on the underlying issues between the parties and thereby
7  avoid arbitration.
8       Mr. Enmon makes a last-minute effort to avoid the
9  arbitration by seeking a jury trial.  Prospect states that
10  apart from its lack of merits, that demand for a jury truly is
11  not timely.  In any event, it clearly is not a basis for
12  avoiding the arbitration provisions.
13       Enmon advances a number of other issues why he
14  believes the April 11, 2006 letter is not binding because it
15  has open terms.  To establish the existence of open terms,
16  Enmon looks to the proposed acquisition agreement and points to
17  provisions in the proposed acquisition agreement which is dated
18  sometime in May which are not contained in the April 11th
19  agreement.  That's entirely understandable.  The April 11th
20  agreement did not purport to deal with all the terms and
21  conditions of the acquisition itself, and the fact that there
22  is a provision in the final agreement which is not in the April
23  11th letter is really irrelevant.
24       Finally, I think I will have covered all of the
25  points.  If there's any I have omitted, you may call them to my
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

43

72DVPROA                    Argument
1  attention.
2       Enmon contends that the April 11th agreement
3  arbitration provision is unenforceable because there's no
4  specific provision such as a backup fee which would have to be
5  paid by Enmon were he to walk away from the deal.  There was no
6  prohibition in the April 11th letter which would prohibit
7  Mr. Enmon from walking away from the deal if prior to its
8  consummation he concluded that it was not advantageous for him
9  to go forward.  And the absence of such provision does not make
10  the April 11th agreement unenforceable.
11       There is a very strong policy as a matter of federal
12  law favoring arbitration, and Mr. Enmon has presented nothing
13  which, in this Court, overcomes that strong public policy.
14       Accordingly, the Court determines that the arbitration
15  agreement is valid and enforceable, and directs that it go
16  forward as scheduled.
17       In preservation of that order, the Court hereby
18  enjoins respondent and its agents, servants, employees, and all
19  persons acting in concert or participation with them from
20  initiating, maintaining, pursuing, assisting or otherwise
Page 20

72DVPROA.txt

```
21   participating in any claim or action against petitioners herein
22   in contravention of the letter agreement entered into on April
23   11, 2006, and the arbitration agreement contained therein,
24   including, but not limited to, all claims asserted by
25   respondent Michael Enmon against petitioners in the action in
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

44

```
     72DVPROA                    Argument
1    the District Court, Jefferson County, Texas, captioned Robert
2    Fiser, Attorney-at-Law, PC, v. Michael Enmon, Index No.
3    B-017745.
4              Now, is there anything I've omitted?
5              MS. GRINALDS:  Your Honor, may we also have a ruling
6    that the bond be exonerated that my client has posted pending
7    determination of the preliminary injunction?
8              THE COURT:  Yes, bond is exonerated.
9              MS. GRINALDS:  Thank you, your Honor.
10             THE COURT:  Anything further?
11             MR. ITKIN:  Nothing further, your Honor.
12             THE COURT:  Thank you.
13             MR. NELSON:  Thank you, your Honor.
14             MS. GRINALDS:  Thank you.
15             THE COURT:  If you wish a written memorialization of
16   the Court's order, you may submit that.  But the Court's oral
17   order is final in writing.
18             MS. GRINALDS:  Thank you, your Honor.
19             MR. NELSON:  Thank you.
20             THE COURT:  Thank you all.
21                             *   *   *
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

American Arbitration Association Claim Confirmation Number: 002-Q5B-VMY

| | |
|---|---|
| Prospect Energy Corporation, | § |
| Prospect Capital Management LLC, | § |
| Bart De Bie, John Barry, and | § |
| M. Grier Eliasek, Walter Parker | § |
| | § |
| Claimants. | § |
| vs. | § |
| | § |
| Michael Enmon | § |
| | § |
| Respondent. | § |

## MICHAEL ENMON'S COUNTERCLAIM

Michael Enmon files this counterclaim against Prospect Energy Corporation, Prospect Capital Management LLC, John Barry, Grier Eliasek, Walter Parker, and Bart de Bie. Enmon sues for fraud, fraudulent inducement, negligent misrepresentation, tortious interference with the Caprock agreement, breach of fiduciary duty, and a declaration that the arbitration provision contained in the term sheet is not enforceable and does not cover the claims before this Honorable Tribunal.

**A.    Enmon Was Presented With a Unique Opportunity to Purchase Caprock Pipe and Supply Co.**

In early 2006, Enmon discovered a unique opportunity to purchase Caprock Pipe and Supply Co. ("Caprock") for substantially less than its market value. Caprock, which operates primarily in Texas and New Mexico, is one of the nation's largest sellers of refurbished pipe for oil and gas production. In one twelve-month period during 2005 and 2006, Caprock's earnings exceeded $15 million. Based on expected market conditions, Caprock's profits will rise significantly over time.

Excited about the opportunity to purchase Caprock, Enmon began the process of acquiring the company's assets. After Caprock agreed to sell its assets to Enmon in February 2006, Enmon performed substantial due diligence on Caprock. Enmon's due diligence confirmed that the Caprock transaction was a truly unique business opportunity that would allow him to earn enormous profits.

The transaction was so advantageous that Enmon spent his life savings, sold his house, and sold many valuable possessions in order to cover due diligence and closing expenses.

**B.      Prospect Indicates Interest in the Caprock Acquisition**

Enmon engaged CIT—one of the nation's largest and most trusted banks—to act as senior lender on the transaction. After considering other options, Enmon also approached Prospect to act as subordinated lender, joint venturer, and partner. As an initial step, Prospect sent Enmon a non-binding term sheet that outlined proposed terms for financing the transaction. The term sheet contains twelve consecutively numbered pages. The Letter comprises the first four pages of the term sheet.[1]

**C.      Prospect Indicated that the Letter was Non-Binding**

Both Enmon and Prospect recognized that the term sheet containing the Letter was not binding and could not be relied upon. Indeed, the e-mail by which Prospect transmitted the second-to-last draft of the term sheet to Enmon expressly stated: "attached please find our **non-binding** term sheet." The express language of the Letter itself further renders it indefinite and no more than an agreement to agree that cannot bind Prospect or Enmon in any way. Specifically, the second sentence of the Letter states that it is incomplete: **"The terms and conditions of this Proposal are not limited to those set forth herein or in the Term Sheet."** The Letter also references **"final documentation"** and **"definitive documentation"** to be executed by the parties at a later date.

**D.      Enmon Never Accepted Prospect's Purported Offer**

Prospect now says that Enmon accepted the terms of the Letter by signing and returning the Letter to Prospect on April 11, 2006. This could not have occurred because, by that date, Prospect's

---

[1] The last eight pages of the term sheet are a "Summary of Proposed Terms and Conditions." Ex. A at 5-12. Enmon maintains that (1) the term sheet is a single document with twelve pages; and (2) no portion of the term sheet is enforceable. Prospect says that the two sections of the term sheet are separate documents, despite that fact that it transmitted all twelve consecutively numbered pages of the term sheet to Enmon as a single document. Prospect makes this "two-document" argument because it only wants to enforce the Letter portion of the term sheet (which contains provisions, such as the arbitration provision, that are advantageous to Prospect). Tellingly, Prospect does not wish to enforce the Summary of Proposed Terms and Conditions portion of the term sheet. That portion summarizes the terms and conditions that Prospect radically retooled minutes before its deal with Enmon was set to close.

purported offer had already expired by its own terms.   Specifically, the Letter states that it "**shall terminate on the earlier of**" several events, the first being the arrival of "**April 11, 2006 unless this letter is accepted and agreed to prior to such date.**"   As evidenced by Enmon's signature on page four of the letter, dated April 11, 2006, Enmon did not accept and agree to the Letter **prior to** April 11, 2006 as required.   Rather, Enmon allegedly accepted Prospect's offer **on** April 11, 2006. Enmon's purported acceptance therefore varied from the terms Prospect says it offered and thereby prevents the formation of a contract.

**E.    Prospect Drafts and Executes Final Documentation to Fund the Caprock Acquisition, But Sabotages the Deal at the Eleventh Hour in an Attempt to Receive a Windfall.**

After it delivered the non-binding term sheet containing the Letter to Enmon, Prospect claims it conducted due diligence on the Caprock transaction (at Enmon's expense).   In the weeks leading up to the scheduled closing date (May 12, 2006), Prospect participated in drafting the final documentation and assured Enmon that funding would be provided in time for the deal to close as scheduled.   In fact, Enmon, Caprock, CIT, and Prospect executed the final documentation, and according to Enmon, Caprock, and CIT, the deal was done.   However, Prospect refused to deliver the executed documentation and closing funds unless Enmon agreed to re-tool the transaction in a way that completely departed from the terms of the final documentation and redirected much of the favorable benefits of the acquisition to Prospect.

Enmon refused to submit to Prospect's fraudulent, hold-up tactics, and insisted that Prospect live up to the terms of the final documentation and the litany of assurances that the deal would close in a manner consistent with such documentation.   Instead, Prospect unethically and improperly contacted Caprock behind Enmon's back in a further attempt to alter the deal.   As a result, the transaction cratered and Enmon was unable to purchase Caprock, costing him millions of dollars.

**F.    Unable to Pay the Legal Fees Incurred in the Failed Acquisition Attempt, Enmon's Corporate Attorney Files Suit Against Him in Texas and Enmon Files a Third-Party Complaint Against Prospect.**

3

Enmon spent his life savings trying to acquire Caprock. When the deal collapsed due to Prospect's machinations, he was unable to pay approximately $50,000 in legal fees to Robert Fiser, the corporate lawyer who advised him on the Caprock transaction. Consequently, on September 21, 2006, Fiser sued Enmon in Jefferson County, Texas, where Enmon resides. Enmon answered the lawsuit, and filed a third-party claim against Prospect for fraud, statutory fraud, and tortious interference with a contract.

**G.     Petitioners Demanded Arbitration in New York.**

After answering and filing a motion to compel arbitration in the Texas case, Prospect filed a *Petition to Compel Arbitration and for Injunctive Relief* in the New York Federal Court. Judge Sand ordered the parties to arbitration. Enmon contends that the arbitration clause and document containing it are unenforceable and that this honorable tribunal should dismiss this proceeding in favor of the Texas case.

ENMON prays that this Honorable Tribunal award him a declaration that allows the Texas case to proceed. In the alternative, Enmon prays that this Honorable Tribunal award him actual damages, consequential damages, pre-judgment and post-judgment interests, reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, costs of court, exemplary damages, and all such other and further relief, to which Enmon may show himself entitled.

Respectfully submitted,

ARNOLD & ITKIN LLP

_____

Jason A. Itkin
Texas State Bar No. 24032461
Stephen R. Foster
Texas State Bar No. 24027314
5 Houston Center
1401 McKinney Street, Suite 2550
Houston, Texas 77010
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

**ATTORNEYS FOR DEFENDANT AND
COUNTER- CLAIMANT MIKE ENMON**

## CERTIFICATE OF SERVICE

I certify that a copy of the this instrument was served under AAA guidelines, via electronic mail and facsimile on February 19, 2007, upon the following counsel of record:

Maura Barry Grinalds
Timothy G. Nelson
**Skadden Arps Slate Meagher & Flom**
Four Time Square
New York, NY 10036
*Counsel for Petitioners*

Robert A. Zanni
Case Manager
**American Arbitration Association**
Northeast Case Management Center
950 Warren Avenue
East Providence, RI 02914

_____
Jason A. Itkin

5

Jason A. Itkin, Esq. (JI 8442)
Kurt B. Arnold, Esq. (KA 8716)
Caj D. Boatright, Esq. (CB 7462)
**ARNOLD & ITKIN LLP**
5 Houston Center
1401 McKinney Street, Ste. 2550
Houston, TX 77010
Tel:   (713) 222-3800
Fax:   (713) 222-3850

Attorneys for Respondent and Intervenor

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x

| | | |
|---|---|---|
| PROSPECT ENERGY CORPORATION, PROSPECT CAPITAL MANAGEMENT LLC, JOHN F. BARRY, M. GRIER ELIASEK, WALTER PARKER and BART DE BIE, | : : : : | |
| Petitioners, | : | 07-Civ. 117 (RLC) |
| -against- | : | |
| MICHAEL ENMON, | : | |
| Respondent. | : | |

-------------------------------------------------------x

**RESPONDENT MICHAEL ENMON AND CAPROCK PIPE & SUPPLY,
INC.'S MOTION FOR RELIEF FROM
ARBITRATION ORDER AND INJUNCTION**

# TABLE OF CONTENTS

Table of Contents.................................................................................ii

Table of Authorities............................................................................iii

I.    Introduction ...............................................................................2

II.   Summary of Facts ......................................................................4

    A.    Enmon Has a Unique Opportunity to Purchase a Business . ............4

    B.    Prospect's April 11, 2006 Financing Proposal to Enmon. ................5

    C.    Prospect Executes the Final Financing Agreement, But Refuses to Provide the Proposed Financing .......................................6

    D.    Prospect Initiates Proceedings in Three Different Tribunals to Compel Enmon to Arbitrate His Claims Against Prospect .............8

    E.    Prospect Falsely Represents to this Court that it Never Executed the Credit Agreement .....................................................9

    F.    Enmon and Caprock Learn Through Discovery in the Arbitration Proceeding that Prospect Executed the Credit Agreement .....................................................................................12

III.  Arguments and Authorities.......................................................13

    A.    Enmon and Caprock are Entitled to a Modification of the Injunction under FED .R. CIV. P. 60(b)(2) ..................................14

    B.    Enmon and Caprock are Entitled to a Modification of the Injunction Under FED. R. CIV. P. 60(b)(5)...................................16

IV.   Conclusion ...............................................................................18

Certificate Of Service ..........................................................................20

### TABLE OF AUTHORITIES

**CASES**

*U.S. Xpress Enters. V. J.B. Hunt Transp.,*
    320 F.3d 809 (8th Cir. 2003) ................................................................ 14

*United States v. All Right, Title and Interest in Property and Premises Known as*
*710 Main Street, Peeskill, New York,*
    753 F.Supp.121, 126 (S.D.N.Y. 1990) ............................................. 14

*Olwine, Connelly, Chase, O'Donnell& Weyher v. Valsan, Inc.,*
    640 N.Y.S.2d 72 (N.Y. App. 1996) .................................................. 15

*Agostini v. Felton,*
    521 U.S. 203, 215 (1997) .................................................................. 17

*New York State Ass'n for Retarded Children, Inc. v. Carey,*
    706 F.2d 956 (2d Cir. 1983) ............................................................. 17

*Kalamazoo River Study Group v. Rockwell, Int'l,*
    355 F.3d 574, 587 (6th Cir. 2004) ..................................................... 17

*Railway Employees v. Wright,*
    364 U.S. 462 (1961) .......................................................................... 17

**STATUTES**

9 U.S.C. § 16

28 U.S.C. § 1291

## RESPONDENT MICHAEL ENMON AND CAPROCK PIPE &SUPPLY, INC.'S MOTION FOR RELIEF FROM ARBITRATION ORDER AND INJUNCTION

Respondent Michael Enmon ("Enmon") and Caprock Pipe & Supply, Inc. ("Caprock") file this *Motion for Relief from Arbitration Order and Injunction* and ask the Court to confirm that Caprock may file a breach of contract claim against Prospect Energy Corporation in New York state court. Movants' motion should be granted because:

(1)     Movants recently discovered in the arbitration proceeding between Enmon and Prospect that a separate contract between Caprock and Prospect was consummated, despite Prospect's repeated false representations to this Court that such contract was never executed;

(2)     Prospect unquestionably breached its contract with Caprock;

(3)     The contract between Caprock and Prospect (a) completely supersedes (through integration and merger clauses) the purported agreement between Enmon and Prospect on which this Court's arbitration order and injunction are based, and (b) expressly preserves Caprock's right to pursue its claims in court; and

(4)     Caprock was not a party to the alleged contract or arbitration agreement between Enmon and Prospect.

In short, Prospect not only failed to produce the executed signature pages of the contract between Caprock and Prospect when this Court decided the arbitration issue, it affirmatively misrepresented to the Court (and to Enmon and Caprock as well) that the final contract was never consummated. As a result, months of time and thousands of dollars in legal fees have been wasted, and Enmon and Prospect are on the cusp of arbitration under the false premise that Prospect never signed a final financing agreement with Caprock. Now that the truth is known, Caprock is

1

ready to pursue its claims against Prospect in the New York Courts pursuant to the forum selection clause in the contract between Caprock and Prospect.

The arbitration provision in the purported agreement between Enmon and Prospect, signed before Caprock even existed, obviously cannot apply to Caprock's claims arising from a breach of a separate contract between it and Prospect. Consequently, Enmon and Caprock do not believe the Court intended its arbitration order and injunction to apply to Caprock's newly discovered contract claims. However, Movants file this motion simply as precautionary measure to ensure that the Court's injunction is not violated.

## I.

## INTRODUCTION

On February 13, 2007, this Court compelled Enmon to arbitrate his tort claims against Prospect based upon an arbitration clause in a purported preliminary letter agreement and term sheet (the "Letter Agreement") between Enmon and Prospect.[1] The order also enjoined Enmon from taking any action outside of the arbitration proceeding against Prospect "in contravention of" the Letter Agreement. In the pleadings, sworn affidavits, and oral hearings leading up to the Court's decision to compel arbitration, Prospect and its counsel falsely represented that the final financing agreement contemplated by the Letter Agreement, which was to include Prospect, a senior lender ("CIT"), and Caprock,

---

[1] As the Court is aware, Enmon disputes that the Letter Agreement and its arbitration provision are binding. Those issues are currently before the Second Circuit and have no bearing on the relief sought herein.

2

was not consummated because the final documentation (the "Credit Agreement") was never executed by Prospect.[2]  The Court and Enmon understandably accepted Prospect's misrepresentations, and the terms of the Letter Agreement (along with its arbitration clause) determined the motion to compel arbitration.

During the arbitration proceeding, Enmon learned that the Credit Agreement <u>was</u> consummated and signed by Prospect's President and CEO, and Prospect's contrary assertions to this Court were false.  Upon execution, the Credit Agreement expressly superseded the Letter Agreement between Enmon and Prospect.  More importantly, the Credit Agreement <u>does not contain an arbitration provision</u>, instead calling for Caprock and Prospect to litigate disputes surrounding the agreement in New York courts.  Accordingly, when the executed signature pages of the Credit Agreement were recently uncovered, Caprock learned for the first time that it has a breach of contract claim against Propsect – a claim completely unaffected by the Letter Agreement between Enmon and Prospect.

To be clear, Caprock was not a party to the Letter Agreement or its arbitration provision, and Enmon is not a party to the Credit Agreement.  Thus, Caprock is confident that this Honorable Court's order compelling Enmon's tort claims to arbitration and enjoining him from further action in Court in contravention of the Letter Agreement was not intended to also enjoin Caprock from suing Prospect for breach of the Credit Agreement.  That is particularly true in this instance, wherein Prospect falsely swore to the Court that the Credit

---

[2] Enmon is not a party to the Credit Agreement.

Agreement was never executed an delivered.   Simply put, neither the Letter Agreement, the Credit Agreement, nor the law permits the injunction to extend to Caprock's claims.   However, because Enmon is a part owner of Caprock, and the Court's injunction could conceivably be read to apply to Caprock's contract claim, Movants file this motion out of an abundance of caution to ensure that neither Enmon nor Caprock violate the Court's order.  To the extent the injunction somehow prohibits Caprock from pursuing its claims against Prospect, Enmon and Caprock request that this Honorable Court modify its injunction pursuant to FED. R. CIV. P. 60(b) to allow Caprock to file a claim against Prospect in New York state court for breach of the Credit Agreement.

## II.

## FACTS

### A.   ENMON HAS A UNIQUE OPPORTUNITY TO PURCHASE A BUSINESS.

In February 2006, Enmon secured an agreement to buy the assets of Caprock Pipe and Supply Co. ("CPSC")[3], a company that specializes in selling refurbished pipe for oil and gas drilling operations. Ex. G, pp.4-5. Based on his due diligence, Enmon believed that his chance to purchase CPSC was a unique business opportunity that would potentially generate enormous profits. *Id.*, p.5. In order to pursue the CPSC transaction, Enmon spent his life savings and sold his

---

[3] CPSC is not to be confused with the Intervenor Caprock, which is the company formed by Enmon and others in May 2006 to execute the Credit Agreement and close the CPSC transaction.

4

house and other possessions to pay for expenses related to due diligence and closing the transaction. *Id.*

After Enmon engaged CIT (one of the nation's largest banks) to act as the senior lender for the CPSC transaction, Enmon approached Prospect to see if it would be interested in providing part of the financing for his acquisition of CPSC. *Id.* Prospect is a publicly traded business development company that allegedly specializes in lending to and investing in companies in the energy industry. Ex. H.

**B.    PROSPECT'S APRIL 11, 2006 FINANCING PROPOSAL TO ENMON.**

On April 11, 2006, Bart de Bie, an officer and managing director of Prospect Capital Management, emailed to Enmon Prospect's proposal to provide $10 million in subordinated debt financing for the CPSC transaction. Ex. E. Prospect's proposal was a single, consecutively paginated, twelve-page document made up of two parts: (1) a four-page letter and (2) an eight-page "Summary of Proposed Terms and Conditions." Ex. J (this document is referred to herein as the "Letter Agreement"). Prospect stated that it made its proposal "pursuant to the terms set forth in this letter and the attached Summary of Proposed Terms and Conditions dated April 11, 2006." *Id.* at 1 (emphasis added).   The Letter Agreement stated that:

> The Term Sheet does not purport to summarize all the terms and conditions upon which the proposed financing is to be based, **which terms and conditions would be contained fully only in <u>final documentation</u>** which must be satisfactory to Prospect and its counsel in their sole discretion.

5

*Id.* (emphasis added). In other words, the Letter Agreement initiated the process by which the Prospect would evaluate the CPSC transaction, and then work with Enmon and other lenders to enter into a final "Credit Agreement" memorializing the financing of the CPSC transaction.

Also included in the Letter Agreement was an arbitration clause that was the subject of the earlier hearings between Prospect and Enmon. *Id.* at 3.[4]

On April 11, 2006, Grier Eliasek (on behalf of Prospect) and Enmon signed the preliminary Letter Agreement. *Id.*; Ex. K. Throughout April and May 2006, Prospect repeatedly represented to Enmon that its was excited about the transaction and reassured Enmon that the CPSC transaction would close on economic terms consistent with the final documentation (the "Credit Agreement") prepared by Prospect's lawyers. Ex. G, pp.5-7.

C.  **PROSPECT EXECUTES THE FINAL FINANCING AGREEMENT, BUT REFUSES TO PROVIDE THE PROPOSED FINANCING.**

As the May 12, 2006 closing date approached, Enmon and others formed Caprock to act as the holding company for the newly acquired assets of CSPC, and to execute, and act as the "Borrower" in the Credit Agreement. Ex. F; Ex. A, ¶4. Caprock is a corporate entity distinct from Enmon, and was not a party to the Letter Agreement or its arbitration clause. Ex. J; Ex. A, ¶4. In fact, Caprock did not even exist when the Letter Agreement was signed. *Id.* Similarly, Enmon is not

---

[4] Enmon disputes the validity of the arbitration provision, upon which the Court relied to compel his tort claims against Prospect to arbitration. Again, the relief sought in this motion has nothing to do with the Letter Agreement or its arbitration provision, and instead is based on Prospect's breach of the Credit Agreement.

a party to the Credit Agreement. *Id.* Put simply, Caprock is not somehow bound by the Letter Agreement's arbitration clause.

On May 12, 2006, the scheduled closing date, Caprock and CIT executed the Credit Agreement and delivered the documents to Prospect. Ex. A, ¶8; Ex. C. As the agent for the CPSC transaction, all executed documents were to be delivered to Prospect. Ex. N, § 4.01(d). Enmon now knows that Prospect also executed the Credit Agreement and even had the transactional funds in place to wire to the sellers. Ex. C.; Ex. D.[5] All that remained was for Prospect to honor the terms of the freshly inked Credit Agreement and wire the funds. But, Prospect, acting under the guise that it had not yet executed the Credit Agreement, refused to wire the funds unless Enmon agreed to radically alter the terms of the financing in a manner that was wholly inconsistent with the terms of the Credit Agreement. A-64. The new terms were extremely favorable to Prospect and detrimental to Enmon. *Id.* By waiting until the day the closing was to occur, Prospect prevented Enmon from seeking an alternative source of financing and the CPSC transaction fell apart. *Id.* Moreover, Prospect's actions on May 12, 2006 constitute a flagrant breach of the Credit Agreement.

---

[5] Until the signature pages executed by Prospect were recently discovered in the underlying arbitration proceeding, Prospect falsely represented to Enmon and this Court that Prospect never executed the Credit Agreement. Ex. O, ¶2; Ex. B, p.5.

### D.  PROSPECT INITIATES PROCEEDINGS IN THREE DIFFERENT TRIBUNALS TO COMPEL ENMON TO ARBITRATE HIS CLAIMS AGAINST PROSPECT.

Based on Prospect's refusal to finance the CPSC transaction on terms consistent with those in the Credit Agreement, Enmon sued Prospect in Texas state court for fraud and tortious interference. Ex. G.  On December 22, 2007, Prospect answered Enmon's suit and filed a motion to compel arbitration based on the arbitration clause in the Letter Agreement between Enmon and Prospect. Prospect also filed a demand for arbitration with the American Arbitration Association. Ex. L.  Lastly, Prospect filed this case and asked the Court to compel Enmon's claims to arbitration based on the Letter Agreement and enjoin Enmon from any further proceedings in the Texas state court action. Ex. B; Ex. M.  The Court issued the TRO and ordered Enmon to appear on January 26, 2007 to show cause why the arbitration clause in the Letter Agreement should not be enforced. Id.[6]

The Court ultimately held three hearings about the enforceability of the Letter Agreement and its arbitration provision.  At the conclusion of the hearings, the Court ruled that the first four pages of the Letter Agreement constituted a valid, binding contract between Enmon and Prospect and that the arbitration clause contained in the first four pages was enforceable. Ex., pp.35-44.  The Court also

---

[6] None of the claims asserted by Enmon involved a breach of the Credit Agreement because he was not a party to the Credit Agreement.  Moreover, Caprock never filed a claim against Prospect for breach of the Credit Agreement because, due to Prospect's misrepresentations, Caprock was unaware the Credit Agreement had been executed.

permanently enjoined Enmon from prosecuting his claims in Texas state court. *Id.*

Specifically the Court ordered that:

> The Court hereby enjoins respondent (Michael Enmon) and its agents, servants, employees, and all persons acting in concert or participation with them from initiating, maintaining, pursuing, assisting, or otherwise participating in any claim or action against petitioners herein in contravention of the letter agreement entered into on April 11, 2006, and the arbitration agreement contained therein, including, but not limited to, all claims asserted by respondent Michael Enmon against petitioners in the action in the district court, Jefferson County, Texas, captioned Robert Fiser, Attorney-at-Law, PC v. Michael Enmon, Index No. B-017745.

*Id.*, pp.43:17-44:3.

### E.   PROSPECT FALSELY REPRESENTS TO THIS COURT THAT IT NEVER EXECUTED THE CREDIT AGREEMENT.

If Enmon had known that Prospect had executed the Credit Agreement, this would have been *the* key issue in the briefing and the two hearings regarding the arbitration issue and the viability of the Letter Agreement. The reason that Prospect's execution of the Credit Agreement is so important is that the final document completely supersedes the Letter Agreement. Specifically, the Credit Agreement has an integration clause that reads:

> Section 11.19 Integration. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Ex. N. Simply put, if the Credit Agreement was executed, the Letter Agreement is fully superseded and cannot conceivably be used to compel Caprock to arbitrate its claims against Prospect. Indeed, the Credit Agreement does not contain an

9

arbitration clause. The Credit Agreement expressly and unequivocally provides for litigation of disputes in New York courts. Ex. N, §§ 11.10, 11.11.

Determined to keep this dispute out of a courtroom, Prospect assured the Court that it did not execute the Credit Agreement. For instance, the CEO of Prospect, John Barry, swore in an affidavit that **"[n]o final financing agreement was ever executed and delivered by or between Prospect and Enmon."** Ex. O, ¶2. Prospect reiterated a virtually identical falsehood in its pleadings, representing that "[n]o final financing agreement was ever executed and delivered by or between Prospect Energy, Enmon, and/or Caprock Pipe & Supply, LP. Ex. B, p.5. And as set forth below, Prospect perpetuated these false representations at oral hearings and the Court accepted Prospect's misrepresentations that the Credit Agreement was never executed.

In actuality, Prospect executed the Credit Agreement and had in its possession complete signature pages from the other parties to the agreement. Ex. C; Ex. D. At that moment, according to the plain language of the document, the Credit Agreement became binding. The Credit Agreement provides that it shall become effective when each of the enumerated conditions precedent are satisfied. Ex. N, § 4.01. Each condition was satisfied. Ex. C; Ex. D; Ex. A, ¶8. With regard to delivery of documents, the contract calls for delivery of executed documents to Prospect, the transaction agent. Ex. N, § 4.01(d). Thus, when Prospect received executed signature pages and other required documents from Caprock and CIT (which it did), then executed the agreement itself (which it did), delivered all

10

executed signature pages to its lawyers (which it did), the deal was consummated and Prospect was obligated to fund the transaction in accordance with the Credit Agreement's terms. Ex. C.; Ex. D.; Ex. A, ¶8.[7]

Due to the fact that Prospect affirmatively misrepresented to this Court, Enmon, and Caprock that it did not execute the Credit Agreement, Caprock was unaware it had a breach of contract claim and the Court was under the impression that the Letter Agreement had not been superseded. Ex. A, ¶¶8-10. As the Court stated at the second hearing on the arbitration issue:

> There's no question by its specific terms that the Term Sheet [the Letter Agreement] is not a final document. **No one signed a closing agreement [the Credit Agreement] that I'm aware of.** And so the question then becomes, what was the purpose of the [Letter Agreement].

Ex. E, p.20:18-21. Later in the hearing, the Court reiterated its reliance on Propsect's assurance that the Credit Agreement was never consummated:

> And what you're doing is you're saying because the letter did not contain all of the terms and provisions that ultimately ended up in the **not-consummated agreement for the acquisition of Caprock,** that the letter is not a binding and enforceable agreement.

*Id.,* p.28:5-9. Despite having the fully executed version of the Credit Agreement in its files with complete signature pages, Prospect withheld the documents and convinced the Court that the agreement was never consummated. Ex. C; Ex. D; Ex. B, p.5.

---

[7] By its own terms, the Credit Agreement was subject to execution in separate counterparts. Ex. N, § 11.08.

F.   ENMON AND CAPROCK LEARN THROUGH DISCOVERY IN THE
     ARBITRATION PROCEEDING THAT PROSPECT EXECUTED THE CREDIT
     AGREEMENT.

After the arbitration proceeding between Enmon and Prospect commenced,
the parties began exchanging documents. Ex. A, ¶10.  Much to Enmon's surprise,
Prospect's production included executed signature pages from each party to the
Credit Agreement and e-mail confirmation that Prospect, who was the transaction
agent, had all final documentation in its possession. Ex. C.; Ex. D.  This was the
first time Enmon learned that the Credit Agreement had been fully executed. Ex.
A, ¶¶8-10.   To that point, Prospect had vehemently denied that the Credit
Agreement was consummated to Enmon, Caprock, and this Court. *See* Section E,
*supra*.  Although Caprock was not a party to the arbitration and had no idea it had
a contract claim against Prospect, it learned through Enmon that Prospect breached
the Credit Agreement. Ex. A, ¶10.

Obviously, Caprock's claim for Prospect's breach of the Credit Agreement
is unaffected by the Letter Agreement between Enmon and Prospect and falls
outside the scope of the Court's injunction, which enjoins only claims brought "in
contravention" of the Letter Agreement. Ex. E, pp.43:17-44:3.  In fact, the Court
recognized at the second hearing that Caprock was entitled to preserve its right to
a trial in the Credit Agreement.

THE COURT:  And what is the significance of there not
being an arbitration agreement in the [Credit Agreement]?

12

MR. ITKIN: Your Honor, it shows that the parties changed not only the open terms in the term sheet, but also the open terms in the letter agreement.

THE COURT: I don't know how you can say that. **Caprock may have said, I don't like arbitration; I like jury trials, and I'm not going to sign any document which foregoes my right to a jury trial.**

Ex. E, pp.29:23-30:6.  Thus, it is only out of an abundance of caution and utmost respect for this Court's rulings that Caprock seeks confirmation that it may pursue its claim against Prospect without violating the injunction against Enmon.

## III.

## ARGUMENTS AND AUTHORITIES

Caprock's newly discovered breach of contract claim against Prospect falls well outside the scope of this Court's February 13 injunction.  First and foremost, Caprock was not a party to the Letter Agreement or its arbitration provision. Secondly, the Credit Agreement, to which Caprock was a party, expressly provides for disputes to be litigated in New York courts.  As such, Enmon and Caprock do not believe that the Court intended the injunction to apply to Caprock's claims.  However, to the extent the Court believes the injunction precludes Caprock's claim, Enmon and Caprock respectfully request the Court to modify the injunction under FED. R. CIV. P. 60(b) so that Caprock may pursue its claim against Prospect for breach of the Credit Agreement.

**A.    ENMON AND CAPROCK ARE ENTITLED TO A MODIFICATION OF THE INJUNCTION UNDER FED. R. CIV. P. 60(B)(2).**

Caprock and Enmon recently discovered that Prospect executed the Credit Agreement on May 12, 2006, and then breached it shortly thereafter. This newly discovered evidence entitles Enmon and Caprock to a modification of the Court's February 13 injunction under FED. R. CIV. P. 60(b)(2) to permit Caprock to pursue its claims against Prospect in New York state court.

Federal Rule of Civil Procedure 60(b)(2) provides that:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)....[8]

A movant seeking a Rule 60(b)(2) modification must demonstrate that the evidence:

> (1)    is material, is not merely cumulative, is not of such a nature that would merely impeach the credibility of an adverse witness;
>
> (2)    would probably change the result previously reached; and
>
> (3)    could not have been previously discovered by the exercise of due diligence.

*U.S. Xpress Enters. v. J.B. Hunt Transp.*, 320 F.3d 809, 815 (8th Cir. 2003);

*United States v. All Right, Title and Interest in Property and Premises Known as 710 Main Street, Peekskill, New York*, 753 F.Supp. 121, 126 (S.D.N.Y. 1990);

---

[8] The Court's February 13, 2007 order compelling arbitration and enjoining Enmon from engaging in any legal action outside of that arbitration is a final judgment for purposes of appeal or motion for relief under Federal Rule 60 because it is a final decision with respect to arbitration and a final judgment disposing of all claims. 9 U.S.C. § 16(a)(3); 28 U.S.C.§ 1291.

14

*Olwine, Connelly, Chase, O'Donnell& Weyher v. Valsan, Inc.*, 640 N.Y.S.2d 72 (N.Y. App. 1996).[9]  Caprock and Enmon satisfy each element in this instance.

The evidence proving that Prospect executed the Credit Agreement is, without question, "newly discovered."  It was not produced until well after the Court ordered Enmon and Prospect to arbitrate and the parties commenced discovery in that proceeding.  In fact, prior to the arbitration, Prospect affirmatively represented to this Court, Enmon, and Caprock that it never executed the Credit Agreement. *See* Section E, supra.  It was several months after the arbitration order was issued that Prospect first turned over executed signature pages of the Credit Agreement, e-mail correspondence confirming the delivery of the executed agreement to their attorneys (who were holding the executed signature pages of the other parties as well), and documents proving that the transactional funds were set aside for wiring at closing. Ex. C; Ex. D; Ex. A, ¶10.

For several reasons, this evidence could not have been discovered with due diligence.  First, the preliminary nature of proceedings in this Court, which focused sharply on the arbitrability of Enmon's tort claims, did not allow for discovery.  But even if discovery had been appropriate, Prospect maintained, and even swore in this Court, that it never executed the Credit Agreement.  Thus, there was no reason to ask for executed signature pages. Ex. O, ¶2; Ex. B, p.5; Ex. A, ¶¶6-10.

---

[9] This case references McKinley's Consolidated Laws of New York Annotated 5015, which is the counterpart to Federal Rule of Civil Procedure 60(b).

15

It is equally clear that the evidence is material, and not cumulative. Enmon and Caprock do not believe the Court intended to enjoin Caprock from pursuing any claims against Prospect based on a breach of the Credit Agreement. But to the extent it did, such a ruling was made without the benefit of the documents showing that the Credit Agreement was executed and under the shroud of Prospect's repeated exhortations that the deal was not consummated. Thus, the newly discovered evidence is material to the injunction's potential effect on Caprock.

In addition, if the Court did intend to restrain Caprock in any way, the evidence would probably change the Court's decision to do so. Because Caprock was not a party to the Letter Agreement (or its arbitration provision), but was a party to the Credit Agreement, which specifically preserves Caprock's right to pursue its claims in Court, there is no legally tenable basis to prevent Caprock from pursuing its claims against Prospect. Thus, if the injunction even applies to Caprock, it is unlikely that the Court would have enjoined Caprock with such evidence in the record.

The newly discovered evidence proving that Prospect executed and then breached the Credit Agreement Caprock provides ample basis to modify the judgment under Rule 60(b)(2) to the extent the Court enjoined Caprock in the first place.

16

**B.    ENMON AND CAPROCK ARE ENTITLED TO A MODIFICATION OF THE INJUNCTION UNDER FED. R. CIV. P. 60(B)(5).**

Caprock and Enmon are also entitled to modification of the injunction under Rule 60(b)(5). This subsection permits modification of an injunction when "the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, **or it is no longer equitable that the judgment should have prospective application.**" FED. R. CIV. P. 60(b)(5) (emphasis added). According to the United States Supreme Court, "it is appropriate to grant a Rule 60(b)(5) motion when the party seeking relief from an injunction or consent decree can show 'a significant change either in factual conditions or in the law.'" *Agostini v. Felton*, 521 U.S. 203, 215 (1997). And the Second Circuit has acknowledged that "[t]he power of a court of equity to modify a decree of injunctive relief is long-established broad and flexible." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983). Injunctions are the type of prospective judgments susceptible to 60(b)(5) challenges. *Id.* ("An injunction, as a final judgment with prospective application, may be modified by the court upon motion by a party and a showing that continuation of the injunction would be inequitable"); *Kalamazoo River Study Group v. Rockwell, Int'l*, 355 F.3d 574, 587 (6th Cir. 2004). Indeed, "[a] court errs when it refuses to modify an injunction or consent decree in light of such changes." *Agostini*, 521 U.S. at 215; *Railway Employees v. Wright*, 364 U.S. 462 (1961).

17

In this case, Enmon and Caprock are confident that the Court did not intend to restrain Caprock from pursuing any claims based on the Credit Agreement. But, to the extent the injunction can be so construed, the drastic change in the factual conditions regarding the status of the Credit Agreement merits modification of the injunction. Prior to Prospect's production of the fully executed Credit Agreement, there was no reason to believe Caprock had a breach of contract claim against Prospect. Thus, even assuming the Court's injunction applied to Caprock, it was inconsequential. However, prospective application of the Court's February 13, 2007 injunction to Caprock became highly inequitable the moment Prospect's executed signature pages to the Credit Agreement (and confirming e-mails) were uncovered. It is unfair (and legally invalid) to enjoin Caprock from suing Prospect for breach of the Credit Agreement based on an arbitration clause in another contract to which Caprock did not agree, particularly when Caprock preserved its right to sue Prospect in court in the Credit Agreement. The Court should therefore exercise its "broad and flexible" authority to modify the injunction under Rule 60(b)(5).

## IV.

## CONCLUSION

Enmon and Caprock respectfully request that the Court confirm that its injunction of February 13, 2007 does not enjoin Caprock's claim against Prospect for breach of the Credit Agreement. To the extent the injunction does apply to

18

such claim, Enmon and Caprock respectfully request that the Court modify the injunction to permit Caprock to pursue the claim.

Respectfully submitted,

**ARNOLD & ITKIN LLP**

*/s/ Jason A. Itkin*

Jason A. Itkin (JI 8442)
Texas State Bar No. 24032461
Kurt B. Arnold (KA 8716)
Texas State Bar No. 24036150
Caj D. Boatright (CB 7462)
Texas State Bar No. 24036237
5 Houston Center
1401 McKinney Street, Ste. 2550
Houston, Texas 77010
Telephone: (713) 222-3800
Facsimile: (713) 222-3850

*Attorneys for Respondent and Caprock
Pipe & Supply, Inc.*

## Certificate of Service

I certify that a copy of his instrument was served under Federal Rules of Civil Procedure on July 12, 2007, upon the following counsel of record:

Maura Barry Grinalds
Timothy G. Nelson
**Skadden Arps Slate Meagher & Flom**
Four Time Square
New York, NY 10036
*Counsel for Petitioners*

/s/ *Jason A. Itkin*

Jason A. Itkin

20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

PROSPECT ENERGY CORP., et al.,                      :

                              Petitioner,           :

                v.                                  :

MICHAEL ENMON,                                      :

                              Respondent.           :

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7 - 24 - 07

**ORDER**

07 Civ. 117 (LBS)

SAND, J.

    Respondent filed a motion under Rule 60(b) of the Federal Rules of Civil Procedure for relief from the Court's order of February 13, 2007 ordering arbitration.  The Court lacks subject matter jurisdiction over the case because the movant has filed an appeal with the Court of Appeals for the Second Circuit.  Following the procedure set forth in Ryan v. United States Lines Co., 303 F.2d 430, 433-34 (2d Cir. 1962), after briefing and argument and for the reasons stated on the record on July 24, 2007, the Court notes that it would not be inclined to grant the motion if the Second Circuit were to remand the case.  Accordingly the motion is denied.  See Toliver v. County of Sullivan, 957 F.2d 47, 49 (2d Cir. 1992) ("In Ryan we noted that the district court may entertain and deny the rule 60(b) motion.").

        **SO ORDERED.**

Dated:  July 24, 2007
        New York, NY

U.S.D.J.

```
 1    77OCPROTC

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    --------------------

 4    PROSPECT ENERGY CORPORATION,
      et al.,
 5
                        Plaintiffs,        New York, N.Y.
 6
                  v.                       07 Civ. 117(RLC)(LBS)
 7
      MICHAEL ENMON,
 8
                  Defendant.
 9
      ----------------------------x
10
                                       July 24, 2007
11                                     3:15 p.m.

12    Before:

13                      HON. LEONARD B. SAND,

14                                           District Judge

15                  APPEARANCES [Via telephone]

16    SKADDEN, ARPS, SLATE, MEAGHER & FLOM,
           Attorneys  for Plaintiffs
17    MAURA BARRY GRINALDS,
      TIMOTHY G. NELSON,
18         of Counsel.

19
      ARNOLD & ITKIN,
20         Attorneys for Defendant,
      KURT B. ARNOLD,
21    JASON A. ITKIN,
           of Counsel.

22

23

24

25
```

Telephone Conference

1      THE COURT:  Will you please state your name and the

2  party that you represent.

3      MS. GRINALDS:  This is Maura Grinalds for Skadden Arps

4  on behalf of Prospect Energy Corporation and the individual

5  petitioners, and with me is Tim Nelson, also of Skadden Arps,

6      MR. ITKIN:  Kurt Arnold and Jason Itkin for defendant

7  Michael Enmon.

8      THE COURT:  My chambers received a call I guess from

9  somebody in Mr. Itkin's office saying that they wanted to

10  proceed with a 60(b) motion before me, and then I subsequently

11  received some correspondence and letter dated July 17, 2007,

12  from Maura Grinalds; a letter dated July 18 from Mr. Itkin, and

13  then there was some correspondence with respect to whether or

14  not the court has jurisdiction to entertain a 60(b) motion in

15  light of the fact that Enmon had filed a notice of appeal with

16  the Second Circuit.  On July 18 I issued an order saying that I

17  lacked jurisdiction.

18      Then, after receiving another communication from

19  Mr. Itkin's office, I entered an order on July 23 indicating

20  that, if there was a desire to do so, I was prepared to proceed

21  in the manner indicated  by the Court of Appeals in Ryan v.

22  United States Lines, 303 F.2d 430, 433-34, (2d Cir.1962), in

23  which the court indicated that, "The district court is first to

24  determine whether it would grant the motion; if it decides in

25  favor of it, then and then only is the necessary remand by the

Telephone Conference

1    Court of Appeals to be sought."

2        I indicated in an order of July 23 that I would hear

3    oral argument this Thursday, and said that if appearing on

4    Thursday presents scheduling difficulties, the court is

5    amenable to hearing argument telephonically, and the parties

6    should contact chambers promptly to schedule a call.  Chambers

7    received a call earlier today, indicating that on Thursday the

8    parties would be tied up, I presume in the arbitration, and

9    requested this telephone conference.

10        I think I may have omitted reference to a letter from

11   Skadden Arps dated July 13, 2007.  Is in fact the arbitration

12   going forward, somebody?

13        MR. ITKIN:  Yes, your Honor.

14        MS. GRINALDS:  Yes, your Honor, we are now in the

15   second full day of hearings with witnesses scheduled for the

16   entirety of the week.  Prospect has put on some of its

17   witnesses, one of whom is being cross examined today.  We have

18   taken a break to call you, but we expect it to be a very full

19   week to complete all the witnesses.  We are hopeful we will be

20   able to conclude these arbitration proceedings by Friday.  That

21   would be through the end of Friday with Mr. Wilkinson's

22   expectation that we would need all of Friday to conclude.

23        THE COURT:  Mr. Itkin, is the issue of whether there

24   was an execution of the agreement which is raised in your

25   letters to the court, is that an issue which is being presented

Telephone Conference

1   to the arbitrator?

2          MR. ITKIN:  It is not an issue on the breach of

3   contract claims and the claims that would flow from Caprock.

4   It is an issue that is in dispute, and as far as the claims

5   that Mr. Enmon has, because frankly, your Honor, it's one of

6   the issues going up into how this deal changed at the last

7   minute.

8          Excuse me, your Honor, actually, I misspoke.  My

9   partner is tapping me on the shoulder.  The claimants in this

10  case have sought a declaration from the arbitrator that the

11  contract claims can't be brought outside the arbitration, and

12  that any finding against Enmon would be binding.  We have

13  responded in a brief saying that we think that that is an issue

14  for your Honor.  We think their position is wrong on the merits

15  but also it's a position that would be outside the scope of the

16  arbitration based on your order and the contract that has --

17         MS. GRINALDS:  May I add our position on your

18  question?

19         THE COURT:  Yes, you may.

20         MS. GRINALDS:  Your Honor, Mr. Itkin on behalf of

21  Michael Enmon is actually adducing testimony going to whether

22  or not there was the ultimate -- whether or not the credit

23  agreement was consummated, so the factual evidence that would

24  support his claim on whether or not a credit agreement was in

25  fact consummated is being elicited or sought here through the

Telephone Conference

1    examination of the witnesses.  Evidence has been presented by

2    Mr. Itkin, we are presenting our own evidence, and the

3    arbitrator, Mr. Wilkinson, will be in a position to rule on

4    whether or not a credit agreement was consummated.  There will

5    be all the evidence he needs to make that determination, and he

6    is legally authorized to do that.

7            It is our position that any such ruling will be

8    binding not only on Mr. Enmon but on his privies, who include

9    Caprock, or whatever it's called, and we have now gathered some

10   testimony on this company that Mr. Itkin has presented to you

11   as Caprock Pipe & Supply, Inc. and we will be able to present

12   that to you on its relationship to Mr. Enmon, but I think it

13   would be worth noting that it isn't in fact called Caprock Pipe

14   & Supply, it's called Enmon Capital.  But we are going to

15   gather that evidence, we are going to seek a declaration from

16   Mr. Wilkinson which will be binding on Michael Enmon, and we

17   will argue precludes this with respect to any review claims

18   that would be brought by Mr. Enmon's shell company which is

19   actually known as Michael Enmon Capital.

20           THE COURT:  Mr. Itkin, what is the relief that you

21   want from this court, and on what basis do you seek that

22   relief?

23           MR. ITKIN:  Your Honor, if you may or may not

24   remember, we were down there in January and again in February,

25   determining whether Michael Enmon's claims were subject to

Telephone Conference

1   arbitration based on a letter agreement and term sheet.  The

2   letter agreement contained an arbitration provision.  You ruled

3   that the arbitration provision was binding, you sent Mr. Enmon

4   to arbitration.  That is up on appeal to the Second Circuit

5   right now.

6          THE COURT:  And you have heard nothing from the second

7   Circuit, right?  You have filed the papers before the Second

8   Circuit and are awaiting some response?

9          MR. ITKIN:  Correct, your Honor.

10         THE COURT:  Did you ask for any immediate relief from

11  the Second Circuit?

12         MR. ITKIN:  We have not, your Honor, because what

13  happened was during the course of discovery in the arbitration,

14  we learned that affidavits that were presented to you were

15  materially false, and that what had happened was the final

16  documents in this case were actually executed, became binding,

17  and they contained an integration clause which got rid of any

18  prior agreements and demanded that any claims on behalf of

19  Caprock against Prospect which arise out of this transaction be

20  brought in New York courts.

21         We looked at it and said what do we need to do?  Do we

22  need to alert the Second Circuit?  Do we need to file a

23  surreply brief?  And in coordination with our appellate

24  lawyers, we understand that the proper motion did one of two

25  things:  One is we can probably, the way I read the order, just

Telephone Conference

1    file the other lawsuit, but in deference to the TRO that's in

2    place, I don't want to inadvertently run afoul of your Honor's

3    injunction.  So what we did in an abundance of caution was file

4    a Rule 60(b) motion, also under Rule 65, for injunction to have

5    your Honor either to the extent necessary modify the judgment

6    or modify the injunction to allow Caprock to pursue its claims

7    in its contractually chosen venue.

8         THE COURT:  As I read the papers furnished by Skadden

9    Arps, they take the position that those execution papers were

10   being held in escrow, that they were never released in

11   accordance with their terms, and that your client repeatedly

12   took the position in various documents that it filed that no

13   agreement other than the document containing the arbitration

14   provision was ever executed by the parties.  So there is a very

15   clearcut factual dispute, is there not?

16        MR. ITKIN:  Your Honor, there is -- two points.  One,

17   let me tell you our side of the story.  Yes, there is a factual

18   dispute on this issue which would be enough not to send it to

19   arbitration under prevailing standards.  But what the credit

20   agreement requires, your Honor, is under -- and I don't have it

21   in from of me but I believe it 4.01(d) and 11.017 -- 11.16 --

22   is that the executed -- the signature pages all be sent to

23   Prospect's lawyers, which they were.

24        When the deal fell apart, we were told -- Prospect's

25   lawyers actually lied and said, "We never got signed documents

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Telephone Conference

1    from Prospect." That was the impression that we were operating

2    under, that these documents did not exist and in fact --

3         THE COURT: Just a minute. When you say documents did

4    not exist, I thought what was being held were execution pages,

5    not the entire document but just the execution pages. When you

6    say documents, are you referring to something other than the

7    execution pages?

8         MR. ITKIN: Sorry, your Honor, I misspoke, the

9    signature pages. We were informed by -- in a sworn affidavit

10   from Mr. Barry and others that the documents were not

11   executed -- the signature pages, excuse me, your Honor -- were

12   not executed and, your Honor, what we learned in discovery in

13   this case, and actually there is an e-mail that we have in our

14   possession from Prospect's lawyers saying, "We didn't get any

15   documents from Prospect." That was the assumption we were

16   working under when -- for the case. We always suspected that

17   they were executed, and in fact they were turned over during

18   the course of this arbitration, and as we were preparing our

19   exhibit list we discovered it and filed the motion with the

20   court. So that is sort of where we are, your Honor. There is

21   a factual dispute.

22        THE COURT: When you say they were executed, they were

23   signed and they were delivered to an attorney to be held in

24   escrow, and you are using "executed" to mean that. The

25   question is whether there was a direction to the escrow agent

Telephone Conference

1  to release the signed signature pages and deliver them, which

2  would in effect be an entry into the contractual commitment.

3              MR. ITKIN:  Your Honor, if I may, under the terms of

4  the credit agreement, the final document, all that needs to

5  happen to make it binding by its own terms is that the lawyers

6  or that Prospect have the signature pages from each of the

7  parties, and they did.

8              THE COURT:  Wait a minute.  You are telling me that

9  there is a specific provision that defines what constitutes

10  entry into the contract?

11             MR. ITKIN:  Correct, it's Section 4.01(d) and 11.016,

12  I believe, although I don't have the document right in front of

13  me.  11.16, your Honor.

14             MS. GRINALDS:  Your Honor, they have --

15             THE COURT:  I will give you an opportunity, I promise

16  you, but let me --

17             MS. GRINALDS:  Thank you.

18             THE COURT:  That is a very unusual provision, I must

19  say in a few years of practicing law I have never seen such a

20  document.  Could you read those provisions to me?

21             MR. ITKIN:  If you give me a second, your Honor, I

22  will have my partner get the credit agreement.  It should have

23  been a attachment to our exhibits.  If you will give us one

24  second, I will read them to you.

25             THE COURT:  All right.  I think my clerk is looking.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Telephone Conference

1          (Pause)

2          THE COURT: I am looking at page 25 of the credit

3     agreement.  What paragraph?

4          MR. ITKIN:  Focus first, your Honor, on page 72.

5          THE COURT:  Page 72 of what document?

6          MR. ITKIN:  Of the credit agreement.

7          THE COURT:  Credit agreement, page 72.  Yes, I have

8     that in front of me.

9          MR. ITKIN:  11.16, binding effect.  Are you there,

10    your Honor?

11         THE COURT:  Yes, I am reading it now.

12         MR. ITKIN:  OK.

13         (Pause)

14         THE COURT:  This agreement shall become effective when

15    it shall have been executed by each loan party, the agent, and

16    each lender, and when the conditions precedent set forth in

17    Section 4.01 hereof have been satisfied.

18         All right.  And what else?

19         MR. ITKIN:  And, your Honor, if you look at section

20    4.01, which is on page 25.

21         THE COURT:  Page 25, 4.01, yes.

22         MR. ITKIN:  (e), under delivery of documents, it

23    requires that the agent, which is Prospect in this case, shall

24    have received on or before the effective day the following, and

25    then a list of documents.  All of that happened, your Honor,

Telephone Conference

1   and --

2           THE COURT:  Wait.  When you say all, is it not the

3   intent of all of this to set up a procedure for the delivery of

4   documents authorized by the parties sought to be bound, and

5   isn't that the issue in dispute, whether authority was given to

6   the escrow agent to deliver the documents so as to cause the

7   agreement to be effective or was not?

8           MR. ITKIN:  That is the dispute, your Honor.  The

9   parties disagree over whether this contract was binding.

10          THE COURT:  If the signature pages were delivered in

11  breach of the escrow agent's obligations to follow the

12  instructions from the party who gave him the documents, the

13  agreement would not be effective, would it?

14          MR. ITKIN:  That's not what happened in this case,

15  your Honor.

16          THE COURT:  I know, but I am just trying to focus on

17  what the disagreement is.

18          MR. ITKIN:  My client -- my client believes that when

19  these documents became binding under that Section 11 we read

20  earlier, that Prospect was under an obligation, a contractual

21  obligation, to fund the $12 million loan.  It would have

22  enabled him to purchase this company.  When Prospect did not

23  fund that loan, my client lost the opportunity to purchase

24  Caprock and this deal fell apart and litigation ensued.

25          THE COURT:  Let me hear from Ms. Grinalds.

Telephone Conference

1       MS. GRINALDS:  Of course, a different response to the

2   assertion that this is brought to you one week before our final

3   arbitration hearing, it's newly discovered information or a

4   fraud on the court, an accusation I take extreme umbrage.

5       As you know, your Honor, when Mr. Itkin appeared

6   before you on February 13, 2007, he had everything he needed to

7   make this argument, which we believe is frivolous, when he

8   said to you, quote, Prospect said to my client and the other

9   lender what were the 'execution documents' which were the final

10  bid transaction documents, my client signed them, CIT signed

11  them, that goes back to Prospect and John Barry, Prospect's CEO

12  apparently signed them, although they were not delivered back.

13  Knowledge of that allegation also appeared in Mr. Enmon's

14  counterclaim in the arbitration itself where he said, really

15  alleged specifically that, quote, Prospect executed the final

16  documentation, and according to Enmon, Caprock, and CIT, the

17  deal was done.  However Prospect refused to deliver the

18  executed documentation and closing funds.  Now, they suggest

19  that only in discovery did they learn something new, that they

20  had a new reason to bring this claim.

21      In fact, No. 1, they received the discovery back in

22  April.  That was three months before making this emergency

23  motion on the eve of our hearing, which we do submit only to

24  disrupt and derail it.  But the discovery, as you, pointed out,

25  your Honor, didn't show the existence of any executed

Telephone Conference

1    documents.  The question was put to the lawyer, were there any

2    executed documents?  Not, as Mr. Itkin said a moment ago, were

3    there any signature pages you were holding in escrow under

4    instructions not to release.  As a result, Mr. Peter Broadbent

5    of Vincent & Elkins responded accurately and Mr. Malkins will

6    be here to testify tomorrow that in fact he had not received

7    any quote executed documentation.

8            That's our position.  Factual evidence is being taken

9    and heard before Mr. Wilkinson on that.  And moreover, all the

10   parties are here to testify if there were any ambiguities in

11   the agreement, which I submit there is not, that everybody

12   understood that delivery to the other counterparties absolutely

13   required consummation of an agreement.

14           Now, on the agreement itself, Mr. Itkin -- I have to

15   compliment him on his creativity because he always keeps me

16   going so I have got to go back and look at things that I take

17   for granted in ordinary, normal contractual deals, and here is

18   this brand new argument that somehow, based on a selective

19   reading of one provision, that we can have a fully consummated

20   agreement materialize where it never has to leave Prospect's

21   office.  In fact if you accept him at his word, his suggestion

22   is once our signature pages end up in the hands of the agent,

23   and the agent is Prospect, there is an agreement, so in fact

24   sending it to Vincent & Elkins was completely unnecessary.

25           THE COURT:  I don't understand that to be Mr. Itkin's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Telephone Conference

1    position, because I asked him specifically with respect to

2    intent and unauthorized delivery, and I don't think he is

3    taking the position -- I hope he is not taking the position,

4    that an unauthorized turnover --

5         MS. GRINALDS:  As soon as Prospect, or Prospect's

6    agent, Vincent & Elkins signed a signature page, signed by

7    Prospect -- that is sufficient to delivery, nothing needs to be

8    said to the other side, and I submit to you, your Honor, that

9    the agreement in several different place refutes that.

10        THE COURT:  Wait.  Mr. Itkin, is that your position?

11        MR. ITKIN:  Your Honor, my position is that this

12    contract was finalized --

13        THE COURT:  No.  Let me be very specific because I

14    thought I asked it before.  Suppose in conscious disregard of

15    his instructions, the person possessing the escrow signature

16    pages turns them over to the other side.  Is it your position

17    then that there is a valid and binding contract?

18        MR. ITKIN:  No, your Honor, that is a different

19    factual scenario from what happened in this case.

20        MS. GRINALDS:  Your Honor, actually his position

21    though really should be, so it be clear for the record, his

22    position is as soon as Vincent & Elkins, our lawyer in Houston,

23    received the signature pages from us and was told to hold on to

24    them under instructions not to send them to the other side,

25    that at that point we executed the agreement notwithstanding

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Telephone Conference

1  our explicit instructions accompanying the sending of the

2  signature pages.  And you should ask him the question, is it

3  his position as soon as Vincent & Elkins received the signature

4  pages a fully consummated agreement came into existence despite

5  the fact that Vincent & Elkins never forwarded them to the

6  other side.

7          THE COURT:  Is that an accurate statement of your

8  position, Mr. Itkin?

9          MR. ITKIN:  They were never needed to be forwarded to

10 the other side, your Honor, because all of the documents were

11 to be sent to Vincent & Elkins and according to the terms of

12 agreement what Prospect's agreement to, CIT agreed to, and my

13 clients agreed to, that the documents would be sent -- that the

14 seller agreed to -- the documents would be sent to Vincent &

15 Elkins and that would make them binding.

16         THE COURT:  Is there anything anybody wishes to tell

17 me?

18         MS. GRINALDS:  The only other thing I would like to

19 tell you, your Honor, I mean obviously, one, the letter

20 agreement made very clear it couldn't be superseded except by

21 an agreement that had to be fully executed and delivered.  The

22 credit agreement itself requires delivery in several places

23 including the specific provision on counterparts which goes to

24 the execution, and it says delivery of an executed counterpart

25 of this agreement -- shall be equally effective as delivery of

Telephone Conference

1    the original.  We never delivered to the other side.  The

2    definition of loan agreement itself, which includes this very

3    agreement, incorporates a provision requiring delivery, and I

4    will just read you the definition because it's therefore flows

5    through the whole agreement, the loan agreement means this

6    agreement, any guarantee agreement, any other agreement, and

7    any other document executed and delivered pursuant hereto or

8    thereto otherwise evidencing any loan or other obligation.

9    Delivery is throughout this agreement.  It's a requirement in

10   fact for the forum selection clause.  This is the third part

11   that Mr. Itkin seems to open up.  He wants to go into New York

12   state courts based on the forum selection clause in his credit

13   agreement, and as you may recall, your Honor, we have already

14   been in Texas courts, we have been before your Honor, we are in

15   the Second Circuit now.  As you know last week, you should we

16   should really be in New York State courts but Section 1110 at

17   the page 70 of the credit agreement says confess to

18   jurisdiction and the parties consent to jurisdiction of the

19   United States District Court for the Southern District of New

20   York.  I guess he doesn't want to go to you, he wants to go to

21   state court, and by execution and delivery of this agreement.

22   That's in Section 1110.  Also the jury trial waiver, which is

23   Section 1111, is also effectuated upon delivery of this

24   agreement by each of the parties.  This is throughout the

25   entirety of this agreement, the understandings that it had to

Telephone Conference

1    be delivered to the other side, and every single party who was

2    a party to this agreement understood it.

3         We heard testimony, live testimony under oath of the

4    parties' agreement that whether the proposed transaction, this

5    is the understanding of everybody except apparently Mr. Itkin,

6    in the epiphany that occurred one week before this arbitration

7    hearing.

8         THE COURT:  All right.  I think I have heard enough,

9    and pursuant to Ryan, I am about to state whether I am inclined

10   to grant or deny the 60(d) motion, and I am inclined to deny it

11   for the following reasons:

12        The motion is based on allegedly newly discovered

13   evidence, that is, evidence which was discovered subsequent to

14   the court's order, and I think there is considerable question

15   as to the accuracy of that allegation.  There is a significant

16   factual dispute, I think it's a factual dispute, with respect

17   to what the consequence was of the delivery of signature pages

18   which were being held in escrow, as I read the agreements that

19   have been referred by the movant, and I do not think that the

20   parties intended a radical variation of the law of contracts

21   which would require that delivery of execution documents with

22   the consent of the parties sought to be bound.  If it should

23   have occurred for any reason that the escrow agent delivered

24   the signature pages contrary to the wishes or intent of the

25   party who furnished the escrow pages to the escrowee, that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Telephone Conference

1    would not constitute a valid contract.

2           Furthermore, and perhaps paramount, my understanding

3    is that this very issue is this week being litigated before the

4    arbitrator who has, of course, authority to determine whether

5    the arbitration is properly before him, and if the arbitrator

6    were to conclude that there is no valid consent to the

7    arbitration, or that a previous consent to the arbitration was

8    negated prior to the commencement of the arbitration, he has

9    full power to determine that issue.

10           The application to this court is, I believe, untimely,

11    and to the extent to which there is a factual dispute which

12    goes to the jurisdiction of the arbitrator, that is now

13    precisely where it should be, that is, before the arbitrator.

14           So that I am for those reasons inclined -- I am using

15    the language in Ryan -- I believe it's the language in Ryan --

16    I am not inclined to grant the motion and therefore will not

17    advise the Second Circuit that it would be my intention to

18    grant the relief were the matter remanded to me, and the court

19    so orders.

20           Anything further?

21           MR. ITKIN:  Thank you, your Honor.

22           THE COURT:  Thank you.

23                            -o-

24

25