Jason A. Itkin*
Kurt B. Arnold*
Caj D. Boatright*
ARNOLD & ITKIN LLP
1401 McKinney St., Suite 2550
Houston, TX  77010
(713) 222-3800
*application for admission pro hac vice to be filed

and

Andrew V. Buchsbaum, Esq.
FRIEDMAN, JAMES & BUCHSBAUM LLP
132 Nassau Street, Suite 900
New York, NY  10038
(212) 233-9385
Local Counsel Only


Attorneys for Respondent


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

PROSPECT ENERGY CORPORATION,  :
PROSPECT CAPITAL MANAGEMENT
LLC, JOHN F. BARRY, M. GRIER  :          08-CIV-3721-CM
ELIASEK, WALTER PARKER and
BART DE BIE,                  :

        Petitioners,        :     **RESPONDENT'S OBJECTOIN TO**
                                        **PETITIONERS' PETITION TO**
    -against-                 :          **CONFIRM ARBITRATION**

MICHAEL ENMON,                :

        Respondent.         :
------------------------------------------------------------x

### Michael Enmon's Objection to Prospect's Petition to Confirm Arbitration, Response to Prospect's Memorandum of Law in Support of Petition to Confirm, and Motion to Stay Confirmation Proceedings Until Arbitration Is Completed

Subject to his motion to dismiss for lack of personal jurisdiction, Michael Enmon

requests that the Court deny Prospect Energy Corporation, Prospect Capital Management LLC,

John Barry, Grier Eliasek, Walter Parker, and Bart de Bie's (collectively referred to as "Prospect") Petition to Compel Arbitration because:

1.  Confirming the arbitration would lead to a waste of judicial resources and duplicative proceedings. Specifically, the validity of the so-called arbitration clause is ripe for decision in the Second Circuit Court of Appeals. This Court should wait for the Second Circuit to rule on whether an arbitration clause is enforceable before deciding whether to confirm an arbitration award that may ultimately be held invalid by the Court of Appeals;

2.  The arbitration is not complete because the tribunal has not decided what fees, if any, Prospect is entitled to. Thus, any confirmation would be premature and could lead to duplicative proceedings;

3.  The arbitrator over-stepped his authority with regard to the Caprock breach of contract claim. That specific portion of the award should be vacated because Caprock was not a party to the arbitration, did not assert claims in the arbitration, and was not represented by counsel at the arbitration; and

4.  The arbitration was improperly conducted. As a result, the decision should be vacated.

## I.

## Background

In February 2006, Michael Enmon secured an agreement to buy the assets of Caprock Pipe and Supply Co., a company that specializes in selling refurbished pipe for oil and gas drilling operations. Based on his due diligence, Enmon believed that his opportunity to purchase Caprock was unique and that it would generate enormous profits. In pursuit of the Caprock transaction, Enmon spent his life savings and sold his house and other possessions to pay for expenses related to due diligence and closing the transaction.

After Enmon engaged CIT bank to act as his senior lender, Enmon approached Prospect to see if it would be interested in providing part of the financing for his acquisition of Caprock.

Prospect is a publicly traded business development company that claimed to specialize in investing in energy companies.

## A. Prospect's April 11, 2006 Non-Binding Financing Proposal to Enmon.

On April 11, 2006, Bart de Bie, an officer and managing director of Prospect, emailed Enmon a proposal to provide $10 million in subordinated debt financing.  De Bie described Prospect's proposal as a "<u>non-binding term sheet</u>."   Prospect's proposal was a single, consecutively paginated, twelve-page document made up of two parts: (1) a four-page letter and (2) an eight-page "Summary of Proposed Terms and Conditions." *See* EX A.    Prospect stated that it made its proposal "pursuant to the terms set forth in this letter *and* the attached Summary of Proposed Terms and Conditions dated April 11, 2006." *Id.*  (emphasis added).  Prospect's proposal repeatedly emphasized that it was not intended to be a complete, binding agreement and that it did not contain all of the material terms.  The proposal stated that:

- "The terms and conditions of this Proposal are not limited to those set forth herein [the four-page letter] or in the Term Sheet."

- "The Term Sheet does not purport to summarize all the terms and conditions upon which the proposed financing is to be based, which terms and conditions would be contained fully only in final documentation which must be satisfactory to Prospect and its counsel in their sole discretion."

- "The Term Sheet indicates only the principal terms and conditions under which the financing would be considered."

- "Those matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion."

The proposal's term sheet explicitly stated that it "is not binding on [Prospect] or any of their affiliates and is submitted for discussion purposes only.  No binding agreement can be reached on the subject matter of this term sheet unless and until definitive and final documentation has

been signed and delivered by all parties containing such terms and conditions as are satisfactory to [Prospect]."

To further emphasize the nonbinding nature of its proposal, Prospect's proposal defined "sole discretion" to mean the "sole and absolute discretion as to process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise." Prospect's proposal also stated that it retained a complete and wholly unconstrained right to change the terms of the proposed financing in any way it wanted, or to not provide any financing at all, and that any such changes would be deemed to be consistent with the April 11 proposal. *Id.*

Also included in Prospect's self-described non-binding proposal was an arbitration clause that purportedly covers "any dispute" between Prospect and Enmon. While the arbitration clause supposedly requires Enmon submit any dispute with Prospect to arbitration, Prospect is not required to submit any dispute to arbitration, unless it chooses to do so. *Id.* The arbitration clause states that "[u]nless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration . . . ." *Id.* In other words, Prospect can choose to assert any claims it believes it has in either an arbitration or in court.

But to make the arbitration clause even more one-sided and unenforceable, the arbitration clause's next sentence also allows Prospect (but not Enmon) to bail out of the arbitration at any time and assert its claims in court. *Id.* The arbitration clause expressly states that "Borrower agrees that Prospect has the right, *at any time*, to remove *any claim in arbitration* to a New York court." *Id.* (emphasis added). So, according to the contract's plain language, even if Prospect chose to submit its claims to arbitration (or compelled Enmon to submit his claims to

4

arbitration), Prospect could call off the arbitration at any time, if Prospect did not like how the arbitration was proceeding or how the arbitral panel decided the asserted claims.

### B. Prospect Fails to Fund and Enmon Sues.

On April 11, 2006, Enmon signed the letter. Enmon also paid Prospect a $25,000 deposit that same day. Throughout April and May 2006, Prospect repeatedly represented to Enmon that its was excited about the transaction and reassured Enmon that the Caprock transaction would close on economic terms consistent with the final documentation prepared by Prospect's lawyers and signed by Enmon and CIT (the senior lender).

Throughout late April and early May, all of the parties to the Caprock transaction— Enmon, the Caprock sellers, CIT and Prospect—continued to work towards closing the deal on Friday, May 12, and all of Prospect's words and deeds indicated that it was ready to proceed with a May 12 closing. Prospect's lawyers were drafting the required paperwork; the parties were nailing down the final terms of the deal; and the numbers were finalized. There was no indication from Prospect that it had yet to approve the financing or that Prospect was in any way uncomfortable with the deal. Prospect made sure that the deal progressed as quickly as possible, and that there were no outward signs of trouble. As Enmon would later learn, however, Prospect was waiting until after the eleventh hour—when it was too late to pursue alternative sources of financing—to take as much of Caprock as Prospect saw fit.

On the day of closing, Enmon, the Caprock sellers—Alan Powers, Ronny Becknell, Mickey Berry, and Albert Weaver—and their wives all met in Albuquerque to execute the closing documents. Knowing they faced a 1:00 p.m. Mountain time wiring deadline, the parties met early in the morning to ensure that all of the documents would be executed on time. The closing in New Mexico proceeded smoothly, with only a few revisions to the closing documents.

All of the documents were signed and ready to be sent to Prospect's lawyers in Houston—the designated document custodian. Believing the deal was done, Enmon, the Caprock sellers, and their wives went to a celebratory lunch.

In New York and Houston, Prospect and its lawyers also were completing what was necessary to close the transaction. They finalized terms, exchanged wiring instructions, and executed and delivered Prospect's signature pages to the document custodian. The same was true of CIT, the senior lender, in Dallas.

At this point, Caprock, Enmon, and CIT thought that they had a done deal and that the only problem was that they did not meet the wiring deadline—meaning that the transaction would fund on Monday even though the deal had "closed" on Friday.

But over the weekend, Prospect changed its tune. Prospect refused to release the money it was holding in escrow unless Enmon agreed to radically alter the terms of the transaction in a manner that was wholly inconsistent with the terms agreed to. The new terms were extremely favorable to Prospect and detrimental to Enmon. By waiting until the last minute, Prospect prevented Enmon from seeking an alternative source of financing when Prospect wrongfully refused to release the funds.

### C. Prospect Initiates Proceedings in Three Different Tribunals to Compel Enmon to Arbitrate His Claims Against Prospect.

Based on Prospect's refusal to finance the Caprock transaction on terms consistent with those that had previously agreed upon, Enmon sued Prospect in Texas state court for fraud and tortious interference. On December 22, 2007, Prospect answered Enmon's suit and filed a motion to compel arbitration based on the so-called arbitration clause in Prospect's April 11 proposal to Enmon.

Unsatisfied with simply seeking to compel arbitration by filing a motion in the state-court case, Prospect filed two other proceedings to compel Enmon to arbitrate his claims. First, the day before Prospect filed its motion to compel arbitration in the Texas case, Prospect filed a demand for arbitration with the American Arbitration Association. In its arbitration demand, Prospect attempted to make an end-run around the courts and sought an order compelling Enmon to arbitrate his state-court claims.

But despite having a motion to compel arbitration pending before the Texas state court and having filed an arbitration demand to compel arbitration, Prospect filed another separate case in the United States District Court for the Southern District of New York on January 5, 2007. Just three days later, and before Enmon was even required to have answered Prospect's petition, Prospect filed a motion for a temporary restraining order to enjoin any further proceedings in the Texas state court. The district court entered the TRO that afternoon *ex parte*. The district court's TRO enjoined any further proceedings in the Texas state court action—including a hearing on Prospect's motion to compel arbitration. The Court also ordered Enmon to appear on January 26, 2007 and show cause why the so-called arbitration clause in Prospect's April 11 proposal should not be enforced.

At the January 26, 2007 hearing, Enmon argued he could not be compelled to arbitrate his claims for a number of reasons, including that (1) the proposal was not a binding agreement because of the existence of material open terms, (2) the arbitration clause was illusory and lacked consideration, and (3) that the arbitration clause was unconscionable. The district court declined to rule at that hearing and requested that the parties file supplemental briefing about whether the proposal was insufficiently definite to create a contract. The court also extended its TRO enjoining the Texas state court proceedings until the subsequent hearing concluded.

On February 13, 2007, the district court held another hearing on Prospect's petition to compel arbitration. At the conclusion of the hearing, the district court held that the first four pages of the proposal constituted a valid, binding contract and that the arbitration clause contained in the first four pages was enforceable. The court also permanently enjoined Enmon from prosecuting his claims in Texas state court and ordered the case to arbitration.

Enmon timely filed a notice of appeal. Around the same time and in order to avoid duplicative litigation, Enmon requested from both the American Arbitration Association and from Prospect that the parties stay the arbitration until the Second Circuit rules on the validity of the so-called arbitration agreement. Several months after those requests were refused, Enmon asked for a short continuance of the arbitration due to his busy trial schedule. Specifically, Enmon's lawyers were in trial for approximately 6 months last year and needed more time to adequately prepare for the arbitration. That request for continuance was denied.

The arbitration proceeded in a haphazard fashion due to Prospect's "scheduling issues" and a failure to allow adequate discovery. For example, the tribunal did not allow for depositions. Further, the proceeding took place over four separate settings—often times months apart. Prospect, with the tribunal's permission, called witnesses out of order and did not subject them to cross-examination immediately. Rather, Enmon had to wait to cross examine the witnesses until they were "available."

On April 14, 2008, the arbitrator issued a decision which dismissed Enmon's claims. The arbitrator's decision did not address the issue of fees to which Prospect may be entitled to. Thus, even though the decision is not final, Prospect filed its petition to confirm arbitration.

## II.

### The Court Should Not Confirm Any Arbitration Until The Second Circuit Rules

The decision whether to withhold confirming the arbitration award rests within this Court's discretion. Here, the balance of the equities way in favor of holding off on any decision until the Second Circuit determines whether this dispute was properly sent to arbitration in the first place. Staying the decision would cause little if any harm to Prospect because they could be made whole if they prevail in the Second Circuit and in this Court.[1] On the other hand, all parties will face significant harm if this Court rules before the Second Circuit determines the validity of the arbitration clause a ruling by this Court will likely add more, duplicative litigation and appeals to those claims which are already before the Court of Appeals.

For example, if this Court hypothetically confirms the arbitration award and Enmon appeals, there will be significant attorneys' fees and time spent briefing and arguing the issues arising out of the hypothetical ruling. All of that time spent will be wasted, if the Second Circuit rules that the arbitration clause was unenforceable. Because the case is ripe for decision before the Second Circuit, any delay from waiting will be minimal. So, because of the burden and wastefulness inherent in duplicative proceedings, the Court should not confirm any arbitration award until the Second Circuit rules. Enmon has attached and incorporates copies of his briefing to the Second Circuit for this Court's convenience as EX C and EX D.

## III.

### The Court Should Not Make Any Decisions Until The Arbitration Award Is Final

The April 14, 2008, arbitration award does not specify the amount of attorneys' fees awarded to Prospect. *See* EX B at 33-34. Rather, it requires Prospect to submit documentation

---

[1] Enmon hereby reasserts and reaffirms his arguments made to the Second Circuit Court of Appeals. Nothing in this brief should be construed as a waiver of any argument that Enmon has made to the Court of Appeals.

for fees within 3 weeks and Enmon to respond that application within 6 weeks. *See id.* Prospect has submitted its documentation, but the deadline for Enmon to respond is still several weeks off. After Enmon responds, the tribunal will have to decide what amount of fees, if any, to award Prospect.

If the Court rules on Prospect's motion to confirm before the arbitrator decides what course to take with regard to the attorneys' fees, then there will be more duplicative and wasteful litigation.    For example, the Court will face two petitions to confirm the arbitration instead of one.   Further, there could be two appeals from those separate petitions.   This duplication does not take into account the other problems with duplication and waste that will be raised if the Second Circuit rules in Enmon's favor.   As such, the Court should not entertain Prospect's petition to confirm arbitration at this time.

## IV.

## The Arbitrator Over-Stepped His Authority By Ruling on Caprock's Breach of Contract Claims

A paramount question for reviewing courts is whether the arbitral panel has acted within the bounds of its authority. *See 187 Concourse Assocs. v. Fishman,* 399 F.3d 524, 527 (2d Cir.2005) (per curiam) (noting in collective bargaining context that the award must "draw[ ] its essence from the collective bargaining agreement, since the arbitrator is not free merely to dispense his own brand of industrial justice" (internal quotation marks omitted)); *Local 1199, Drug, Hospital, & Health Care Employees Union v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992) ("The scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." (quotation marks and citation omitted)). The authority of the arbitral panel is established only through the contract

between the parties who have subjected themselves to arbitration, and a panel may not exceed the power granted to it by the parties in the contract. *See* 9 U.S.C. § 10(a)(4); *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir.2003); *see also Brook v. Peak Int'l*, 294 F.3d 668, 672 (5th Cir.2002) ("The power ... of arbitrators ... is dependent on the provisions under which the arbitrators were appointed." (internal quotation marks omitted)). The arbitrator is constrained foremost by this principle that "a party cannot be forced to arbitrate any dispute that it has not obligated itself, by contract, to submit to arbitration." *See United Steelworkers v. Mead Corp.*, 21 F.3d 128, 131 (6th Cir.1994).

Where the arbitrator goes beyond that self-limiting agreement between consenting parties, it acts inherently without power, and an award ordered under such circumstances must be vacated. 9 U.S.C. § 10(a)(4). Here, the arbitrator exceeded his authority and his award must be vacated. As discussed above, the final closing documents in this case were signed and delivered by all parties. The entity acquiring Caprock was known as Caprock Pipe & Supply, Inc. Mr. Enmon was a majority owner of that company.

Caprock Pipe & Supply Inc. has breach of contract and misrepresentation claims against Prospect that arise out of this transaction. Caprock Pipe & Supply Inc. was not a party to the arbitration, did not assert claims in the arbitration, and is most definitively not a party to any arbitration agreement. In fact, the arbitration provision in the purported agreement between Enmon and Prospect was signed before Caprock Pipe & Supply Inc. even existed, so obviously it cannot apply to Caprock Pipe & Supply Inc.'s claims arising from a breach of a separate contract between it and Prospect.

Because Caprock Pipe & Supply Inc. was not a party to the Letter Agreement (or its arbitration provision), but was a party to the Credit Agreement, which specifically preserves its

right to pursue its claims in Court, there is no legally tenable basis to prevent Caprock Pipe &
Supply Inc. from pursuing its claims against Prospect. Thus, the arbitrator's decision with regard
to Caprock Pipe & Supply Inc.'s claims is *ultra vires* and should be vacated.

V.

### The Arbitration Award Should Be Vacated Due To Improprieties

The arbitration award should be vacated because the arbitration provision is null, void
and unenforceable for the reasons set forth in Enmon's brief to the Court of Appeals. Putting
that aside, the FAA allows for vacatur: "(1) where the award was procured by corruption, fraud,
or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either
of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing,
upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the
controversy; or of any other misbehavior by which the rights of any party have been prejudiced;
or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a
mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. §
10(a).

Here the arbitrator was guilty of misconduct in refusing to postpone the hearing. As
noted above, Enmon attempts to continue these proceedings due to his busy trial schedule and
resulting lack of time to adequately prepare were rebuffed. Further, the requests to stay the case
were also denied. Compounding matters, the arbitration went forward in a disjointed manner
that prevented a fair presentation of the evidence. This disjointed manner included, calling
witness out of order, not cross-examining witnesses immediately after their direct testimony, and
not allowing depositions. The combination of these factors resulted in an improper decision and
misapplication of clear law. As a result, the arbitrator's award should be vacated.

12

Dated: May 12, 2008

ARNOLD & ITKIN LLP

_____

Jason A. Itkin*
(jitkin@arnolditkin.com)
Kurt B. Arnold *
(karnold@arnolditkin.com)
Caj D. Boatright*
(cboatright@arnolditkin.com)
ARNOLD & ITKIN LLP
1401 McKinney St., Suite 2550
Houston, TX  77010
(713) 222-3800
*application for admission pro hac vice to be filed

-and-

FRIEDMAN, JAMES & BUCHSBAUM LLP

_____

Andrew V. Buchsbaum (AB-6475)
(abuchsbaum@friedmanjames.com)
FRIEDMAN, JAMES & BUCHSBAUM LLP
132 Nassau Street, Suite 900
New York, NY  10038
(212) 233-9385
Local Counsel Only

Attorneys for Respondent

Captok Pipe & Supply – April 11, 2006



PROSPECT ENERGY

10 EAST 40ᵗʰ STREET • SUITE 4400 • NEW YORK, NEW YORK 10016

April 11, 2006

Mr. Michael Esmon
6620 Briarcliff NE
Albuquerque, NM 87111

RE:     Proposal to provide up to $10,000,000 of Subordinated Debt ( "Sub Debt") plus Net Profit Interest ("NPI")
by Prospect Energy Corporation or an Affiliate to Captok Pipe & Supply, LP

Dear Mr. Esmon:

1.   Prospect Energy Corporation ("Prospect", "we" or "us") is pleased to provide Mr. Michael Esmon ("Sponsor") with this proposal (the "Proposal") to provide and/or arrange up to $10,000,000 of subordinated secured debt pursuant to the terms set forth in this letter and the attached Summary of Proposed Terms and Conditions dated April 11, 2006 (the "Term Sheet") to fund the acquisition of Captok Pipe & Supply, LP ("Borrower") by Sponsor. The terms and conditions of this Proposal are not limited to those set forth herein or in the Term Sheet. The Term Sheet does not purport to summarize all of the terms and conditions upon which the proposed financing is to be based, which terms and conditions would be contained fully only in final documentation which must be satisfactory to Prospect and its counsel in their sole discretion. The Term Sheet indicates only the principal terms and conditions under which the financing would be considered. Those matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion.

2.   Neither Prospect nor its counsel have had the opportunity to complete the due diligence efforts necessary to substantiate the financial, legal, tax and accounting premises upon which this proposal is based or the reasonableness of the projections delivered to Prospect by the Sponsor regarding the Borrower (the "Projections"). Accordingly, Prospect's proposal to provide the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence, and until the execution of definitive documentation and closing, with all aspects of the proposed transaction, including but not limited to: (i) the business, operations, properties, assets, liabilities (whether contractual or otherwise, and including without limitation environmental liabilities), condition (financial or otherwise) and prospects of the Borrower and its respective subsidiaries, (ii) the legal and capital structure of the Borrower, (iii) the reasonableness of the Projections and the accuracy and completeness of all material furnished Prospect, (iv) the negotiation, execution and delivery of final documentation acceptable to Prospect in its sole discretion, (v) the absence of any material adverse change in the condition or prospects of the Borrower and its subsidiaries, to be determined in the sole discretion of Prospect, (vi) compliance with all the terms and conditions set forth in the Term Sheet and this letter and such final documentation, and no default thereunder, (vii) final approval in its sole discretion of Prospect's Investment Committee, (viii) compatibility of the corporate form of the Borrower and structure of the transaction with regulatory requirements governing Prospect as a result of its status as a regulated investment company under the 1940 Act and under the Internal Revenue Code, and (ix) any other matter we regard as material, in our sole discretion. In the event that our continuing review of the Borrower discloses information relating to conditions or events not previously disclosed to us or relating to information or developments concerning conditions or events previously disclosed to us which we believe may have an adverse effect on the business, operations, properties, assets, liabilities, condition (financial or otherwise) or prospects of the Borrower or its subsidiaries or the proposed financing or for any other reason, we may in our sole discretion suspend alternative financing amounts or structures or decline to participate in the proposed financing without incurring any liability and you agree to assert none. When we refer to anyone's "sole discretion", we each mean that party's sole and absolute discretion as to proceed and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise.

3.   You agree that our proposal of alternative financing amounts or structures or our decision not to proceed for any or no reason, at any time, shall not be inconsistent with this proposal and shall not support any claim or assertion of liability by the Borrower or any affiliate or other person against us. You agree to accept any such decision by us without

1



**EXHIBIT**

**A**

Caprock Pipe & Supply – April 11, 2006

disputing it, and agree not to assert any claim before any court, arbitrator or other tribunal. You also agree not to assert that we fraudulently induced you to sign this agreement, that you signed under duress or coercion, that you lacked mental or other capacity, that we have discriminated against you in any way, or that we have made any representations or that we have any understanding or agreement other than as set forth in this letter. You have reviewed this agreement with able counsel of your own free choosing.

4. This letter shall terminate on the earlier of (1) April 11, 2006 unless this letter is accepted and agreed to prior to such date, (2) a default listed in the Term Sheet, (3) a material adverse change in the condition or prospects of the Borrower, to be determined in the sole discretion of Prospect, (4) notification by Prospect to the Borrower that the results of its due diligence were unsatisfactory, that it was unable to obtain approval by its Investment Committee of the financing, or that the final definitive documents do not meet with the approval of Prospect or its counsel (preparation of documents proposed by Prospect counsel does not remove Prospect's right to object to such documents for any reason regardless of who prepared such documents), or (5) the financing is for any reason not closed on or prior to May 15, 2006 unless this letter is extended in the sole discretion of Prospect . Prospect may terminate before, on or after any deadline set by Borrower or anyone else without liability. Prospect is not obligated to explain exercise of its sole discretion to terminate but need only cite this paragraph when terminating and Prospect shall have no liability.

5. This letter is being made available to Borrower on a confidential basis. Neither this letter, including the attached Term Sheet, nor its contents are to be divulged to any person without the prior written consent of Prospect. Borrower and its employees, agents, directors, advisors and affiliates shall not refer to this letter, the Term Sheet or Prospect in any communication with any other party except with the written consent of Prospect. This letter describes with specificity all of the discussions between Borrower and Prospect. There are no other understandings or agreements except as specifically described herein. This letter can only be amended by a formal written instrument signed by Borrower and John F. Berry as CEO of Prospect.

6. If this proposal is satisfactory to you, please memorialize your intention to proceed on these terms by signing and returning a copy of this letter. By signing and returning this letter, Borrower agrees to pay all reasonable out-of-pocket costs and expenses as incurred by Prospect in connection with all (i) due diligence by Prospect, its officers, employees, agents, consultants and representatives, (ii) documentation and (iii) other costs incidental to the closing of the proposed financing, including but not limited to fees and disbursements to engineers, accountants, consultants, advisors and legal counsel, whether or not the proposed financing is consummated (and regardless of the reasons for consummation or non-consummation). In further consideration of the delivery of this letter, and recognizing that in connection herewith Prospect may be incurring substantial costs and expenses including without limitation fees and expenses of counsel and due diligence, transportation, duplication, consultant, search, filing and recording fees, Borrower hereby acknowledges its obligation to pay such costs and expenses (whether incurred before or after the date hereof) as incurred or immediately upon demand, whichever is earlier, regardless of whether any of the transactions contemplated hereby are consummated or any definitive documents are agreed to and signed. Prospect may cease all work on this matter without liability in the absence of immediate payment. In addition, Borrower shall pay all costs and expenses, including legal fees, incurred in connection with any enforcement of this letter. As a nonrefundable deposit against such costs and expenses, Borrower will pay to Prospect $25,000 (the "Deposit") at such time that this Proposal is accepted. Borrower shall at all times keep on deposit with Prospect $5,000 in excess of all expenses paid or accrued, as notified to Borrower in Prospect's sole discretion, such that Prospect will always have on deposit from Borrower a $5,000 cushion against unpaid and future expenses. The Deposit is nonrefundable under all circumstances, except that the unused amounts will be returned to Borrower after payment of all expenses.

7. Neither the Borrower nor any of its affiliates or advisors shall (i) solicit, encourage or enter into discussions concerning any proposed financing by or involving you or any of your affiliates that is similar to, or would obviate the need for, the financing contemplated herein or (ii) finance any non-public information concerning the proposed financing or the acquisition targets to be financed to any other person or entity except in connection with (x) a transaction not restricted under clause (i) or (y) as required by law. The Borrower agrees to notify Prospect promptly of any inquiries from other sources of capital.

8. You agree that this letter and the related term sheet are for your confidential use only and will not be disclosed by you to any person.

9. In consideration of the delivery of this letter, the Borrower hereby indemnifies and holds harmless Prospect and each director, officer, employee, agent, advisor, representative, shareholder and affiliate (including controlling parties) thereof (each, an "Indemnified Person") from and against any and all losses, claims, damages, expenses and liabilities,

2

Caprock Pipe & Supply – April 11, 2006

joint or several, incurred by an Indemnified Person that arise out of or relate to any matter referred to in this agreement (including any claim by the Borrower or its affiliates and including any claim related to any services to be rendered or action to be taken hereunder) or any investigation or other proceeding (including any threatened investigation or threatened litigation or other proceeding and whether or not such Indemnified Person is a party hereto or thereto) relating to this letter or the transactions contemplated hereby or to the actual or proposed use of the financing or that are attributable wholly or in part to the acts or omissions of the Borrower, or any of its directors, officers, employees, agents, advisors, representatives, shareholders or officers including without limitation the fees and disbursements of counsel (with respect to any claim or defense) as incurred, and amounts paid in settlement, whether or not (i) any proceeding, action or suit is commenced, (ii) Prospect or any Indemnified Party is or is not a party thereto, and (iii) the transactions contemplated hereby are or are not consummated. The Borrower agrees not to settle any such claim except on terms acceptable to all Indemnified Parties, and solely for the purpose of this agreement accepts the jurisdiction and venue in any forum where any such claim is made. Under no circumstances shall Prospect be responsible or liable to the Borrower or any other person for damages, including any punitive, exemplary, incidental, indirect or consequential damages, including any which may be alleged as a result of this letter or any of the transactions contemplated hereby, whether or not any financing closes.

10. This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws. Unless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration in New York City according to the rules of the American Arbitration Association with the losing party paying the legal and related fees and expenses of the prevailing party. Borrower agrees that Prospect has the right, at any time, to remove any claim in arbitration to a New York court. Without in any way diminishing such agreement to binding arbitration or Prospect's right to remove, each party hereto expressly waives, to the fullest extent permitted by applicable law, any right to trial by jury of any dispute relating hereto, including any claim, demand, action or cause of action arising in connection with this letter or term sheet, any transaction arising hereto or thereto, or any other instrument, document, or agreement executed or delivered in connection herewith or therewith, whether sounding in contract, tort or otherwise. Each party hereto consents and agrees that the state or federal courts located in New York County, City of New York, shall have exclusive jurisdiction to hear and determine any claim or dispute between or among any of the parties hereto pertaining to this letter, the term sheet, the financing or the transaction under consideration, any other financing related thereto, any investigation, litigation, or proceeding related to or arising out of any such matters, any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party to this agreement provided that the parties hereto acknowledge that any appeals from these courts may have to be heard by a court located outside of such jurisdiction and that any such dispute must first be submitted to binding arbitration (subject to Prospect's right to remove, as aforesaid). Each party hereto expressly agrees not to assert any claim relating hereto elsewhere, but instead submits and consents in advance to such New York jurisdiction in any action or suit commenced in any such New York court, and hereby waives any objection which such party may have based upon lack of personal jurisdiction, improper venue or inconvenient forum. Should Prospect's good faith efforts hereunder be tendered as a defense in any proceeding, such good faith efforts shall be conclusively shown by evidence, without more, that Prospect has gathered or reviewed more than fifty pages of due diligence materials relating to the proposed transaction.

11. The Borrower recognizes that Prospect is a registered investment company regulated by the Investment Company Act of 1940, Subchapter M of the Internal Revenue Code, as amended, and by other laws and regulations, and that any investment hereunder must comply therewith, which may require changing the amount of any financing, the terms or other variables, and the Borrower agrees not to assert any claim should these changes be required or deemed advisable or appropriate by Prospect even if it can be asserted that such changes were or should have been known at any prior time or are, in fact, not advisable, appropriate or necessary.

12. Prospect is a publicly traded closed end fund and as a result may become fully invested from time to time, pending draws on credit facilities, equity raises, and other means of growing Prospect's asset base that may or may not become available from time to time. Should Prospect be unable to fully fund the financing contemplated here as a result, wholly or in part, of one or more of the conditions described in the immediately preceding sentence (or any other condition), Prospect will attempt to work with the Borrower to complete the financing in as complete and timely a manner as practicable but shall have no liability to Borrower and Borrower shall assert no liability.

13. Prospect may, at its option and expense, publish an announcement of a closed transaction.

14. Borrower and its affiliates shall not rely on any work or analysis by Prospect or any consultant to Prospect, whether or not paid by Prospect or Borrower.

3

Caprock Pipe & Supply – April 11, 2006

15.  All obligations described in paragraphs 3 through 14 of this letter shall survive termination hereof.  No modification or waiver of the requirements set forth in the Term Sheet or this letter shall be effective unless a formal instrument providing therefore is signed by Borrower and John R. Barry, CEO of Prospect.

We appreciate the opportunity to provide this proposal. We will proceed after we have received this letter signed by you and returned to Prospect with the required payment by April 11, 2006 at which time this proposal will otherwise automatically expire and be of no force or effect.  Once effective, Prospect's proposal to provide financing in accordance with the terms of this letter shall cease if the transaction does not close, or the financing is not funded, for any reason, on or before May 15, 2006 and neither Prospect nor any of its affiliates shall have any liability to any person in connection with Prospect's refusal to fund the financing or any portion thereof before or after such date.

Very truly yours,

Prospect Energy Corporation
By:

Name:   M. Grier Eliasek
Title:   President and COO
Date:   4/11/06

I have read and understand the contents of this letter agreement.

Agreed to and accepted:

Mr. Michael Ennes

Date:   4/11/06

4

Caprock Pipe & Supply – April 11, 2006

# UP TO $10,000,000 SUBORDINATED DEBT WITH NET PROFITS INTEREST

## SUMMARY OF PROPOSED TERMS AND CONDITIONS

*Nothing contained in this Summary of Proposed Terms and Conditions is or is intended to be a commitment to provide or arrange all or any portion of the financing. Outlined below are some of the major terms and conditions that Prospect Energy Corporation ("Prospect" or "Lender") is considering for this transaction. These terms and conditions are intended for discussion purposes only. The actual terms and conditions upon which the Lender might provide financing are subject to satisfactory completion of due diligence (satisfactory in the sole discretion of Lender), approval of the investment in the sole discretion of Lender's Investment Committee, satisfactory review of the documentation (satisfactory in all respects in the sole discretion of Lender), and such other items as are determined by the Lender and its consent in their sole discretion. This outline does not bind Lender and cannot provide any part of the basis for any claim against Lender in any court or arbitration.*

**BORROWER:**  Caprock Pipe & Supply, LP, a New Mexico limited partnership ("Borrower") to be acquired by Mr. Michael Bannon ("Guarantor").

**LENDER:**  Prospect Energy Corporation ("Prospect" or "Lender"), a Maryland Corporation, or its affiliate assignee.

**LOAN AMOUNT:**  Up to $10,000,000 of a subordinated secured debt facility (the "Sub Debt").

**PURPOSE:**  To partially-fund the acquisition of the Borrower by Mr. Michael Bannon.

**SOURCES:**

| | |
|---|---|
| CIT Senior Debt | $ 17,900,000 |
| Prospect Subordinated Debt | 10,000,000 |
| Equity | 0 |
| TOTAL | $ 26,750,000 |

**USES:**

| | |
|---|---|
| Purchase Price – Caprock Pipe & Supply, LP | $ 13,194,382 |
| Repay Rayellen Resources | 3,500,000 |
| Repay Wells Fargo Term Loan | 3,305,618 |
| Repay Wells Fargo Line of Credit | 6,000,000 |
| Investment Banker Fee | 1,050,000 |
| Debt Service Reserves and Closing Costs | 750,000 |
| TOTAL | $ 16,750,000 |

**CLOSING:**  No later than May 15, 2006.

**MATURITY:**  Three (3) years from the date of Closing.

**GUARANTOR:**  Mr. Michael Bannon shall personally guarantee the Sub Debt. The guarantee document shall include language specifically waiving the defense of validity of the guarantee.

**INTEREST RATE:**  Higher of (i) 10.00% over 12-month LIBOR and (ii) 15.00% per annum, payable monthly in advance and computed on basis of 360 day year counting actual days elapsed.

**PAYMENT-IN-KIND:**  None.

**UP-FRONT POINTS:**  2.5% of the Loan Amount payable to Lender at Closing.

5

Caprock Pipe & Supply – April 11, 2006

| | |
|---|---|
| **NOTE:** | Note or Notes evidencing the Loan Amount. |
| **DEBT SERVICE RESERVE ACCOUNT:** | A Debt Service Reserve Account (the "DSRA") shall be funded at Closing in order to meet potential shortfalls in debt service on the Note. The DSRA shall initially be funded with three (3) months debt service (interest plus principal repayment) from the proceeds of the Note into an escrow account held by Prospect's counsel or, at Prospect's option, at a financial institution acceptable to the Lender and governed by a deposit account control agreement. Any draws on the DSRA will be replenished with Free Cash Flow (as defined below) until the required balance is achieved. Interest income on the DSRA will accrue to the balance of the DSRA. |
| **AMORTIZATION:** | The principal amount of the Sub Debt would be repaid in full at maturity ("Bullet"). |
| **CASH SWEEP:** | Lender will have the option at its sole discretion to amortization payments equivalent to 100.0% of Free Cash Flow above a cash floor of $100,000, payable within fifteen (15) days of the end of each calendar quarter. Free Cash Flow as of each quarter's end shall be defined as cash and cash equivalents as of the beginning of the quarter, plus cash flow from operations (after payment of general and administrative expenses defined in the G&A Budget (defined below), Permitted Tax Distributions (defined below), changes in working capital and budgeted capital expenditures defined in the Capex Budget (defined below)), less scheduled debt service on the CIT senior debt. There shall be no Yield Maintenance Premium (defined below) applied to cash swept per this Cash Sweep. |
| **SUBORDINATION:** | The Sub Debt shall be subordinated in right of payment to loans to up to $20,000,000 provided by CIT with subordination terms acceptable to the Lenders in the Lenders' sole discretion. The Sub Debt shall be senior to all other loans and debt obligations. All restricted accounts, including any Operating Account (defined below) and the DSRA shall be pledged to secure the Sub Debt and be for the benefit of and subject to the second lien of Lender, subject only to the first lien of CIT. |
| **SECURITY:** | The Notes shall be secured by all equity interests of the Borrower held by Mr. Michael Easton (effected by delivery of share certificates and execution and delivery of an irrevocable proxy) and a second lien on all of Borrower's tangible and intangible assets, to include patents and all other intangibles, subordinated only to the liens of an approved Senior Lender, enabling non-judicial foreclosure and an opinion from counsel confirming the same. First liens on acquired real estate will permit subsequent senior debt liens subject to the approval of the Lenders. Borrower's counsel shall provide to Prospect its written opinion confirming Prospect's non-judicial foreclosure remedies upon default. |
| | All restricted accounts, including the Operating Account (defined below) and DSRA shall be maintained with a financial institution acceptable to Prospect and subject to a control agreement, satisfactory to Prospect, for the purpose of (i) providing Prospect with the right to control each account in the event of default and (ii) perfecting a security interest in each account as security for the Sub Debt. In the case where CIT establishes an account equivalent to the Operating Account (i.e., in the case where CIT establishes a lock-box), Prospect shall nonetheless take a second perfected security interest in the lock-box and enter into an intercreditor agreement with CIT regarding the lockbox acceptable to Prospect in its sole discretion in advance of Closing. |
| **DEFAULT REQUIRING MANDATORY PREPAYMENT:** | At Lender's option, at any time upon (1) a casualty or condemnation event, (2) a Change of Control (as defined herein), (3) insolvency of the Borrower, (4) the sale of 20% or more of the Borrower's assets (proceeds from sales of lesser amounts shall be 100% utilized to pay optional prepayments), (5) an IPO, or (6) any other default, the Sub Debt outstanding shall be prepaid in full with fees, expenses, accrued interest and the Yield Maintenance Premium (defined below). A Change of Control will mean that Mr. Michael Easton shall cease to own at least 51.0% of the voting common stock of the Borrower, or any other transfer or transfers of ownership that in the aggregate exceed 20.0% of the voting common stock of the Borrower. |
| **VOLUNTARY PREPAYMENT:** | The Sub Debt may not be voluntarily prepaid within one (1) year of Closing. Thereafter, the Sub Debt may be prepaid with fifteen (15) business days' prior notice in increments of no less than $300,000. Prepayments shall be applied to payments of all unpaid expenses, fees and interest, in |

Caprock Pipe & Supply – April 11, 2006

that order, then to any term loans in the inverse order of their maturity. At the time of any prepayment (whether voluntary or by acceleration), Borrower would be required to pay to Lender the Yield Maintenance Premium.

**YIELD MAINTENANCE PREMIUM:**
Upon a Mandatory or Voluntary Prepayment, Lender shall receive an additional payment beyond that otherwise required hereunder equivalent to the discounted value of the remaining expected interest and principal payments avoided by such prepayment, assuming an interest rate of 15.0% for the prepaid amount's average life, discounted at the yield at closing of actively-traded three-month U.S. Treasury Securities. The Yield Maintenance Premium shall not apply to a Cash Sweep.

**EQUITY DISTRIBUTIONS:**
There shall be no distributions to equity or any class of security subordinate to the Sub Debt so long as (i) any portion of the Sub Debt remains outstanding and (ii) so long as the Lender has failed to achieve the lesser of (a) 25.0% IRR Threshold (defined below) and (b) 2.5x Cash-on-Cash Threshold (defined below); provided, however, that Mr. Michael Enmon and the other owners of Borrower may take distributions to himself for tax liabilities directly a result of their ownership of Borrower (the "Permitted Tax Distributions"). Borrower may satisfy the test herein at any time, subsequent to which the Lender would retain its 10.0% NPI (defined below).

**KEY-MAN LIFE INSURANCE:**
In advance of Closing, Borrower shall purchase life insurance in the amount of $9,000,000 in the aggregate insuring the lives of Mr. Alan Powers ($7,000,000) and Mr. Arvel M. Barry ($2,000,000), and naming the Lenders as beneficiary to the extent of the outstanding Sub Debt.

**NET PROFITS INTEREST (NPI):**
At Closing, Borrower shall deliver to Lender a detachable Net Profits Interest ("NPI") that provides for distributions to Lender equivalent to 10.0% of any and all distributions to the owners of the Borrower, including but not limited to periodic distributions, distributions at a Mandatory Prepayment Event or exit and Permitted Tax Distributions. The NPI shall contain customary rights and restrictions on fundamental transactions and investments, incurrence of debt and liens, affiliate transactions, dividends, distributions, restricted payments, changes in organizational documents, accounting policies, capital accounts and book up of underlying assets.

**MANDATORY NPI REDEMPTION:**
Upon the occurrence of a Mandatory Prepayment Event, an initial public offering, an event of default or at their expiration, Lender may put back to the Borrower all or any portion of the NPI originally issued to Lender (the "Put") at a Redemption Price equal to 10.0% multiplied by the highest of: (a) Fair Value of the common equity as determined by an independent appraiser mutually acceptable to the Borrower and Lender; (b) the Put Valuation defined as a multiple of 3.0x times the higher of (i) trailing twelve month Adjusted EBITDA plus cash and marketable securities less total funded debt, excluding shareholder loans or (ii) the average of the previous three (3) years Adjusted EBITDA plus cash and marketable securities less total funded debt, excluding shareholder loans; or (c) the highest offer received from a third party. Adjusted EBITDA shall exclude deductions for extraordinary items and excess owner compensation (to be defined in final documentation).

**IRR THRESHOLD:**
Upon the occurrence of the earlier of a Mandatory Prepayment Event, an initial public offering, an event of default or ten (10) years from Closing, if the Lender has not earned the lesser of (a) a 25.0% realized cash annualized IRR (the "IRR Threshold") or (b) 2.5x Cash-on-Cash (the "Cash-on-Cash Threshold"), the Borrower will provide the Lender with additional an additional NPI in an amount that provides the Lender with the lesser of an IRR of at least 25.0% or Cash-on-Cash of at least 2.5x. Dilution will occur only with the Lender's permission. IRR and Cash-on-Cash shall be calculated including all cash flows from and to the Lender, including Drawdowns, Up-Front Points, Interest, Cash Sweep, any Prepayment and any Yield Maintenance Premium, and any payments to the Lender as a result of its NPI, but not including expense reimbursement to Lender (where IRR shall be calculated using the Microsoft Excel XIRR function).

**UNLOCKING PROVISION:**
At any time after the Maturity of the Sub Debt (three years from Closing) the Lender has the option to put its NPI to the Borrower at a purchase price to be determined by the greatest of: fair market value ("FMV") determined by third party; actual sale value; or 3.0x trailing twelve month EBITDA.

7

Caprock Pipe & Supply – April 11, 2006

consolidated balance sheet, consolidating and consolidated income statement, and a statement of cash flow. These statements shall be accompanied by representations from the Chief Financial Officer and Chief Executive Officer of the Borrower that confirm their review of the statements, their completeness and accuracy, and a certification of covenant compliance and compliance with all terms of the Credit Agreement.

ii.  Annual financial statements within 75 days of fiscal year end audited by an accounting firm acceptable to the Lender with officer's Compliance Certificate and auditor's management letter.

iii.  Comparative information for prior comparable periods with respect to 1-2 above.

iv.  Detailed annual budget and capital expenditures program for three (3) years on a monthly basis for the Borrower delivered to Lender 30 days prior to fiscal year end, including consolidating and consolidated balance sheets, income and cash flow statements. For the FYE 12/31/06, this will be prepared and within 30 days of Closing. It will be reviewed and revised quarterly with monthly reports to be prepared and submitted to Lender. Any expenses larger than $20,000 in excess of approved annual budget must be pre-approved by Prospect.

v.  Such other financial information as is customary or Lender or its counsel requests.

vi.  Immediate notice of any default or potential default or material adverse change or change in accounting or financial practice.

**AFFIRMATIVE COVENANTS – OTHER:**  The loan agreement shall contain usual and customary affirmative covenants for facilities and transactions of this type, including, but not limited to:

i.  Maintenance of insurance;

ii.  Inspection of books and properties;

iii.  Maintenance of licenses and authorizations;

iv.  Maintenance of books and records;

v.  Compliance with customary environmental and ERISA requirements;

vi.  Maintenance of security interests and security accounts;

vii.  Compliance with budgeting process and annual budgets;

viii.  Use of proceeds as agreed;

ix.  Preservation of and compliance with material contracts;

x.  Provision of additional collateral as it becomes available, including all after acquired property;

xi.  Monthly certificates from CEO and CFO confirming compliance herewith;

xii.  Obligation to notify Lender immediately of any default;

xiii.  Obtaining all necessary authorizations; and

xiv.  Providing further assurances as reasonably requested.

**NEGATIVE COVENANTS – FINANCIAL:**  The loan agreement shall contain the following financing covenants, which shall be calculated by the Borrower within twenty (20) days of the end of each calendar quarter:

i.  EBITDA:  EBITDA of the Borrower shall not be less than $3,900,000 in any trailing four (4) quarter period.

ii.  TOTAL DEBT/EBITDA:  Total debt as of quarter end divided by EBITDA for four (4) trailing quarters shall not exceed 3.0x.

Caprock Pipe & Supply – April 11, 2006

| | |
|---|---|
| | xviii.  Limitations on partnerships and joint ventures. |
| **EVENTS OF DEFAULT:** | The loan agreement shall contain usual and customary Events of Default for facilities and transactions of this type, including, but not limited to: |
| | i.  Failure to pay expenses, principal, interest or fees when due (no cure period); |
| | ii.  Breach of covenants, representations or warranties (5 day cure period); |
| | iii.  Cross default to any other debt or obligation; |
| | iv.  Assertion of and/or failure of any loan document to remain in full force and effect; |
| | v.  Assertion of and/or failure or loss of priority of any lien or security interest of Lenders; |
| | vi.  Bankruptcy, insolvency or dissolution; |
| | vii.  Loss, termination or default under any material contract, consent, authorization, permit or license; |
| | viii.  Judgments in excess of specified amounts; |
| | ix.  Abandonment of any Project or significant asset; |
| | x.  Change in control (defined above); |
| | xi.  Change in ownership or management; |
| | xii.  Material adverse change; |
| | xiii.  Mandatory Prepayment event or other prepayment event; |
| | xiv.  Reporting failures; |
| | xv.  ERISA violations; and |
| | xvi.  Loan documents asserted invalid. |
| **POST-DEFAULT AND CURE PERIOD INTEREST RATE AND EQUITY PAYMENT:** | The Interest Rate plus 5.0 % (i) upon the occurrence and continuation of an Event of Default, whether or not declared and (ii) for so long as any management or financial reports are overdue, whether or not declared.  For each month or partial month of default, whether or not declared, Lender shall receive 1.0% of the undiluted equity of the Borrower, which equity shall be cancelled if such default shall be cured within two weeks of its occurrence. |
| **MANAGERIAL ASSISTANCE FEE:** | Borrower shall pay lender a Managerial Assistance fee of $10,000 for every month that the Borrower is in default, payable in cash on the last day of each month. |
| **INDEMNIFICATION:** | Customary language. |
| **EXPENSES:** | Borrower hereby agrees to reimburse Lenders on demand for all reasonable expenses of Lenders, their counsel and their consultants, whether or not any transaction closes. |
| **CONDITIONS TO CLOSING:** | Closing of the Sub Debt is conditioned upon the fulfillment of certain conditions including, but not limited to: |
| | i.  Accuracy of Representations and Warranties; |
| | ii.  The Lender's satisfaction with the terms and conditions of the total financing package consistent with the stated Sources and Uses; |
| | iii.  Completion of legal documentation satisfactory in sole discretion of Lenders; |
| | iv.  All contracts, permits, licenses and regulatory approvals have been received and are valid; |
| | v.  Formal approval of the proposed Sub Debt loan by the Lender's Investment Committee in it sole discretion; |

11

Caprock Pipe & Supply – April 11, 2006

vi.   A copy of the executed Definitive Purchase Agreement ("DPA") between the Mr. Michael Eimon and the sellers of the Borrower.

vii.  The Lenders' satisfaction in their sole discretion with all due diligence including financial and legal, accounting, and management due diligence, as may be deemed necessary or appropriate;

viii. Delivery of a long range business and strategic plan;

ix.   Environmental review by consultant to be retained by Lender;

x.    Prospect is satisfied in its sole discretion with reference checks for key management personnel;

xi.   Satisfactory management employment agreements;

xii.  Satisfactory title review of all properties;

xiii. Lenders are satisfied in their sole discretion with the cash management systems of the Company;

xiv.  Creation of Operating Account (unless equivalent created by CIT, in which case Lender will require an intercreditor agreement with CIT acceptable to Lender in its sole discretion);

xv.   No material adverse changes;

xvi.  Verification to the satisfaction of Lender that every statement or fact regarding this transaction of any importance to Lender has been proven by objective third party evidence completely satisfactory to each Lender in its sole discretion;

xvii. Delivery of legal opinions in form and substance from (i) seller's counsel, (ii) borrower's counsel and (iii) Prospect counsel in each case satisfactory to Lender in its sole discretion under New York Law and the law of each jurisdiction where Borrower or any project is located;

xviii. Borrower has insurance, reasonably satisfactory to Lenders for which Lenders would be named as an additional insured and property insurance with respect to the Collateral for which Lenders would be named a loss payee;

xix.  No Event of Default; and

xx.   Any such other conditions as the Lenders and their legal counsel shall reasonably request in the course of their due diligence.

**GOVERNING LAW:**    State of New York, without regard to conflicts of laws principles.

**JURISDICTION:**    Exclusive to New York courts.

**CONFIDENTIALITY:**    This Summary of Proposed Terms and Conditions is being made available to the Borrower on a confidential basis. Neither this Term Sheet nor its contents are to be divulged to other parties without the express written consent of the Lenders.

**ASSIGNMENT:**    Prospect may sell or assign its securities to any affiliate or 3rd party in sole discretion, and shall have the right to alienate its interests herein at any time.

**JURY TRIAL:**    All parties will waive any right to jury trial.

**NOT A
COMMITMENT:**    This term sheet is not binding on Lender or any of their affiliates and is submitted for discussion purposes only. No binding agreement can be reached on the subject matter of this term sheet unless and until definitive and final documentation has been signed and delivered by all parties containing such terms and conditions as are satisfactory to Lender. This term sheet cannot form any part of any claim by Borrower before any court, arbitrator or other tribunal.

12

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

—————————————————————————x

PROSPECT ENERGY CORPORATION; PROSPECT
CAPITAL MANAGEMENT LLC; BART DE BIE;
JOHN BARRY; GRIER ELIASEK; and WALTER
PARKER,

Claimants,

vs.

MICHAEL ENMON,

Respondent.

Case No.:<br>13 148 02866 06

—————————————————————————x

## PARTIAL, FINAL ARBITRATION AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the parties, dated April 11, 2006, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby render the following Partial, Final Arbitration Award:

## I
## BACKGROUND FACTS

### A. The Parties

Prospect Energy Corporation[1] is a business development company that lends to and invests in companies that have little or no access to capital from banks and the national capital markets. Prospect Capital Management, LLC is the investment advisor to Prospect. The individual Claimants and Counterclaim-Respondents are:

- **John F. Barry**, the Chairman and Chief Executive Officer of Prospect.

- **M. Grier Eliasek**, the President and Chief Operating Officer of Prospect.

---

[1] In 2006, the name of Prospect Energy Corporation was changed to Prospect Capital Corporation. These two entities are collectively referred to herein as "Prospect."



EXHIBIT

*B*

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

- **Walter Parker**, an independent outside director of Prospect, and

- **Bart de Bie**, a Principal of Prospect in 2006 and presently a Managing Director.

Respondent Michael Enmon holds an MBA from the University of Chicago and since 2006, he has been an officer of Compass Bank in Houston. Prior to that: he was a commercial banker at Wells Fargo Company ("Wells Fargo") in Albuquerque in 2005 and early 2006; a banker at Bank of America in Albuquerque in 2003-04; Director of Corporate Finance for SBC Communications in San Antonio in 2001; an investment banker at Merrill Lynch in New York in 1998-2000; and an officer at Nationsbank in Houston in 1994-96.

## B. Caprock LP, Efforts to Sell

As of 2005, Caprock Pipe & Supply LP ("Caprock LP") was a New Mexico limited partnership engaged in the purchase, refurbishment and sale of pipe for use in connection with oil and natural gas wells. In mid-2005, the owners of Caprock LP wished to sell their business, thus capitalizing on existing high gas prices and accommodating the wish of Caprock LP's CEO (Alan Powers) to return to Texas. In furtherance of this goal, Caprock LP retained the investment banking firm Wells Fargo Securities, LLC ("Wells Fargo") as investment advisor to assist in the sale. Shortly after being retained, Wells Fargo prepared a Confidential Information Memorandum for potential purchasers wherein it discussed numerous aspects of Caprock LP's management and operations.

During 2005 and early 2006, Caprock LP's owners engaged in discussions to sell their ownership interests to a company named Speedy Heavy Hauling. In early 2006, however, Mr. Enmon (while still a Wells Fargo employee) approached his client Caprock

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

LP directly and made his own personal offer to purchase the company.[2] This ultimately resulted in a February 2006 non-binding letter of intent proposing that Mr. Enmon purchase 100% of all interests in Caprock LP for approximately $42 million. It was additionally stipulated, however, that a condition of closing any such purchase was Mr. Enmon's procurement of financing sufficient to fund the transaction. Mr. Enmon thus began shopping for lenders to finance 100% of his proposed acquisition of Caprock LP.

## C. Enter Prospect

In early April 2006, PNC Bank contacted Prospect's Bart de Bie to explore the possibility of Prospect's providing subordinated debt to finance Enmon's proposed acquisition of Caprock LP. In the initial discussions among PNC Bank, Mr. de Bie and Mr. Enmon, Mr. de Bie was urged to offer indicative terms for such a deal promptly since there were other contenders for the business and since Enmon already had term sheets from two other sources.

While Mr. de Bie's initial reaction to the PNC/Enmon overture was positive, he was concerned by the current owners' proposed sale of 100% of the business since this would have left those owners with no motivation to assist in the post-acquisition management of the company. As a result, Mr. Enmon renegotiated the acquisition terms so that he would acquire only 75% of Caprock LP.

## D. Caprock Pipe & Supply, Inc.

In April 2006, Mr. Enmon created a New Mexico Company called Caprock Pipe & Supply, Inc., later renamed Enmon Capital Inc. ("Caprock Inc."). Caprock Inc. was a single purpose entity which was formed solely as the vehicle for purchasing Caprock L.P. and for borrowing funds in connection therewith. Mr. Enmon has at all times controlled

---

[2] This was contrary to Wells Fargo policy and led to Wells Fargo's firing Mr. Enmon for cause.

Case 1:08-cv-03721-CM    Document 6-2    Filed 04/30/2008    Page 4 of 34

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

Caprock L.P. and has at all times treated it as his own entity. Based on considerable

evidence at the hearing, it is clear that Caprock Inc. is the <u>alter ego</u> of Mr. Enmon and is

in privity with him.

**E. Letter Agreement,**
**Term Sheet**

Based on the above-described negotiations, Prospect tendered to Mr. Enmon a four

page draft Letter Agreement, wherein it stated the terms on which it was prepared to

consider financing on the basis set forth in an indicative Term Sheet which was attached

to the draft agreement. Upon receipt of these documents, Mr. Enmon initiated further

negotiations which resulted in significant changes to Mr. Enmon's benefit. On April 11,

2006, Mr. Enmon signed the Letter Agreement under the words "Agreed to and

Accepted" and, at the same time, he paid a $25,000 deposit, as required by Section 6 of

the Letter Agreement.

While the Letter Agreement constituted a binding commitment to engage in good

faith negotiation and to furnish other specified consideration, there was no binding

obligation at the time to enter into a final financing. In fact, the Letter Agreement stated

that the attached Term Sheet did "not purport to summarize all of the terms and

conditions upon which the proposed financing is to be based" and, in addition, it provided

that any financing was expressly contingent on Prospect's completion of due diligence to

its satisfaction. More particularly, Section 2 of the Letter Agreement stated:

> In the event that our continuing review of the Borrower
> discloses information relating to conditions or events not
> previously disclosed to us or relating to information or
> developments concerning conditions or events previously
> disclosed to us which we believe may have an adverse
> effect on the business, operations, properties, assets,
> liabilities, condition (financial or otherwise) or prospects of

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon.

the Borrower or its subsidiaries or the proposed financing or for any other reason, we may in our sole discretion suggest alternative financing amounts or structures or decline to participate in the proposed financing without incurring any liability and you agree to assert none. When we refer to anyone's "sole discretion", we each mean that party's sole and absolute discretion as to process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise.[3]

### (i) Investment Committee Approval

The Letter Agreement also provided that no financing could be furnished to Prospect without approval of Prospect's Investment Committee. This was a standard requirement by Prospect since it had never consummated any transaction without the unanimous, written approval of its Investment Committee which consisted of Prospect's CEO, Mr. Barry, its COO, Mr. Eliasek and a number of others. Typically, Investment Committee meetings are robust, comprehensive exchanges, with one Prospect participant being the champion of the deal in question and another being the loyal opposition. Often, these meetings culminate with a request that further questions be answered and that further due diligence be conducted.

One reason for the overriding caution of Prospect's Investment Committee is that Prospect (as a "mezzanine lender") is issuing highly risky loans which a bank would never even consider. Whereas a bank or other secured lender can protect itself with liens over corporate assets, a mezzanine lender has few, if any, assets against which to seek recourse. Thus, a mezzanine lender is heavily dependent on an enterprise's cash flow

---

[3] The Letter Agreement also provides that: (i) "Under no circumstances shall Prospect be responsible or liable to the Borrower or any other person for damages . . ." (Sec. 9) and (ii) " . . . neither Prospect nor any of its affiliates shall have any liability to any person in connection with Prospect's refusal to fund the financing or any portion thereof . . . ." (final par.).

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

being sufficient to fund repayment of the loan and, in addition, a mezzanine lender must rely heavily on the character and management capabilities of the principals behind the enterprise.

## F. Due Diligence

Upon receipt of the signed Letter Agreement and the $25,000 deposit from Mr. Enmon, Prospect immediately began its due diligence investigation. Mr. de Bie, as deal "originator", led this process. In the course of its due diligence, Prospect devoted over 100 management hours to things such as reviewing significant amounts of Caprock financial information and obtaining and checking personal and professional references about Enmon and Caprock management. Further, some of Prospect's representatives interviewed Mr. Enmon in person at Prospect's New York office on April 18, 2006 and, in addition, they visited Caprock's primary facility in Lovington, New Mexico and its headquarters in Houston; they conducted interviews with the managers of Caprock, who were to have reported to Mr. Enmon after closing; they reviewed Caprock's inventory; and they interviewed Caprock's major customers.

In short, Prospect conducted comprehensive, good faith due diligence on Caprock, indeed, due diligence which far exceeded what was required by the Letter Agreement.[4] And when the first round of due diligence was nearing completion, Mr. de Bie (Prospect's designated "champion" of the deal) told Mr. Enmon he was cautiously optimistic that the Enmon/Caprock transaction would ultimately be consummated. There still remained, however, the finalization of due diligence, as well as the presentation of

---

[4] Section 10 of the Letter Agreement provided that Prospect's good faith efforts:

> shall be conclusively shown by evidence, without more, that Prospect has gathered or reviewed more than fifty pages of due diligence materials relating to the proposed transaction.

6

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

the deal to Prospect's Investment Committee followed by the necessary unanimous vote of that Committee.

**II**
**MAY 8-16, 2006**

**A. CIT Reduces Its**
    **Loan Commitment**

In March 2006, CIT Group, Inc. ("CIT"), a consumer and commercial finance company, provided Enmon with a term sheet proposing to furnish approximately $18 million of senior secured debt to partially finance the purchase of a controlling interest in Caprock LP. On May 8, 2006, however, Enmon informed Prospect that CIT was reducing its loan commitment by $2 million, apparently because of downward adjustments to inventory and receivables since CIT first calculated its borrowing base. As a result, Mr. Enmon asked Prospect to make up the $2 million difference by raising its commitment from $10 million to $12 million.

In response to this troubling development, Mr. de Bie asked Prospect's attorneys (Vinson & Elkins) to amend the draft Credit Agreement to increase Prospect's commitment to $12 million. This did not represent a funding commitment, however, since Prospect's Investment Committee had not even approved the initial $10 million loan and since the $2 million increase was simply a change in the proposal that would ultimately be presented to that Committee.

**B. Change of the Closing Date**

In the early stages of the negotiation, there had been a general understanding that everyone was working toward May 12 as the closing date for the Caprock acquisition and the related financing transactions. By May 7, 2006, however, CIT's delay in furnishing

7

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

loan documentation prompted Mr. de Bie to send an email to Mr. Eliasek and others at Prospect advising that CIT's "foot dragging" would likely preclude a closing before May 19. Further, as of May 9, Prospect had still not completed its due diligence and was still seeking, for example "a few more interviews", as well as "a draft of [CIT's] final background check" on Mr. Enmon.

Given the slow moving status of the project, Prospect and CIT both expressed concern on May 10 that a May 12 closing date was extremely aggressive and unlikely to happen. CIT's counsel, in turn, conveyed this view directly to Mr. Enmon.

Despite this broad acquiescence in a delayed closing date, Mr. Enmon abruptly informed Prospect on May 10 that the Caprock transaction had to close in **two days** by Friday May 12, 2006. At the same time, Mr. Enmon circulated a May 10, 2006 email from Caprock LP's CEO, Alan Powers, wherein Powers stated that if the transaction did not close by May 12 "the [other Caprock LP] partners are through with the deal and I know I am." Suffice it to say that this sounded a literal fire alarm within Prospect. Thus, for example, Mr. Eliasek (Prospect's President and COO) testified that "from Prospect's perspective, the [investment] committee's perspective, this thing was put in rapid fast forward, you know, 8X on your DVD."  Similarly:

- On May 11, Mr. de Bie informed colleagues at Prospect that: "the deal recently jumped to a very tight time frame to close (we had expected a Tues or Wed [May 16 or 17] close based on progress as of earlier this week)", and

- On May 13, 2006, John Barry (Prospect's CEO) complained that "[f]or some reason this deal was accelerated past anyone's ability to analyze it."

13 148 02866 06; Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

## C. Emergency Meeting of
## Investment Committee

On learning of the unexpected "need" to close two days hence on May 12, Prospect accelerated its efforts on an emergency basis. Thus, Mr. de Bie worked around the clock to put together a transaction memorandum, which was circulated at 1:33 p.m. on May 11. And at the same time, Mr. de Bie convened a meeting of the Investment Committee for that same day on just a few hours' notice.

Prospect's Investment Committee met at approximately 6 p.m. on Thursday May 11, 2006. In the course of that meeting, Mr. de Bie (the designated "deal champion") strongly supported Mr. Enmon's loan request while Richard Brand (the "loyal opposition") joined the other Committee members in critiquing the deal.

As a whole, the Committee had serious concern over late-arriving information that Caprock LP's first quarter 2006 EBITDA had significantly declined in relation to the first quarter of 2005. This was highly significant to Prospect since a borrower uses operating cash flow to service its debt and since a decrease in EBITDA could therefore impair Enmon's ability to repay the loan. So too, the Committee was troubled by CIT's unilateral reduction of its loan by $2 million and the concomitant request that Prospect increase its loan by the same $2 million. More particularly, the Committee was concerned that the reduction in the CIT loan was an indicator of inventory problems at Prospect and, in addition, the Committee had difficulty with how a $2 million reduction by the fully secured creditor (CIT) could sensibly be accompanied by a $2 million increase on the part of the subordinated lender (Prospect).

At the close of its May 11 meeting, Prospect's Investment Committee determined it could not approve the Enmon loan on the basis of the information then before it and,

accordingly, it requested that Mr. de Bie seek further data, as well as answers to a number of questions of serious concern. Mr. de Bie immediately communicated this information to Mr. Enmon, expressing hope that perhaps the loan could close the following Monday, May 14 or Tuesday, May 15.

**D. Enmon's May 12 "Closing"**

Confronted, on the one hand, with Prospect's notice that it would not be closing on May 12 and, on the other, with the pronouncement of Caprock LP's CEO (Alan Powers) that Caprock LP was "through with the deal" if it did not close by May 12, Mr. Enmon opted to "close" with CIT and Caprock LP on May 12 without telling them that Prospect was not closing on the same day. Mr. Enmon's decision to proceed in this manner was apparently a result of his near desperation to bind Caprock LP and CIT to a deal on May 12, coupled with his hope that Prospect would soon thereafter come on board and close on its $12 million loan to Enmon.

\* \* \* \*

At the same time as Enmon was participating in the "closing", Mr. de Bie was repeatedly contacting him with further questions about Caprock LP's financial affairs. During these calls, Mr. de Bie made clear that Enmon's proposal had not received Investment Committee approval and that Prospect had not committed to fund the acquisition of Caprock LP. Indeed, Mr. Enmon could not possibly have understood otherwise since Mr. de Bie's pursuit of further due diligence (along with Mr. Enmon's same day responses) were entirely inconsistent with Prospect's having bound itself to do anything.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

### E. May 12—Emergence
### of Further Concerns

On May 12, 2006, Prospect analyzed a CIT inventory audit which had arrived in the late afternoon of May 11 and had therefore not been a part of the Investment Committee's May 11 deliberations. This audit showed further shortcomings with Caprock LP's inventory, including: "accounts receivable, a turnover slowdown"; "increase in the accounts receivable dilution"; "aging test irregularities"; "inventory turnover slow down"; and "significant change in inventory level." This was a red flag to Prospect that Caprock LP's inventory problems were potentially far more serious than what CIT had previously described when it was justifying the $2 million reduction of its secured loan to Enmon.

Late in the day on May 12, Prospect also reviewed a background report on Enmon which had been furnished by CIT the preceding day and, again, had not been part of the Investment Committee's May 11 deliberations. This report showed, among other things, that: (i) Enmon had defaulted on two student loans; (ii) tax liens against Enmon had been obtained by the State of Illinois and the State of New York; (iii) a GMAC auto account in Enmon's name had been closed with an outstanding balance of $29,800; and (iv) Enmon's FICO score was below the national average. All of this was of understandable concern to Prospect.

In addition, Prospect became aware at this time that one Chad Dufrene had funded Enmon's due diligence costs in return for a 5% interest in the purchaser of Caprock LP. This seriously concerned Prospect because it meant that Enmon was contributing zero dollars to the transaction and was undertaking zero financial risk. And finally, natural gas prices—which directly affected the ability of Caprock LP to service its debt—had

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

plunged dramatically since April 2006 and were still dropping during the week of May 8, 2006.

**F. Saturday, May 13**
**Sunday, May 14**

**(i) Discovery of Negative Flow**
**for 1st Quarter 2006**

Throughout Saturday, May 13 and Sunday, May 14, Messrs. de Bie and Enmon spent significant time analyzing the financial results of Caprock LP. In the course of making some adjustments which transferred some revenue from 2005 into the first quarter of 2006, they discovered a number of additional first quarter 2006 expenses. When they were finished incorporating these expenses and making other adjustments, Enmon's prior representation of a $3 million positive cash flow for the first quarter of 2006 was radically changed to reflect a $4 million negative cash flow in that quarter. This raised additional serious concerns about the viability of the proposed financing for the reason, among others, that the negative operating cash flow figures showed that Caprock LP was already in default of the debt covenants in the proposed credit agreement between Caprock LP and Enmon.[5]

**(ii) Conversation with Alan Powers**

Acting on instructions from Messrs. Barry and Eliasek, Mr. de Bie told Enmon on Saturday, May 13 that Prospect needed to talk to Alan Powers (Caprock LP's CEO) in order to better understand Caprock LP's questionable recent performance and to obtain

---

[5] While financial statements provided by Enmon to Prospect after the close of the first quarter 2006 did not disclose the negative cash flow numbers, Enmon argues that Prospect could nonetheless have derived the actual cash flow figures from several other documents in its possession at the time. This is of no present significance, however, since the point is not whether Prospect might have pieced together some documents and found the negative cash flow sooner (which should not have been its burden) but, rather, that Prospect was justifiably concerned when the negative numbers did come to the fore.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

more information about management's future plans. Mr. Enmon strongly resisted this request, probably because he had theretofore withheld from Mr. Powers the fact that the Prospect loan had not closed. Despite Enmon's opposition, Messrs. Barry and Eliasek remained firm and, as a result, Mr. Enmon contacted Mr. Powers on Saturday to request a call between Powers and Prospect. In the course of his conversation with Enmon, Mr. Powers for the first time learned that the Prospect loan had not closed. Powers' reaction on hearing this was deep anger, followed by a statement that he would not talk to Prospect until after Prospect had closed on the loan on Monday. Mr. Enmon passed this ultimatum back to Mr. de Bie and at the same time stated that he (Enmon) had assured Mr. Powers of Prospect's commitment to close the following Monday. Upon hearing all this, Mr. de Bie responded swiftly and brusquely to Enmon as follows:

> If Alan wants to buy that ranch of his, he might want to change his attitude. His attitude just made things a lot worse than they needed to be. Guys around here don't like getting pushed around. No one ever committed to wiring a penny. We simply indicated that we were moving in that direction. I challenge you . . . to find a single document or message where anyone at Prospect committed to funding this deal.

Ultimately, Prospect succeeded in speaking with Mr. Powers for five or ten minutes during the afternoon of Sunday, May 14. That call, however, provided no comfort to Prospect since, among other things: (i) Mr. Powers did not provide satisfactory explanations concerning Caprock LP's finances; (ii) Mr. Powers (the expert in Caprock LP's business) indicated he would not be staying at Caprock LP for more than six months.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

after the sale of the company; and (iii) Mr. Powers said that he and his colleagues did not think Enmon was capable of running the business.[6]

Following this phone call, there were further conversations between Enmon and Prospect in which Enmon was verbally abusive toward Prospect's senior management, even engaging in threats and obscenities which further increased Prospect's concerns about Enmon's suitability to be the CEO who would lead the company.

### (iii) Exploration of Alternatives

Given the wave of negative news about Caprock and Mr. Enmon, Prospect determined on Sunday, May 14 that it could not loan Mr. Enmon $12 million on the basis that had previously been envisioned. Late Sunday afternoon, however, Messrs. Barry, Eliasek and de Bie had two telephone conversations with Mr. Enmon and his lawyer (Mr. Fiser) wherein the Prospect representatives sought to explore a possible alternative transaction whereby: (i) Enmon and the other members of the Caprock LP management team would continue to run the company; (ii) Enmon would acquire an initial 24.9% interest in Caprock LP with the right to obtain further percentage interests in the company upon reaching certain EBITDA targets or goals which were below those projected by Enmon; (iii) pending attainment of such targets, Prospect would own 50.1% of Caprock LP which would be reduced to 12.5% following achievement of the EBITDA goals; (iv) Enmon and his wife would draw an increased salary for their services; (v) Prospect's

---

[6] Enmon asserts that in this call between Prospect and Mr. Powers, Prospect explored the possibility of its purchasing Caprock LP without the participation of Enmon. Messrs. Barry, de Bie and Eliasek (the Prospect representatives who participated in the call) all testified, however, that it was solely a due diligence call, nothing more. The Arbitrator accepts this testimony since: (i) the Prospect witnesses were generally credible; (ii) the "evidence" that Prospect made such an overture to Powers at this time is, at best, highly questionable; and (iii) in the circumstances of Sunday, May 14, it would have made no sense for Prospect to initiate a discussion with Mr. Powers about the possibility of Prospect's purchasing Caprock LP itself.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

interest rate/minimum internal rate of return would be increased to reflect its heightened

risk; and (vi) Enmon would continue to contribute zero dollars to the project.

While Prospect's new proposal would have provided Enmon the same interest in

Caprock LP once the EBITDA targets were met, Enmon summarily rejected Prospect's

offer. As he testified:

> Q. You continued through the weekend and you ultimately
> did not reach an agreement with Prospect; right?
>
> A. I did not accept their back-flip, total-screw-me
> agreement that they stuck in my face on Sunday, you're
> right, I didn't.

* * * *

Following Mr. Enmon's rejection of Prospect's alternative proposal, there were a few

communications between the parties but those contacts basically led nowhere and, in the

end, Prospect did not loan $12 million to Mr. Enmon, and Mr. Enmon did not purchase

Caprock.[7]

### III
### ARBITRABILITY

The April 11, 2006 Letter Agreement between Prospect and Enmon contains a

clearly stated arbitration clause which provides:

---

[7] Enmon makes much of the fact that at some point after the Prospect/Enmon deal had completely fallen apart, Prospect contacted Caprock LP to inquire about whether Mr. Powers was still seeking to sell the Company. Passing the fact that nothing ever came of this, Prospect was wholly within its rights to have made such an inquiry. Until the total collapse of its negotiations with Enmon, Prospect was providing him with alternative, last minute proposals, and when Enmon brusquely and finally rejected all such offers, Prospect was clearly entitled to see if any new and different approaches might be of interest to Caprock LP.

Contrary to what Enmon asserts, Prospect's after the fact overture to Caprock LP in no way indicates that Prospect wanted Caprock LP for itself throughout its negotiations with Enmon and that it scuttled its loan to Enmon at the last minute in order to position itself to grab Caprock LP for itself. Suffice it to say that there is no evidence to support Enmon's speculation along these lines, and there is substantial evidence to support Prospect's good faith throughout its negotiations with Enmon.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

> This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws. Unless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration in New York City according to the rules of the American Arbitration Association with the losing party paying the legal and related fees and expenses of the prevailing party. Borrower agrees that Prospect has the right, at any time, to remove any claim in arbitration to a New York court.

The above-quoted language incorporates the "rules of the American Arbitration Association" including Rule 7(a) which provides that: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." In light of Rule 7(a), this Arbitrator has jurisdiction to decide any issues as to arbitrability which might be presented. See Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005) ("when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to the arbitrator.")

Here, Respondent raises a number of arbitrability issues each of which is separately discussed and ruled upon below.

## A. Effect of Non-binding Term Sheet

Claimants argue that the Term Sheet attached to the Letter Agreement is non-binding and that this renders the Letter Agreement itself (including its arbitration clause) non-binding and unenforceable. This contention, however ignores the fact that the Letter Agreement and the Term Sheet are two separate and distinct documents, with the Term Sheet setting forth the non-binding basics of the substantive agreement toward which the

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

parties were working and the Letter Agreement containing the binding framework within which the parties were to negotiate and otherwise act in good faith in an effort to consummate a loan agreement along the lines set forth in the Term Sheet.

Preliminary commitments such as those in the Letter Agreement are known under New York law[8] as binding and enforceable "Type 2 Preliminary Agreements." As the court stated in Teachers Insurance and Annuity Association of America vs. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987):

> [In a Type 2 Preliminary Agreement, a party] may demand . . . that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of [a] final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. **The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.** (Emphasis added.)[9]

Accord: Adjustrite Systems, Inc. v. GAB Business Services, Inc., 145 F.3d 543, 548 (2d Cir. 1998).[10]

---

[8] The Letter Agreement provides that: "This letter shall be governed by and construed in accordance with the internal laws of the State of New York for contracts made and to be enforced therein, without regard to principles of conflicts of laws."

[9] Brown v. Cara, 2005 WL 1785064 (C.A.2 (N.Y.) lists five factors that bear on whether there is a valid and enforceable Type 2 Preliminary Agreement. Without getting into unnecessary detail, suffice it to say that the Letter Agreement satisfies all five of these considerations.

[10] In support of his contention that the Letter Agreement is unenforceable, Enmon cites to portions of cases pertaining to Type 1 (not Type 2) preliminary agreements. E.g., Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69 (2d Cir. 1989). A Type 1 Preliminary Agreement arises when the parties have reached agreement on all or virtually all terms of their underlying deal and await only the formalization of those terms in executed documents. Neither the Letter Agreement nor the Term Sheet are even close to being a Type 1 Preliminary Agreement and, that being so, portions of cases pertaining to Type 1 Preliminary Agreements are irrelevant here.

Further, the Letter Agreement contains language clearly and specifically reflecting the parties' intent that it is to be binding. Thus, for example, Mr. Enmon executed the Letter Agreement under the heading "Agreed to and accepted", and the Letter Agreement contains other similarly indicative language, such as:

> If this proposal is satisfactory to you, please memorialize your intention to proceed on these terms by signing and returning a copy of this letter. By signing and returning this letter, Borrower agrees to pay all reasonable out-of-pocket costs and expenses as incurred by Prospect in connection with all [due diligence and the like].
>
> * * *
>
> In consideration of the delivery of this letter, the Borrower hereby indemnifies and holds harmless Prospect . . . from and against any and all losses . . . that arise out of or relate to any matter referred to in this agreement . . . .
>
> * * *
>
> All obligations described in paragraphs 3 through 14 of this letter shall survive termination hereof. No modification or waiver of the requirements set forth in . . . this letter shall be effective unless a formal instrument providing therefore is signed by Borrower and John F. Barry, CEO of Prospect.

For the reasons stated, the Arbitrator rejects the argument that the Letter Agreement is rendered non-binding by the non-binding nature of the Term Sheet which is attached thereto.

## B. Alleged Lack of Consideration

Claimant asserts that the Letter Agreement (and its arbitration clause) are unenforceable because the Agreement fails to provide for any consideration or required performance on the part of Prospect. This contention is rejected for the following reasons:

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

**FIRST**, This Arbitrator has already held that the Letter Agreement obligated

Prospect "to negotiate and otherwise act in good faith in an effort to consummate a loan

agreement along the lines set forth in the Term Sheet." (See pgs. 16-17, supra), and

**SECOND**, In fact, the Letter Agreement specified additional obligations on the part

of Prospect, such as the requirements that it:

- proceed with "continuing review" and with "completion of its due diligence" upon execution of the Letter Agreement.

- hire experts and pay for due diligence expenses (subject to promised reimbursement by Enmon).

- submit to the exclusive jurisdiction of the New York courts.

- Attempt to work with Enmon under the conditions specified in paragraph 12.

- waive any and all rights to a jury trial, and

- abide by all surviving "obligations" described in paragraphs 3 through 14 of the Letter Agreement, even after termination of the Letter Agreement.

## C. Claimed Unconscionability

Mr. Enmon asserts that the arbitration clause in the Letter Agreement is

unenforceable because the Letter Agreement and its arbitration clause are

unconscionable. A contract may only be invalidated as unconscionable, however, if it is

"'so grossly unreasonable or unconscionable in the light of the mores and business

practices of the time and place as to be unenforceable according to its literal terms.'"

Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 534 N.E.2d 824, 537 N.Y.S.2d

787 (1988).

Unconscionability has two essential elements—**procedural** and **substantive**

unconscionability, both of which must generally be established in order to render an

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

agreement unenforceable. Ciago v. Ameriquest Mortgage Co., 295 F. Supp. 2d 324

(S.D.N.Y. 2003). As the court stated in Gillman, supra:

> A determination of unconscionability generally requires a showing that the contract was **both** procedurally and substantively unconscionable when made—*i.e.,* "some showing of an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" (Citations omitted; emphasis added.)

\* \* \* \*

The procedural and substantive aspects of Enmon's unconscionability argument are separately discussed below.

### (i) Procedural Unconscionability

Mr. Enmon has in no way established that he was subjected to procedural unconscionability, i.e., that he had no "meaningful choice" at the time he executed the Letter Agreement. To the contrary:

- Mr. Enmon is a sophisticated businessman who holds an MBA from the University of Chicago and has been an officer of several banks, as well as an investment banker at Merrill Lynch and Director of Corporate Finance for SBC Communications in San Antonio.

- Mr. Enmon was at all times represented by counsel in the negotiation of the Letter Agreement. In fact, Enmon's counsel ultimately billed him $40,000 for these services.

- The Letter Agreement was part of a complex transaction being negotiated by Enmon whereby he would acquire control of a substantial corporation without putting a penny into the deal himself.

20

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

- In fact, it was Enmon who urged Prospect to enter the Letter Agreement posthaste (not vice versa), his argument being that certain Prospect competitors were poised to lend him the money if Prospect did not jump in and grab the business.

* * * *

In light of the foregoing, there was nothing even close to procedural unconscionability here. See, e.g., Rubin v. Telemet America, Inc., 698 F. Supp 447 (S.D.N.Y. 1988) (court struck an unconscionability argument as a matter of law, noting that "Telemet . . . had been investing in the stock market for 20 years and was not an unsophisticated businessman.")

**(ii) Substantive Unconscionability**

While certain provisions of the Letter Agreement unquestionably tilt toward Prospect, this was a necessary part of the deal since Prospect had no obligation to loan Enmon anything and since Prospect needed to isolate itself from liability in the event a loan was never consummated.

In any event, the only "unconscionability" that could affect the enforceability of the Letter Agreement's arbitration clause would be unconscionability directed to the arbitration clause itself, as opposed to the Letter Agreement as a whole. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 18 L. Ed.2d 1270, 87 S. Ct. 1801 (1987); JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004). Here, the only argument advanced by Enmon as to unconscionability of the arbitration clause is based on the clause's provision that: "Prospect [not Enmon] has the right, at any time, to remove any claim in arbitration to a New York court." For the following reasons,

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

however, this assertion of unconscionability cannot possibly satisfy the standard of

Gillman, supra, that a contract can only be unconscionable if it is "grossly unreasonable

or unconscionable in the light of the mores and business practices of the time and place":

**FIRST**, Claimant Prospect's removal right has no applicability here since removal is

a procedure solely exercisable by a respondent in arbitration. Stated somewhat

differently, it would be unseemly, at best, for a claimant such as Prospect to initiate an

arbitration and then seek to remove its own arbitration to a court. Clearly, therefore, a

claimant who files an arbitration demand waives any right it might otherwise have had to

remove the arbitration to court.

**SECOND**, Prospect has expressly and unequivocally waived any right to remove

this arbitration to court.

**THIRD**, Even if Prospect were somehow to remove this arbitration to court, that

would not be unconscionable since a court would provide a neutral and fair forum for

Enmon. Indeed, Enmon has left no stone unturned in its effort to have this dispute heard

in court, as opposed to arbitration.

**FOURTH**, Under New York law, an arbitration clause is not unenforceable by

reason of one side's reserving a right not to arbitrate. In Sablosky v. Edward S Gordon

Company, Inc., 73 N.Y.2d 133, 535 N.E.2d 643, 538 N.Y.S.2d 513 (1989), for example,

the court enforced an arbitration clause, stating:

> The principal issue submitted is whether an employment
> contract, which is supported by consideration on both sides
> and which contains an arbitration clause compelling one
> party to submit all disputes to arbitration but allows the
> other party the choice of pursuing arbitration or litigation,
> is invalid for lack of mutuality of remedy or obligation.

\* \* \*

22

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

> Mutuality of remedy is not required in arbitration contracts. If there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement.
>
> * * *
>
> Nor should the court refuse to enforce the clause on policy grounds. Over the last 20 years arbitration has emerged as a preferred method for the settlement of many controversies. . . . Arbitrators customarily have an expertise over a particular subject matter and are able to offer parties a relatively expeditious and inexpensive forum to resolve their disputes. Although a party gives up an important right when it agrees to submit a dispute to arbitration, such proceedings are not less effective in discovering the truth than are judicial proceedings and it is not, as a matter of public policy, per se unfair to give one party the right to select them.

### D. "Executed" Credit Agreement

Enmon asserts that: (i) a Credit Agreement between him and Prospect became effective on May 12, 2006; (ii) the Credit Agreement did not contain an arbitration clause; (iii) the Credit Agreement superseded the Letter Agreement, which did contain an arbitration clause; and (iv) the present dispute between Enmon and Prospect is therefore not arbitrable.[11]

The foregoing argument is based on Prospect's having forwarded provisionally signed signature pages of a Credit Agreement to its own counsel, Vinson & Elkins. These pages, however, were undated; they were unattached to any specific draft of the Credit Agreement; and their purpose was to place Vinson & Elkins in a position where it could

---

[11] Rule 7(c) of the American Arbitration Association's Commercial Arbitration Rules provides that:
> A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. . . .

Enmon's challenge to arbitrability based on a superseding Credit Agreement is untimely under Rule 7(c) since it was first asserted long after the filing of Enmon's counterclaim and since Enmon knew the basic facts supporting this challenge to arbitrability at the time his counterclaim was filed.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

quickly circulate an executed Credit Agreement if and when one was ever finalized and agreed to by Prospect. In fact, when Mr. de Bie forwarded these pages to Peter Broadbent (an associate at Vinson & Elkins), the covering email expressly stated:

> **Pete, Attached are our signature pages. Please check form. DO NOT SEND OUT UNTIL YOU TALK TO ME. For V&E only.**[12]

Prospect never authorized Vinson & Elkins to release the executed signature pages of of the Credit Agreement to Enmon, and Vinson & Elkins of course never did so. Since there was never a "delivery" of an executed Credit Agreement to Enmon, there was never compliance with the following condition of the Letter Agreement:

> Accordingly, Prospect's proposal to provide the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence . . . with all aspects of the proposed transaction, including but not limited to: . . . (iv) the negotiation, execution and **delivery of final documentation** acceptable to Prospect in its sole discretion, . . .[13] (Emphasis added.)

It is routine in complex business transactions for a party to forward executed signature pages to its counsel on the understanding that the pages have no legal effect until there is a final agreement between the parties and the signatures are physically delivered to the other side. This practice is recognized and respected by the New York courts which will not enforce an agreement in such circumstances until the executed pages are released to the other side, along with a final copy of the agreement.

---

[12] The same instruction accompanied Prospect's transmission to Vinson & Elkins of provisional signature pages to the proposed funds disbursement letter:
**AGAIN: DO NOT FORWARD THOSE SIGNATURE PAGES.**

[13] Similarly, the draft Credit Agreement provided that it would need to be delivered to be binding ("Delivery of an executed counterpart of this Agreement by telecopier shall be equally as effective as delivery of an original executed counterpart of this Agreement.").

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

In Schwartz v. Greenberg, 304 N.Y. 250, 107 N.E.2d 65 (1952), for example, each

party to a negotiation, signed a final agreement but did not furnish signature pages to the

other side. The day after the signings, one of the parties withdrew from the deal. In these

circumstances, the New York Court of Appeals held that there never had been a contract

between the parties since:

> [T]here is no evidence of an intention of the parties to be
> bound by any mere oral understanding. Indeed they drafted
> a formal contract on April 4, 1950, and each of them
> retained a copy thereof until they met again the next day,
> when the defendant withdrew from the transaction. It is
> entirely plain, then, that the parties did not intend to be
> bound until a written agreement had been signed and
> delivered . . . .

> Accord: Intercontinental Monetary Corp. v. Performance Guarantees, Inc.,
> 705 F. Supp. 144 (S.D.N.Y. 1989), where the court stated:

> The general rule in New York, applicable to most written
> agreements, is that the intent of the parties determines
> whether they are enforceable immediately upon their
> execution or only upon delivery.
> * * *
> Even where delivery is not absolutely required as a matter
> of law, there are situations where the absence of delivery
> may provide conclusive evidence that the process of
> contract formation is incomplete. Such may be the case, for
> example, where the parties to a written agreement sign the
> instrument outside of the presence of each other and then
> withhold delivery of the signed document.

* * * *

For all the reasons set forth above, there was never a binding and enforceable Credit

Agreement between Prospect and Enmon and, hence, their Letter Agreement (together

with its arbitration clause) was never superseded.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

## IV
## ENMON'S CLAIMS

Mr. Enmon claims that Prospect's wrongful acts (as "proven" at the hearing) give rise to meritorious claims for: (i) breach of fiduciary duty; (ii) tortious interference; (iii) fraud; and (iv) negligent misrepresentation. Each of these legal theories is discussed directly below.

### A. Fiduciary Duty

The primary shortcoming in Enmon's claim for breach of fiduciary duty is that there is no credible evidence to support Enmon's position (see pgs. 1-15, supra). In addition, however, the claim is legally deficient because the relationship between Prospect and Enmon was one of lender and borrower which, as a matter of law, is not fiduciary in nature. See, e.g., BHC Interim Funding, L.P. v. Finantra Capital, Inc., 283 F. Supp. 2d 968, 989 (S.D.N.Y. 2003); In re N.T. Grant Co., 699 F. 2d. 599, 609 (2d Cir. 1983); Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 272 (E.D.N.Y. 1994); Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp., 180 A.D.2d 588, 589, 580 N.Y.S.2d 299, 301 (1st Dep't 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors.")

According to Enmon, the foregoing cases are trumped by the facts that: (i) Prospect was to receive a 12.5% Net Participation Interest in Caprock, Inc., as part of the loan arrangement; and (ii) this Participation created a joint venture and, thus, a fiduciary relationship between Prospect and Enmon. This contention is rejected for the following reasons:

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

**FIRST**, The draft Participation Agreement between Caprock Inc. and Prospect, which was an exhibit to the draft Credit Agreement, expressly disclaimed any "partnership, agency, independent contractor or other relationship." See CNA Ins. Co. v. Travelers Ins. Co., 105 A.D.2d 680, 481 N.Y.S.2d 121 (2d Dep't 1984) (finding no fiduciary duty where the parties' contract expressly defined the parties' relationship as contractor/subcontractor).

**SECOND**, As defined, Prospect's anticipated Participation Interest in Caprock Inc. excluded any voting or other management rights in Caprock Inc. because Prospect's only rights, as "Holder" were: (i) the right to payment of participation amounts; (ii) "board observation" rights; (iii) "information rights"; and (iv) contingent options to purchase stock. See Mitler v. Friedeberg, 32 Misc. 2d 78, 82, 222 N.Y.S.2d 480, 485-86 (Sup. Ct. N.Y. County 1961), where the court held that a similar arrangement lacked the essential features of a joint venture, i.e., "'a mutual promise or undertaking of the parties to share in the profits of the business, and submit to the burden of making good the losses'", and

**THIRD**, A fiduciary duty cannot arise where, as here, there was a planned but unconsummated investment transaction. See Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 444-47 (S.D.N.Y. 2006) (no fiduciary duty between prospective joint venturers); Frutico, S.A. de C.V. v. Bankers Trust Co., 833 F. Supp. 288, 301 (S.D.N.Y. 1993) ("An agreement to enter into a joint venture must be finalized before a fiduciary duty is created.)"

## B. Tortious Interference

There is no credible evidence supporting Enmon's claim for tortious interference (see pgs. 1-15, supra). What Enmon characterizes as tortious interference was no more than

27

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

Prospect's exercise of its contractual right to decline to make the $12 million loan to

Enmon. Further--as a matter of law--Prospect's decision not to do business with Enmon

cannot give rise to a claim for tortious interference. See WFB Telecomms., Inc. v.

NYNEX Corp., 188 A.D.2d 257-58, 590 N.Y.S.2d 460, 461 (1st Dep't 1992).

## C. Fraud and Negligent Misrepresentation

Enmon's fraud and misrepresentation claims are of course dependent on Enmon's

establishing that Prospect wrongfully made material misstatements to Enmon or that it

failed to make material disclosures. Enmon's argument that Prospect made such

misstatements or omissions is based on his claim that: (i) Prospect made an oral

commitment to fund Enmon's $12 million loan; and (ii) it failed to give Enmon timely

notice that Prospect's Investment Committee had not approved the loan. This factual

position, however, is rejected for the following reasons:

FIRST, Right after Prospect's Investment Committee declined to approve the

Enmon loan in the evening of Thursday, May 11, 2006, Mr. de Bie so informed Enmon.

SECOND, While Mr. de Bie at times gave Enmon reason to hope, indeed, perhaps

even expect that the loan would ultimately be consummated,[14] no one from Prospect ever

told Enmon that Prospect had committed to make the loan or that Prospect's Investment

Committee had approved the loan.

THIRD, If Prospect had orally committed to loan $12 million to Enmon, one would

expect that so important a commitment would somewhere be reflected in a writing, even

if it only be an email. To the contrary, however—Mr. de Bie wrote to Mr. Enmon in the

---

[14] Such expressions of hope or expectations cannot give rise to a claim based on fraud. See Roney v. Janis,
77 A.D.2d 555, 557, 430 N.Y.S.2d 333, 335 (1st Dep't 1980), aff'd, 53 N.Y.2d 1025, 425 N.E.2d 872
(1981) (a claim for fraud "cannot be based upon a statement of future intentions, promises or expectations
which were speculative or an expression of hope at the time when made").

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

evening of Saturday, May 13, 2006 that: "No one ever committed to wiring a penny. We simply indicated that we were moving in that direction. I challenge you . . . to find a single document or message where anyone at Prospect committed to funding this deal."

**FOURTH**, The Letter Agreement clearly stated that a Credit Agreement could only take effect upon "the negotiation, execution and delivery of final documentation acceptable to Prospect in its sole discretion, . . . ." In <u>Jordan Panel Systems, Corp. v. Turner Construction Co.</u>, 45 A.D.3d 165, 841 N.Y. Supp.2d 561 (1ˢᵗ Dep't 2007), a term sheet similarly provided that defendant did not intend to be bound until it had actually executed a written agreement. Nonetheless, plaintiff asserted (as does Enmon) that there had been a breach of an oral agreement between the parties. In rejecting this argument, the court relied on the term sheet, stating:

> . . . it should be borne in mind that the concept of freedom of contract includes the "[f]reedom to avoid oral agreements," a freedom that "is especially important when business entrepreneurs and corporations engage in substantial and complex dealings." Jordan's position, if adopted, would essentially destroy this freedom. We think it preferable to allow sophisticated parties operating in the business world to decide when and how they wish to enter into legally enforceable contracts.

\* \* \* \*

For the reasons stated immediately above and based on all the facts recited throughout this Award, Enmon's claims based on fraud, negligent misrepresentation, breach of fiduciary duty and tortious interference are denied and dismissed.

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

## V
## PROSPECT'S CLAIMS

### A. Alleged Breaches of Arbitration
### and Forum Selection Clauses

The facts on which Prospect bases its claim for breach of the arbitration and forum selection clauses of the Letter Agreement are briefly recited below.

On or about December 4, 2006, Enmon instituted an action against Prospect and others in the Texas State Court in Beaumont ("Texas Action") alleging fraud, statutory fraud and tortious interference with Enmon's contract with Caprock LP, based on Prospect's failure to consummate any financing agreement with Enmon. In response, Claimants initiated the present arbitration before the American Arbitration Association on December 22, 2006 and, then, they petitioned the United States District Court for the Southern District of New York ("District Court") to compel Enmon to arbitrate. In addition, Claimants sought an order from the District Court enjoining Enmon from further prosecuting the Texas Action. These proceedings are referred to herein as the "District Court Petition".

On February 13, 2007, Judge Sand granted Claimants' petition to compel arbitration and enjoined Enmon from further pursuing the Texas Action. Enmon thereafter appealed that decision to the United States Court of Appeals for the Second Circuit ("Second Circuit Appeal").

In July 2007 (on the eve of the hearings in this arbitration), Enmon filed a Rule 60(b) action before Judge Sand, claiming that the arbitration clause in the Letter Agreement had been superseded by an executed Credit Agreement, which did not contain an arbitration clause. (See pgs. 23-25, supra). After argument, Judge Sand declined to recommend Rule

60(b) relief, stating that Enmon's position was a "radical departure from the law of contracts." After initially appealing this decision, Enmon abandoned the appeal with prejudice.

\* \* \* \*

Prospect claims that Enmon's Texas action and related legal activities are in direct violation of the arbitration and forum selection clauses in the Letter Agreement and that Prospect is therefore entitled to all of its reasonable attorneys' fees and costs incurred in enforcing those clauses against Enmon. The Arbitrator agrees. The validity and enforceability of the arbitration and forum selection clauses in the Letter Agreement were upheld on the basis of a detailed discussion at an earlier point in this Award. (See pgs., 15-25, supra). And where, as here, a party to valid arbitration and forum selection agreements initiates a lawsuit in violation of those agreements, then the other party has a right to recover its costs and expenses incurred in enforcing the arbitration and forum selection agreements. See, e.g.:

- Morrell & Co. v. Lehr Constr. Corp., 287 A.D.2d 257, 730 N.Y.S.2d 709 (1st Dep't 2001) (permitting arbitration claim "for legal fees incurred by defendant in resisting alleged breaches of the underlying agreement by plaintiff's previous recourse to litigation instead of the arbitration remedy provided by contract")

- MWN Group, Inc. v. MAG USA, Inc., No. 3:06-MC-47, 2007 U.S. Dist. LEXIS 57979, at *11 (E.D. Tenn., Aug. 8, 2007) (upholding arbitrator's award of damages incurred by prevailing party arising from opponent's actions in "filing suit in Michigan rather than instituting arbitration proceedings")

- Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank, 304 A.D.2d 429, 431, 758 N.Y.S.2d 308, 311 (1st Dep't 2003) (awarding damages in the form of attorneys' fees expended as a result of defendant's breach of exclusive forum clause: "damages may be obtained for breach of a forum selection clause and

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

an award of such damages does not contravene the American Rule that deems attorneys' fees a mere incident of litigation") (Citations omitted.)[15]

- The Shaw Group, Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 119 (2d Cir. 2003) (permitting arbitration claim "to charge [appellee] with breaching the Representation Agreement by pursuing a court stay of arbitration . . . [and seeking] damages in an amount equal to [appellant's] attorneys' fees and costs in opposing the stay")

* * * *

For the reasons stated, Prospect's claim for attorneys' fees and related expenses incurred in connection with the Texas Action, the District Court Petition and the Second Circuit Appeal is granted.

**B. Due Diligence Expenses**

Under paragraph 6 of the Letter Agreement, Enmon was required to reimburse Prospect for all reasonable out-of-pocket costs and expenses incurred by Prospect in connection with its due diligence, documentation and other costs incidental to the proposed financing, "whether or not the proposed financing [was] consummated." Prospect allegedly incurred costs and expenses that were not reimbursed by Enmon and now seeks recovery thereof. This claim is granted, subject to verification as to the amount due.

**C. Costs and Attorneys' Fees**

Section 10 of the Letter Agreement provides that the "losing party" in an arbitration under the Agreement is to pay "the legal and related fees and expenses of the prevailing party." Prospect is the "prevailing party" and Mr. Enmon is the "losing party" in this arbitration which was brought pursuant to the terms of the Letter Agreement. Therefore,

---

[15] See Allendale Mut. Ins. v. Excess Ins. Co., 992 F. Supp. 278, 285-86 (S.D.N.Y. 1998) (awarding damages in the form of fees expended in defending proceedings instituted in England in breach of a forum selection clause specifying jurisdiction in the United States)

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and Walter Parker vs. Michael Enmon

Mr. Enmon is to pay the reasonable legal and related fees and expenses incurred by Claimants in connection with this arbitration.

## VI
## CONCLUSION

By way of summary and conclusion, the undersigned Arbitrator hereby enters his Partial, Final Arbitration Award as follows:

1.  Claimants' claim that Respondent's Texas Action and related legal activities are in direct violation of the arbitration and forum selection clauses in the Letter Agreement and that Claimants are therefore entitled to all of their reasonable attorneys' fees and costs incurred in enforcing those clauses against Enmon in the Texas Action, the District Court Petition and the Second Circuit Appeal is granted. Within three weeks of receipt of this Partial, Final Arbitration Award, Claimants are to submit one or more affidavits, together with backup and supporting papers, setting forth and supporting the amount of such fees and costs. Respondent is to serve any answering papers within six weeks of receipt of this Partial, Final Arbitration Award.

2.  Prospect's claim under Paragraph 6 of the Letter Agreement that Respondent is required to reimburse it for its reasonable out-of-pocket costs and expenses incurred by it in connection with its due diligence, documentation and other costs incidental to the proposed financing, "whether or not the proposed financing [was] consummated" is granted. Within three weeks of receiving this Partial, Final Arbitration Award, Prospect is to submit one or more affidavits, together with backup and supporting papers, setting forth and supporting the amount of any such costs and expenses, which have not been

Case 1:08-cv-03721-LBS     Document 13-3     Filed 05/12/2008     Page 34 of 34
APR. 14. 2008   6:42PM     FULTONROWE&HART     Filed 04/30/2008     NO. 989   P. 2
Case 1:08-cv-03721-CM     Document 6-2     Filed 04/30/2008     Page 34 of 34

13 148 02866 06, Prospect Energy Corporation; Prospect Capital Management LLC; Bart de Bie; John Barry, Grier Eliasek and
Walter Parker vs. Michael Enmon

previously reimbursed by Respondent. Respondent is to serve any answering

papers within six weeks of receipt of this Partial, Final Arbitration Award.

3.  All of Respondent's counterclaims are denied and dismissed.

4.  Section 10 of the Letter Agreement provides that the "losing party" in an

arbitration is to pay the legal and related fees and expenses of the "prevailing

party." Prospect is the prevailing party in this arbitration within the meaning

of Section 10. Within three weeks of receipt of this Partial, Final Arbitration

Award, Prospect is to serve one or more affidavits, together with backup and

supporting papers, setting forth and supporting the reasonable amount of any

such attorneys' fees and expenses, other than Arbitrator fees and

administrative fees of the American Arbitration Association. Respondent is to

serve any answering papers within six weeks of receipt of this Partial, Final

Arbitration Award.

5.  Aside from attorneys' fees and costs, as well as Arbitrator fees, administrative

fees of the American Arbitration Association and due diligence costs, this

Partial, Final Arbitration Award is in full settlement of all claims submitted to

this arbitration. To the extent that any such claim is not specifically mentioned

herein, it is denied.

_John Wilkinson_      4/14/08
John Wilkinson       Dated

I, John Wilkinson, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument, which is my Partial, Final Arbitration
Award.

_John Wilkinson_      4/14/08
John Wilkinson       Dated

34

# 07-1047-cv

## In the
## United States Court of Appeals
## for the Second Circuit

---

PROSPECT ENERGY CORPORATION, ET AL.,
*Petitioners–Appellees,*

v.

MICHAEL ENMON,
*Respondent–Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

**BRIEF OF APPELLANT MICHAEL ENMON**

---

Kurt B. Arnold
Jason A. Itkin
Caj D. Boatright
ARNOLD & ITKIN, L.L.P.
1401 McKinney, Suite 2550
Houston, Texas 77010
[Tel.] (713) 222-3800
[Fax] (713) 222-3850

Gregory S. Coleman
Marc S. Tabolsky
YETTER & WARDEN, L.L.P.
221 West 6th Street, Suite 750
Austin, Texas 78701
[Tel.] (512) 533-0150
[Fax] (512) 533-0120

**ATTORNEYS FOR APPELLANT MICHAEL ENMON**

EXHIBIT

C-1

## STATEMENT REGARDING ORAL ARGUMENT

Michael Enmon believes that oral argument will substantially aid the Court in its decision in this case and, accordingly, requests oral argument.

# TABLE OF CONTENTS

Statement Regarding Oral Argument...................................................................... i

Table of Contents ........................................................................................................ ii

Table of Authorities .................................................................................................. iv

Preliminary Statement.............................................................................................1

Jurisdictional Statement .........................................................................................1

Statement of the Issues.............................................................................................2

Introduction ................................................................................................................3

Statement of the Case...............................................................................................5

Statement of Facts .....................................................................................................6

    I.     Prospect's April 11, 2006 Financing Proposal to Enmon.....................7

    II.    Prospect Fails to Provide the Proposed Financing and Enmon Sues..................................................................................................................12

    III.   Prospect Initiates Proceedings in Three Different Tribunals to Compel Enmon to Arbitrate His Claims Against Prospect................13

Summary of the Argument.....................................................................................16

Standard of Review ..................................................................................................17

Argument.....................................................................................................................17

    I.     The District Court Erroneously Compelled Enmon to Arbitrate His Claims Against Prospect Because The Parties Never Entered Into a Binding Contract........................................................17

         A.    Whether the Proposal's Terms Were Sufficiently Definite to Allow a Contract to Be Formed Is a Question for the Court...................................................................................................17

B. Enmon and Prospect Did Not Enter Into an Agreement to Arbitrate Because Prospect's Proposal Is Too Indefinite to Form a Contract. .................................................................19

1. The District Court Erred in Finding that Prospect's Proposal Contained Both a Binding Contract and a Nonbinding Term Sheet..............................................19

2. Prospect's Proposal Is Too Indefinite to Create a Binding Contract...........................................................21

II. The Arbitration Clause in Prospect's Proposal Is Unconscionable and Unenforceable.....................................................32

III. Enmon Never Entered Into a Legally Binding Arbitration Agreement with Prospect Because the Proposal Lacked Consideration..............................................................43

IV. The District Court Erred in Enjoining Enmon from Prosecuting His Claims Against Prospect in Texas State Court............................48

Conclusion....................................................................................48

Certificate of Compliance ...........................................................50

Certificate of Service ..................................................................51

TABLE OF AUTHORITIES

CASES

*Adams v. Suozzi,*
    433 F.3d 220 (2d Cir. 2005) ....................................................................18, 21

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,*
    145 F.3d 543 (2d Cir. 1998) ................................................. *passim*

*Alexander v. Anthony Int'l, L.P.,*
    341 F.3d 256 (3d Cir. 2003) ..........................................................41

*Arcadian Phosphates, Inc. v. Arcadian Corp.,*
    844 F.2d 69 (2d Cir. 1989) ...................................... 23, 24, 26, 28

*Arnold v. United Cos. Lending Corp.,*
    511 S.E.2d 854 (W. Va. 1998) ..................................................36

*Brown v. Cara,*
    420 F.3d 148 (2d Cir. 2005) ...............................................23, 27

*Buckeye Check Cashing, Inc. v. Cardegna,*
    546 U.S. 440, 126 S. Ct. 1204 (2006) ............................... 18, 19, 33

*Burden v. Check Into Cash of Ky., LLC,*
    267 F.3d 483 (6th Cir. 2001) ......................................................41

*Cappelli v. Cappelli,*
    729 N.Y.S.2d 174 (N.Y. App. Div. 2001)......................................38

*Chastain v. Robinson-Humphrey Co.,*
    957 F.2d 851 (11th Cir. 1992) ......................................................18

*Cheek v. United Healthcare of Mid-Atlantic, Inc.,*
    835 A.2d 656 (Md. 2003) .....................................................40, 43

*Credit Alliance Corp. v. Joshco Mining Corp.*,
    90 F.R.D. 187 (S.D.N.Y. 1981) ...................................................................34

*David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*,
    923 F.2d 245 (2d Cir. 1991) .....................................................................41

*Davis v. O'Melveny & Myers*,
    No. 04-56039, 2007 WL 1394530 (9th Cir. May 14, 2007) ........................35

*Desiderio v. Nat'l Ass'n of Sec. Dealers*,
    191 F.3d 198 (2d Cir. 1999) .....................................................................33

*Doctor's Assocs., Inc. v. Distajo*,
    66 F.3d 438 (2d Cir. 1995) ..................................................................33, 43

*Dumais v. Am. Golf Corp.*,
    299 F.3d 1216 (10th Cir. 2002) .................................................................43

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*,
    715 N.E.2d 1050 (N.Y. 1999) ...............................................................21, 22

*Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*,
    408 F.3d 460 (8th Cir. 2005) ....................................................................29

*Ferguson v. Countrywide Credit Indus.*,
    298 F.3d 778 (9th Cir. 2002) ....................................................................38

*Floss v. Ryan's Family Steak Houses, Inc.*,
    211 F.3d 306 (6th Cir. 2000) ....................................................................43

*Matter of Friedman*,
    407 N.Y.S.2d 999 (N.Y. App. Div. 1978)...............................................35, 36

*Geoffroy v. Wash. Mut. Bank*,
    No. 06 CV 1732 BEN (WMC), 2007 WL 1334375
    (S.D. Cal. May 3, 2007)..........................................................................35

*George v. LeBeau*,
    455 F.3d 92 (2d Cir. 2006) .......................................................................17

*Gillman v. Chase Manhattan Bank, N.A.*,
    534 N.E.2d 824 (N.Y. 1988) ........................................................... 34, 35, 40

*Gonzalez v. W. Suburban Imps., Inc.*,
    411 F.Supp.2d 970 (N.D. Ill. 2006).................................................43

*Holt v. Feigenbaum*,
    419 N.E.2d 332 (N.Y. 1981) .......................................................44

*Hooters of Am., Inc. v. Phillips*,
    173 F.3d 933 (4th Cir. 1999) ......................................................43

*Horn v. New York Times*,
    790 N.E.2d 753 (N.Y. 2003) ..................................................27, 47

*Iwen v. U.S. W. Direct*,
    977 P.2d 989 (Mont. 1999).........................................................35

*Jenkins v. First Am. Cash Advance of Ga., LLC*,
    400 F.3d 868 (11th Cir. 2005) ....................................................41

*Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*,
    417 N.E.2d 541 (N.Y. 1981) .......................................................22

*Kessler v. Kessler*,
    818 N.Y.S.2d 571 (N.Y. App. Div. 2006) ....................................33

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) ..................................................36, 37

*Larrison v. Scarola Reavis & Parent, LLP*,
    812 N.Y.S.2d 243 (N.Y. Sup. Ct. 2005)........................................39

*Lumhoo v. Home Depot USA, Inc.*,
    229 F. Supp. 2d 121 (E.D.N.Y. 2002)..........................................44

*Lytle v. CitiFinancial Servs.*,
    810 A.2d 643 (Pa. Super. Ct. 2002)..............................................36

*Madol v. Dan Nelson Auto. Group,*
    372 F.3d 997 (8th Cir. 2004) .......................................................................41

*N.Y. County Lawyers' Ass'n v. Pataki,*
    727 N.Y.S.2d 851 (N.Y. Sup. Ct. 2001).......................................................44

*Nabors Drilling USA, LP v. Carpenter,*
    198 S.W.3d 240 (Tex. App.—San Antonio 2006, no pet.) ..........................37

*Nagrampa v. MailCoups, Inc.,*
    469 F.3d 1257 (9th Cir. 2006) .....................................................................41

*Nat'l Bulk Carriers, Inc. v. Princess Mgmt.,*
    597 F.2d 819 (2d Cir. 1979) ........................................................................39

*Opals on Ice Lingerie v. Bodylines Inc.,*
    320 F.3d 362 (2d Cir. 2003) ........................................................................18

*Penn v. Ryan's Family Steak Houses, Inc.,*
    269 F.3d 753 (7th Cir. 2001) .......................................................................43

*Perl v. Smith Barney Inc.,*
    646 N.Y.S.2d 678 (N.Y. App. Div. 1996).................................................19, 20

*Phox v. Atriums Mgmt. Co.,*
    230 F.Supp.2d 1279 (D. Kan. 2002)............................................................40

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
    388 U.S. 395, 87 S. Ct. 1801 (1967) ..........................................................33

*Pub. Employees Mut. Ins. Co. v. Sellen Constr. Co.,*
    740 P.2d 913, 915 (Wash. Ct. App. 1987) ..................................................38

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    170 F.3d 1 (1st Cir. 1999)............................................................................41

*Sabetay v. Sterling Drug, Inc.,*
    506 N.E.2d 919 (N.Y. 1987) ..................................................................28, 47

*Sablosky v. Edward S. Gordon Co.,*
    535 N.E.2d 643 (N.Y. 1989) ...............................................36, 43

*Sandvik AB v. Advent Int'l Corp.,*
    220 F.3d 99 (3d Cir. 2000) ...............................................18

*SCS Commc'ns, Inc. v. Herrick Co.,*
    360 F.3d 329 (2d Cir. 2004) ...............................................29, 30

*Showmethemoney Check Cashers, Inc. v. Williams,*
    27 S.W.3d 361 (Ark. 2000) ...............................................43

*Shuster v. First Nat'l Monetary Corp.,*
    450 N.Y.S.2d 711 (N.Y. Civ. Ct. 1982) ...............................................34

*Simpson v. MSA of Myrtle Beach, Inc.,*
    No. 26293, 2006 WL 4388016 (S.C. March 26, 2007)...............................................38

*Spahr v. Secco,*
    330 F.3d 1266 (10th Cir. 2003) ...............................................18

*Sphere Drake Ins. Ltd. v. All Am. Ins. Co.,*
    256 F.3d 587 (7th Cir. 2001) ...............................................18, 19

*S.S.D.W. Co. v. Brisk Waterproofing Co.,*
    556 N.E.2d 1097 (N.Y. 1990) ...............................................37, 40

*State v. Wolowitz,*
    468 N.Y.S.2d 131 (N.Y. App. Div. 1983)...............................................34

*Taylor v. Butler,*
    142 S.W.3d 277 (Tenn. 2004) ...............................................36

*Teachers Ins. & Annuity Ass'n v. Tribune Co.,*
    670 F.Supp. 491 (S.D.N.Y.1987) ...............................................24, 26

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364, 68 S. Ct. 525 (1948) ...............................................17

*Universal Leasing Servs., Inc. v. Flushing Hae Kwan Res.*,
    565 N.Y.S.2d 199 (N.Y. App. Div. 1991)......................................................35

*Wash. Mut. Fin. Group, LLC v. Bailey*,
    364 F.3d 260 (5th Cir. 2004) ...................................................................41

*Williams v. Aetna Fin. Co.*,
    700 N.E.2d 859 (Ohio 1998) ...................................................................36

*Wis. Auto Title Loans, Inc. v. Jones*,
    714 N.W.2d 155 (Wis. 2006)..............................................................35, 36

## STATUTES

9 U.S.C. §3 ...................................................................................................48

9 U.S.C. §16(a)(3) ...........................................................................................1

28 U.S.C. §1291 ...............................................................................................1

28 U.S.C. §1332(a) ...........................................................................................1

FED. R. APP. P. 4(a)(1)(A) ...............................................................................1

## OTHER AUTHORITIES

8 SAMUEL WILLISTON, A TREATISE ON THE LAW OF CONTRACTS, §18:9 ..........33, 34

ix

## PRELIMINARY STATEMENT

This is an appeal by Michael Enmon from a final judgment entered in a proceeding to compel arbitration before the Honorable Leonard B. Sand of the United States District Court for the Southern District of New York  The district court's decision is not reported.

## JURISDICTIONAL STATEMENT

Enmon appeals from the district court's February 13, 2007 order granting Prospect's petition to compel arbitration and for injunctive relief.  Enmon timely filed his notice of appeal on March 14, 2007.  *See* FED. R. APP. P. 4(a)(1)(A).

The district court exercised jurisdiction based on diversity of citizenship under 28 U.S.C. §1332(a).  Michael Enmon is a resident of Texas.  Prospect Energy Corporation is a Maryland corporation with its principal place of business in New York City.  Prospect Capital Management LLC is a Delaware limited liability company with its principal place of business in New York City.  John F. Barry, III and Walter Parker are residents of Connecticut.  Bart de Bie and M. Grier Eliasek are residents of New York.  It is undisputed that the amount in controversy is greater than $75,000.

This Court has appellate jurisdiction under 28 U.S.C. §1291 and 9 U.S.C. §16(a)(3) because the February 13, 2007 order was a final decision with respect to an arbitration and a final judgment disposing of all claims.

1

STATEMENT OF THE ISSUES

1.    Whether the district court erred in compelling Enmon to arbitrate his claims
      filed against Prospect because it incorrectly found that a valid arbitration
      agreement existed between Enmon and Prospect.

2.    Whether the district court erred in enjoining Enmon from prosecuting his
      claims against Prospect in Texas state court.

### INTRODUCTION

This appeal involves Prospect's attempt to impose an unconscionable arbitration obligation on Michael Enmon as part of an ongoing pattern of overreaching, abuse, and pushing its negotiating leverage beyond the limits of legal enforceability.

Michael Enmon obtained the right to buy Caprock Pipe & Supply Co. on highly profitable terms. Enmon brought the deal to Prospect, a large business development company specializing in the oil-and-gas industry, to see if it was interested in financing his purchase of Caprock. Prospect, in return, and operating from its position of strength, sent him a proposal in the form of a letter with a term sheet attached that bound Prospect to do nothing and unequivocally stated that it did not bind Prospect to provide the sought-after financing under any circumstances. The proposal purported to impose all sorts of obligations on Enmon, and none on Prospect, and moreover entitled Prospect to apply, waive, or change the terms in its "sole discretion," which was specifically defined to give Prospect the right to act as arbitrarily and capriciously as it wanted. Among the one-sided impositions in that document was an unenforceable arbitration clause that required Enmon, but not Prospect, to submit to arbitration, and further allowed Prospect, if it did begin an arbitration, to end it and remove the claims to court at any time.

Prospect's attempt to impose one-sided conditions on any future negotiations was the prelude to Prospect's perpetration of a fraud on Enmon—stringing him along by representing that it would finance his deal on terms the parties had worked out, and then at the last minute, when it was too late for Enmon to secure alternate financing, insisting on radical changes to the terms of the deal that, once again, were all in Prospect's favor. Enmon sued Prospect in Texas state court to recover for the fraud. After filing a motion to compel arbitration in the Texas case, Prospect filed a new case in New York federal court to compel Enmon to arbitrate his claims against Prospect. The district court entered, at Prospect's request, a TRO enjoining the Texas case (including any proceeding related to Prospect's pending motion to compel). The district court subsequently granted Prospect's petition to compel arbitration.

The district court's order compelling arbitration is erroneous, because in applying its leverage to attempt to impose the most one-sided conditions conceivable, giving itself all rights and no obligations and Enmon the exact opposite, Prospect reached too far and thus prevented a contract from ever being created.

Specifically, the district court erred in compelling arbitration for three reasons. First, Enmon and Prospect never entered into a binding contract because Prospect's proposal lacked any definite terms related to the proposal's subject

matter and thus could not demonstrate the parties' intent to be bound (and, indeed, by its plain language affirmatively demonstrated Prospect's intent not to be bound). Second, the arbitration clause is unconscionable, and thus unenforceable. The arbitration clause's plain language allows Prospect, and only Prospect, to stop an ongoing arbitration at any time and force the claim to be relitigated in court. The arbitration clause's removal provision, combined with the overall gross one-sidedness of every other term in the proposal that would govern the resolution of any possible disputes between Prospect and Enmon, renders the arbitration clause unconscionable. Finally, the arbitration clause cannot be enforced because the document containing the arbitration clause is unsupported by any consideration.

In short, Prospect, having attempted to impose a "deal" about possible future negotiations that was so one-sided and unfair as to really be no deal at all, should not be allowed to rely on that non-agreement to evade judicial scrutiny of its misleading course of dealings with Enmon. The Court should reverse the district court's decision, and let Enmon proceed with his state-court case.

### STATEMENT OF THE CASE

In early November 2006, Michael Enmon filed claims for fraud and tortious interference in Texas state court against Prospect Energy Corporation, Prospect Capital Management, LLC, John F. Barry, M. Grier Eliasek, Walter Parker, and Bart de Bie (collectively "Prospect"). A-175. Prospect answered Enmon's claims

on December 22, 2006. A-103–35. When Prospect answered Enmon's claims, Prospect also filed a motion to compel Enmon to arbitrate his claims against Prospect pursuant to an arbitration clause in a purported letter agreement between Enmon and Prospect Energy Corporation dated April 11, 2006. *Id.*

Before the Texas court could hear Prospect's motion to compel arbitration, however, Prospect initiated this parallel proceeding by filing a petition to compel arbitration and for injunctive relief on or about January 5, 2007, in the United States District Court for the Southern District of New York. A-13–23. On January 11, 2007, Prospect obtained a temporary restraining order from the federal court enjoining any further proceedings in the Texas case—including any hearings on Prospect's own motion. A-136–38.

On February 13, 2007, the district court held a hearing on Prospect's petition to compel arbitration. At the end of the hearing, the district court ruled from the bench that the arbitration clause in the April 11, 2006 letter was valid and enforceable, ordered Enmon to arbitrate his claims against Prospect, and enjoined Enmon from prosecuting the pending case in Texas state court. A-667–76.

### STATEMENT OF FACTS

In February 2006, Michael Enmon secured an agreement to buy the assets of Caprock Pipe and Supply Co., a company that specializes in selling refurbished pipe for oil and gas drilling operations. A-62–63. Based on his due diligence,

Enmon believed that his chance to purchase Caprock was a unique business opportunity that would potentially generate enormous profits.  A-63.  In order to pursue the Caprock transaction, Enmon spent his life savings and sold his house and other possessions to pay for expenses related to due diligence and closing the transaction.  *Id.*

After Enmon engaged a bank to act as senior lender for the Caprock transaction, Enmon approached Prospect to see if it would be interested in providing part of the financing for his acquisition of Caprock.  *Id.*  Prospect is a publicly traded business development company that specializes in lending to and investing in companies in the energy industry.  A-16.

## I.    PROSPECT'S APRIL 11, 2006 FINANCING PROPOSAL TO ENMON.

On April 11, 2006, Bart de Bie, an officer and managing director of Prospect Capital Management, emailed to Enmon Prospect's proposal to provide $10 million in subordinated debt financing.  A-576–603.  De Bie described Prospect's proposal as a "non-binding term sheet."  A-260.  Prospect's proposal was a single, consecutively paginated, twelve-page document made up of two parts: (1) a four-page letter and (2) an eight-page "Summary of Proposed Terms and Conditions." A-623–32.  Prospect stated that it made its proposal "pursuant to the terms set forth in this letter ***and*** the attached Summary of Proposed Terms and Conditions dated April 11, 2006."  A-623 (emphasis added).  Prospect's proposal repeatedly

emphasized that it was not intended to be a complete, binding agreement and that it did not contain all of the material terms.  The proposal stated that:

- "The terms and conditions of this Proposal are not limited to those set forth herein [the four-page letter] or in the Term Sheet."

- "The Term Sheet does not purport to summarize all the terms and conditions upon which the proposed financing is to be based, which terms and conditions would be contained fully only in final documentation which must be satisfactory to Prospect and its counsel in their sole discretion."

- "The Term Sheet indicates only the principal terms and conditions under which the financing would be considered."

- "Those matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion."

A-623.  The proposal's term sheet explicitly stated that it "is not binding on [Prospect] or any of their affiliates and is submitted for discussion purposes only. No binding agreement can be reached on the subject matter of this term sheet unless and until definitive and final documentation has been signed and delivered by all parties containing such terms and conditions as are satisfactory to [Prospect]."  A-632.  Not only did Prospect expressly state that no binding agreement could be reached until definitive documents were signed and delivered, Prospect further retained the right to object to proposed final definitive documents even if they were drafted by Prospect's own lawyers.  A-624.

To further emphasize the nonbinding nature of its proposal, Prospect's proposal defined "sole discretion" to mean the "sole and absolute discretion as to

8

process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise." A-623. Prospect's proposal also stated that it retained a complete and wholly unconstrained right to change the terms of the proposed financing in any way it wanted, or to not provide any financing at all, and that any such changes would be deemed to be consistent with the April 11 proposal. *Id.* ("You [Enmon] agree that our proposal of alternative financing amounts or structures or our decision not to proceed for any or no reason, at any time, shall not be inconsistent with this proposal and shall not support any claim or assertion of liability by [Caprock Pipe and Supply, LP] or any affiliate or other person against us.").[1]

In short, Prospect attempted to impose all sorts of obligations on Enmon, while in return, not actually promising Enmon anything at all. Prospect did not even promise to undertake any due diligence regarding the transaction. The April 11 letter states that "Prospect's proposal to providing the financing described in this letter is subject to Prospect's satisfaction *in its sole discretion*, upon completion of its due diligence, and until the execution of definitive documentation

---

[1] "[N]either Prospect nor any of its affiliates shall have any liability to any person in connection with Prospect's refusal to fund the financing or any portion thereof before or after [May 15, 2006]." A-626.

and closing, with all aspects of the proposed transaction." A-623. (emphasis added); *see also* A-624 (stating that "Prospect is not obligated to explain [the] exercise of its sole discretion to terminate but need only cite [paragraph 4 of the letter] when terminating and Prospect shall have no liability").

But, as defined in the proposal, "sole discretion" referred to both Prospect's "process" and "result" regarding a possible debt offering. A-623. By explicitly defining sole discretion to cover not only Prospect's decision regarding whether to provide financing, but also the process it employed in making its decision, Prospect's proposal allowed Prospect to refuse to perform any due diligence whatsoever. Thus, it is unsurprising that there is no affidavit, document, or any other evidence in the record (other than Prospect's unsupported allegation) that Prospect ever performed any due diligence regarding the Caprock transaction after Enmon signed the April 11 letter.

While Prospect's April 11 proposal did not actually require Prospect to do anything, the proposal purportedly required Enmon to undertake numerous non-reciprocal obligations and purportedly give up various rights and remedies against Prospect.

| Enmon/Caprock | Prospect |
| --- | --- |
| Required to keep Prospect's proposal confidential. | No confidentiality obligation because Prospect retained the right to waive the confidentiality provision. |

10

| | |
|---|---|
| "[S]hall pay all costs and expenses, including legal fees, incurred in connection with any enforcement of this letter." | No reciprocal obligation. |
| Prohibited from seeking alternative or similar sources of financing. | No exclusivity obligations. |
| Indemnifies and holds harmless Prospect from third-party claims. | No reciprocal obligation. |
| Limitation of liability and remedies against Prospect. | No reciprocal limitation of liability and remedies against Enmon or Caprock. |

Also included in Prospect's self-described non-binding proposal was an arbitration clause that purportedly covers "any dispute" between Prospect and Enmon. A-625. While the arbitration clause supposedly requires Enmon submit any dispute with Prospect to arbitration, Prospect is not required to submit any dispute to arbitration, unless it chooses to do so. *Id.* The arbitration clause states that "[u]nless Prospect in its sole discretion waives the requirement to arbitrate, the parties agree to submit any dispute to binding arbitration . . . ." *Id.* In other words, Prospect can choose to assert any claims it believes it has in either an arbitration or in court.

But to make the arbitration clause even more one-sided, the arbitration clause's next sentence also allows Prospect (but not Enmon) to bail out of the arbitration at any time and assert its claims in court. *Id.* The arbitration clause expressly states that "Borrower agrees that Prospect has the right, *at any time*, to

11

remove *any claim in arbitration* to a New York court." *Id.* (emphasis added). So, according to the contract's plain language, even if Prospect chose to submit its claims to arbitration (or compelled Enmon to submit his claims to arbitration), Prospect could call off the arbitration at any time, if Prospect did not like how the arbitration was proceeding or how the arbitral panel decided the asserted claims.

## II.    PROSPECT FAILS TO PROVIDE THE PROPOSED FINANCING AND ENMON SUES.

On April 11, 2006, Grier Eliasek (on behalf of Prospect) and Enmon signed the letter. A-574. Enmon also paid Prospect a $25,000 deposit that same day. *Id.* Throughout April and May 2006, Prospect repeatedly represented to Enmon that its was excited about the transaction and reassured Enmon that the Caprock transaction would close on economic terms consistent with the final documentation prepared by Prospect's lawyers and signed by Enmon and CIT (the senior lender). A-63–65.

But, on May 12, 2006 (the scheduled closing date), Prospect refused to deliver the executed final documents that it had prepared unless Enmon agreed to radically alter the terms of the financing in a manner that was wholly inconsistent with the terms discussed up to that point. A-64. The new terms were extremely favorable to Prospect and detrimental to Enmon. *Id.* By waiting until the day the closing was to occur, Prospect prevented Enmon from seeking an alternative source of financing and the Caprock transaction fell apart. *Id.*

III.   **PROSPECT INITIATES PROCEEDINGS IN THREE DIFFERENT TRIBUNALS TO COMPEL ENMON TO ARBITRATE HIS CLAIMS AGAINST PROSPECT.**

Based on Prospect's refusal to finance the Caprock transaction on terms consistent with those that Prospect repeatedly told Enmon would be put in the financing agreement, Enmon sued Prospect in Texas state court for fraud and tortious interference. A-56–69. On December 22, 2007, Prospect answered Enmon's suit and filed a motion to compel arbitration based on the arbitration clause in Prospect's April 11 proposal to Enmon. A-103.

Unsatisfied with simply seeking to compel arbitration by filing a motion in the state-court case, Prospect filed two other proceedings to compel Enmon to arbitrate his claims. First, the day before Prospect filed its motion to compel arbitration in the Texas case, Prospect filed a demand for arbitration with the American Arbitration Association. A-130–32. In its arbitration demand, Prospect attempted to make an end-run around the courts and sought an order compelling Enmon to arbitrate his state-court claims. *Id.*

But despite having a motion to compel arbitration pending before the Texas state court and having filed an arbitration demand to compel arbitration, Prospect filed this case in the United States District Court for the Southern District of New York on January 5, 2007 and served its petition on Enmon on January 8. A-23; Docket No. 9. Just three days later, and before Enmon was even required to have answered Prospect's petition, Prospect filed a motion for a temporary restraining

order to enjoin any further proceedings in the Texas state court. The district court entered the TRO that afternoon. A-136–38. The district court's TRO enjoined any further proceedings in the Texas state court action—including a hearing on Prospect's motion to compel arbitration. *Id.* The Court also ordered Enmon to appear on January 26, 2007 and show cause why the arbitration clause in Prospect's April 11 proposal should not be enforced. *Id.*

At the January 26, 2007 hearing, Enmon argued he could not be compelled to arbitrate his claims for a number of reasons, including that (1) the proposal was not a binding agreement because of the existence of material open terms, (2) the arbitration clause was illusory and lacked consideration, and (3) that the arbitration clause was unconscionable. A-529–72. The district court declined to rule at that hearing and requested that the parties file supplemental briefing about whether the proposal was insufficiently definite to create a contract. The court also extended its TRO enjoining the Texas state court proceedings until the subsequent hearing concluded. A-503–04.

On February 13, 2007, the district court held another hearing on Prospect's petition to compel arbitration. Among the issues addressed at that hearing was whether the arbitration clause's provision that gave Prospect, but not Enmon "the right, *at* any *time*, to remove *any claim in arbitration* to a New York court," A-625, rendered the arbitration clause unenforceable. A-644.

14

Prospect's counsel admitted that she did not think that any court would enforce an arbitration clause that would allow a party to remove a claim from arbitration at any time. *Id.* ("Now, Mr. Enmon claims, Well, we're always at risk that Prospect might scuttle the arbitration. First of all, I don't think any court would ever enforce the agreement along the interpretation that they're proposing, which is one that Prospect has never advanced."). But despite the arbitration clause's unambiguous language that provides that "Prospect has the right, at any time, to remove any claim in arbitration to a New York court," Prospect's counsel never suggested any alternative interpretation of the clause, consistent with its plain language, that would prevent Prospect from scuttling an ongoing arbitration. A-625. Instead, Prospect merely asserted that it would be bound by its assertion to the American Arbitration Association that its dispute with Enmon must be submitted to arbitration, even though the arbitration clause does not impose any such requirement. *Id.*

At the conclusion of the hearing, the district court held that the first four pages of the proposal constituted a valid, binding contract and that the arbitration clause contained in the first four pages was enforceable. A-667–76. The court also permanently enjoined Enmon from prosecuting his claims in Texas state court.

### SUMMARY OF THE ARGUMENT

The district court's order compelling Enmon to arbitrate his claims against Prospect should be reversed because Enmon never entered into a binding contract, let alone a binding arbitration agreement, with Prospect.  Prospect's proposal containing the arbitration clause is not a binding contract because it is too indefinite to be enforced: The proposal repeatedly emphasizes that it is not a binding agreement and gave Prospect the right to alter any or all of the proposal's terms.  Whether Enmon and Prospect ever actually entered an agreement in the first place is a threshold issue for the court to decide.  Additionally, Enmon and Prospect did not enter into a contract because Prospect's promises are illusory and therefore lack consideration.

In any event, the proposal's arbitration clause is unconscionable because the clause's plain language allows Prospect to bail out of any arbitration with Enmon at any time—even if Prospect itself initiated the arbitration.  Courts faced with similar arbitration clauses that permit only one party to scuttle an arbitration proceeding and instead press its claims in court have uniformly found such clauses unenforceable.  The courts' refusal to enforce these types of clauses is unsurprising because a bail-out provision in an arbitration clause undermines the very policies that support judicial enforcement of arbitration clauses—judicial economy and the avoidance of multiple litigation proceedings.  The arbitration clause's bail-out

provision, combined with the wholly one-sided nature in favor of Prospect of every

other clause in the proposal that could relate to the resolution of disputes between

the parties, renders the arbitration clause unconscionable.

## STANDARD OF REVIEW

The district court's decision regarding whether Enmon and Prospect agreed

to arbitration is a conclusion of law that is reviewed de novo.  The factual findings

underlying the district court's conclusion may be overturned only if they are

clearly erroneous.  *George v. LeBeau*, 455 F.3d 92, 93 (2d Cir. 2006).  A finding of

fact is clearly erroneous "when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction

that a mistake has been committed."  *United States v. U.S. Gypsum Co.*, 333 U.S.

364, 395, 68 S.Ct. 525, 542 (1948).

## ARGUMENT

**I.    THE DISTRICT COURT ERRONEOUSLY COMPELLED ENMON TO ARBITRATE HIS CLAIMS AGAINST PROSPECT BECAUSE THE PARTIES NEVER ENTERED INTO A BINDING CONTRACT.**

**A.    Whether the Proposal's Terms Were Sufficiently Definite to Allow a Contract to Be Formed Is a Question for the Court.**

Whether Prospect's proposal, which contains an arbitration clause, as a

whole is sufficiently definite to allow a binding agreement to be formed is a

question for the court, not an arbitrator, because courts have the duty "to determine

whether there ever existed an agreement to arbitrate between the parties" before

17

compelling a litigant to arbitrate its claims. *Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005); *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (stating that while "the presumption in favor of arbitration is strong, the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute").

It is well-settled that a party's challenge to the validity of an entire contract that contains an arbitration clause is a question for the arbitrator, not the court. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, ___, 126 S.Ct. 1204, 1209 (2006). But unlike questions about a contract's validity, questions about whether the parties ever actually entered into a contract (*i.e.*, questions of contract formation) even when the purpoted contract contains an arbitration clause, is a question for the court. *See Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 590 (7th Cir. 2001); *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 105–06 (3d Cir. 2000); *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 855 (11th Cir. 1992). This is because "[i]f the contract embodying a purported arbitration agreement never existed, the arbitration agreement itself does not exist." *Adams*, 433 F.3d at 226; *see also*

18

*Sphere Drake Ins. Ltd.*, 256 F.3d at 590 (holding that whether party ever agreed to the purported contract containing an arbitration clause is a question for the court).[2]

> **B.    Enmon and Prospect Did Not Enter Into an Agreement to Arbitrate Because Prospect's Proposal Is Too Indefinite to Form a Contract.**
>
> **1.    The District Court Erred in Finding that Prospect's Proposal Contained Both a Binding Contract and a Nonbinding Term Sheet.**

The district court's erroneous ruling that the first four pages of Prospect's April 11 proposal formed a binding contract is based on its incorrect finding that it could separate Prospect's twelve-page proposal that consisted of a letter with an attached term sheet into two separate instruments: a binding four-page letter and a nonbinding eight-page term sheet that was attached to the letter. A-668–69, 674. The district court's finding that the letter and nonbinding term sheet are separate documents is clearly erroneous and misapplies general principles of contract law.

"A contract can be comprised of separate writings or documents if the writings make it clear that they are to be read in conjunction with other writings to determine the intent of the parties." *Perl v. Smith Barney Inc.*, 646 N.Y.S.2d 678,

---

[2] *Buckeye Check Cashing* expressly distinguished the question of whether a contract was valid from whether the parties actually made an agreement. 546 U.S. at ___, 126 S.Ct. at 1208 at n.1 ("The issue of the contract's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded."). The Court expressly stated that its decision regarding whether certain issues regarding an arbitration clause's enforceability were for the court or an arbitrator did not address whether courts or arbitrators should decide whether an alleged obligor and oblige actually concluded an agreement. *Id.*

19

679 (N.Y. App. Div. 1996). In this case, the letter and term sheet manifestly show that they are in fact one instrument to be read as a whole.

The most obvious evidence that the letter and term sheet constitute a single document is the fact that the letter and term sheet are consecutively paginated: the letter is numbered pages 1–4 and the term sheet is numbered pages 5–12. A-623–32. Furthermore, the April 11 proposal states that the letter and term sheet are to be read together to describe Prospect's proposal. The first sentence of the letter states that Prospect "is pleased to provide [Enmon] with this proposal (the "Proposal") to provide and/or arrange up to $10,000,000 of subordinated secured debt pursuant to the terms set forth in this letter **and** the attached Summary of Proposed Terms and Conditions dated April 11, 2006 (the "Term Sheet) . . . ." A-623 (emphasis added). The letter further states that "[t]he terms and conditions of this Proposal are not limited to those set forth herein or in the Term Sheet" and that "[t]hose matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion." *Id.* In other words, the April 11 document repeatedly defines the proposal in terms of both the letter and the term sheet that was attached to the letter. Thus, Prospect's proposal on its face shows that the two documents are to be read together as a single instrument.

Furthermore, the district court's finding that the four-page letter is a stand-alone agreement that does not incorporate the eight-page term sheet prevents the

20

letter from including the very information that it was intended to convey—the proposed terms for Prospect to provide Enmon with $10 million in debt financing. The letter expressly states that it is Prospect's proposal for providing Enmon with $10 million in financing. A-623. But the letter itself does not contain any proposed financing terms; the terms are found only in the term sheet. A-606–15; *see also* A-623 ("The Term Sheet indicates only the principal terms and conditions under which the financing would be considered.") Without reading the attached term sheet, the letter becomes meaningless and does not even fulfill its stated purpose. The letter can serve its explicit purpose—to communicate Prospect's proposal—only if the term sheet and letter are read together as a single instrument.

### 2. Prospect's Proposal Is Too Indefinite to Create a Binding Contract.

When Prospect's twelve-page proposal is treated as a single instrument, it is clear that the proposal was never intended to be a final binding agreement. The instrument's express purpose was to communicate Prospect's proposal to provide Enmon with debt financing to purchase Caprock. But a contract cannot exist unless there is a manifestation of mutual assent that is sufficiently definite to assure that the parties have actually reached an agreement. *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999).[3] But

---

[3] "When contract formation is at issue in an FAA case, we generally apply state-law principles." *Adams*, 433 F.3d at 227.

Prospect's proposal repeatedly states that, even if both parties signed the proposal, Prospect could choose at any time to not provide Enmon financing for "any reason or no reason." A-623–24, 627. And even if Prospect decided to offer Enmon the necessary debt financing, Prospect explicitly reserved the right to make the offer on any terms it chose, regardless of whether they were, in fact, consistent with the proposal's terms. A-623–24.

Prospect's unilateral and unqualified ongoing right to decide whether it would provide debt financing to Enmon, prevents the proposal from being sufficiently definite to have allowed Prospect and Enmon to provide a sufficiently definite mutual assent to anything, let alone assent to enter into a binding agreement. *Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053 (stating that a binding contract does not exist unless "a sufficiently definite offer that its unequivocal acceptance will give rise to an enforceable contract"); *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) (stating that a binding contract does not exist when "a material term is left for future negotiations). An offer's material terms must be definite because "definiteness as to material matters is of the very essence of contract law." *Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053 (quoting *Schumacher*, 417 N.E.2d at 543). But Prospect's proposal is wholly indefinite with respect to the terms of the debt financing that Prospect might have chosen to offer Enmon because it does not in

22



any way bind Prospect to provide Enmon with financing at all, let alone on terms consistent with the proposal.

Nor can Prospect's proposal be a binding preliminary agreement. Prospect's proposal cannot constitute a binding preliminary agreement because it did not require Prospect to negotiate in good faith towards the goal of a final financing agreement with Enmon. *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 844 F.2d 69, 71–72 (2d Cir. 1989) (holding as a matter of law that an instrument that expressly referred to a binding future agreement and noted that negotiations might fail was not a binding preliminary agreement despite partial performance). To the contrary, it expressly empowered Prospect to act in an arbitrary and capricious way.

Generally, when two parties, such as Enmon and Prospect, "contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). Under certain circumstances, however, parties can enter into a binding preliminary agreement.[4] As relevant

---

[4] The Second Circuit has recognized two types of binding preliminary agreements which are referred to as Type I and Type II preliminary agreements. *Id.* A Type I preliminary agreement is one where "the parties have reached complete agreement on all of the issues that require negotiation, but they have not yet completely formalized their agreement." *Arcadian Phosphates, Inc.*, 844 F.2d at 72; *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). A Type II preliminary agreement is one "in which the parties have committed themselves to some major terms, but some

23

here, a preliminary agreement is binding and enforceable if it is one "in which the parties have committed themselves to some major terms, but some terms will remain to be negotiated." *Arcadian Phosphates, Inc.*, 844 F.2d at 72.

To determine whether a document is a binding preliminary agreement courts examine "whether the intent to be bound was revealed by (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Arcadian Phosphates, Inc.*, 884 F.2d at 72. The instrument's language is the most important factor in determining whether the parties intended to be bound. *Id.* Ultimately, a binding preliminary agreement exists when "[t]he parties 'accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement.'" *Adjustrite Sys., Inc.*, 145 F.3d at 548 (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987)).

The proposal's plain language, however, did not require Prospect to make any effort, let alone a good-faith effort, to reach a final agreement. Thus, it cannot be a binding preliminary agreement. In fact, the proposal expressly disclaims any

---

terms will remain to be negotiated." *Arcadian Phosphates, Inc.*, 844 F.2d at 72. Neither party contended in the district court that Prospect's proposal could constitute a Type I preliminary agreement. Thus, only Type II preliminary agreements are addressed herein.

obligation for Prospect to negotiate or work in good faith with Enmon. The first page of Prospect's financing proposal unambiguously states that

> Prospect's proposal to providing the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence, and until the execution of definitive documentation and closing, with all aspects of the proposed transaction . . . .

* * * *

> You [Enmon] agree that our proposal of alternative financing amounts or structures or our decision not to proceed for any or no reason, at any time shall not be inconsistent with this proposal and shall not support any claim or assertion of liability by [Caprock Pipe and Supply, LP] or any affiliate or other person against us.

A-623. And the proposal expressly states that "sole discretion" means that Prospect could act as arbitrarily and capriciously as it wanted and its discretion was "subject to no standard of reasonableness." *Id.*

Similarly, the first page of the term sheet states that "[n]othing contained in this Summary of Proposed Terms and Conditions is or is intended to be a commitment to provide or arrange all or any portion of the financing" and that "[t]hese terms and conditions are intended for discussion purposes only." A-627. The term sheet further states that "[n]o binding agreement can be reached on the subject matter of this terms sheet unless and until definitive and final documentation has been signed and delivered by all parties containing such terms and conditions as are satisfactory to [Prospect]." A-632.

The proposal cannot constitute a binding preliminary agreement because its language shows less of an intent to bind the parties than the language *Arcadian Phosphates* held was insufficient to constitute a binding preliminary agreement. *Arcadian Phosphates, Inc.*, 884 F.2d at 71–72.   *Arcadian Phosphates* held that even though the parties had partially performed did not enter into a binding preliminary agreement based solely on the plain language of a memorandum that contained "references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date." *Id.* at 72.   Prospect's proposal, however, contains far stronger reservations—indeed it does not require Prospect to make any efforts towards a final agreement at all.

Not only do the terms of Prospect's proposal fail to show any intent to create a binding agreement, but they further show that the proposal does not even meet the most basic requirement of an enforceable Type II preliminary agreement—that "[t]he parties 'accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement.'" *Adjustrite Sys., Inc.*, 145 F.3d at 548 (quoting *Teachers Ins. & Annuity Ass'n*, 670 F.Supp. at 498).   The April 11 letter's plain language affirmatively states that Prospect was not making any commitment to negotiate together in good faith to reach a final agreement.   The April 11 letter stated that Prospect could refuse to offer financing to financing for "any or no reason." A-623.   Prospect further stated that its decision whether or not to offer

26

Enmon debt financing was committed to Prospect's "sole discretion." *Id.* And Prospect's "sole discretion" meant that it could act as "arbitrarily and capriciously" as it wanted and that it was "subject to no standard of reasonableness." *Id.*

This language stands in stark contrast to the language this Court has found sufficient to create a binding preliminary agreement. In *Brown*, the parties executed a memorandum stating that the parties agreed to "work together to develop, build, market, and manage" a commercial property and to "work together in accordance with the terms and conditions outlined [in the memorandum]. *Brown*, 420 F.3d at 158. The Court held that these express promises to work together demonstrated an intent to create a binding preliminary agreement. *Id.* Prospect's proposal, however, is the polar opposite of the memorandum in *Brown*. At every turn, Prospect's proposal disclaims any obligation to do anything at all and proclaims that Prospect does not have to even be reasonable in its decisions.

In light of this explicit language, Prospect's proposal cannot be a binding preliminary agreement because it does not express any intent by Prospect, let alone mutual intent, "to negotiate together in good faith in an effort to reach final agreement." *Adjustrite Sys., Inc.*, 145 F.3d at 548. While, in some cases, a court could imply a covenant of good faith and fair dealing, no such covenant can be implied in this case because to do so would be inconsistent with the proposal's express language. *Horn v. New York Times*, 790 N.E.2d 753, 756 (N.Y. 2003)

27

(quoting *Sabetay v. Sterling Drug, Inc.*, 506 N.E.2d 919, 922 (N.Y. 1987)). ("[A] covenant of good faith [and fair dealing] can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract.").

That Grier Eliasek (on behalf of Prospect) and Enmon both signed the April 11 letter is not relevant to determining whether Prospect's proposal was sufficiently definite to give rise to a binding contract. Courts routinely find preliminary documents signed by both parties to not create a binding obligation. *See, e.g., Arcadian Phosphates, Inc.*, 884 F.2d at 70 (noting that the parties had both signed the memorandum that the court held was not a binding agreement). This is unsurprising because the relevant question is whether the proposal's terms are *sufficiently definite* to show an intent to be bound. The mere act of signing the April 11 letter does not indicate whether, as a matter of law, the proposal's terms are definite enough to show that parties both intended to bound to the terms of the proposal.

The fact that the signature block for Enmon—*but not Prospect*—refers to the letter as a "letter agreement" and says "Agreed to and accepted" further shows the absence of any intent by both parties to enter into a binding agreement. The letter's signature block appears as follows:



A-626.   That Prospect drafted its proposal to only have Enmon sign under the words "[a]greed to and accepted" shows Prospect's intent to create the most one-sided deal imaginable.   While Enmon stated that he "agreed to" the letter, Prospect made no such representation.

This is significantly different than language explicitly stating that *all* the parties to the instrument agree to work together or perform certain obligations, which courts have found can be evidence of an intent to be bound.   *See Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc.*, 408 F.3d 460, 465 (8th Cir. 2005) (holding that document showed an intent to be bound based on provision that "By signing this Term Sheet, SAAI, FLI, and Mesaba evidence their agreement to negotiate, execute and deliver definitive documentation" and further providing that the term sheet's provisions will control over inconsistent terms in subsequent draft agreement); *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 340 (2d Cir. 2004) (finding an intent to be bound by language stating "[t]he Parties agree that neither they nor any of their affiliates or any other entity in which they own an interest . . .

will acquire The Orleander Group without complying with the terms of this letter"
which had replaced language that neither party agreed to bound until definitive
documentation had been executed).

The differences between Prospect's proposal and the contracts in *Herrick*
and *Fairbrook Leasing* underscores the nonbinding nature of the proposal. Unlike
the contract in *Fairbrook Leasing*, Prospect's proposal explicitly disclaims any
obligation by Prospect to negotiate, execute, or deliver a definitive debt agreement.
A-623. Furthermore, unlike *Fairbrook Leasing*'s contract, which provided that the
initial term sheet's provisions would control over inconsistent provisions in
subsequent draft agreement's, Prospect's proposal states that the terms stated in its
proposal will never control over inconsistent provisions in subsequent drafts. In
short, the very aspects of the document in *Fairbrook Leasing* that were found to
establish an intent to be bound are completely absent in Prospect's proposal.

Prospect's proposal is also wholly unlike the contract in *Herrick*, in which
the parties explicitly promised not to purchase another company "without
complying with the terms of this letter" after one of the parties refused to sign a
document stating that the agreement was not binding until definitive
documentation had been executed. *Herrick Co.*, 360 F.3d at 340. Unlike *Herrick*,
however, Prospect's proposal explicitly states that Prospect was not even bound to
offer the proposed financing under any terms and that even if Prospect did offer to

30

finance the Caprock transaction, that its subsequent offer was not restricted by any of the proposal's terms. A-623–24, 627, 632. The stark difference between the proposal's terms that unambiguously establish that Prospect was not bound by any of its terms, even after it had been signed, and the terms of the contract in *Herrick*, which unambiguous impose a mutual obligation on the parties to not undertake the transaction except on terms consistent with the agreement, further shows the complete lack of intent for Prospect's proposal to be binding.

Furthermore, even if the district court properly treated the four-page letter and the attached term sheet as a single instrument, the district court nevertheless erred when it held that the four-page letter, standing alone, could constitute a binding preliminary agreement. Setting aside the language in the term sheet attached to the letter, the letter repeatedly emphasizes (as noted above) that even after Enmon signed the letter and paid Prospect a $25,000 deposit, Prospect was not required under any circumstances whatsoever to actually provide Enmon the financing nor was it required to make a good-faith attempt to reach a final agreement with Enmon. A-623–24. Nor did Prospect even commit to undertake any due diligence because its decision whether or not to provide financing was committed to its "sole discretion," which the letter defined to mean that Prospect could act as "arbitrarily and capriciously" as it chose with respect to both the "process" and "result" of its actions. A-623.

31

In effect, whether the four-page letter is considered alone, or together with the nonbinding term sheet, Prospect's proposal is nothing more than a statement that if Enmon (1) signs the letter, (2) pays Prospect a deposit, (3) purportedly agrees to waive any claim for damages that Enmon may have based on Prospect's past or future acts or omissions, and (4) purportedly agrees to indemnify Prospect from any and all claims brought against them by anyone (including Enmon himself), then Prospect *might* consider whether or not to provide Enmon with the sought-after debt financing. But Prospect still retained the right to choose to not even consider providing Enmon with any financing. Because the express intent, as expressed in the letter, is to not require Prospect to do anything at all establishes the absence of a mutual commitment to work together—the *sine qua non* of a binding preliminary agreement—precludes the proposal (in whole or in part) from being a binding agreement. *Adjustrite Sys., Inc.*, 145 F.3d at 548.

## II. THE ARBITRATION CLAUSE IN PROSPECT'S PROPOSAL IS UNCONSCIONABLE AND UNENFORCEABLE.

The district court also erred when it held that the proposal's arbitration clause was not unconscionable. A-672–73. The proposal's arbitration clause is unconscionable and unenforceable because the clause's plain language requires Enmon to arbitrate his claims but allows Prospect, if it does not like how the arbitration is going, to force Enmon to drop his claims in the arbitration and assert them in court. A-625 ("Borrower agrees that Prospect has the right, at any time, to

32

remove any claim in arbitration to a New York court."). Similarly, if Prospect files a claim against Enmon in arbitration and Prospect does not like how the arbitration is going, Prospect can bail out of the arbitration and reassert its claims in court. *Id.*

Congress's purpose when it enacted the FAA was "to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S.Ct. 1801, 1806 n.12 (1967); *see also Buckeye Check Cashing, Inc.*, 546 U.S. 440, 126 S.Ct. at 1207 (noting that §2 of the FAA "places arbitration agreements on equal footing with all other contracts.). Thus, "generally applicable contract defenses, such as . . . unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 116 S.Ct. 1652, 1656 (1996). Unconscionability is a generally applicable contract defense under New York law. *Kessler v. Kessler*, 818 N.Y.S.2d 571, 574 (N.Y. App. Div. 2006) (stating that "contracts may be set aside or held void as unconscionable or in violation of public policy.").

"A contract or clause is unconscionable when there is an 'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Desiderio v. Nat'l Ass'n of Sec. Dealers*, 191 F.3d 198, 207 (2d Cir. 1999) (quoting 8 SAMUEL WILLISTON, A

TREATISE ON THE LAW OF CONTRACTS, §18:9).[5]    Generally, a finding of

unconscionability "requires a showing that the contract was both procedurally and

substantively unconscionable when made." *Gillman v. Chase Manhattan Bank,*

*N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). "The procedural element of

unconscionability requires an examination of the contract formation process and

the alleged lack of meaningful choice." *Id.* A contract is substantively

unconscionable if the terms are "unreasonably favorable to the party against whom

unconscionability is urged." *Id.* at 829.

　　But "procedural and substantive unconscionability operate on a 'sliding

scale'; the more questionable the meaningfulness of choice, the less imbalance in a

contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 468

N.Y.S.2d 131, 145 (N.Y. App. Div. 1983).   And in some "exceptional cases" a

contract provision can be "so outrageous as to warrant holding it unenforceable on

the ground of substantive unconscionability alone." *Gillman*, 534 N.E.2d at 829.

This is one of those cases.

　　Whether a contract is substantively unconscionable is determined by looking

at the language of the contract. "An unconscionable contract [is] defined as one

---

[5] That this case involves a commercial dispute does not render the doctrine of
unconscionability irrelevant. *Credit Alliance Corp. v. Joshco Mining Corp.*, 90
F.R.D. 187, 189 (S.D.N.Y. 1981); *see also Shuster v. First Nat'l Monetary Corp.*,
450 N.Y.S.2d 711, 716 (N.Y. Civ. Ct. 1982) ("The doctrine of unconscionability
may be applied in this case, even though the setting involves a commercial dispute
and not a consumer-oriented transaction.") (citations omitted).

which is so grossly unreasonable or unconscionable in the light of the mores and

business practices of the time and place as to be unenforcible *according to its

literal terms.*" *Gillman*, 534 N.E.2d at 828 (internal quotations omitted) (emphasis

added); *see also Matter of Friedman*, 407 N.Y.S.2d 999, 1008 (N.Y. App. Div.

1978) ("Substantive elements of unconscionability appear in the content of the

contract per se."); *Universal Leasing Servs., Inc. v. Flushing Hae Kwan Res.*, 565

N.Y.S.2d 199, 200 (N.Y. App. Div. 1991) (noting that "substantive

unconscionability looks to the content of the contract"). In this case, the arbitration

clause's plain language, as well as the text of other provisions in Prospect's

proposal, demonstrates the arbitration clause's substantive unconscionability.[6]

The fact that the arbitration clause in Prospect's proposal only requires one

party to submit its claims to arbitration suggests that the arbitration clause is

substantively unconscionable. *Davis v. O'Melveny & Myers*, No. 04-56039, 2007

WL 1394530, at *7 (9th Cir. May 14, 2007) (noting that a lack of mutuality is a

relevant factor in analyzing substantive unconscionability); *see also Iwen v. U.S.

W. Direct*, 977 P.2d 989, 996 (Mont. 1999) (holding that one-sided arbitration

clause is unconscionable and unenforceable); *Geoffroy v. Wash. Mut. Bank*, No. 06

CV 1732 BEN (WMC), 2007 WL 1334375, at *6 (S.D. Cal. May 3, 2007); *Wis.*

---

[6] Enmon challenges only the unconscionability of paragraph 10 (the arbitration clause) of Prospect's proposal. Enmon is not asserting that the proposal as a whole is unconscionable.

35

*Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 172–73 (Wis. 2006); *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 866 (Ohio 1998); *Lytle v. CitiFinancial Servs.*, 810 A.2d 643, 665 (Pa. Super. Ct. 2002); *Arnold v. United Cos. Lending Corp.*, 511 S.E.2d 854, 862 (W. Va. 1998); *Taylor v. Butler*, 142 S.W.3d 277, 286–87 (Tenn. 2004).[7]

But the arbitration clause in this case is far more one-sided than an arbitration clause that simply requires one party, but not the other, to submit its claims to arbitration. The arbitration clause's plain language provides: "Borrower agrees that Prospect has the right, ***at any time***, to remove ***any claim in arbitration*** to a New York court." A-625. The only reasonable interpretation of the clause's plain language is that Prospect retained the right to remove claims from an ongoing arbitration initiated by either Prospect or Enmon and require them to be relitigated in court. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195,

---

[7] The holding in *Sablosky v. Edward S. Gordon Co.*, 535 N.E.2d 643 (N.Y. 1989), that the one-sided arbitration clause in that case was not unconscionable is not dispositive in this case. *Id.* at 647. In *Sablosky*, the party challenging the arbitration clause pointed only to the fact that one side was required to arbitrate, while the other side was not so required, to justify unconscionability. *Id.* In this case, however, the arbitration clause is not only one-sided but it also gives Prospect a unilateral right to bail out of an ongoing arbitration initiated under the arbitration agreement. And there are a number of other aspects of Prospect's proposal that demonstrate the substantive unconscionability of the arbitration clause. Thus, because this case's facts are markedly different than those in *Sablosky*, the Court of Appeals opinion does not preclude a finding that Prospect's arbitration clause is unconscionable. *Matter of Friedman*, 407 N.Y.S.2d at 1008 (noting that the doctrine of unconscionability "must necessarily be applied in a flexible manner depending upon all the facts and circumstances of a particular case").

206 (2d Cir. 2005) ("In interpreting a contract under New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.") (internal quotation marks omitted).

The proposal's arbitration clause is readily distinguishable from arbitration clauses that permit only one party to unilaterally alter an arbitration clause but expressly prohibit any alteration of the clause after an arbitration has been filed. *See, e.g.*, *Nabors Drilling USA, LP v. Carpenter*, 198 S.W.3d 240, 248–49 (Tex. App.—San Antonio 2006, no pet.) (enforcing an arbitration clause that expressly provided that an employer could alter or amend the arbitration clause unless an arbitration proceeding had already been initiated). Thus, the district court's interpretation of the proposal's removal language as only providing a limited right of removal is plainly erroneous because the court's interpretation of the clause renders the words "at any time" and "any claim in arbitration" a nullity. *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206. The district court's conclusion that the arbitration clause's language did not provide Prospect the right to remove a claim from arbitration to court at any time is plainly erroneous, as it directly contradicts the plain language of the proposal and effectively rewrites the arbitration clause. *S.S.D.W. Co. v. Brisk Waterproofing Co.*, 556 N.E.2d 1097, 1102 (N.Y. 1990) ("The court cannot ignore the language agreed upon by the parties, or revise or

37

rewrite the contract") (quoting *Pub. Employees Mut. Ins. Co. v. Sellen Constr. Co.*, 740 P.2d 913, 915 (Wash. Ct. App. 1987)); *Cappelli v. Cappelli*, 729 N.Y.S.2d 174, 175 (N.Y. App. Div. 2001) ("Therefore, a court may not rewrite or impose different or additional contractual terms, nor may a court ignore unequivocal language, search for evidence of the parties' intent outside of the contract, or read the contract so as to distort its apparent meaning.").

Because the language of the arbitration clause purportedly gives Prospect the right to remove claims from an ongoing arbitration initiated by either Prospect or Enmon and require the claims to be relitigated in court, the clause allows Prospect's judicial remedies to supersede the arbitration clause's purported arbitral remedies. This renders the arbitration clause unenforceable. *Simpson v. MSA of Myrtle Beach, Inc.*, No. 26293, 2006 WL 4388016, at *8 (S.C. March 26, 2007) (holding unconscionable an arbitration clause that permits one party's judicial remedies to supersede the other party's arbitral remedies); *see also Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 787 (9th Cir. 2002) (holding under California law that an arbitration clause that provides one-sided discovery is substantively unconscionable when viewed in light of numerous other provisions that favor lender should any dispute arise).

Furthermore, the arbitration clause's removal provision is contrary to the policies that justify judicial enforcement of arbitration clauses. "Arbitration cannot

38

achieve the savings in time and money for which it is justly renowned if it becomes merely the first step in lengthy litigation." *Nat'l Bulk Carriers, Inc. v. Princess Mgmt.*, 597 F.2d 819, 825 (2d Cir. 1979); *Larrison v. Scarola Reavis & Parent, LLP*, 812 N.Y.S.2d 243, 246–47 (N.Y. Sup. Ct. 2005) ("The policy of this State favors and encourages arbitration as a means of conserving the time and the resources of the courts and contracting parties.").    In this case, however, the arbitration clause does not support these policies because Prospect retains the right to bail out of an arbitration that either Enmon filed or that Prospect itself filed, if it does not like how the arbitration is proceeding.    The proposal's unilateral bailout right underscores how "unreasonably favorable" the arbitration clause is to Prospect.

Prospect's counsel conceded during the hearing before the district court that she "[didn't] think any court would ever enforce the agreement" in a way that would allow Prospect to "scuttle the arbitration" by removing the claims from arbitration and forcing them to be litigated in court.  A-644.  But that is precisely what the plain language of the arbitration clause provides: "Borrower agrees that Prospect has the right, *at any time*, to remove *any claim in arbitration* to a New York court." A-625 (emphasis added).  Prospect's counsel confirmed that Prospect interpreted the agreement to allow Prospect to remove to court a claim brought by Enmon in an arbitration.  A-644.

As there is no other reasonable interpretation of the arbitration clause's removal provision, Prospect's only defense of the removal clause is that because it filed a demand for arbitration with the American Arbitration Association, it could not enforce its removal right. A-644. But Prospect's after-the-fact disavowal of its unlimited right of removal cannot save the arbitration clause from being unenforceable. *See Cheek v. United Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 662 n.5 (Md. 2003); *Phox v. Atriums Mgmt. Co.*, 230 F.Supp.2d 1279, 1283 (D. Kan. 2002). This is consistent with the general principle that substantive unconscionability is determined by examining the "literal terms" of the agreement, *Gillman*, 534 N.E.2d at 828, and that courts "cannot ignore the language agreed upon by the parties, or revise or rewrite the contract." *S.S.D.W. Co.*, 556 N.E.2d at 1102.

Prospect's argument, in fact, underscores the unconscionability and unenforceability of the arbitration clause. Prospect acknowledges that the arbitration clause is unenforceable as written but then suggests that the clause can be resuscitated by the fact that courts would not actually let Prospect exercise the rights that the arbitration clause's text provides. But it is well settled that substantive unconscionability is determined by the contract's "literal terms." *Gillman*, 534 N.E.2d at 828. That the courts will not permit Prospect to exercise the arbitration clause's removal right to the extent allowed by the clause's plain

language demonstrates the "unreasonably favorable," and thus unconscionable, nature of the arbitration clause.

While the substantive unconscionability of the proposal's arbitration clause is established by the language of the arbitration clause itself, the one-sided nature of the proposal's other terms governing disputes between Enmon and Prospect further underscore the unconscionable nature of the arbitration clause. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1271 (9th Cir. 2006) (en banc) (holding that when a litigant only attacked a contract's arbitration clause as unconscionable, the court could examine the making of the entire contract as part of that analysis, if required by state law).[8]

In addition to the fact that only Enmon is bound to pursue his claims in arbitration under the proposal's arbitration clause and that Prospect has the right to remove claims filed in arbitration to the courts if it does not like how arbitration is

---

[8] *Nagrampa* relied on cases from a number of circuits in support of its holding that a court could look at the contract as a whole to determine the enforceability of the arbitration clause, so long as the enforceability of the contract as a whole was not challenged. *See Nagrampa*, 469 F.3d at 1271–75 (citing *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 16 (1st Cir. 1999); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 249 (2d Cir. 1991); *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003); *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260 (5th Cir. 2004); *Burden v. Check Into Cash of Ky., LLC*, 267 F.3d 483, 486 (6th Cir. 2001); *Madol v. Dan Nelson Automotive Group*, 372 F.3d 997, 998 (8th Cir. 2004)). *But see Jenkins v. First Am. Cash Advance of Ga.*, LLC, 400 F.3d 868, 877 (11th Cir. 2005),

proceeding, every other provision of the contract that would relate to the litigation

of disputes between the parties is tilted in favor of Prospect.

- Prospect retained the right to not go forward with the transaction for any reason or no reason. Enmon did not have a reciprocal right.

- Borrower was required to "pay all costs and expenses, including legal fees, incurred in connection with any enforcement of this letter." Prospect did not have any reciprocal obligation to Enmon.

- Borrower was required to indemnify and hold harmless Prospect from third-party claims and claims brought by Caprock and Enmon, with no reciprocal obligation by Prospect.

- Borrower purportedly agreed to a limitation of remedies and liability clause. No reciprocal obligation by Prospect.

- Arbitration clause includes a provision that "Should Prospect's good faith efforts hereunder be tendered as a defense in any proceeding, such good faith efforts shall be conclusively shown by evidence, without more, that Prospect has gathered and reviewed more than fifty pages of due diligence materials relating to the proposed transaction."

A-623–25. Every clause in the contract that would likely affect the resolution of

any dispute between the parties unambiguously and overwhelmingly favored

Prospect. Simply put, if this arbitration clause, in the context of the overall

proposal, cannot constitute a substantively unconscionable, and thus

unenforceable, agreement, it is difficult to imagine what agreement could.

III.  **ENMON NEVER ENTERED INTO A LEGALLY BINDING ARBITRATION AGREEMENT WITH PROSPECT BECAUSE THE PROPOSAL LACKED CONSIDERATION.**

The district court further erred when it held that the non-mutual arbitration clause constituted a binding agreement because it incorrectly found that it was supported by consideration found elsewhere within Prospect's proposal.  A-672. While a one-sided arbitration clause does not lack consideration so long as there is consideration for the contract as a whole,[9] no court has held that a one-sided arbitration clause is enforceable in the absence of any other consideration in the alleged underlying contract.[10]

---

[9] *Sablosky*, 535 N.E.2d at 645 (stating that "[i]f there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement . . . ."); *Doctor's Assocs., Inc.*, 66 F.3d at 453 (applying Connecticut law). *But see, e.g., Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) (holding that "an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory"); *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 759–60 (7th Cir. 2001); *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 315–16 (6th Cir. 2000) (ability to choose nature of forum and alter arbitration without notice or consent renders arbitration agreement illusory); *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939 (4th Cir. 1999) (holding that among other reasons, employer's ability to modify rules "in whole or in part" without notice to employee renders arbitration agreement illusory); *Gonzalez v. W. Suburban Imports, Inc.*, 411 F.Supp.2d 970, 972–73 (N.D. Ill. 2006); *Cheek*, 835 A.2d at 669 (holding that an arbitration clause that only bound one party to the agreement was unenforceable for lack of consideration); *Showmethemoney Check Cashers, Inc. v. Williams*, 27 S.W.3d 361, 366 (Ark. 2000) (holding that a non-mutual arbitration clause renders the clause void as to the bound party).

[10] As explained in section I.A., *supra*, questions regarding whether parties ever entered into an underlying contract that contains an arbitration clause is a question for the court, not the arbitrator.  Because consideration is required for an agreement

This case, however, presents precisely this situation. It is indisputable that the plain language of the proposal's arbitration clause requires Enmon to arbitrate his claims against Prospect but not vice versa because Prospect retained the unilateral right to waive the arbitration agreement. A-625. Thus, in the absence of a reciprocal arbitration promise by Prospect, the arbitration clause is unsupported by consideration unless some other provision of Prospect's proposal provides the necessary consideration.

But in this case, the proposal does not require Prospect to either confer a benefit on Enmon nor to suffer any detriment. *See Holt v. Feigenbaum*, 419 N.E.2d 332, 336 (N.Y. 1981) (stating that consideration can be "either a benefit to the promisor or a detriment to the promise"). The district court did not identify any explicit obligation in the proposal that constituted consideration by Prospect. A-672.[11] Instead, the only consideration the district court found to exist was that

---

to be created, the court may examine whether Prospect's proposal as a whole was supported by adequate consideration. *Lumhoo v. Home Depot USA, Inc.*, 229 F.Supp.2d 121, 161 (E.D.N.Y. 2002) ("The requirements for the *formation* of a contract under New York law include an (a) offer, (b) acceptance and (c) consideration.") (emphasis added); *N.Y. County Lawyers' Ass'n v. Pataki*, 727 N.Y.S.2d 851, 861 (N.Y. Sup. Ct. 2001) ("A binding contract requires mutuality of consideration; that is, each party must furnish consideration to the other, or undergo a detriment.").

[11] Paragraph 10 of the letter does contain a New York choice-of-law clause and a New York County forum-selection clause. A-625. However, because Prospect has its principal place of business in New York County and thus is necessarily subject to jurisdiction and venue in New York, these promises do not constitute any detriment to Prospect. Furthermore, Prospect did waive its right to a jury trial of

"Prospect agreed in good faith to expend its time and efforts and resources in furtherance of a proposed transaction."  A-672.  The district court's finding, however, is clearly erroneous because the proposal's plain language affirmatively shows that Prospect disclaimed any obligation to perform in good faith and that the proposal was not subject to the implied covenant of good faith and fair dealing.  A-623 (stating that Prospect's "sole discretion" with respect to deciding whether to provide financing is the "sole and absolute discretion as to process and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise").

Prospect's proposal repeatedly emphasized not only that Prospect was not obligated to provide any financing or perform any due diligence at all, but that it was not obligated to act in good faith under the proposal.  In its April 11 proposal, Prospect stated that it retained an unconstrained right to change the terms of the proposed financing in any way it wanted, or to not provide any financing at all, and that any such changes would be deemed to be consistent with the April 11 proposal.  A-623 ("You [Enmon] agree that our proposal of alternative financing

---

any dispute between the parties.  A-625.  But Prospect's mere agreement to waive a jury trial for any disputes it had with Enmon cannot constitute a detriment to Prospect because Prospect did not actually undertake any binding obligation of performance under the proposal.

amounts or structures or our decision not to proceed for any or no reason, at any time, shall not be inconsistent with this proposal and shall not support any claim or assertion of liability by [Caprock Pipe and Supply, LP] or any affiliate or other person against us.").

Additionally, not only did Prospect disclaim any obligation to provide Enmon with financing for the Caprock transaction, Prospect's proposal did not even contain a promise to perform due diligence related to the transaction. Prospect stated that its "proposal to providing the financing described in this letter is subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence, and until the execution of definitive documentation and closing, with all aspects of the proposed transaction . . . ." A-623.   Prospect never explicitly promised to perform any due diligence; nor can a contractual obligation to perform due diligence be implied.  This is because the proposal defines "sole discretion" to mean the

> sole and absolute discretion *as to process* and result, which shall be final for all purposes hereunder, to be exercised as arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness or review, and part of no claim, before any court, arbitrator or other tribunal or otherwise.

A-623.  By explicitly defining sole discretion to cover not only Prospect's decision regarding whether to provide financing, but also the process it employed in making

its decision, Prospect's proposal does not even require Prospect to perform any due diligence.

Nor can the court find an implied obligation that Prospect was required to proceed in good faith. "[A] covenant of good faith and fair dealing 'can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract.'" *Horn*, 790 N.E.2d at 756 (quoting *Sabetay*, 506 N.E.2d at 922). But in this case, Prospect's proposal explicitly precludes any obligation of good faith from being imposed on Prospect. The proposal states that Prospect's decision whether or not to provide financing and how to go about making its decision to providing financing is subject to Prospect's "sole discretion." A-623. But the proposal's definition of sole discretion provides that when a party has the sole discretion regarding a purported obligation under the proposal, that party may exercise its discretion as "arbitrarily and capriciously as that party may wish, for any or no reason, subject to no standard of reasonableness." *Id.* Given that Prospect's proposal explicitly states that its decisionmaking process and final decision regarding whether to provide financing are at Prospect's sole discretion and thus "subject to no standard of reasonableness," a covenant of good faith cannot be implied because to do so would be inconsistent with the proposal's plain language. Thus, the district court clearly erred in finding that Prospect's was

47

obligated to act in good faith under the proposal and thus erred in finding that the arbitration clause was supported by consideration.

**IV.    THE DISTRICT COURT ERRED IN ENJOINING ENMON FROM PROSECUTING HIS CLAIMS AGAINST PROSPECT IN TEXAS STATE COURT.**

Because Enmon and Prospect did not enter into a binding contract containing a valid arbitration clause, the district court's order enjoining Enmon from prosecuting his claims against Prospect in Texas state court must be vacated because the Federal Arbitration Act authorizes a court to enjoin a party from litigating his claims in court if the party is bound to a valid arbitration agreement. 9 U.S.C. §3. Thus, the district court's injunction against Enmon that is predicated on the erroneous finding that Enmon had entered in to a binding agreement with Prospect that contained a valid arbitration clause must be vacated.

CONCLUSION

For these reasons, the Court should reverse the district court's order compelling arbitration, vacate the district court's injunction against Enmon's litigation of the Texas suit, and render judgment in favor of Enmon.

48

Respectfully submitted,

*Gregory S. Coleman*

Gregory S. Coleman
Marc S. Tabolsky
YETTER & WARDEN L.L.P.
221 West 6th Street, Suite 750
Austin, Texas 78701
[Tel.] (512) 533-0150
[Fax] (512) 533-0120

Kurt B. Arnold
Jason A. Itkin
Caj. D. Boatright
ARNOLD & ITKIN, L.L.P.
1401 McKinney, Suite 2550
Houston, Texas 77010
[Tel.] (713) 222-3800
[Fax] (713) 222-3850

49

## CERTIFICATE OF COMPLIANCE

The undersigned certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7).

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 11,462 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word XP in Times New Roman font size 14.

Gregory S. Coleman
Attorney for Appellant
Dated:  May 23, 2007

50

CERTIFICATE OF SERVICE

I certify that on May 23, 2007, I sent Brief of Appellant Michael Enmon and

Appellant's Appendix by electronic mail and Federal Express overnight mail for

filing with the Court and that two copies of the brief and one copy of the appendix

were served in the same manner on all counsel of record:

Jonathan J. Lerner
Maura Barry Grinalds
Timothy G. Nelson
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036

*Attorneys for Respondents-Appellees*
*Prospect Energy Corporation, et al.*

Gregory S. Coleman

51

# 07-1047-cv

## 𝔍𝔫 𝔱𝔥𝔢
## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

---

PROSPECT ENERGY CORPORATION, PROSPECT CAPITAL MANAGEMENT LLC.,
JOHN F. BARRY, M. GRIER ELIASEK, WALTER PARKER AND BART DE BIE,
*Petitioners–Appellees,*

v.

MICHAEL ENMON,
*Respondent–Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York

---

### REPLY BRIEF OF APPELLANT MICHAEL ENMON

---

Kurt B. Arnold
Jason A. Itkin
Caj D. Boatright
ARNOLD & ITKIN, L.L.P.
1401 McKinney, Suite 2550
Houston, Texas 77010
[Tel.] (713) 222-3800
[Fax] (713) 222-3850

Gregory S. Coleman
Marc S. Tabolsky
YETTER & WARDEN, L.L.P.
221 West 6th Street, Suite 750
Austin, Texas 78701
[Tel.] (512) 533-0150
[Fax] (512) 533-0120

**ATTORNEYS FOR APPELLANT MICHAEL ENMON**



TABLE OF CONTENTS

Table of Authorities ................................................................................ ii

Introduction .......................................................................................... 1

Argument .............................................................................................. 2

    I.    The District Court Erred When It Compelled Enmon to Arbitrate His Claims Against Prospect Because the Parties Never Reached an Agreement .............................................. 2

        A.    Whether Enmon and Prospect Ever Reached an Agreement Is a Threshold Question for the Court to Decide ................................................................... 2

        B.    The District Court Erred When It Held That Prospect's Financing Proposal Contained Both a Binding Contract and a Nonbinding Term Sheet ................................... 4

        C.    Prospect's April 11 Proposal Is Not a Binding Contract Because It Lacks Sufficiently Definite Terms to Show a Meeting of the Minds .............................................. 7

        D.    Prospect's Proposal Is Not a Binding Preliminary Agreement to Negotiate in Good Faith ..................................... 11

    II.    The Proposal's Arbitration Clause Is Unenforceable Because It Contains No Genuine Promise of Arbitration and Is Unconscionable .................................................................. 16

        A.    The Proposal's Arbitration Clause Is Not an Agreement to Arbitrate and Lacks Consideration ....................................... 16

        B.    The Proposal's Arbitration Clause Is Unconscionable ............. 21

Conclusion ........................................................................................... 28

Certificate of Compliance ..................................................................... 30

Certificate of Service ............................................................................ 31

i

## TABLE OF AUTHORITIES

**CASES**

*50 Pine Co. v. CapitalSource Fin. LLC (In re 50 Pine Co.),*
    317 B.R. 276 (Bankr. S.D.N.Y. 2004) ...................................................13, 15

*Adams v. Suozzi,*
    433 F.3d 220 (2d Cir. 2005) .......................................................................2, 9

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,*
    145 F.3d 543 (2d Cir. 1998) .....................................................................4, 14

*Arcadian Phosphates, Inc. v. Arcadian Corp.,*
    884 F.2d 69 (2d Cir. 1989) ................................................................. *passim*

*Baldeo v. Darden Rests., Inc.,*
    No. 04-cv-2185, 2005 WL 44703 (E.D.N.Y. Jan. 11, 2005) ........................26

*Barnwell v. Consol. Edison Co.,*
    376 N.Y.S.2d 3 (N.Y. App. Div. 1975)........................................................24

*Buckeye Check Cashing, Inc. v. Cardegna,*
    546 U.S. 440, 126 S.Ct. 1204 (2006) ............................................................3

*Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.,*
    368 F.3d 86 (2d Cir. 2004) ....................................................................24, 25

*Cheek v. United Healthcare of Mid-Atlantic, Inc.,*
    835 A.2d 656 (Md. 2003) ............................................................................25

*Ciago v. Ameriquest Mortgage Co.,*
    295 F.Supp.2d 324 (S.D.N.Y. 2003) ......................................................26, 27

*Cohen v. Lehman Brothers Bank, FSB,*
    273 F.Supp.2d 524 (S.D.N.Y. 2003) ......................................................13, 15

*Davis v. ECPI Coll. of Tech., L.C.*,
 No. 05-2122, 2007 WL 840506 (4th Cir. Mar. 20, 2007) ............................27

*Del. County Dairies v. White*,
 80 N.Y.S.2d 392 (N.Y. App. Div. 1948) ......................................................22

*Diatect Int'l Corps. v. Organic Materials Review Inst.*,
 No. 2:05-cv-00465, 2007 WL 752165 (D. Utah March 7, 2007) ................20

*Ernst Steel Corp. v. Horn Constr. Div.*,
 481 N.Y.S.2d 833 (N.Y. App. Div. 1984) .......................................................3

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*,
 715 N.E.2d 1050 (N.Y. 1999) ...........................................................3, 8, 10

*Genesco, Inc. v. T. Kakiuchi & Co.*,
 815 F.2d 840 (2d Cir. 1987) ...........................................................................10

*Gibson v. Neighborhood Health Clinics, Inc.*,
 121 F.3d 1126 (7th Cir. 1997) .......................................................................18

*Gill v. World Inspection Network Int'l, Inc.*,
 No. 06-cv-3187, 2006 WL 2166821 (E.D.N.Y. July 31, 2006) ....................27

*Gillman v. Chase Manhattan Bank, N.A.*,
 534 N.E.2d 824 (N.Y. 1988) ...................................................................21, 25

*Gold v. Deutsche Aktiengesellschaft*,
 365 F.3d 144 (2d Cir. 2004) ...........................................................................10

*Horn v. New York Times*,
 790 N.E.2d 753 (N.Y. 2003) ..........................................................................19

*Int'l Minerals & Mining Corp. v. Citicorp N. Am., Inc.*,
 736 F.Supp. 587 (D.N.J. 1990) ......................................................................13

*J.M. Davidson, Inc. v. Webster*,
 128 S.W.3d 223 (Tex. 2003) ..........................................................................20

*Jackson v. Millar Elevator Indus., Inc.,*
    468 N.Y.S.2d 624 (N.Y. App. Div. 1983)....................................24

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,*
    417 N.E.2d 541 (N.Y. 1981) ...........................................10

*Koam Produce, Inc. v. DiMare Homestead, Inc.,*
    329 F.3d 123 (2d Cir. 2003) ....................................13, 14

*Nagrampa v. MailCoups, Inc.,*
    469 F.3d 1257 (9th Cir. 2006) (en banc)..................................21, 28

*Nat'l Bulk Carriers, Inc. v. Princess Mgmt.,*
    597 F.2d 819 (2d Cir. 1979) .......................................22

*Opals on Ice Lingerie v. Body Lines Inc.,*
    320 F.3d 362 (2d Cir. 2003) ......................................3

*Perl v. Smith Barney Inc.,*
    646 N.Y.S.2d 678 (N.Y. App. Div. 1996).................................5

*Philips Credit Corp. v. Regent Health Group, Inc.,*
    953 F.Supp. 482 (S.D.N.Y. 1997) .....................................13

*Phox v. Atriums Mgmt. Co.,*
    230 F.Supp.2d 1279 (D. Kan. 2002) ...................................25

*Sablosky v. Edward S. Gordon,*
    535 N.E.2d 643 (N.Y. 1989) .......................................17, 18, 22, 23

*Simpson v. MSA of Myrtle Beach, Inc.,*
    No. 26293, 2006 WL 4388016 (S.C. March 26, 2007)..................................22

*Specht v. Netscape Commc'ns Corp.,*
    306 F.3d 17 (2d Cir. 2002) .......................................2, 3

*Sphere Drake Ins. Ltd. v. All Am. Ins. Co.,*
    256 F.3d 587 (7th Cir. 2001) ......................................21

*Stradiot Specialty, Inc. v. Am. Calendar Co.*,
    No. 2004-L-162, 2007 WL 1881309
    (Ohio Ct. App. June 29, 2007).................................................................20

*Tarulli v. Circuit City Stores, Inc.*,
    333 F.Supp.2d 151 (S.D.N.Y. 2004) ............................................................27

*Teachers Ins. & Annuity Ass'n v. Tribune Co.*,
    670 F.Supp. 491 (S.D.N.Y. 1987) ......................................................11, 12, 14

*Thomas James Assocs. v. Jameson*,
    102 F.3d 60 (2d Cir. 1996) ..........................................................................10

*TVT Records v. The Island Def Jam Music Group*,
    412 F.3d 82 (2d Cir. 2005) ....................................................................5, 6, 7

*Umscheid v. Simnacher*,
    482 N.Y.S.2d 295 (N.Y. App. Div. 1984).....................................................19

*Universal Leasing Servs., Inc. v. Flushing Hae Kwan Rest.*,
    565 N.Y.S.2d 199 (N.Y. App. Div. 1991)......................................................25

### STATUTES

9 U.S.C. §2...........................................................................................................18

28 U.S.C. §1441 ....................................................................................................24

28 U.S.C. §1446 ....................................................................................................24

28 U.S.C. §1452(a) ................................................................................................24

N.Y. C.P.L.R. §325................................................................................................24

## INTRODUCTION

The arbitration clause in Prospect's April 11 nonbinding proposal to Enmon to provide financing to purchase a company is not enforceable because it is not part of a binding contract, and, even if it were, is unenforceable.  Although Prospect's proposal has certain cosmetic attributes of a contract, it lacks the most fundamental element of a contract—an agreement to undertake a binding obligation.  At every turn, Prospect's proposal disclaims any obligation on the part of Prospect to do anything or to act in good faith.  Because the April 11 proposal as a whole is not a binding contract, the arbitration clause contained within it is not an enforceable agreement to arbitrate.

The proposal's unambiguous intent to not bind Prospect to do anything is exemplified by the arbitration clause that Prospect now seeks to enforce.  The arbitration clause not only purportedly required Enmon, but not Prospect, to submit its claims to arbitration; it further allowed Prospect to bail out of an arbitration filed by either Enmon or Prospect at any time, if it did not like how it was going, and force the claims to be refiled and litigated in court.  While some courts enforce arbitration clauses that bind one party, but not the other, to submit its claims to arbitration, no court has ever enforced an arbitration clause that permits the second party to skip out of arbitration if it changes its mind after arbitration has begun.  Such a clause is not an agreement to arbitrate under the Federal Arbitration Act.

1

Furthermore, to the extent such a clause could be an agreement, it is unconscionable, and thus unenforceable.

**ARGUMENT**

I. **THE DISTRICT COURT ERRED WHEN IT COMPELLED ENMON TO ARBITRATE HIS CLAIMS AGAINST PROSPECT BECAUSE THE PARTIES NEVER REACHED AN AGREEMENT.**

The district court erred in compelling Enmon to arbitrate his claims against Prospect Energy Corporation, Prospect Capital Management, LLC, John F. Barry, M. Grier Eliasek, Walter Parker, and Bart de Bie, because Prospect's April 11 financing proposal that contained the purported arbitration agreement is not a contract. Prospect's April 11 proposal is not a contract because it is too indefinite to demonstrate Enmon's and Prospect's mutual assent to its terms, thus precluding a meeting of the minds, and the April 11 proposal is not a binding preliminary agreement under New York law because it unequivocally disclaims any obligation by Enmon and Prospect to work together in good faith to consummate the proposed loan transaction.

A. **Whether Enmon and Prospect Ever Reached an Agreement Is a Threshold Question for the Court to Decide.**

Before a court may compel arbitration, it must first determine whether the parties ever entered into a contract. *Adams v. Suozzi*, 433 F.3d 220, 226 (2d Cir. 2005) ("If the contract embodying a purported arbitration agreement never existed, the arbitration agreement itself does not exist."); *Specht v. Netscape Commc'ns*

2

*Corp.*, 306 F.3d 17, 26 (2d Cir. 2002). Thus, unlike questions regarding the validity of a contract as a whole, which are questions for the arbitrator to decide, questions regarding contract formation—"whether any agreement between the alleged obligor and obligee was ever concluded"—are for the Court to decide prior to compelling arbitration. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, ___, 126 S.Ct. 1204, 1208 n.1 (2006). Thus, questions regarding whether parties reached a meeting of the minds as to the contract as a whole are for the Court to decide. *See Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 369-70 (2d Cir. 2003) (holding that court could address claim of forgery on a purported contract because it would show that an agreement was never concluded because there was not a "meeting of the minds"); *Ernst Steel Corp. v. Horn Constr. Div.*, 481 N.Y.S.2d 833, 839 (N.Y. App. Div. 1984) (stating that a meeting of the minds is "essential to the formation of a binding contract").

Enmon's arguments that the April 11 proposal is not a contract because it is too indefinite and cannot constitute a binding preliminary agreement under New York law similarly challenge whether there was a meeting of the minds. *See Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999) (explaining that a contract must be sufficiently definite in order to show that there was a meeting of the minds); *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (explaining that the preliminary-

agreement doctrine is a means for determining whether the parties intended to enter into a binding agreement). Because Enmon's arguments challenge whether Prospect and Enmon ever entered into a contract at all, they must be addressed prior to compelling arbitration.

Prospect's contrary argument relies on cases stating that an attack on the entirety of an agreed-to contract for lack of consideration is a question for the arbitrator. Prospect Br. 26-29. But Enmon's challenge regarding the indefiniteness of the April 11 proposal has nothing to do with consideration. Nor is Enmon's argument that the April 11 proposal is not a binding preliminary agreement under *Arcadian Phosphates*—because it lacks a "mutual commitment to negotiate together in good faith in an effort to reach final agreement"—an attack on the mutuality or consideration of the April 11 proposal as a whole. The mutual-commitment requirement is not an element of consideration but is the very element that indicates that parties intended to enter into a binding preliminary agreement. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998).

## B. The District Court Erred When It Held That Prospect's Financing Proposal Contained Both a Binding Contract and a Nonbinding Term Sheet.

The very first paragraph of Prospect's April 11 proposal to Enmon states that Prospect "is pleased to provide [Enmon] with this proposal (the 'Proposal') to provide and/or arrange up to $10,000,000 of subordinated secured debt pursuant to

4

the terms set forth in this letter ***and*** the attached Summary of Proposed Terms and Conditions dated April 11, 2006 (the 'Term Sheet')." A-623 (emphasis added). But despite the fact that Prospect's proposal expressly states that it is outlined both by the four-page letter and the eight-page term sheet, the district court erroneously held that the letter and term sheet were separate documents and that the four-page letter standing alone constitutes a binding contract. SPA-4–5.

The district court's conclusion is contrary to the principle that writings that are part of a single transaction and serve the same purpose must be read together. *TVT Records v. The Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005); *Perl v. Smith Barney Inc.*, 646 N.Y.S.2d 678, 679 (N.Y. App. Div. 1996) ("A contract can be comprised of separate writings or documents if the writings make it clear that they are to be read in conjunction with other writings to determine the intent of the parties."). The evidence here unequivocally establishes that the four-page letter and eight-page term sheet that constitute Prospect's April 11 proposal were intended to be treated as a single document.

First, the letter and term sheet are consecutively paginated. A-623-32 (pages 1-4 are the letter and pages 5-12 are the term sheet). Second, the proposal states that its terms are set forth in the letter and the term sheet. A-623. Third, Prospect considered the letter and term sheet to be a single document conveying their financing proposal. In emails to Enmon, Bart De Bie of Prospect repeatedly

referred to the entire twelve-page document as Prospect's term sheet. In one email, de Bie referred to the entire twelve-page document as Prospect's "non-binding term sheet." A-260; *see also* A-261-72 (the attachment to the email which was both the four-page letter and the eight-page term sheet). In a subsequent email, de Bie again referred to the entire twelve-page document (the letter and the attached summary of terms) as a "term sheet." A-576; *see also* A-577 (identifying two attachments: a clean copy and a redlined copy of the twelve-page proposal).

Prospect's only response is that there are numerous sentences in the four-page letter that refer to the letter and term sheet separately. For example, Prospect suggests that because the letter states that "[t]he terms and conditions of this Proposal are not limited to those set forth herein or in the Term Sheet," A-623, and that "[t]hose matters that are not covered or made clear herein or in the Term Sheet are subject to the approval of Prospect in its sole discretion," *id.*, this shows the parties intended to treat the letter and term sheet as separate documents. Prospect Br. 25-26. This turns the proposal's language on its head. The very provisions cited by Prospect show that Enmon could determine what the terms of Prospect's proposal were only by reading the documents together. This is precisely when two documents should be read together as a single document. *See TVT Records*, 412 F.3d at 89-90 (holding that two agreements should be read together as a single

document when one document repeatedly referred to itself and the other document as describing the scope of the parties' obligations).

That the letter and term sheet in Prospect's April 11 proposal constitute a single document is further underscored by the fact that if the letter is treated as a stand-alone document, then it does not even convey the very information that it was intended to communicate. The four-page letter states that it is Prospect's proposal for providing Enmon with $10 million in financing. A-623. But the letter does not contain any financing terms whatsoever; all of the financing terms are found in the term sheet that was attached to the letter. A-606-15. Thus, if the letter and term sheet conveying Prospect's April 11 proposal are not treated as a single document, the letter would be meaningless because it does not describe the proposed financing terms. But this Court has found that documents should be read together as a single instrument when one of the documents standing alone would be meaningless. *TVT Records*, 412 F.3d at 89.[1]

### C. Prospect's April 11 Proposal Is Not a Binding Contract Because It Lacks Sufficiently Definite Terms to Show a Meeting of the Minds.

Once Prospect's twelve-page proposal is properly treated as a single instrument, it is apparent that Prospect's proposal is not a binding contract because all of its principal terms are wholly indefinite and thus could not support the

---

[1] Prospect never suggests that if the entire twelve-page proposal is treated as a single document that it could be held to be a binding preliminary agreement.

mutual assent needed to establish that Prospect and Enmon had concluded an agreement. *See Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053. Prospect never even suggests that the letter and the term sheet, if construed as a single instrument, constitute a binding contract. *See* Prospect Br. 22-26.

When read as a single instrument, however, it is apparent that Prospect's proposal is too indefinite to support a binding agreement. Prospect admits that it did not have any obligation to complete the financing transaction. Prospect Br. 36. Further, Prospect's proposal is too indefinite to give rise to a binding contract because it does not actually contain any binding terms regarding the proposed financing. The proposal repeatedly states that Prospect could decide to not provide Enmon financing for "any or no reason." A-623-24, 627. The proposal further states that if Prospect chose to offer debt financing to Enmon, Prospect could make the offer on any terms it chose, regardless of the proposal's terms. A-623-24.

Nor did the proposal even require Prospect to perform any due diligence. Prospect's proposal was "subject to Prospect's satisfaction in its sole discretion, upon completion of its due diligence, and until the execution of definitive documentation and closing, with all aspects of the proposed transaction." A-623. But Prospect never promised to perform any due diligence because the proposal defines "sole discretion" to mean the

> sole and absolute discretion *as to process* and result, which shall be
> final for all purposes hereunder, to be exercised as arbitrarily and

> capriciously as that party may wish, for any or no reason, subject to
> no standard of reasonableness or review, and part of no claim, before
> any court, arbitrator or other tribunal or otherwise.

A-623 (emphasis added).  Because Prospect's sole discretion, as defined, covers

the process Prospect employed in deciding whether to provide financing,

Prospect's proposal does not even require Prospect to perform any due diligence.

In short, every term in the proposal regarding the terms under which the proposed

financing may be provided are unequivocally and indisputably not binding in any

way whatsoever. A-623-24.

Given the failure of the April 11 proposal (which constitutes both the four-

page letter and the eight-page term sheet), to contain any binding or definite

material terms regarding the financing, the April 11 proposal cannot constitute a

contract because it is impossible to establish a meeting of the minds, which is

essential to finding an intent by the parties to be bound.  And because the April 11

proposal is not a contract, the arbitration clause contained within the proposal is

unenforceable. *Adams*, 433 F.3d at 226.

Other than a conclusory statement in a footnote that the four-page letter that

sets forth Enmon's and Prospect's "specific agreement in detail" is more definite

than those found indefinite in the cases cited in Enmon's opening brief, Prospect

Br. 23-24 n.14, Prospect's only argument that the letter is a binding agreement is

based on the fact that Prospect and Enmon signed the letter.  Prospect Br. 22-23.

9

Prospect's argument, however, misses the point.  While it is certainly true that if two parties sign a sufficiently definite document, the signatures alone indicate mutual assent to enter into a contract, the presence of signatures is irrelevant if the instrument's terms are not sufficiently definite to show a meeting of the minds regarding the terms of the purported contract.  *Express Indus. & Terminal Corp.*, 715 N.E.2d at 1052 (holding that an executed document was insufficiently definite to create a binding contract); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) (holding that an option clause in an executed lease agreement was too indefinite to create a binding obligation).[2]

Even if the letter and term sheet that together comprised Prospect's proposal are treated separately, the letter standing alone is also too indefinite to create a contract.  The letter standing alone is even more indefinite because it does not contain any proposed financing terms, even though the whole purpose of the proposal was to outline terms on which Prospect would consider providing financing. A-623.

---

[2] In the cases cited by Prospect holding that a party's signature was sufficient to establish the party's assent to enter into a binding contract, there was no suggestion that the signed documents were insufficiently definite to establish a meeting of the minds that would create a binding agreement.  *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 148-50 (2d Cir. 2004) (no argument that the instrument's terms were insufficiently definite); *Thomas James Assocs. v. Jameson*, 102 F.3d 60, 63-66 (2d Cir. 1996) (same); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845-46 (2d Cir. 1987) (same).

**D.    Prospect's Proposal Is Not a Binding Preliminary Agreement to Negotiate in Good Faith.**

The district court's conclusion that the four-page letter in Prospect's April 11 proposal created a "complete binding agreement" that caused the "parties to go forward in an attempt to consummate the Caprock acquisition," SPA-4-5, is flawed because it failed to apply the Second Circuit's framework for determining whether a preliminary agreement creates a binding contract. *See Arcadian Phosphates, Inc.*, 884 F.2d at 71-72 (describing framework for determining whether a preliminary agreement is binding). As explained in Enmon's opening brief, the plain language of the April 11 proposal shows less of an intent to bind the parties to negotiate in good faith towards a final agreement than other preliminary agreements that this Court has found not binding. Enmon Br. 23-32.

Prospect's primary response is a misplaced suggestion that cases addressing whether preliminary agreements are binding are inapplicable here. Prospect Br. 35-36. Prospect's argument, however, misunderstands the relevance of the cases addressing whether preliminary agreements are binding. In *Arcadian Phosphates, Inc.*, the Second Circuit adopted its framework for determining whether a preliminary agreement regarding a future transaction is a binding agreement. *Arcadian Phosphates, Inc*, 884 F.2d at 71-72 (citing *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y. 1987)). Prospect dismisses as irrelevant cases discussing whether preliminary agreements are binding because,

11

unlike this case, in each of those cases, the recovery sought by the party attempting to enforce the purported binding agreement was based on the failure of the final transaction to be consummated. Prospect Br. 36.

But the fact that Prospect seeks a different form of relief than the plaintiffs in those cases does not render them irrelevant. The preliminary-agreement cases are directly on point because, just as the plaintiffs sought relief on the grounds that preliminary agreements in those cases were binding, Prospect similarly seeks relief based on the premise that the April 11 proposal was a binding contract. In other words, while the form of relief sought by Prospect in this case is different from the parties seeking to enforce preliminary agreements in the cases cited in Enmon's opening brief, the underlying legal issue—whether the document at issue is a binding preliminary agreement—is exactly the same. Just as the plaintiffs in the other preliminary-agreement cases based their claims on the premise that the preliminary agreement constituted a binding contract, so too does Prospect's attempt to compel arbitration rely on a finding that the April 11 proposal (which contains the arbitration clause) constitutes a binding contract.

Prospect's analytical error is underscored by the fact that the seminal case regarding preliminary agreements—*Teachers Insurance & Annuity Association*—addressed whether a *loan proposal* created a binding agreement. *Teachers Ins. & Annuity Ass'n*, 670 F.Supp. at 496. And courts routinely apply the *Teachers*

12

framework in cases involving attempts to enforce preliminary documents regarding loan and financing proposals. *See, e.g., 50 Pine Co. v. CapitalSource Fin. LLC (In re 50 Pine Co.)*, 317 B.R. 276, 282-83 (Bankr. S.D.N.Y. 2004); *Cohen v. Lehman Bros. Bank, FSB*, 273 F.Supp.2d 524, 529 (S.D.N.Y. 2003); *Philips Credit Corp. v. Regent Health Group, Inc.*, 953 F.Supp. 482, 513 (S.D.N.Y. 1997).

Prospect mischaracterizes the only case it cites in support of its suggestion that the preliminary-agreement cases are irrelevant. Prospect characterizes *International Minerals & Mining Corp. v. Citicorp North America, Inc.*, 736 F.Supp. 587 (D.N.J. 1990), as "noting that an agreement to 'consider' a loan proposal in good faith is to be analyzed independently of the principles concerning preliminary agreements." Prospect Br. 36. But *International Minerals & Mining Corp.* never says anything suggesting that. In fact, it never discusses the Second Circuit's preliminary-agreement doctrine at all, *International Minerals & Mining Corp.*, 736 F.Supp. at 595, which is unsurprising given that it was analyzing New Jersey law, rather than New York law. *Id.* at 595 n.7.

Prospect relegates to a footnote its alternative argument that if the preliminary-agreement framework applies then the four-page letter in the proposal is a binding agreement because it satisfies the criteria set forth in *Arcadian Phosphates, Inc.* Prospect Br. 36 n.27. Prospect's inclusion of this argument solely in a footnote constitutes a waiver of the argument. *Koam Produce, Inc. v.*

13

*DiMare Homestead, Inc.*, 329 F.3d 123, 127 n.2 (2d Cir. 2003) (refusing to consider an appellee's alternative argument that was raised only in a footnote). But even if Prospect's footnote argument is considered, Prospect has failed to show that the first four pages of its April 11 proposal creates a binding contract.

The most important factor in determining whether a proposal is a binding preliminary agreement is whether the plain language shows that the parties intended to create a binding agreement. *Arcadian Phosphates, Inc.*, 884 F.2d at 72. The intent that must be shown to establish a binding preliminary agreement is that "[t]he parties 'accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement.'" *Adjustrite Sys., Inc.*, 145 F.3d at 548 (quoting *Teachers Ins. & Annuity Ass'n*, 670 F.Supp. at 498). But as explained in Enmon's opening brief, the four-page letter explicitly disclaims any obligation whatsoever by Prospect to act in good faith with respect to performing due diligence or negotiating a final agreement. Enmon Br. 24-27, 31-32.

Prospect incorrectly states in its brief (but not in the footnote addressing the preliminary-agreement issues) that paragraph 10 of the letter "explicitly acknowledges Prospect Energy's obligation to apply 'good faith' efforts." Prospect Br. 34 (citing A-625, §10). But paragraph 10 says nothing of the sort. Paragraph 10 states only that "[s]hould Prospect's good faith efforts hereunder be tendered as a defense in any proceeding, such good faith efforts shall be

14

conclusively shown by evidence, without more, that Prospect has gathered or reviewed more than fifty pages of due diligence materials relating to the proposed transaction." A-625. This language does not impose a good-faith obligation on Prospect—it simply attempts to secure a concession to potentially be used if Prospect needed to argue good faith as an affirmative defense to a litigation claim. *Id.* Nor does any other provision of the proposal impose a good-faith obligation on Prospect. The April 11 proposal is emphatic that Prospect's decision whether or not to offer Enmon debt financing was committed to Prospect's "sole discretion" and that "sole discretion" meant that it could act as "arbitrarily and capriciously" as it wanted and that it was "subject to no standard of reasonableness." A-623. Courts routinely hold that loan proposals that expressly reserve the right to not provide financing for any reason cannot create a binding contract. *50 Pine Co.*, 317 B.R. at 282-83; *Cohen*, 273 F.Supp.2d at 529.

The fact that the letter refers to itself as an "agreement" cannot overcome the letter's explicit provisions that preclude any obligation to work towards a final agreement in good faith. *Arcadian Phosphates, Inc.*, 884 F.2d at 70-72 (holding as a matter of law that an instrument that called itself an "agreement" was not a binding preliminary agreement despite partial performance). The parties' signatures on the letter are also irrelevant. *Id.* at 72 (holding that an executed instrument was not a binding preliminary agreement). Similarly, Prospect's partial

15

performance (if any) cannot overcome the letter's plain language demonstrating a lack of intent to create a binding agreement. *Id.* (holding that substantial partial performance could not overcome language showing intent not to be bound).

II.    **THE PROPOSAL'S ARBITRATION CLAUSE IS UNENFORCEABLE BECAUSE IT CONTAINS NO GENUINE PROMISE OF ARBITRATION AND IS UNCONSCIONABLE.**

Even if the first four pages of Prospect's proposal are a binding contract, the district court erred in compelling arbitration because it erroneously held that the proposal's arbitration clause constitutes a binding agreement to arbitrate and is not unconscionable. A-672-73. The proposal's so-called arbitration provision requires Enmon (but not Prospect) to assert any claims he has in arbitration and further provides that Prospect has the unilateral and unfettered right at any time, while an arbitration is pending, to scuttle the arbitration and force refilling of the suit in either New York state or federal court. A-625. Such a provision is an arbitration agreement in name only, not enforceable in substance, and is so grossly unfair and contrary to the basic policies underlying the Federal Arbitration Act that it renders the proposal's arbitration clause unconscionable and unenforceable.

A.    **The Proposal's Arbitration Clause Is Not an Agreement to Arbitrate and Lacks Consideration.**

Courts have dealt with grossly one-sided arbitration provisions under various doctrines, including mutuality, consideration, and unconscionability. Some courts have held that one-sided (or nonmutual) arbitration agreements are not enforceable

16

because they are illusory or lack consideration,[3] while the New York Court of Appeals and others have held that the mere fact that only one party is bound to arbitrate does not necessarily make the clause unenforceable.[4]  But neither *Sablosky* nor any other case has enforced an arbitration clause that only requires one party to submit its claims to arbitration and simultaneously gives the other party the unilateral right to avoid being bound by bailing out of an arbitration filed by the first party.  But that is precisely what the clause in Prospect's proposal permits.

The proposal's arbitration clause provides that "Borrower agrees that Prospect has the right, ***at any time***, to remove ***any claim in arbitration*** to a New York court."  A-625 (emphasis added).  Thus, the provision facially provides that Prospect retained the right to remove claims from an ongoing arbitration initiated by either Prospect or Enmon and require them to be relitigated in court.  The contract's plain language does not impose any limit on when Prospect can scuttle an arbitration nor does it preclude Prospect from dropping its own arbitration if it does not like how it is going and then reasserting its claims in court.  A-625.

Because the proposal gave Prospect the unilateral right to scuttle an arbitration filed by Enmon even though he is purportedly required to only seek relief through arbitration, the proposal's arbitration clause cannot be enforced

---

[3] *See* Enmon Br. 43 n.9 (citing cases).
[4] *Sablosky v. Edward S. Gordon*, 535 N.E.2d 643, 645 (N.Y. 1989).

because it either cannot be said to be an agreement to arbitrate at all or it lacks consideration. *See Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1131-32 (7th Cir. 1997).

The arbitration clause in Prospect's proposal is easily distinguishable from *Sablosky v. Edward S. Gordon*, 535 N.E.2d 643 (N.Y. 1989). In *Sablosky*, while only one party was required to submit his claims to arbitration, the other party at least agreed to participate fully in arbitration—and to be bound thereby. *Id.* at 645. Here, however, Enmon is required to submit his claims to arbitration, but Prospect does not even agree to let Enmon complete the arbitration, because Prospect has a unilateral right to bail out of an arbitration filed by Enmon. This is simply not an agreement to arbitrate at all, and thus, the district court erred in compelling arbitration under the FAA because either it is not an agreement to arbitrate under 9 U.S.C. §2 or it lacks consideration.

Prospect tries to defend the district court's erroneous conclusion that the nonmutual arbitration clause in the April 11 proposal can be enforced because it is supported by consideration found elsewhere in the contract, A-672, even though Prospect did not promise to provide any financing or perform any due diligence at all and disclaimed any obligation in good faith, Enmon Br. 43–48, by pointing to various provisions in the proposal that it claims imposed a legal detriment on

18

Prospect.    But none of the provisions that Prospect identifies actually imposes a legal detriment on Prospect.

First, Prospect never promised in the April 11 proposal to act in good faith. *See, supra*, p. 15.    An obligation of good faith be implied because Prospect expressly disclaimed any obligation to act in good faith. *Horn v. New York Times*, 790 N.E.2d 753, 756 (N.Y. 2003).

Second, Enmon has not admitted that Prospect provided consideration by performing due diligence after he signed the April 11 proposal.    The only evidence Prospect cites are two paragraphs in Enmon's affidavit in which he states that beginning in February 2006 he and Prospect worked on a financing agreement. A-819, ¶¶2-3 (cited at Prospect Br. 34).    But Prospect's acts prior to the signing of the proposal cannot constitute consideration for the April 11 proposal. *Umscheid v. Simnacher*, 482 N.Y.S.2d 295, 297 (N.Y. App. Div. 1984).

Third, Prospect lists several purported express obligations that it undertook in the proposal.    Prospect Br. 35.    But the plain language of the April 11 proposal does not support Prospect's position.    Five of the purported promises relate to Prospect's alleged promise to perform due diligence and how due diligence would be performed. *Id*.    The proposal's plain language, however, provides that Prospect was not obligated to perform any due diligence at all. *See* Enmon Br. 45-46 (discussing Prospect's lack of obligation to perform due diligence).    Nor did

19

Prospect undertake any confidentiality obligations—the proposal's confidentiality clause only required Enmon to keep the proposal confidential. A-624. Prospect's promise to abide by any surviving obligations does not provide consideration because there is no legally enforceable obligation that could survive. A-626.

Fourth, the arbitration clause's dispute-resolution procedures are not a legal detriment to Prospect because it did not actually undertake any binding obligation of performance under the proposal. Under Prospect's analysis, a promise can become a binding contract supported by consideration anytime Person A promises to perform some act for Person B even if Person B promises nothing in return other than certain limits on B's rights to enforce A's promise. But an otherwise illusory contract that binds one party to do nothing cannot be made enforceable simply by including a forum-selection clause. *See Diatect Int'l Corps. v. Organic Materials Review Inst.*, No. 2:05-cv-00465, 2007 WL 752165, at *3 (D. Utah March 7, 2007) (noting that a contract containing a forum-selection clause was illusory); *cf. Stradiot Specialty, Inc. v. Am. Calendar Co.*, No. 2004-L-162, 2007 WL 1881309, at *3 (Ohio Ct. App. June 29, 2007) (refusing to enforce a forum-selection clause in an executed application in which there were no promises of performance); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 237 (Tex. 2003) (Schneider, J., dissenting) (stating that a one-sided arbitration clause containing a

20

mutual jury waiver in which the employer could unilaterally amend the arbitration clause lacked consideration).

And finally, it is a question for the Court, not the arbitrator, to decide if, as Enmon asserts, an arbitration clause (rather than the contract as a whole) is unsupported by consideration, thus establishing the absence of an agreement to arbitrate. *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001).[5]

### B.    The Proposal's Arbitration Clause Is Unconscionable.

Even if the arbitration clause is supported by consideration, the clause's removal provision that lets Prospect bail out of arbitration renders this the "exceptional case" in which a contract provision is "so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 829 (N.Y. 1988). In assessing substantive unconscionability, the court does not look to how the parties to the alleged contract have acted; rather, substantive unconscionability is determined by looking to the contract's "literal terms." *Id.* at 828; *see also* Enmon Br. 35 (citing additional cases). In interpreting a contract's terms, the court must look to the contract's plain meaning and consider the "reasonable expectation and

---

[5] Of course, the Court may examine the contract as a whole to determine if there is no consideration supporting the arbitration agreement. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1271 (9th Cir. 2006) (en banc).

21

purpose of the ordinary business man when making an ordinary business contract."

*Del. County Dairies v. White*, 80 N.Y.S.2d 392, 397 (N.Y. App. Div. 1948).

The proposal's arbitration clause is unconscionable because Prospect can

bail out of an arbitration filed by either Enmon or Prospect if it does not like how it

is going and then relitigate the claims in court. A-625. This is contrary, however,

to the fundamental policies underlying judicial enforcement of arbitration

agreements. *Nat'l Bulk Carriers, Inc. v. Princess Mgmt.*, 597 F.2d 819, 825 (2d

Cir. 1979) ("Arbitration cannot achieve the savings in time and money for which it

is justly renowned if it becomes merely the first step in lengthy litigation.");

*Simpson v. MSA of Myrtle Beach, Inc.*, No. 26293, 2006 WL 4388016, at *8 (S.C.

March 26, 2007) (holding unconscionable an arbitration clause that permits one

party's judicial remedies to supersede the other party's arbitral remedies).[6] For this

reason alone, the arbitration clause is unconscionable and unenforceable.

Contrary to Prospect's assertion, the New York Court of Appeals's decision

in *Sablosky* is not controlling. While *Sablosky* held that an arbitration clause that

bound only one party to the contract was not unconscionable, *id.* at 647, the court

was not faced with an arbitration clause that permitted one party, but not the other,

---

[6] Prospect appears to attempt to distinguish *Simpson* on the ground that it is a consumer contract. Prospect Br. 49 n.37. But this distinction is irrelevant because allowing one party's judicial remedies to supersede the other party's arbitral remedy is substantively unconscionable in any case whether in the business context or the consumer context.

to scuttle an arbitration and force the case to be relitigated. Prospect attempts to analogize the removal provision in the proposal's arbitration clause to the *Sablosky* clause's provision that allowed the employer to move to compel arbitration in a court proceeding filed by the employee before the employer answered the suit. Prospect Br. 42-43; *see id*. at 645.[7] But that provision was nothing like the clause here, which requires Enmon to file any claim in arbitration, but then allows Prospect to bail out of the arbitration at any time if it does not like how it is going.

To avoid the gross unfairness of the arbitration clause due to Prospect's virtually unlimited right to scuttle an ongoing arbitration, Prospect argues for the first time on appeal that "[o]n its face" the use of the "remove" in the arbitration clause "adopts the federal concept of 'removal.'" Prospect Br. 45. Based on its belief that the word "remove" is imbued with the spirit of the federal removal statutes, Prospect argues that it would only be allowed to scuttle an arbitration when it was a defendant/respondent in an arbitration filed by Enmon and would not be allowed to drop an arbitration and refile the case in Court. *Id*.

Nothing in the April 11 letter remotely suggests that the word "remove" was intended to be read in the context of the federal removal statute. It should be interpreted according to its ordinary meaning. At most, given that the arbitration

---

[7] Furthermore, *Sablosky*'s unconscionability analysis was based on whether the clause was unconscionable in light of the particular practices and mores of the real estate business. *Sablosky*, 535 N.E.2d at 646-47.

23

clause states that it is to be construed under New York law, it is far more reasonable that the word remove should be interpreted in light of how New York law—not federal law—defines removal. New York's removal statute (governing removal between New York courts) permits plaintiffs and defendants to seek removal. N.Y. C.P.L.R. §325; *Jackson v. Millar Elevator Indus., Inc.*, 468 N.Y.S.2d 624, 625 (N.Y. App. Div. 1983); *Barnwell v. Consol. Edison Co.*, 376 N.Y.S.2d 3, 4 (N.Y. App. Div. 1975).

Second, Prospect itself does not take seriously the idea of limiting its right to remove a case from arbitration to court to the same extent as the federal removal statutes. Prospect argues that while the limits of 28 U.S.C. §§1441, 1446 on only allowing defendants to remove cases applies to the arbitration clause, none of the other limits on removal apply. Prospect Br. 45. Prospect's attempt to pick and choose the parts of the removal statute that it likes shows that the removal clause was never intended to incorporate the federal removal statute's limitations on removal into the arbitration clause. Furthermore, contrary to what Prospect states, removal is not "a concept solely applicable to a defendant/respondent." *Id.* Sections 1441 and 1446 limit removal to defendants because they expressly refer to "defendants" having the right to remove cases. But 28 U.S.C. §1452(a), which refers to "a party" having a right to remove allows either a plaintiff or defendant to remove a case to federal court. *Cal. Pub. Employees' Ret. Sys. v. WorldCom, Inc.*,

24

368 F.3d 86, 103 (2d Cir. 2004). In this case, the arbitration clause's "removal"

provision defines the removal right in terms of a particular party—Prospect—not a

plaintiff or defendant. Thus, to the extent federal law is relevant in interpreting the

arbitration clause, §1452(a) is the most natural analog.

Third, because unconscionability is determined by examining the literal

terms of the contract, *Gillman*, 534 N.E.2d at 829, Prospect's disavowal of its right

to remove Enmon's claims from arbitration is irrelevant. *See Cheek v. United*

*Healthcare of Mid-Atlantic, Inc.*, 835 A.2d 656, 662 n.5 (Md. 2003); *Phox v.*

*Atriums Mgmt. Co.*, 230 F.Supp.2d 1279, 1283 (D. Kan. 2002).[8] While *Cheek* and

*Phox* held that a party's assertion that it would not exercise rights it had under an

arbitration clause could not save arbitration clauses that were unenforceable on

their face, because they only bound one party, the underlying principle that a

facially unenforceable contract cannot be saved by a party promise to the Court not

to take advantage of the improper rights is equally applicable in this case, because

unconscionability is determined by looking at a contract's plain terms. *Universal*

*Leasing Servs., Inc. v. Flushing Hae Kwan Rest.*, 565 N.Y.S.2d 199, 200 (N.Y.

App. Div. 1991).

---

[8] Thus, whether Prospect's alleged assertions to the arbitrator that all disputes
between the parties must be submitted to arbitration would create a judicial
estoppel preventing Prospect from exercising its removal power is similarly
irrelevant. This is nothing more than an improper attempt by the Prospect to
offensively use an estoppel against Prospect to rewrite the arbitration clause so as
to make it enforceable against Enmon.

Prospect attempts to avoid the arbitration clause's unfairness by suggesting that the Court cannot consider the removal provision in the middle of paragraph 10 (which contains the arbitration provision) in determining whether the arbitration clause is unconscionable. Prospect Br. 43. Under Prospect's view, it would seem that in assessing unconscionability the Court cannot look at anything other than the particular sentence that mandates arbitration.

That is simply not the law. While the Court may not assess the enforceability of specific procedural provisions within an arbitration clause once the clause as a whole is found to be valid and enforceable, such provisions can be examined for determining the threshold issue of whether the arbitration clause as a whole is unconscionable. This is the precise analysis employed in *Ciago v. Ameriquest Mortgage Co.*, 295 F.Supp.2d 324 (S.D.N.Y. 2003), on which Prospect bases its argument. Prospect Br. 43-44. In *Ciago*, the Court held that an arbitration clause's notice, forum-selection, and fee-splitting provisions did not render it substantively unconscionable. *Id.* at 329-30. It was only after holding that the arbitration agreement as a whole was not unconscionable that the Court questioned, but refused to decide, whether the particular provisions found within the arbitration clause were unconscionable. *Id.* at 330-31; *see also Baldeo v. Darden Rests., Inc.*, No. 04-cv-2185, 2005 WL 44703, at *7 (E.D.N.Y. Jan. 11, 2005) (concluding that an arbitration clause's procedural provisions did not render

26

arbitration agreement as a whole unconscionable but refusing to consider the enforceability of the procedural provisions).[9]

Even if the one-sided arbitration clause containing a removal provision at issue in this case is not substantively unconscionable in and of itself, when read in the context of the letter's other provisions governing disputes between the parties, the arbitration clause is unconscionable and unenforceable. *See* Enmon Br. 41-42. Prospect never addresses the wholly one-sided nature of the dispute-resolution procedures contained within the letter;[10] it simply argues that the Court cannot look to the contract as a whole to determine whether the arbitration clause is

_____

[9] The other cases cited by Prospect are inapposite. In two cases, the arbitration clause's validity was undisputed; the challenge was limited solely to certain procedures to be used in the arbitration. *See Davis v. ECPI College of Tech., L.C.*, No. 05-2122, 2007 WL 840506, at *2 (4th Cir. Mar. 20, 2007) ("The plaintiffs have not raised the question of arbitrability. They concede that their claims are properly in arbitration."); *Gill v. World Inspection Network Int'l, Inc.*, No. 06-cv-3187, 2006 WL 2166821 (E.D.N.Y. July 31, 2006) (plaintiff conceded that claims were arbitrable and only challenged the forum-selection clause). And *Tarulli v. Circuit City Stores, Inc.*, 333 F.Supp.2d 151 (S.D.N.Y. 2004), refused to consider the enforceability of specific procedural provisions in the arbitration clause because it had concluded that the lack of procedural unconscionability was dispositive. *Id.* at 158.

[10] Prospect's assertion that because arbitration is a neutral forum, the proposal's arbitration clause is not unconscionable, is irrelevant and unsupported by legal authority. Enmon's unconscionability argument is based on Prospect's unilateral right to bail out of an arbitration if it does not like how it is going. The neutrality of arbitration is irrelevant. The sole case cited by Prospect, *Ciago*, does not support its argument. In *Ciago*, the Court held that an arbitration clause was not unconscionable because it provided a neutral forum despite the plaintiffs' arguments regarding the fairness of the forum. 295 F.Supp.2d at 330. In this case, however, Enmon's challenge is premised on the overwhelming one-sided nature of the arbitration clause in light of the removal provision.

substantively unconscionable.    Prospect Br. 50-51.    Although Prospect states otherwise, *see* Prospect Br. 50, *Nagrampa* never stated that the unconscionability of an arbitration clause may be determined by looking only to the arbitration clause.    469 F.3d at 1270.    *Nagrampa* emphasized that in deciding whether an arbitration clause is enforceable, the Court may look to the contract as a whole, as long as the party challenging the arbitration clause limited its unconscionability attack to the arbitration clause.    *Id.* at 1271.

### CONCLUSION

For these reasons, the Court should reverse the district court's order compelling arbitration, vacate the injunction,[11] and render judgment in Enmon's favor.

---

[11] Because the arbitration provision is unenforceable, there is no basis for the district court's injunction.

Respectfully submitted,


/s/ Gregory S. Coleman
Gregory S. Coleman
Marc S. Tabolsky
YETTER & WARDEN L.L.P.
221 West 6th Street, Suite 750
Austin, Texas 78701
[Tel.] (512) 533-0150
[Fax] (512) 533-0120

Kurt B. Arnold
Jason A. Itkin
Caj. D. Boatright
ARNOLD & ITKIN, L.L.P.
1401 McKinney, Suite 2550
Houston, Texas 77010
[Tel.] (713) 222-3800
[Fax] (713) 222-3850

## CERTIFICATE OF COMPLIANCE

The undersigned certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7).

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,961 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word XP in Times New Roman font size 14.

/s/ Gregory S. Coleman
Gregory S. Coleman
Attorney for Appellant
Dated: July 9, 2007

**CERTIFICATE OF SERVICE**

I certify that on July 9, 2007, I sent the Reply Brief of Appellant Michael

Enmon via electronic mail and Federal Express overnight mail for filing with the

Court and that two copies of the brief were served in the same manner on all

counsel of record:

Jonathan J. Lerner
Maura Barry Grinalds
Timothy G. Nelson
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM** LLP
Four Times Square
New York, NY 10036

*Attorneys for Respondents-Appellees*
*Prospect Energy Corporation, et al.*

/s/ Gregory S. Coleman
Gregory S. Coleman